UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

Plaintiff,

v.

Isaac Sant,

Defendant.

Court File No. 26-cr-115 (KMM/DTS)

**DEFENDANT'S RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL BRIEF**

## INTRODUCTION

The government has filed a supplemental brief regarding one of Mr. Sant's seven discovery requests. The request addressed by the government's supplemental brief seeks "reports generated pursuant to CUC Operation Keyhole." The government represents that Operation Keyhole is a funding source for HSI's undercover operations in the Twin Cities that not only pays for the undercover surveillance of protesters, unions, and progressive organizations, but also funds other, legitimate, law enforcement investigations. Accordingly, it argues, the Court should not grant Mr. Sant's request for Keyhole documents because they are irrelevant and not material to his defense.

Mr. Sant does not seek Keyhole documents related to legitimate law enforcement investigations into drug and human trafficking. He seeks only those Keyhole documents related to Operation Puppet Master, Project Whipple Shield, and other surveillance of protesters, unions, and progressive organizations during Operation Metro Surge. These materials are discoverable under Rule 16 because they are helpful to the preparation of Mr.

Sant's pretrial motions and trial defenses. Additionally, they must be produced under *Brady/Giglio* because they constitute impeachment evidence of investigatory incompetence and bias.

Finally, while Operation Keyhole may not be name for the government's nationwide surveillance program of so-called "leftist" organizations and individuals, such a program exists. The investigation in this case was directed and conducted by out-of-state agents, at least some of whom were part of specialized HSI units dedicated to surveilling protesters and administration opponents nationwide. And, as discussed at the hearing on Mr. Sant's Motion for Discovery, this prosecution was and continues to be directed by DOJ and senior Trump administration officials. All of which confirms that this case is part of a broader initiative to target those who oppose ICE and the administration's immigration agenda, which began with the issuance of NSPM-7, and blossomed into undercover HSI agents surreptitiously recording conversations with ordinary Minnesotans in parks, schools, churches and libraries. The HSI units and investigative techniques that were used to surveil protesters here were used similarly elsewhere, as discussed below. To the extent the government possesses records of surveillance of activists and organizations opposing ICE or DHS in other jurisdictions, those records are material to Mr. Sant's defense, regardless of whether they were funded by Operation Keyhole, and they should be disclosed.

For all these reasons, the Court should require the government to produce Operation Keyhole documents related to Operation Puppet Master, Project Whipple Shield, and any other surveillance of protesters and organizations conducted during Operation Metro

Surge, as well as any documents from other jurisdictions in which HSI surveilled those individuals and organizations protesting or opposing ICE and DHS.

## ARGUMENT

### I. DEFENDANT SEEKS KEYHOLE DOCUMENTS RELATED TO THIS CASE OR OTHER POLITICALLY MOTIVATED SURVEILLANCE.

The government states that Keyhole is a certified undercover operation (CUC) administered exclusively by the HSI SAC in St. Paul. ECF 263 at 2. The government states Keyhole originated in 2008 and functions as a "funding source, not an investigative tool." *Id.* It states, "[i]nclusion of Operation Puppet Master and Project Whipple Shield enabled the use of CUC Keyhole funds to provide investigative support, such as funding the deployment of personnel and the acquisition of necessary equipment." *Id.* at 4.

Per the government, Keyhole "was first certified on December 22, 2008 by then Director of the ICE Office of Investigations . . . following a review and recommendation by the Undercover Review Committee (URC) . . . of senior officials from HSI and the Department of Justice." The government further represents: "Each CUC is subject to regular review and reauthorization." *Id.*

Mr. Sant seeks only Operation Keyhole documents related to Operation Puppet Master, Project Whipple Shield, or other surveillance of protesters, unions, and non-profit organizations. Given that the government represents Operation Keyhole is local to the Twin Cities, and not a nationwide program, the universe of requested documents should be relatively limited. As discussed below, Keyhole documents related to this case or other political surveillance during Metro Surge are helpful to Mr. Sant's defense and are not only

discoverable but must be produced under *Brady/Giglio*. This includes documents regarding the authorization, review, and reauthorization of HSI's use of Keyhole to fund surveillance of protesters, unions and non-profit organizations, as well as the funding requests for "deployment of personnel and the acquisition of necessary equipment," justification for the funds requested, and related communications and reports.

## II. THE OPERATION KEYHOLE DOCUMENTS MR. SANT SEEKS WOULD BE HELPFUL TO HIS PRETRIAL MOTIONS AND TRIAL DEFENSES.

### A. The requested documents must be disclosed under Rule 16.

Under Rule 16, the government must produce "documents and objects" that are "material to preparing the defense." This is a low bar. "In the context of the federal rules, 'material' simply means 'helpful to the defense.' " *United States v. Wirth*, No. CRIM. 11-256 ADM/JJK, 2012 WL 1110540, at *2 (D. Minn. Apr. 3, 2012) (quoting *United States v. Vue,* 13 F.3d 1206, 1208 (8th Cir. 1994)); *United States v. Williams,* No. 23-CR-236 (JWB/ECW), 2024 WL 4589865, at *16 (D. Minn. Oct. 28, 2024) (same); *United States v. Farah*, No. 22-CR-124 (NEB/TNL), 2023 WL 8757097, at *9 (D. Minn. Dec. 19, 2023) (same).

The requested Keyhole documents will be helpful to Mr. Sant's pretrial motions and trial defenses. Among other things, HSI's use of Keyhole funds for surveillance of protesters, unions and progressive organizations appears to violate federal law. Using appropriations statutorily authorized for legitimate undercover operations, for the purpose of surveilling First Amendment protected meetings and protests, and obtaining financial records of unions and nonprofit organizations, would violate the "Purpose Statute," 31 U.S.C. § 1301. The Purpose Statute provides: "Appropriations shall be applied only to the

objects for which the appropriations were made except as otherwise provided by law." *Id.* Congress has not appropriated any funds for undercover surveillance of the Trump administration's political opponents, "leftist" organizations, or those who oppose ICE and the administration's immigration policies. HSI's use of Keyhole funds for those purposes would thus be unlawful. Moreover, Congress *cannot* appropriate funds to surveil protesters and the administration's political opponents. *See, e.g., Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 549, (2001) ("Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest.") There is no credible argument that use of Keyhole funds to surveil First Amendment protected activity was a lawful use of those funds.

Further, DHS's official policy (though apparently not its practice) is that appropriated funds must be spent in a manner that comports with the Constitution. For example, in an agency letter from Acting Secretary of Homeland Security Kevin K. McAleenan on May 17, 2019, the Secretary emphasizes: "Under the Privacy Act of 1974, all DHS personnel are prohibited from maintaining records that describe how a U.S. citizen (USC) or alien lawfully admitted for permanent residence (LPR) exercises his or her First Amendment rights, 'unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity.' " Ex. A (quoting 5 U.S.C. § 552a(e)(7)). Evidence already presented in support of Mr. Sant's Motion for Discovery shows that this policy was widely violated during Operation Metro Surge. Use of Keyhole funds to collect and maintain records of

Minnesotans' First Amendment activity – as apparently occurred, according to the government's supplemental brief – would also violate this policy.

For these reasons, documents reflecting Keyhole expenditures for "the deployment of personnel and acquisition of necessary equipment" to surveil protected First Amendment conduct would be helpful to Mr. Sant's defense as they would support his First Amendment, vindictive/selective prosecution, and suppression motions, as well as his First Amendment and entrapment defenses at trial.

Further, and more generally, even if these expenditures for surveillance of protesters and progressive organizations did not violate the Purpose Statute or the First Amendment, they are nonetheless evidence of the government's animus toward "leftist" political viewpoints and thus relevant to Mr. Sant's pretrial motions and trial defenses.

**B. *Brady* and *Giglio* require disclosure of the requested Keyhole documents.**

Keyhole documents reflecting funding for surveillance of leftists and ICE opponents are classic impeachment evidence of government bias and incompetence. Evidence tending to impeach a government witness must be disclosed to a defendant if known to the government. *United States v. Jackson*, 75 F. App'x 121, 121–22 (4th Cir. 2003) (citing *Giglio v. United States,* 405 U.S. 150, 153-55 (1972)); *United States v. Esteves*, No. 24-30336, 2025 WL 1912748, at *2 (5th Cir. July 11, 2025) ("Under *Brady* and *Giglio*, the government violates a defendant's due process rights by suppressing exculpatory evidence or evidence that could be used to impeach a government witness.").

"A vital means of impeaching a witness is revealing possible biases, prejudices or ulterior motives of the witness relating to the personalities at trial." *United States v.*

*Buchanan*, 891 F.2d 1436, 1443 (10th Cir. 1989). "For that reason, 'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" *Id.* (quoting *Davis v. Alaska,* 415 U.S. 308, 316–17 (1974)); *Robinson v. Mills*, 592 F.3d 730, 737 (6th Cir. 2010) ("A defendant has the constitutional right to impeach a witness by showing bias.") (citing *Davis v. Alaska,* 415 U.S. 308, 316–17 (1974)).

"The term 'bias' describes 'the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party.' " *Id.* (quoting *United States v. Abel,* 469 U.S. 45, 52 (1984)). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel,* 469 U.S. 45, 52 (1984).

Similarly, evidence of a shoddy investigation or charging decision is classic impeachment material. *E.g., Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir.1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation."); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir.1985) (awarding a new trial after *Brady* evidence "carried within it the potential... for the... discrediting... of the police methods employed in assembling the case"); *United States v. Bagcho*, 151 F. Supp. 3d 60, 70 (D.D.C. 2015), *aff'd,* 923 F.3d 1131 (D.C. Cir. 2019) ("Impeachment evidence can be damaging when it allows defense counsel to attack the reliability of an investigation.").

The Keyhole documents reflect expenditure of funds for "deployment of personnel and acquisition of necessary equipment" to spy on protesters and activists in churches, parks and at peaceful protests, evidencing both bias and incompetence. For that reason alone, they must be disclosed for their impeachment value. Further, to the extent that the Keyhole documents *preclude* the use of Keyhole funds for such unconstitutional surveillance, they are impeachment evidence of agent misbehavior and noncompliance with DHS policy. Regardless, they are *Brady/Giglio* material that must be disclosed.

**C. Mr. Sant has already made a credible showing of vindictive and selective prosecution, which further supports his Keyhole discovery request.**

In order to obtain discovery in connection with a motion to dismiss for selective prosecution, a defendant must make "a credible showing of different treatment of similarly situated persons." *United States v. Armstrong*, 517 U.S. 456, 470 (1996). Put differently, "a defendant 'must present some evidence that tends to show the existence of both' discriminatory effect and discriminatory purpose." *Lazarro*, 2022 WL 16948157 at * 2 (quoting *United States v. Perry*, 152 F.3d 900, 903 (8th Cir. 1998)).

Similarly, in order to obtain discovery in connection with a motion to dismiss for vindictive prosecution, a defendant must offer "some evidence" of vindictiveness – that "the prosecution was brought in order to punish the defendant for the exercise of a legal right." *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004); *United States v. Perry*, 152 F.3d 900, 903 (8th Cir. 1998) (applying the "some evidence" standard from *Armstrong* to vindictive prosecution claim); *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004);

*Carey*, 816 F. Supp. 3d at 144 ("Carey must offer some evidence tending to show that he would not have been prosecuted but for his protected speech. Carey easily clears that bar.").

As discussed at the hearing, the already relaxed showing required to obtain selective/vindictive prosecution discovery must be further relaxed given the government's dissipation of the "presumption of regularity." The Supreme Court has explained, "the presumption of regularity supports [the government's] prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *U.S. v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation omitted). For this reason, "[i]n order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." *Id.* (internal quotation omitted). Further, "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim [] require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468. Thus, *Armstrong*'s "credible showing" standard for discovery rests on the presumption of regularity.

Unfortunately, DOJ has squandered the presumption of regularity. *See, e.g.,* Evidentiary Hr'g Tr. at 11:8-9, *Abrego Garcia v. Noem*, 8:25-cv-00951, ECF No. 235 (D. Md. July 14, 2025) ("You have taken the presumption of regularity and you've destroyed it in my view."); Order at 2, *Singh v. Tsoukaris*, 1:26-cv-01531 (D.N.J. Feb. 20, 2026), ECF No. 10 ("The presumption of regularity and integrity previously and routinely afforded to the Executive branch and the United States Attorney's Office has been undeniably eroded in this jurisdiction and across the country."); *United States v. Oregon*, --- F. Supp. 3d ----, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has

been previously extended to [the government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."); *United States v. Stewart*, 2025 WL 2754480, at *1 (D.D.C. Sept. 29, 2025) (describing federal prosecutors' conduct as "[a]t a minimum, . . . unseemly; more than likely it is unlawful. Not to mention, this only deepens the growing mistrust of the actions of prosecutors. That is a sentiment that was once unthinkable, but the irregular is now the regular"); Op. and Order at 13, *Chicago Headline Club v. Noem*, 1:25-cv-12173 (N.D. Ill. Nov. 20, 2025), ECF No. 281 ("[The government's] widespread misrepresentations call into question everything that Defendants say they are doing."); Mem. & Order, *In re: Administrative Subpoena to Rhode Island Hospital*, 1:26-mc-00007, ECF No. 38 at 1 (D.R.I. May 13, 2026) ("DOJ has proven unworthy of this trust at every point in this case."); *Juan T.R. v. Noem*, 2026 WL 555601, at *2 (D. Minn. Feb. 26, 2026) ("The Court is not aware of another occasion in the history of the United States in which a federal court has had to threaten contempt—again and again and again—to force the *United States government* to comply with court orders.").[1]

---

[1] The dissipation of the presumption has been marked by widespread resignations and firing of prosecutors throughout the Department of Justice. *See, e.g.*:

- https://www.thejusticeconnection.org/farewell-messages/
- https://www.nytimes.com/2026/09/25/us/chicago-federal-prosecutor-resigns-broadview-six.html
- https://kstp.com/kstp-news/top-news/star-tribune-8-more-federal-prosecutors-leaving-minnesota-u-s-attorneys-office/
- https://www.nytimes.com/2026/01/13/us/prosecutors-doj-resignation-ice-shooting.html?eafs_enabled=false
- https://www.americanbar.org/advocacy/governmental_legislative_work/publications/washingtonletter/november-25-wl/outside-the-gao-1125wl/
- https://www.cbsnews.com/news/joe-digenova-resigns-doj-grand-conspiracy-investigation-trump-obama-biden/

Given this dissipation of the presumption of regularity, a more relaxed standard than *Armstrong*'s "credible showing" should be applied to determine whether Mr. Sant is entitled to discovery regarding his vindictive and selective prosecution defenses. Regardless, even if the traditional "credible showing" standard is applied, Mr. Sant has already made such a showing as set forth in his Motion. *See* ECF 212 at 12-20; *see also* Ex. B (citing NSPM-7 and ordering DOJ to prosecute those who, among other things, engage in "organized campaigns" to "direct or change policy outcomes" related to ICE).

Because the Keyhole documents reflect funding requests and awards for "deployment of personnel and acquisition of necessary equipment" to surveil those who oppose ICE and the government's immigration policies, they are properly the subject of vindictive and selective prosecution discovery. The Court should order the government to produce them.

---

- https://www.bostonglobe.com/2026/04/19/nation/fbi-justice-department-scrambling-to-rebuild-after-resignations-firings/
- https://www.cbsnews.com/news/minneapolis-ice-agent-shooting-justice-department-civil-rights-division-resignations/
- https://apnews.com/article/justice-department-bondi-trump-firings-prosecutors-b4134e5db9d9ff7963fc8c4bf7a0a166
- https://www.cnn.com/2026/01/16/us/video/ebof-ex-doj-attorney-resignation
- https://www.axios.com/2025/11/24/doj-resignation-letters-page-trump-administration-firings

## III. THE WORK PRODUCT PROTECTION DOES NOT SHIELD THE KEYHOLE DOCUMENTS REQUESTED.

The government makes passing reference to Rule 16(a)(2) in its supplemental brief. ECF 263 at 6. It is not clear the extent to which the government contends that the Keyhole documents are protected work product under Rule 16(a)(2). Regardless, even if these documents were work product protected, that protection was waived by the government's selective disclosure of documents discussing its purported rationale for opening Operation Puppet Master and Project Whipple Shield, and the operational planning and surveillance conducted in conjunction with those operations.

Rule 16(a)(2) codifies the work product protection into the Federal Rules of Criminal Procedure. *United States v. Armstrong*, 517 U.S. 456, 463 (1996). But the work product protection is not absolute. Among other things, it may be waived when a party intentionally discloses some protected materials but withholds others.

Federal Rule of Evidence 502(a) provides, for example, "that when a party has disclosed a document subject to the attorney-client privilege or work-product protection, the Court may find that the party has waived the privilege or protection for all documents related to that subject matter." *Fagen, Inc. v. Exergy Dev. Grp. of Idaho, L.L.C.,* No. CV 12-2703 (MJD/SER), 2015 WL 12977507, at *4 (D. Minn. June 1, 2015).

Rule 502(a) states:

> When the disclosure is made in a federal proceeding . . . and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>
> (1) the waiver is intentional;

(2) the disclosed and undisclosed communications or information concern the same subject matter; and

(3) they ought in fairness to be considered together.

Here, the government has produced copious reports and information related to the genesis of this prosecution and the investigations underlying it, including the case opening memoranda and numerous reports repeating the government's purported basis for initiating the prosecution, which involves allegations of violence, assault, and property destruction completely at odds with the evidence adduced thus far. Further, the government held a press conference and issued a press release detailing the purported motivations behind this prosecution. It cannot now use the work product protection to shield internal discussions inconsistent with these other representations upon which it clearly intends to rely. Rather, these internal discussions – including the internal discussions about spending congressionally authorized funds to surveil protesters, unions, and non-profit organizations – "ought in fairness to be considered together" with the rationales stated in the reports already produced in this case. Even if the work product protection applied to some of these documents, it has been waived under Rule 502, and they should be produced.

## IV. REGARDLESS OF WHAT DHS LABELS ITS NATIONWIDE SURVEILLANCE OF PROTESTERS AND ADMINISTRATION OPPONENTS, RELATED DOCUMENTS SHOULD BE PRODUCED.

While the government represents that Operation Keyhole is not directly connected to its nationwide investigation of activists and unions, there is no doubt such a nationwide surveillance effort exists. Nearly all the HSI agents who worked on Operation Puppet Master and Project Whipple Shield were detailed here from other jurisdictions. For

example, Mark Zito and Steven Schrank, who temporarily served as HSI's Acting Special Agents in Charge of the St. Paul office during Operation Metro Surge, were detailed here from Kansas City and Atlanta, respectively. *See* Exs. C, D.

Special Agent John Zappone, stationed in Tucson, "was assigned temporary duty to the HSI office in St. Paul, Minnesota from January 2026 until June 2026. While in St. Paul, [he] was assigned oversight of criminal investigations targeting organized criminal activity of agitators towards federal law enforcement and support personnel in St. Paul, Minnesota." Ex. E. This included oversight of Operation Puppet Master and Project Whipple Shield, and the surveillance of First Amendment protected activity in Minnesota churches. *See id.*

Terri Botterbusch, a Senior Special Agent from Tampa, Florida, prepared and issued the administrative summonses that obtained extensive financial records for CWA, Sunrise Movement, and others engaged in purely First Amendment protected activity. *See* ECF 212-8; Ex. F.

Guy Gino, a Special Agent from Portland, Oregon, performed the Clearview AI searches used in this case, as well as other investigative activities. ECF 212-29; Ex. G. Gino works at the HSI Innovation Lab in Virginia, which "develops solutions that range from advanced analytics capabilities to new investigative tools . . . ."[2] Among these tools is "RAVEN," which is "the in-house data analytics platform . . . [containing] HSI's vast data holdings and a growing number of custom data analytic tools that enable users to

[2] https://www.ice.gov/hsi/centers-labs/innovation-lab

rapidly ingest, clean, structure, compare, and search complex datasets with ease." *Id.* RAVEN and its "vast data holdings" were used to "rapidly ingest . . . and search complex datasets" in this case. *See* Ex. H (documenting use of RAVEN and PLX programs).[3]

Ryan Ribner, a Special Agent from Los Angeles, investigated twenty-nine different individuals and/or organizations in connection with Operation Puppet Master, using Section 314(a) of the Patriot Act to obtain their otherwise protected financial information. *See* ECF 244, 244-1.[4] Notably, Ribner is part of Homeland Security Task Force 4 ("HSTF-4). *See* ECF 244. HSTF-4 is "is a cyber financial group that is responsible for investigating cybercrimes, cyber enabled crimes, and financial crimes," including, among other things, "organizations involved in illegal activities during protests and the use of cyber and digital

---

[3] PLX is another disturbingly broad surveillance tool that "captur[es] live communications and web activity . . . [and] conducts geospatial tracking using real-time location pings from cellphones and intercepted data from mobile apps such as Uber, Lyft, Tinder, and Discord, and social media platforms such as Facebook, Snapchat, and Instagram." https://prismreports.org/2026/04/29/dhs-surveillance-location-data-penlink-plx/

[4] "Section 314 helps law enforcement identify, disrupt, and prevent terrorist acts and money laundering activities by encouraging further cooperation among law enforcement, regulators, and financial institutions to share information regarding those suspected of being involved in terrorism or money laundering." https://www.fincen.gov/resources/statutes-and-regulations/usa-patriot-act. Importantly, "FinCEN's Section 314(a) process requires federal law enforcement to provide assurances that the request has been subject to appropriate scrutiny at the agency level and that the matter under investigation satisfies FinCEN's standards for processing a formal Section 314(a) inquiry. FinCEN requires all requesters to submit a form certifying that the investigation is based on credible evidence of terrorist financing or money laundering." https://www.sec.gov/about/offices/ocie/aml2007/fincen-314afactsheet.pdf; *see also* 31 CFR 1010.520(b)(1) (setting forth the written certification requirements for FinCEN inquiries). Thus, in order to obtain the FinCEN information for the 29 individuals and entities subject to inquiry, Ribner or others had to certify that they had "credible evidence of terrorist financing or money laundering" related to this case. Those certifications, and any related documents, should be produced.

tools to do the same." Ex. I. HSTF-4's recent activities have included digital surveillance of a progressive California organization called VC Defensa, which opposes ICE and the administration's immigration policies. HSTF-4 surveillance of VC Defensa culminated in a criminal prosecution similar to this one. *See id.*

In short, Operation Puppet Master and Project Whipple Shield were part of a nationwide effort to investigate opponents of ICE and DHS that began with the issuance of NSPM-7, encompassed this prosecution, and involved agents and specialized cybercrime units from around the country. Regardless of whether this nationwide effort was called Operation Keyhole, or something else entirely, the government should be required to produce documents regarding its surveillance of activists and progressive organizations in other communities, including the investigations surrounding VC Defensa. These records are material to Mr. Sant's defense, bearing not just on his vindictive and selective prosecution motions, but also his First Amendment defense at trial.

## V. THE COURT SHOULD REQUIRE THE GOVERNMENT TO SUPPLEMENT THE RECORD WITH AGENT TESTIMONY.

The government's supplemental brief seeks to augment the record with an attorney proffer as opposed to actual evidence. No agent or other representative of HSI or DHS submitted a declaration in support of the supplemental brief. Instead, we are left with unsupported assertions from the Department of Justice, apparently based on some individual(s) with knowledge within DHS, but the source of the assertions in the government's brief is unclear. Regardless, attorney proffers are not evidence. *United States v. Wadlington*, 233 F.3d 1067, 1079 (8th Cir. 2000).

As Mr. Sant requested in his response to the government's Motion to File Supplemental Briefing, the Court should order an evidentiary hearing at which a DHS agent with knowledge of Operation Keyhole's connection to Operation Puppet Master and Project Whipple Shield, and other similar surveillance in this community, can testify about these matters and provide actual record evidence that the Court can consider in deciding Mr. Sant's motion.

## CONCLUSION

For all these reasons, and those stated in Mr. Sant's Motion for Discovery, exhibits and at the hearing on Mr. Sant's motion, the Court should grant Mr. Sant's Motion in full, including requiring production of the requested Operation Keyhole documents.

Respectfully submitted,

DATED: September 25, 2026

*/s/ Kevin C. Riach*
Kevin C. Riach, #389277
125 Main St. SE, Suite 339
Minneapolis, MN 55412
Telephone: 612.203.8555
kevin@riachdefense.com
*Attorney For Defendant*