AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
10/28/25
CENTRAL DISTRICT OF CALIFORNIA
BY: MRV DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
October 28, 2025
CENTRAL DISTRICT OF CALIFORNIA
BY: CLD DEPUTY

United States of America

v.

VIRGINIA REYES and ISAI CARRILLO,

Defendants.

Case No. 2:25-mj-06733-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of July 10, 2025, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 372 | Conspiracy to Impede or Injure a Federal Officer |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Eric Diaz*
*Complainant's signature*

Eric Diaz, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: October 28, 2025

*Judge's signature*

City and state: Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA: Patrick Kibbe, x6482

**EXHIBIT I**

# AFFIDAVIT

I, Eric Diaz, being duly sworn, declare and state as follows:

## I. BACKGROUND OF AGENT

1. I am a Special Agent with Homeland Security Investigations (HSI), and have been so employed since December 2024. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrest for offenses enumerated in Title 18, United States Code. During my tenure as a Special Agent, I have completed approximately six months of instruction at the Federal Law Enforcement Training Center (FLETC), in Glynco, Georgia, completing the Criminal Investigator Training Program (CITP), and HSI’s add on training, Homeland Security Investigations Special Agent Training (HSISAT). Prior to my employment with HSI, I was employed by the Lee County, Florida Sheriff’s Office (LCSO) for approximately eight years. During my tenure with LCSO, I investigated and assisted in numerous investigations involving the distribution and possession of narcotics, property crimes, and crimes against persons. Additionally, I currently hold a master’s degree in criminal justice, earned in December of 2021.

2. I am currently assigned to Homeland Security Task Force (HSTF) group 4, which is a cyber financial group that is responsible for investigating cybercrimes, cyber enabled crimes, and financial crimes related to illicit cryptocurrency and



EXHIBIT I

financial technology platforms. As part of this assignment, I am currently investigating organizations involved in illegal activities during protests and the use of cyber and digital tools to do the same.

## II. INTRODUCTION

3. This affidavit is made in support of a criminal complaint against, and arrest warrants for, **Virginia REYES** and **Isai CARRILLO** for violating 18 U.S.C. § 372, Conspiracy to Impede or Injure a Federal Officer (the "SUBJECT OFFENSE"). This affidavit is also made in support of search warrants for **REYES'** and **CARRILLO**'s residence (the "SUBJECT PREMISES"), as further described in Attachment A-1; **REYES'** vehicle ("SUBJECT VEHICLE 1"), as further described in Attachment A-2; and the persons of **REYES** and **CARRILLO**, as further described in Attachments A-3 and A-4. The requested warrant seeks authorization to seize the items described in Attachment B, which are the evidence, fruits, and instrumentalities of the SUBJECT OFFENSE.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and search warrants and does not intend to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this

affidavit are related in substance and in part only and all dates and times are on or about those indicated.

## III. SUMMARY OF PROBABLE CAUSE

5. On July 10, 2025, Department of Homeland Security (DHS) agents conducted several search warrants on locations including a business known as the Glass House Farms in Camarillo, California. The search warrants were predicated on violations of federal immigration laws. Before the enforcement operations commenced, agents determined that the operation was compromised earlier than expected due to social media posts. During the search warrant enforcement operation, numerous protestors arrived in and around the area of the Glass House Farms. Some of the protestors were members of or associated with the organization "VC Defensa," which posted on social media to its members to go to the Glass House Farms.

6. I know from this investigation that VC Defensa is an organization that operates and manages a "Rapid Response Network" ("RRN"). An RRN is comprised of several volunteer members who mobilize in vehicles to follow, chase, agitate and impede federal agents and their operations so that immigration arrests are unsuccessful. The VC Defensa RRN members also conduct surveillance of DHS office buildings and alert the community to the presence of federal agents within their neighborhoods. Although not every member or associate of VC Defensa is involved in violations of federal law, several VC Defensa members are involved in conspiracies to impede and assault federal officers during the commission of their duties.

7. During the Glass House Farms enforcement operation, protestors, including VC Defensa members, built a roadblock using farm equipment at the primary entrance/exit to the Glass House Farms. Due to the roadblock, federal law enforcement vehicles used an alternate exit via a dirt service road onto Wood Road to leave the location. Government vehicles that exited the Glass House Farms and traveled south on Wood Road were stopped by protestors, including individuals throwing rocks at the vehicles.

8. When additional Government vehicles attempted to exit onto Wood Road and travel north, protestors, including VC Defensa members, created a chokepoint and ambush of the vehicles. Specifically, at least two vehicles and several individuals, including one with a bicycle, attempted to block the Government vehicles from exiting. Meanwhile, other individuals threw large rocks at the vehicles. During the incident, at least four Government vehicles were damaged and at least one federal contract employee sustained injuries.

9. During this investigation, law enforcement determined that at least ten subjects acted in concert to impede and assault federal officers and damage Government property, some of whom are identified herein. Specifically, as described more fully below, VC Defensa member **REYES** was present for the construction of the roadblock and drove her vehicle to the ambush location to impede Government vehicles while VC Defensa member **CARRILLO** and others threw rocks at the Government

vehicles, causing damage to the vehicles and injuring a federal contract employee.

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my conversations with other law enforcement officers, review of relevant reports, databases, videos, photos, and extracted digital evidence pursuant to search warrants, I understand the following:

### A. BACKGROUND ON VC DEFENSA

11. The organization "VC Defensa" is a volunteer organization that has divided Ventura County into four geographic areas with a manager for each specific area. The organization operates a web presence at www.vcdefensa.org and various social media platforms which post protest related information and information about their Rapid Response Network ("RRN") activities. The information also includes the identification of "ICE" vehicles.

12. From this investigation, I learned that their RRN activities include mobile vehicle anti-ICE patrols and chasing HSI/ICE agents for the purpose of disrupting and impeding their law enforcement operations. To facilitate this, VC Defensa has a hotline (805-296-1119) where members can call to report ICE sightings and law enforcement activities. This hotline is advertised in organization documents and is posted on the VC Defensa website and social media domain.

13. VC Defensa utilizes at least one encrypted third-party application for their communications. They communicate internally during their RRN ICE patrols and counter-surveillance

activities. Furthermore, VC Defensa coordinates their anti-ICE patrols with at least one other RRN organization. During the patrols and counter-surveillance activities, VC Defensa members specifically will utilize the encrypted chat platform to update other members about the location of DHS agents, take photographs of vehicles, and to collect information on DHS agents and operations. VC Defensa members also collect information about the hotel locations where DHS agents are staying for the purpose of obtaining information about DHS law enforcement operations.

### B. VC DEFENSA MEMBERS PARTICIPATE IN ATTACK AGAINST LAW ENFORCEMENT ON JULY 10, 2025 AT GLASS HOUSE FARMS

14. On July 10, 2025, Homeland Security Investigations, with assistance from the United States Border Patrol ("USBP") and United States Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO"), executed multiple federal search warrants at work-site locations in Camarillo and Oxnard, California. One of the target locations was the Glass House Farms, located at 645 Laguna Road in Camarillo, California.

15. Prior to the search warrants being served at their respective locations in Ventura County, HSI agents learned that an unknown person(s) utilized social media to announce the presence of federal officers in and around the Ventura County locations. The VC Defensa social media account, as well as VC Defensa members, sent messages to alert others to come to the search warrant locations.










16. Throughout the day, a large group of protesters, including members of VC Defensa, formed two crowds, one near Laguna Road at or near the front of the Glass House Farms and the other near the intersection of Laguna Road and Wood Road. At the first location, DHS agents with crowd control gear were assigned to act in the capacity of civil disturbance control. At the other location, at the intersection of Laguna Road and Wood Road, the Ventura County Sheriff's Department ("VCSO") with crowd control gear were assigned to act in the capacity of civil disturbance control.

17. During the execution of the search warrant, protestors, including those later identified to be VC Defensa members, gathered farm equipment and barricaded the primary entrance/exit route to the Glass House Farms.




18. Specifically, this included a Hispanic female wearing a black sweatshirt shirt, black pants, black and white Nike Dunk shoes, and a respirator facemask (**SUBJECT 1**). Later in the day, video shows that **SUBJECT 1** was no longer wearing the black sweatshirt, and was wearing a black VC Defensa t-shirt. **SUBJECT 1** was driving a silver Toyota Rav 4 bearing California license plate number 9SQP125 (**SUBJECT VEHICLE 1**) and had parked it near the roadblock.






19. A Hispanic male on a bicycle wearing a black Oxnard MESA t-shirt and light-colored shorts (**SUBJECT 3**) also assisted in building the roadblock.







20. A medium-build, light-brown skinned Hispanic male, approximately in his 20's and wearing a White Dodgers baseball jersey (**SUBJECT 5**) also assisted in building the roadblock.



21. A Hispanic male in a white t-shirt, dark colored bandana tied around his neck, and Dallas Cowboys hat (**SUBJECT 7**) was also present at the roadblock.




22. **SUBJECT 1** drove **SUBJECT VEHICLE 1** to one of the protest groups where VCSO deputies and news cameras were stationed. **SUBJECT 1** and a male wearing a red bandana around his neck, black baseball hat, black t-shirt over a gray long sleeve shirt, work style boots, and jeans (**SUBJECT 4**) exited the vehicle, and the two are seen at the protest. **SUBJECT 1** was holding a homemade shield/sign that said, "We the People vs ICE." **SUBJECT 1** then walked over to two VCSO deputies who were located on northwest corner of Laguna Road and Wood Road near a television news vehicle. **SUBJECT 1** looked at the VCSO deputy and stated, "I know you; you know me . . . Alright guys, see you on the front lines". One VCSO deputy stated to the other, "She's at the ICE building everyday . . . The one in Camarillo".










23. Another individual at the protest scene, a Hispanic male with a large frame, black shirt, block hat, dark colored bandana, and beard (**SUBJECT 9**) confronted VCSO deputies. The deputies informed **SUBJECT 9** to step back. An individual in a dark colored sweatshirt with a hood pulled over his head, a black bandana or face mask around his face, and white tennis shoes (**SUBJECT 10**) was also present.










24. At approximately 5:30 p.m., a law enforcement vehicle convoy began to depart from the Glass House Farms using a designated alternate exit route due to protestors barricading

the primary entrance/exit route. The alternate exit route had the convoy exit the Glass House Farms complex from a dirt road onto Wood Road.

25. Some of the Government vehicles exiting the Glass House Farms turned south onto Wood Road. However, the vehicles were stopped by protestors blocking the road. The vehicles started to drive in reverse back north on Wood Road. During this time protestors began to throw rocks at the Government vehicles.

26. Specifically, **SUBJECT 7** began to throw rocks at Government vehicles.





**EXHIBIT I**

27. A Hispanic female in a dark colored sweatshirt with white lettering and dark colored pants (**SUBJECT 8**) was walking with **SUBJECT 7** and also threw rocks at Government vehicles.




28. **SUBJECT 10** also threw rocks at Government vehicles.







29. **SUBJECT 1** left the protest area, waved "bye" to VCSO deputies, and walked back toward **SUBJECT VEHICLE 1**. **SUBJECT 4** followed **SUBJECT 1** toward **SUBJECT VEHICLE 1**. **SUBJECT 1** is then observed in a distance getting into **SUBJECT VEHICLE 1**.










30. **SUBJECT VEHICLE 1** then drove north on Wood Road to where the US Government vehicles were exiting onto Wood Road from the dirt service road. **SUBJECT VEHICLE 1** was following **SUBJECT 3** on a bicycle.






EXHIBIT I

31. Law enforcement vehicles in the convoy continued to exit onto Wood Road and turned north to avoid the protestors blocking the southbound direction of Wood Road. Then, a white Nissan sedan with California license plate 7TRK670 (**SUBECT VEHICLE 2**) parked in front of the dirt road exit to Wood Road, partially blocking it. A Hispanic female in a dark colored sweatshirt and light-colored shorts (**SUBJECT 2**) appeared to exit the vehicle and stood in the roadway to slow the Government vehicles.




32. **SUBJECT VEHICLE 1** then arrived and stopped in front of the exit to Wood Road, partially blocking and slowing the Government vehicles from exiting onto Wood Road.





**EXHIBIT I**

33. **SUBJECT 3** arrived on a bicycle, stopped in the middle of Wood Road, and also started to partially block and slow Government vehicles from exiting.




34. **SUBJECT 9** then stood in front of a Government vehicle to block it from exiting.







35. While **SUBJECT VEHICLE 1, SUBJECT VEHICLE 2, SUBJECT 2, SUBJECT 3,** and **SUBJECT 9** were impeding the exit of Government

vehicles, other protestors began to throw rocks at the Government vehicles.

36. Specifically, this included **SUBJECT 4,** who threw rocks at the front passenger door window of a white Government van from close range.




37. **SUBJECT VEHICLE 1** then pulled forward onto the dirt road to further impede Government vehicles from exiting onto Wood Road. **SUBJECT 4** moved to the side of the dirt road and continued throwing rocks.






EXHIBIT I

38. Other protestors also began to throw rocks at the white Government vehicle. This included **SUBJECT 5** who threw rocks at the US Government vehicles.




39. In addition, a Hispanic male with a white t-shirt, black hair, black shorts, black socks and what appear to be Nike Air Jordan shoes (**SUBJECT 6**) also threw rocks at the US Government vehicles.








**EXHIBIT I**

40. **SUBJECT 10** also continued to throw rocks at the US Government vehicles.







41. The white Government vehicle sustained damage including a broken front windshield and broken front passenger window. A rock that entered through the front driver's window struck the hand of the driver, AA, causing injury. Glass shards also struck AA. AA was a federal contractor in the performance of his/her official duties.




42. The protestors continued to assault other Government vehicles as they attempted to exit onto Wood Road. **SUBJECT VEHICLE 1** was now repositioned perpendicular to Wood Road to impede Government vehicles from turning onto Wood Road. **SUBJECT 4** continued to throw large rocks at the Government vehicles, including a black four door sedan.







43. While **SUBJECT VEHICLE 1** continued to impede the exit, **SUBJECT 4** then threw rocks at another Government vehicle, a blue Ford Expedition, damaging the windshield and side mirror.






44. As the Government vehicles turned onto Wood Road, **SUBJECT 3** continued to slow the vehicles with his bicycle in the road and holding up his hands, as other protestors including **SUBJECT 4, SUBJECT 5, SUBJECT 6,** and **SUBJECT 10** continued to throw rocks at the vehicles.




45. **SUBJECT 2** also attempted to slow the Government vehicles with her body and hands as **SUBJECT 4, SUBJECT 5, SUBJECT 6, and SUBJECT 10** continued to throw rocks at the vehicles.






46. After the assault was completed, **SUBJECT 4** entered the back driver's side door of **SUBJECT VEHICLE 1**.




47. In total, at least four Government vehicles suffered damage due to being struck by rocks, and a federal contract employee was injured as he/she was struck with shards of glass and by a rock on his/her hand.

C. **SUBJECT 1 IS REYES AND SUBJECT 4 IS CARRILLO**

48. **SUBJECT 1** is **REYES**. As discussed further below, **REYES** is well-known to law enforcement based on numerous encounters with her. A comparison of photos of **SUBJECT 1** from the July 10, 2025 incident (top row) and of **REYES'** from her phone (bottom left and middle), and a recent law enforcement encounter with **REYES** (bottom right) confirms that **REYES** is **SUBJECT 1**:







49. **REYES** resides at 402 N. A Street, Oxnard, California ("**SUBJECT PREMISES 1**"), described further in Attachment A-1. **SUBJECT PREMISES 1** is **REYES'** registered address on her California's driver's license. Law enforcement observed **REYES**

going in and out of this residence as recently as October 26, 2025.

50. Based on database checks, **REYES** is the registered owner of **SUBJECT VEHICLE 1**, described further in Attachment A-2, which is registered to her at **SUBJECT PREMISES 1**. Three days following the July 10, 2025 incident at the Glass House Farms, on July 13, 2025, law enforcement conducted an address check of **SUBJECT PREMISES 1** and confirmed that **SUBJECT VEHICLE 1** was parked in the driveway next to the residence. Law enforcement observed **SUBJECT VEHICLE 1** at **SUBJECT PREMISES 1** as recently as October 26, 2025. Based on social media videos posted by **REYES**, and messages on one of **REYES'** phones, I know that REYES uses a video camera in **SUBJECT VEHICLE 1** to record US Government vehicles and personnel.

51. As discussed further below, during this investigation two phones were seized from **REYES** on or about August 13, 2025. I know that **REYES** has replaced the phones that were seized. For example, on October 26, 2025, **REYES** placed two phones against the window of a US Government vehicle to see inside and uploaded a video of the incident to her TikTok account.

52. **SUBJECT 4** is **CARRILLO**. Based on my review of records and messages in this case, I know that **CARRILLO** is **REYES'** brother.

//

//

//

53. A comparison of **SUBJECT 4** (bottom row) with **CARRILLO's** driver's license photos (top left) and an image from **REYES'** phone (top middle) confirms the likeness of **CARRILLO** to **SUBJECT 4**.












54. In addition, during a review of one of **REYES'** phones, discussed further below, law enforcement observed that on or about November 26, 2024, **REYES** sent **CARRILLO** a photograph of three work boots and pointed to the boot that was light tan in color (top right above). **CARRILLO** informed her to purchase the boot for him. Based on videos from the impeding and assault incident, **CARRILLO** is wearing the same or similar work boots that were purchased by **REYES** for him.

55. **CARRILLO** resides with **REYES** at **SUBJECT PREMISES 1.** This address is listed on a photograph of **CARRILLO**'s IRS 1095-C form that was found in **REYES'** phone. Law enforcement observed **CARRILLO** coming and going from the residence since at least August 2025. Most recently, law enforcement observed **CARRILLO** going in and out of **SUBJECT PREMISES 1**, and **CARILLO**'s registered vehicle parked outside **SUBJECT PREMISES 1**, on October 23 and October 25, 2025.

56. As described further below, based on the investigation in this case, I know that **CARRILLO** has at least one digital device that he uses to communicate with **REYES** and other VC Defensa members.

57. **REYES** has had numerous interactions with law enforcement before and after the July 10, 2025 incident at the Glass House Farms. As a VC Defensa member, **REYES** has regularly followed and impeded law enforcement operations in **SUBJECT VEHICLE 1.**

58. For example, on August 13, 2025, Virginia **REYES** impeded federal agents with **SUBJECT VEHICLE 1**, in coordination with at least one other person, when she pursued a US Government law enforcement vehicle onto a military base in Port Hueneme, California. As a result, Naval Police Officers detained **REYES** and Diplomatic Security Service ("DSS") agents seized two cell phones that were in her possession at the time of the incident.

59. HSI agents obtained two federal search warrants (2-25-MJ-5105 and 2-25-MJ-5106) allowing agents to image the contents of **REYES'** phones. A review of the contents of **REYES'** phones

further confirms **REYES**' and **CARRILLO**'s involvement VC Defensa and the July 10, 2025 Glass House Farms incident.

60. Based on text message conversations, **REYES** joined VC Defensa in or about June 2025. In a June 16, 2025, text message conversation with a VC Defensa volunteer coordinator who bears the initial of "J", he/she stated to **REYES**, "You recently signed up to volunteer with us so I wanted to let you know that we have three volunteer meetings this week [dates/times/locations of meetings] . . . Will you be able to make any of these?". **REYES** stated, "Hi I went to one on Saturday. I have been added to signal [encrypted chat] under veechy…". J stated, "No problem at all, thank you for getting back to me. Let me know you have any further questions or need any other information. I saw you in the chat today and I'm happy to have you helping us, we appreciate you".

61. Based on text message conversations, **CARRILLO** also joined VC Defensa in or about June 2025. During a text conversation on June 21, 2025, at approximately 11:38 p.m., **CARRILLO** stated to **REYES**, "Pick me up tomorrow". **REYES** stated, "Pick you up for?". **CARRILLO** replied, "To bug the ice agents!!!". **REYES** stated, "With your record we'll both get arrested".

62. Further, **CARRILLO** asked **REYES** for access to the VC Defensa encrypted third-party application chat string. During a conversation on June 30, 2025, at approximately 4:37 a.m., **CARRILLO** texted **REYES** and stated, "What's the number for the signal app". **REYES** responded to **CARRILLO** and advised him that

the group will send him the 'QR code' for the chat". Later, **REYES** sent a media photo to **CARRILLO** that stated, "SIGN UP TO VOLUNTEER WITH VC DEFENSA REPORT ICE SIGHTINGS TO: 805-296-1119 [The media photo had a QR code in the middle]".

63. Messages on **REYES'** phone between **REYES**, **CARRILLO**, and others further confirm **REYES'** and **CARRILLO**'s involvement in VC Defensa and unlawful activities to impede law enforcement.

a. On June 10, 2025, at approximately 8:16 p.m., **REYES** sent a photograph text to **CARRILLO**. The photograph showed a large square white plastic piece that was made into what appeared to be a shield. The plastic shield was spray painted in red lettering and stated, "ICE OUT!!". **CARRILLO** liked the photograph. Further in the conversation **REYES** stated, "Made em myself". **CARRILLO** replied, "Dope Buy some laser pointers green ones". Through my training, knowledge, and experience, I know that green laser pointers have been used to shine in the eyes of federal officers during recent civil disturbance events related to immigration protests.

b. On July 3, 2025, at approximately 11:59 a.m., **CARRILLO** advised **REYES**, "Be more careful you idiot". **REYES** stated, "I am careful. The racist fucken CHP boot licker is a bitch". **CARRILLO** stated, "Just listen for once Be extra careful. Your in they're radar now". **REYES** stated, "I've been on their radar lol [emoji with tears] they know my name they drive by my house . . . One of the ICE agents told me I'm famous lol [emoji with tears] . . . ".

c. On July 3, 2025, at approximately 5:52 p.m., **REYES** and "MC" had a text chat on Facebook messenger. MC stated, "Ur a real one for following them!!! [referencing US Government law enforcement vehicles]". **REYES** stated, "Imma get arrested soon but fuck it. They hate me. They have the FBI building a case on me. But they don't have anything on me other than traffic violations". Later in the conversation, **REYES** stated, "They tried getting me arrested soon many times lol [laughing with tears emoji] . . . But right now they are just building up evidence towards me. Because I be driving like a savage to keep up with them . . . I got some crazy videos but I can't post because it will incriminate me. Lol [laughing with tears emoji] . . . The community donated a dashcam because they try to hit me with their cars all the time . . . But I'm too quick they hate me [laughing emoji with tears]". MC stated, "Are you with the 805 immigration page too???". On July 4, 2025, at 12:44 a.m., **REYES** replied, "Nah. I'm with VC defensa. We are a little more aggressive. But we work with 805immigration. They help us keep look out at the ice headquarters . . . They tell us who comes in and out. And we park at a distance to follow the cars".

d. On July 5, 2025, at approximately 9:54 p.m., **REYES** participated in a group text message with other individuals. During the conversation **REYES** stated, "I'll see you then if I haven't already been arrested by the FBI lol [laughing emoji with tears]".

e. On July 30, 2025, at approximately 3:17 a.m., **CARRILLO** had a conversation with **REYES**. **CARRILLO** stated, "Tail

gate closer so they won't get between you any the other vehicles". **REYES** stated, "They tend to reverse and break check". **CARRILLO** stated, "Nah don't let them get the chance… What you need is someone with a bike . . . Don't give them the opportunity to get between you them…". **REYES** stated, "So they can get hit and go flying". **CARRILLO** stated, "It's a strategic counter defense". As described above, during the July 10, 2025 incident, **REYES** used her vehicle, **SUBJECT VEHICLE 1**, to impede law enforcement while **SUBJECT 3** did the same with his bicycle, while **CARRILLO** threw rocks at the US Government vehicles.

64. Evidence from **REYES'** phone also further confirms **REYES** and **CARRILLO**'s involvement in the incident at the Glass House farms.

a. On July 10, 2025, from 5:27 p.m. to 5:38 p.m., one of **REYES'** phones was in contact with the (805) 296-1119 phone number a total of 10 times. The calls coincide with the lead-up to the impeding and assault incident. The phone number (805) 296-1119 is the number in which VC Defensa members encourage the public to call and report on ICE operational activities.

b. On July 10, 2025, at approximately 10:12 p.m., during a text conversation with work colleagues, **REYES** sent a selfie photograph with her wearing an industrial grade respirator mask. **REYES** is standing in front of several DHS agents who are outfitted in crowd control gear. **REYES** stated, "Alright guys it was nice knowing yall lol [laughing emoji with tears]". Later she stated, "I'm at the front line getting shot

by rubber bullets and gas. My car window is broken". **REYES** then responded to a question in the chat string about her not being at work. **REYES** stated, "I called out. They got military platoons here on the back roads of Oxnard . . . I pissed myself".

65. Evidence of **REYES** and **CARRILLO**'s involvement in the July 10, 2025 Glass House Farms ambush continued in the days after the incident.

a. On July 11, 2025, at approximately 5:08 a.m., **CARRILLO** sent a video text message from an Instagram account with the moniker name "Raider Tommy". The video was of the assault incident involving the Government vehicles as the vehicles attempted to exit onto Wood Road, as described above. **CARRILLO** then asked **REYES** to "Share" her location. Later, in reference to **CARRILLO**'s phone, **REYES** stated, "Where was it". **CARRILLO** stated, "Some guy had it . . . I went to his house to go get it . . . Look at my story [referencing the Raider Tommy video of the ambush incident]". **REYES** then sent **CARRILLO** a posted story to TikTok about the protest at the Glass House Farms.

b. On July 12, 2025, at approximately 7:32 p.m., **CARRILLO** stated, "Manuel is in Oxnard I told him if anything happens to call you or me it I have the kids".

c. On July 12, 2025, at approximately 3:38 p.m., **REYES** had a Facebook Messenger discussion with "EC". **REYES** stated, "I stopped giving a fuck I do what they do. I'm surprised they haven't arrested me. But I know it's just a

matter of time before the feds comes knocking on my door . . . In the meantime imma keep doing what I do".

d. On or about July 16, 2025, **REYES** posted a video to her TikTok social media account that is operated under the moniker name of "Veechy". At the top of the account page is written, "Follow VCDEFENSA on IG. Any donations can be sent to VCDefensa. venmo.com/u/veechy03". The video posted on or about July 16, 2025 is an edited collage of videos that related to the July 10, 2025 incident at the Glass House Farms. The first part of the video is an unknown male filming what appears to be a convoy of US Government vehicles driving on the California 101 with text that stated, "The moment we realized it was going to be huge". The next part of the video contained written text that stated, "Glass house in Carpenteria and Glass house in Oxnard completely surrounded!!" The video shows law enforcement vehicles and agents in the roadway and in front of a greenhouse, then transitions to **REYES** taking a selfie-photograph wearing a respirator mask with a female wearing a Mexican flag bandana on her face. The video then transitions to **REYES** video recording herself talking about being shot by a "rubber bullet" and "gassed". **REYES** is wearing mostly black clothing and a VC Defensa shirt and carrying a plastic shield. **REYES** then mentioned that she had to get her vehicle. The video then transitioned into the same "Raider Tommy" video of the impeding and assault incident that **CARRILLO** sent her in a text message, which shows **CARRILLO** throwing rocks at Government vehicles.

e. The montage video that **REYES** posted to her TikTok account also captured **SUBJECT VEHICLE 1.** The video showed a still photograph of the makeshift roadblock that was previously mentioned. Parked in the distance appeared to be **SUBJECT VEHICLE 1.** The next portion of the video showed **SUBJECT VEHICLE 1.** **REYES** then stated, "These fuckers hit my car . . . My window, they fucking shot at my window . . ." **REYES** walked with the camera and videotaped the back of **SUBJECT VEHICLE 1**'s rear window, highlighting the damage.

66. Another image on one of **REYES'** phones shows **SUBJECT VEHICLE 1** with the captions "Just some minor scratches but Babygirl is a [sic] clean now" and "The battle aftermath". In another image on **REYES'** phone is **SUBJECT VEHICLE 1** with the caption "La bichota[1] is back in action!!" and "@bennysautoglass @vcdefensa Thank you for all the support!!"










[1] I know from my investigation in this case that Bichota is a slang term that roughly translates to "big shot," and is often used in the context of referring to a top-ranking member of a gang or a mobster.

67. There was also a photo on one of **REYES'** phones that appeared to be a daytime photograph of a restricted fenced parking lot area at a DHS office located in Camarillo, California. The photograph showed the blue Ford Expedition that **CARRILLO** damaged while **REYES** was blocking the exit onto Wood Road with **SUBJECT VEHICLE 1**. The photograph stated in white lettering on top, "7/17/2025 The broken windshield and mirror still not fixed [emoji with smiling face and tears]". The photograph appeared to be earmarked for a social media post.







### V. <u>TRAINING AND EXPERIENCE ON ORGANIZED PROTEST GROUPS</u>

68. Based on my training and experience, as well as my familiarity with investigations conducted by other law enforcement agents into groups who organize in an effort to obstruct federal law enforcement in the execution of their duties, I know the following:

69. Such groups are often organized along ideological lines; for instance, these groups may organize around a shared

ideology opposed to the enforcement of federal immigration laws. As such, the members of these groups often communicate with one another to share information about their common ideology. Such sharing is usually conducted via text message, Internet messaging application, and/or social media via digital devices. Such digital devices are often kept in places where the members of these groups have ready access to them such as on their persons, in their vehicles, or in their homes.

70. Such groups typically consist of a large number of participants who are poised to coalesce into action on short notice. For example, should a group that is organized around a shared ideology opposed to the enforcement of federal immigration law learn of what the group believes to be an immigration law enforcement operation, those members will communicate with each other via digital devices to mobilize large numbers of group members to hinder law enforcement action, as illustrated by the actions of VC Defensa and its members on July 10, 2025. Such digital devices are often kept in places where the members of these groups have ready access to them such as on their persons, in their vehicles, or in their homes.

71. In some instances, such groups have contacts who are privy to non-public law enforcement documents. By having access to such documents, the groups are able to anticipate law enforcement action and mobilize more quickly to hinder such action. Members of these groups often share such non-public information via digital devices. Such digital devices are often kept in places where the members of these groups have ready

access to them such as on their persons, in their vehicles, or in their homes.

72. Members of these groups often keep the names, addresses, and telephone numbers of those involved in their activities on their digital devices. Such digital devices are often kept in places where the members of these groups have ready access to them such as on their persons, in their vehicles, or in their homes. Additionally, they often keep records of meetings with associates on their digital devices, including in the form of calendar entries and location data.

73. When members of these groups or those acting in concert with them mobilize and confront law enforcement, they often engage in physical confrontations with law enforcement that can lead to assaults on federal officers. Following those incidents, members of these groups and individuals acting in concert with them communicate via digital with one another and share their recollections of the event, to include sharing videos that capture officer assaults. Such digital devices are often kept in places where these individuals have ready access to them such as on their persons, in their vehicles, or in their homes.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

74. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

75. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

76. The search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **REYES'** or **CARRILLO**'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of **REYES'** or **CARRILLO**'s face, with his/her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VII. CONCLUSION

77. For all of the reasons described above, there is probable cause to believe that **REYES** and **CARRILLO** violated 18 U.S.C. § 372, Conspiracy to Impede or Injure a Federal Officer.

78. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSE, will be found in the **SUBJECT PREMISES**, **SUBJECT VEHICLE 1**, and the

//

//

//

//

//

//

//



EXHIBIT I

persons of **REYES** and **CARRILLO**, as described in Attachments A-1 through A-4.

/s/ *Eric Diaz*
Eric Diaz, Special Agent
Homeland Security
Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 28th day of October, 2025.

HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE