**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Isaac Auman Sant, Emmett James Doyle, Cameron Kennedy, Callum Robinet, Erik Davis, Brian Stillwell Apland, Kyle Wagner, Hannah Margaret Van De Water Davis, Treasure Cay Thoreson, Nathan Junho Kim, Alec Stewart, Douglas Misterek, Dustin Scott Beisell, William Morgan, Natasha Rakotz,

Defendants.

Case No. 0:26-CR-00115-KMM-DTS (D. Minn.)

**NON-PARTY MATTHEW DEATES'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RETURN OR DESTRUCTION OF ICE MEMORANDUM AND TO COMPEL A CORRECTION OF THE RECORD**

---

## INTRODUCTION

Non-party Matthew Deates, Assistant Federal Defender for the District of Minnesota, does not represent, and has never represented any of the fifteen defendants charged in this matter. Nevertheless, in this case, the government produced a DHS/ICE memorandum that falsely accused Deates—by name and title—of having "aided and abetted" a criminal defendant's escape from immigration custody in an entirely separate matter (the "O'Neal Memorandum").[1] That accusation is demonstrably false. In addition, the ICE agent who wrote the memorandum admits that he did not learn the single fact

---

[1] The "O'Neal Memorandum" refers to the April 29, 2026 memorandum captioned "Aid and Abetting," written by Deportation Officer Michael J. O'Neal to ICE Assistant Field Office Director Corey McMahon attached to the Declaration of Matthew Deates (Oct. 1, 2026) ("Deates Decl.") at Exhibit 9.

that forecloses his baseless allegations against Deates until after the events he purports to describe.

Deates's counsel demanded that the government undertake corrective action by September 18, 2026. The government asked for more time, which Deates provided. A week later, on September 25, 2026, the government wrote to defense counsel in this case conceding that the O'Neal Memorandum "is neither material nor relevant to your client's case. Thus, is [sic] was not within the scope of required discovery," and asked that it be returned or destroyed. (Deates Decl., Ex. 9 at 1.) But that letter says nothing about the truth of the memorandum's accusation—it does not mention Deates at all—and offers only that the memorandum "does not reflect the position of the United States Attorney's Office." (*Id*. at 2.) That is not a correction of the record. And it further appears that defense counsel in this matter do not intend to return or destroy the O'Neal Memorandum.

Accordingly, Deates respectfully submits this memorandum in support of his motion for an order (1) directing the United States Attorney's Office to notify every recipient of the April 29, 2026 memorandum captioned "Aid and Abetting," written by Deportation Officer Michael J. O'Neal to ICE Assistant Field Office Director Corey McMahon that the memorandum was produced in error; (2) directing that all recipients return or destroy every copy, excerpt, and summary of the O'Neal Memorandum; and (3) finding that Deates did not aid or abet Ezequiel De Jesus Portillo-Rodriguez in evading arrest, detention, or capture.

## FACTS

### A. Deates's Unrelated Representation of Portillo-Rodriguez

Deates is an Assistant Federal Defender for the District of Minnesota. (Deates Decl. ¶ 1.) Deates does not represent any of the fifteen defendants prosecuted in this action. (*Id*. ¶ 2.) In contrast, Deates did represent Ezequiel De Jesus Portillo-Rodriguez ("Portillo-Rodriguez") in *United States v. Portillo-Rodriguez*, No. 0:25-cr-00138 (D. Minn.), an illegal-reentry prosecution that has no relationship to this case. (*Id*.)

### B. The Court-Authorized Release and Travel That the O'Neal Memorandum Mischaracterizes

On September 2, 2025, Portillo-Rodriguez was arrested in the Eastern District of California on the illegal-reentry indictment arising from the United States District Court for the District of Minnesota. (Deates Decl. ¶ 4, Ex. 2 at 1.) That same day, Portillo-Rodriguez made his initial appearance in the Eastern District of California, where United States Magistrate Judge Allison Claire ordered him released on his own recognizance and further permitted his travel between the Eastern District of California and the District of Minnesota "for court purposes only." (*Id.*) This was nearly eight months before the April 28, 2026 hearing described below. Before Portillo-Rodriguez was released on September 2, 2025, ICE detained him in immigration custody.

On March 18, 2026, the United States District Court for the Eastern District of California ordered Portillo-Rodriguez released from ICE custody and further enjoined the government from re-detaining him on immigration grounds "absent exigent circumstances, without providing [him] notice and a pre-detention hearing before an immigration judge." (*Id.*¶ 3, Ex. 1 at 9.) Following his court-ordered release from

immigration custody, Portillo-Rodriguez reported for pretrial supervision in the Eastern District of California pursuant to the previously entered order setting conditions of his release. (*Id.* ¶ 4.)

The United States District Court for the District of Minnesota subsequently scheduled Portillo-Rodriguez's initial appearance for April 28, 2026. Days before that hearing, the government itself, through AUSA Nicole Moody of the Eastern District of California, stipulated without objection that Portillo-Rodriguez would not be electronically monitored "while he's traveling between California and Minnesota for the purposes of attending court," and the assigned magistrate judge so ordered. (*Id.* ¶ 5, Ex. 3 at 1–3.) The Minnesota probation officer's addendum, filed the day before the hearing, likewise authorized that travel and confirmed that both the government and the defense had been informed of the updated recommendations and reported no objections. (*Id.* ¶ 6.)

Consequently, the government was fully aware of, and agreed to, Portillo-Rodriguez's continued release before he ever appeared in court on April 28. Ahead of the hearing, AUSA Matthew Murphy notified the District of Minnesota's Federal Defender's Office, including Deates, that Portillo-Rodriguez would be attending an initial appearance in Minnesota, and confirmed that "Gov't will agree to continued release." (Deates Decl. ¶ 7, Ex. 5.)

On April 28, 2026, Portillo-Rodriguez appeared in the U.S. District Court for the District of Minnesota before the Honorable David T. Schultz for his initial appearance. (Deates Decl. ¶ 8.) Deates was personally present throughout the hearing. (*Id.*) On the record, with AUSA Grayson Feist present and raising no objection, Deates confirmed that

Portillo-Rodriguez lives in California and had come to Minnesota only because the charge arose in this District. (*Id.* ¶ 8, Ex. 6 at 3–4.) AUSA Feist asked Magistrate Judge Schultz to adopt Pretrial Services' recommendations for Portillo-Rodriguez's release, and Magistrate Judge Schultz did so on the record before Portillo-Rodriguez and Deates left the courtroom. (*Id.*)

The written release order entered that same day again authorized Portillo-Rodriguez's travel between "California and Minnesota (court purposes only)" and removed the location-monitoring conditions previously in place. (Deates Decl. ¶ 9, Ex. 7 at 2.) That same order directed that "[t]he defendant is ORDERED released after processing"—meaning that when Deates and his client left the courthouse, Portillo-Rodriguez had just been ordered released by a sitting federal magistrate judge and was not in custody, under arrest, or subject to any lawful process Deates could have helped him evade. (*Id.* ¶¶ 9–10, Ex. 7 at 2, 6.)

### C. The O'Neal Memorandum's False and Unreliable Accusation

Despite this record, ICE Officer O'Neal—who, by his own account, intended to conduct a unilateral administrative arrest of Portillo-Rodriguez at the U.S. Probation and Pretrial Services Office that same day, notwithstanding the standing federal injunction described above (Deates Decl. ¶ 17, Ex. 9 at 1–2)—authored an April 29, 2026 memorandum to ICE Assistant Field Office Director Corey McMahon captioned "Aid and Abetting," stating: "To my knowledge, Portillo-Rodriguez did not make his appointment with the U.S. Public Defenders Office and was aided and abetted from immigration arrest by Assistant Public Defender Matthew Deates." (*Id.* ¶ 16, Ex. 9 at 2.)

By his own account, Officer O'Neal did not learn of the Eastern District of California injunction—the very order that made his intended arrest unlawful—until after the April 28 hearing, on his drive home, from Special Agent Brubaker:

> It must be noted that on my drive home, I contacted Special Agent Brubaker, I inquired about the case, and she stated PORTILLO-Rodriguez had been in custody in California and released on a Habeas Corpus and made his way to Minnesota to attend an initial appearance. At no time prior to the incident had I been aware of that information.

(*Id.* ¶ 20, Ex. 9 at 2.)

After the April 28 hearing, Deates walked his client to the light rail for the sole purpose of enabling his return to California—"the very state to which the Court had just ordered him to return." (Deates Decl. ¶ 11.) As Deates did so, no less than three federal agents followed him:

> Deputy Marshals Stone, Gnitka, and I followed PORTILLO-Rodriguez and Assistant Public Defender Matthew Deates while wearing plain clothes with no police markings visible. We were stopped at a red light awaiting to cross at the intersection of 3rd Avenue and 4th Street while PORTILLO-Rodriguez and Assistant Public Defender Matthew Deates continued South. Deputy Marshal Stone called her supervisor to brief them of the ongoing situation, while I contacted SDDO Holien of the ongoing situation. Upon arrival to the light rail station between the Minneapolis City Hall and the Hennepin County Courthouse PORTILLO-Rodriguez and Assistant Public Defender Matthew Deates were not seen, there were light rail cars in each direction at the time of our arrival, once the cars departed, Assistant Public Defender Matthew Deates was seen by himself on the South platform, PORTILLO-Rodriguez had boarded a light rail car heading East, unknown if it was a green or blue line. Deputy Marshals Stone, Gnitka, and I returned to the United States District Courthouse and met by Supervisory Deputy Marshal Austin who was watching from inside the building.

(*Id*. Ex. 9 at 2.)

Had Officer O'Neal accomplished what he intended that day, his own conduct, not Deates's, would have violated federal law, i.e., Officer O'Neal would have committed contempt of court by violating the Eastern District of California injunction. (*See* 18 U.S.C. § 401.) And faced with what he now claims was Deates committing a federal

felony in his presence, Officer O'Neal—as well as multiple other federal agents—did not intervene, did not arrest, and did not act. Instead, Officer O'Neal wrote a memo. (Deates Decl. Ex. 9.)

### D. The O'Neal Memorandum's Sloppiness

Officer O'Neal misidentified the presiding judicial officer as "Chief Magistrate Judge Erickson," (Deates Decl. Ex. 9 at 1) when the court's own transcript confirms the hearing was conducted by United States Magistrate Judge David T. Schultz. (Deates Decl. ¶ 18, Ex. 6 at 1.) He also asserted that Portillo-Rodriguez missed his appointment with the "U.S. Public Defenders Office," when in fact Portillo-Rodriguez fulfilled that appointment at the conclusion of the April 28 hearing. (*Id.* ¶ 19.)

### E. The Conduct of the United States Attorney's Office for the District of Minnesota Shows Nothing Improper Occurred

The District of Minnesota AUSA's own contemporaneous conduct confirms that nothing improper occurred. The morning after the hearing, AUSA Murphy emailed Deates that Portillo-Rodriguez "made his initial appearance yesterday on an illegal reentry charge" and that "we can probably wrap this one up pretty quickly"—the language of routine case management, not of a prosecutor who believed defense counsel had just helped a defendant evade federal custody. (Deates Decl. ¶ 13, Ex. 8.) Deates and the prosecuting AUSA went on to litigate the case openly and cooperatively, jointly moving to vacate a status conference and discussing a Rule 20 transfer to California given Portillo-Rodriguez's residence there—conduct wholly inconsistent with the concealment the O'Neal Memorandum imputes to Deates. (*Id.* ¶ 14.)

### F. Improper Production to Fifteen Unrelated Defendants

Despite bearing no relevance whatsoever to the charges pending against the defendants in this case (as the government itself now concedes), the government produced the O'Neal Memorandum in discovery on August 20, 2026, to counsel for all fifteen defendants. (Deates Decl. ¶¶ 2, 15, 23, Ex. 12 at 1.) The production exposed a highly respected, sitting Assistant Federal Defender to public suspicion of criminal conduct, based on an ICE officer's admittedly uninformed and erroneous account of a routine, court-authorized event. (*Id*. ¶¶ 2, 15–17, 25.)

### G. Demand and the Government's Incomplete Response

By letter dated September 4, 2026, Deates's counsel wrote two Assistant U.S. Attorneys and a Special Assistant U.S. Attorney at the U.S. Attorney's Office for the District of Minnesota and demanded that, on or before September 18, 2026, the United States Attorney's Office (1) notify counsel for each defendant to whom the O'Neal Memorandum was produced that it was produced in error and that its allegations concerning Deates are inaccurate; (2) request that each recipient return all copies of the O'Neal Memorandum and destroy any copies, excerpts, or summaries that cannot be returned; and (3) confirm in writing that the foregoing had been done. (Deates Decl. ¶ 21, Ex. 10.)

On September 18, 2026, AUSA LeeAnn Bell spoke with Deates's counsel and requested additional time for the government to respond. (Deates Decl. ¶ 22.) By email on September 21, 2026, Deates's counsel confirmed that Deates would give the government "another week to accomplish what we've asked for," cautioned that "simply

retrieving the O'Neal memorandum is insufficient," reiterated that "[t]he government needs to satisfy our demands as stated in my September 4, 2026 letter at pages 6-7," and identified *Briggs*, *Smith*, *Anderson*, and *Holy Land Foundation*—the principal authorities on which this motion relies—as cases Deates would cite if forced to file this motion. (*Id.*, Ex. 11.)

On September 25, 2026, within the additional time it had requested, the government responded—not to Deates's counsel, but by a letter from AUSA Tory Sailer to counsel for the defendants in this case, which was not addressed or copied to Deates or his counsel. (Deates Decl. ¶ 23, Ex. 12.) The letter confirms that the O'Neal Memorandum was disclosed on August 20, 2026, as pages 9 through 11 of a Report on Investigation designated "ROI 24" (Bates No. 58752); acknowledges that the memorandum "references a different defendant on unrelated charges and is neither material nor relevant to your client's case. Thus, is [sic] was not within the scope of required discovery"; requests that recipients return the memorandum and "any summaries, excerpts or other data referencing" it or, if they cannot be returned, destroy them; and states that the memorandum "does not reflect the position of the United States Attorney's Office." (*Id.*) The letter does not state that the O'Neal Memorandum's accusations concerning Deates are false—indeed, it does not mention Deates at all. (Deates Decl. ¶ 24.) Nor does it ask recipients to confirm that they have returned or destroyed their copies, and the government has not confirmed to Deates's counsel that any recipient has done so. (*Id.*)

## ARGUMENT

### I. THE COURT HAS AUTHORITY TO GRANT A NON-PARTY RELIEF FROM THE FALSE, REPUTATION-DAMAGING DOCUMENT THAT THE GOVERNMENT PRODUCED IN THIS CASE

#### A. Courts Entertain—and Grant—Non-Party Motions for the Exact Relief Sought Here

In *United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975), the Fifth Circuit held that the government's identifying private, uncharged individuals in a manner that damages their reputations—without affording them any opportunity to respond—violates due process, and ordered the offending references expunged notwithstanding that the affected individuals were not parties to the prosecution. As the court explained, "[t]he grand jury that returns an indictment naming a person as an unindicted conspirator does not perform its shielding function but does exactly the reverse. If the charges are baseless, the named person should not be subjected to public branding, and if supported by probable cause he should not be denied a forum." *Id*. at 803. Weighing that injury against the government's asserted interests, the court found that "[t]he Department of Justice suggests nothing that rises to the dignity of a substantial interest," *id*. at 804, and concluded that "[t]he balance tips wholly in favor of the adversely affected appellants," *id*. at 806.

The court reaffirmed and extended that relief in *In re Smith*, 656 F.2d 1101 (5th Cir. Unit A 1981), which rejected the government's argument that *Briggs* applied only to uncharged co-conspirators named by a grand jury in an indictment.[2] The Fifth Circuit

---

[2] The Eleventh Circuit adopted all decisions of the former Fifth Circuit prior to October 1, 1981, as binding precedent. *Bonner v. City of Prichard, Ala*., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). Consequently, *Briggs* and *Smith* remain binding precedent in the Eleventh Circuit as well as the Fifth Circuit.

found "no reason to distinguish between an official defamation originating from a federal grand jury or an Assistant United States Attorney," explaining that "no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights," and that *Briggs* "would be rendered meaningless if it could be so easily circumvented by the actions of an Assistant United States Attorney." *Id.* at 1106. That logic reaches at least as far as the O'Neal Memorandum at issue here, which was written by an immigration-enforcement officer and produced by the government in an unrelated case (namely, the instant case).

Directly on point is *United States v. Anderson*, 55 F. Supp. 2d 1163 (D. Kan. 1999). In *Anderson*, in addition to prosecuting two doctors, three hospital executives, and two lawyers in an alleged Medicare kickback scheme, the government named three prominent health care attorneys as "unindicted coconspirators" in pre-trial papers and at trial. *Id*. at 1165. Although the two lawyer defendants were acquitted by the court at the close of the prosecution's case, there was no similar form of redress for the three unindicted attorneys. *Id*. at 1165 n.1. "The government's identification of the movants as coconspirators was notoriously reported in the legal and healthcare community." *Id*. at 1165–66. Therefore, the three attorneys moved—in that criminal case—for "(1) an order expunging from the record all references to them as 'coconspirators' or 'unindicted coconspirators,' and (2) a finding that the proof at trial did not support the government's allegation that they participated in an unlawful conspiracy." *Id*. at 1165. The court directed the clerk to "completely and permanently strike" all such references in the

government's pretrial memorandum, while leaving undisturbed references governed by a separate evidentiary rule. *Id.* at 1170.

The *Anderson* court explained why the distinction mattered: unlike an evidentiary reference offered at trial under Federal Rule of Evidence 801(d)(2)(E), which "does not allow for the reasonable inference" that the named individual is a criminal, the government's "unqualified identification" of the movants as unindicted co-conspirators in its pretrial papers "allow[ed] for the reasonable inference that they have been labeled criminals." *Id.* at 1169–70. Nonetheless, the court denied the movants' requests to make factual findings related to their innocence because "[t]he underlying trial focused on the guilt or innocence of the named defendants and simply was not focused on the movants' guilt or innocence of any crime." *Id.* at 1170.

Here, the O'Neal Memorandum was never offered for any evidentiary purpose in this or any other proceeding; it was simply produced, unqualified, in pretrial discovery to fifteen defendants. (Deates Decl. ¶¶ 2, 15.) Under *Anderson's* own reasoning, that is the more, not the less, offensive category of naming. *Anderson*, like *Briggs* and *Smith*, confirms that a court presiding over a criminal case may grant a non-party an order correcting or removing a document that falsely brands the non-party with criminal conduct.

The Fifth Circuit reaffirmed this framework as recently as 2010. In *United States v. Holy Land Foundation*, 624 F.3d 685 (5th Cir. 2010), the court found that a non-party organization's due-process rights were violated by the government's public, unsealed pretrial filing naming it as an unindicted co-conspirator, even though the underlying

accusation served a legitimate prosecutorial purpose, because that purpose "could have been equally well-served by filing [the document] under seal."[3] *Id*. at 693. The same is true of the O'Neal Memorandum: whatever internal law-enforcement purpose it might have served, that purpose did not require producing it, without qualification or context, to counsel for fifteen defendants who have no connection to Deates. The government now concedes as much. (Deates Decl. ¶ 23, Ex. 12 at 1.)

The same practical accommodation appears in the media-access context, where courts have permitted news organizations that are strangers to a criminal prosecution to file motions directly in that case challenging restrictions on court access, notwithstanding the absence of any criminal-rule mechanism for their participation. *See*, *e.g.*, *United States v. Wecht*, 484 F.3d 194 (3d Cir. 2007). What unites *Briggs*, *Smith*, *Anderson*, and *Wecht* is a common recognition: a person's cognizable interest in material generated within a pending criminal case can be vindicated by motion in that case, regardless of whether that person satisfies the technical definition of a "party."

Deates's position is, if anything, stronger than the petitioners' in *Briggs*, *Smith*, and *Anderson*. Those cases involved allegations that the affected individuals had joined a conspiracy already charged in the case at hand. Here, the O'Neal Memorandum accuses Deates of a federal felony—aiding and abetting evading arrest—in a matter with which he has no connection whatsoever, based on an account its own author concedes was

---

[3] The *Holy Land* court ultimately held the district court did not abuse its discretion in declining to expunge the non-party organization's name from the (now sealed) attachment. *Holy Land*, 624 F.3d at 693.

missing the single fact that foreclosed the validity of the accusation in the first place—and the government then produced it to fifteen defendants and their counsel. (Deates Decl. ¶ 20, Ex. 9 at 2.) As the cases above instruct, that is a due-process violation this Court has the authority to remedy.

### B. Rule 16(d)(1) and the Court's Inherent Supervisory Authority Over Its Own Discovery Process Independently Support Relief

Federal Rule of Criminal Procedure 16(d)(1) provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1). That authority is framed as the Court's own continuing power over material exchanged in discovery in a case pending before it—it is not limited to motions filed by the government or a defendant. Good cause is present here in overflowing measure: the O'Neal Memorandum is irrelevant to any charge against any defendant in this case, as the government itself now concedes (Deates Decl. ¶¶ 2, 15, 23, Ex. 12 at 1); it is demonstrably false in its central accusation and unreliable in ancillary details such as the identity of the presiding judicial officer (*id.* ¶ 18, Ex. 6 at 1); and it has already been used to expose a sitting Assistant Federal Defender to public suspicion of a federal felony (*id.* ¶ 25). An order requiring the government to notify recipients of the error and to secure the return or destruction of copies is well within the "other appropriate relief" Rule 16(d)(1) contemplates, and well within this Court's inherent authority to supervise discovery conducted under its own case number. Indeed, the government's own September 25 letter asking recipients to return or destroy the O'Neal Memorandum confirms that such relief is appropriate; the only questions are whether that relief will be

made enforceable and whether it will be accompanied by the correction the government has so far declined to provide. (Deates Decl. ¶¶ 23–24, Ex. 12.)

## II. DUE PROCESS REQUIRES CORRECTION OF THE RECORD

The United States Constitution does not permit the government to circulate a false, stigmatizing accusation of criminal conduct against a person—particularly an officer of this Court—without any opportunity for that person to be heard. *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.").

Deates is a current Assistant Federal Defender whose excellent professional standing depends on the trust of this Court, opposing counsel, and his clients. (Deates Decl. ¶ 25.) The O'Neal Memorandum's false accusation—now in the hands of counsel for fifteen defendants who have no reason to know it is false—directly threatens that excellent standing. (*Id*. ¶¶ 2, 15, 25.) The government's September 25 letter does not lift that threat. A statement that the O'Neal Memorandum "does not reflect the position of the United States Attorney's Office" is not a statement that its accusation is false; a reader could fairly take it to mean simply that the United States Attorney's Office has not necessarily adopted the accusation, not that the accusation is untrue—leaving open the possibility that some other prosecuting authority believes it to be accurate. (Deates Decl. ¶¶ 23–24, Ex. 12.) Correcting the record is the only remedy that restores Deates to the position he occupied before the government's error, and it does so without imposing any burden on the prosecution of the underlying case.

This case differs from *Anderson* in a way that makes Deates's need for relief greater. The *Anderson* court declined to make findings about the movants' innocence because "[t]he underlying trial focused on the guilt or innocence of the named defendants and simply was not focused on the movants' guilt or innocence of any crime." *Anderson*, 55 F. Supp. 2d at 1170. There, the movants were at least alleged to have joined the conspiracy on trial. Here, Deates is not. The O'Neal Memorandum accuses him of conduct in an unrelated immigration matter, and nothing in the prosecution of the "Antifa" defendants will address, much less resolve, that accusation. Whether those defendants are convicted or acquitted, the trial cannot clear Deates's name. Only this Court's order can.

## III. THE REQUESTED RELIEF IS NARROWLY TAILORED

The relief Deates seeks tracks what his counsel already requested of the United States Attorney's Office on September 4, 2026: a notice to existing recipients that the O'Neal Memorandum was produced in error and that its allegations concerning Deates are false, and a request that those recipients return or destroy their copies. (Deates Decl. ¶ 21, Ex. 10.) It does not require disclosure of any additional material, does not touch the merits of the charges against any defendant, and does not delay these proceedings.

The government's September 25 letter confirms just how modest that relief is: the government has already conceded that the O'Neal Memorandum is irrelevant to this case and has asked recipients to return or destroy it. (Deates Decl. ¶ 23, Ex. 12.) What the government's letter omits—namely, any statement that the accusation against Deates is false, and any means of confirming that copies have in fact been returned or destroyed—

is precisely what remains necessary. (*Id.* ¶ 24.) Given that the government—after requesting and receiving additional time, and after being told expressly that retrieving the O'Neal Memorandum alone would be insufficient—chose to send a letter that leaves the false accusation uncorrected (*id.* ¶¶ 21–24, Exs. 10–12), an order of this Court is now the only mechanism reasonably available to correct the record before the O'Neal Memorandum's false accusation causes further harm.

## CONCLUSION

For the foregoing reasons, Deates respectfully requests that this Court grant his motion in accordance with his Proposed Order.

DATED: October 1, 2026

**MADEL PA**

By: *s/ Christopher W. Madel*

Christopher W. Madel (230297)
434 Lake Street
Excelsior, Minnesota 55331
Telephone: 612-605-0630
cmadel@madellaw.com

*Attorney for Matthew Deates*