**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>ISAAC AUMAN SANT, et al.,<br><br>*Defendants.* | Case No. 26-cr-115 (KMM/DTS)<br><br>**BRIEF OF AMICI CURIAE MINNESOTA CHURCHES IN SUPPORT OF DEFENDANTS' MOTION FOR DISCOVERY** |

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici curiae are three Minnesota-based churches—the First Universalist Church of Minneapolis, Hennepin Avenue United Methodist Church, and St. John the Evangelist Episcopal Church (collectively, "Amici Minnesota Churches")—each of which was directly affected by the government surveillance described in Defendants' pending motion for discovery.[1]

**First Universalist Church of Minneapolis.** The First Universalist Church of Minneapolis is an 800-plus-member faith community rooted in principles of love, justice, and radical inclusivity. For more than 160 years, the church has provided a powerful voice

[1] Defendant Sant filed a motion for discovery on August 13, 2026, ECF 212, which thirteen other defendants subsequently joined. *See* ECF 218-219. This brief refers to the motion as "Defendants' motion for discovery" and to ECF 212 as "Defs.' Mot."

Amici further state that no party or counsel for any party authored this brief in whole or in part or made a monetary contribution intended to fund its preparation or submission. No person other than amici curiae, their members, or their counsel made any monetary contribution to the preparation or submission of this brief. Before filing this brief, counsel for amici gave notice to counsel for the parties; no parties objected to the filing.

for justice in Minneapolis and beyond. Its members live out their faith by protecting the poor and oppressed, building an inclusive community, and providing a supportive space for personal and collective transformation.

**Hennepin Avenue United Methodist Church.** Hennepin Avenue United Methodist Church (HAUMC) is a Minneapolis congregation of approximately 1,000 members. It celebrated 150 years of worship in 2025. HAUMC's mission is to love boldly, serve joyfully, and lead courageously in local communities and worldwide connections. A Reconciling congregation since 1994, the church welcomes all people and embraces the diversity of its neighborhood and the world. Its members answer Christ's call to pursue justice and peace through ministries serving neighbors experiencing poverty and homelessness and through interfaith advocacy across Minneapolis.

**St. John the Evangelist Episcopal Church.** St. John the Evangelist Episcopal Church is a parish of nearly 500 active members in St. Paul's historic Ramsey Hill neighborhood, where it has worshipped since January 1881. Known as the "Church of the Open Door," the parish welcomes all who seek a deeper and more meaningful life in its community of faith. Its commitment to direct service, social justice, and advocacy spans generations. Since at least the 1970s, the congregation has supported civil rights and voting rights. Today, St. John's advocates for hunger relief, safe housing, and accessible health services in the wider community.

Amici submit this brief in support of Defendants' motion for discovery to explain the concrete harm the government's surveillance has inflicted on Minnesota's faith communities, including the apparent targeting of religious institutions and their members

because of their faith, beliefs, and constitutionally protected expression. Amici also submit this brief to underscore the First Amendment interest in obtaining a complete account of the government's surveillance through this criminal proceeding.

## INTRODUCTION

As the federal government began what ICE called "the largest immigration operation ever,"[2] Minnesotans turned to churches and other civic groups for comfort, community, and opportunities to collaborate in peaceful dissent. The government responded by deploying a surveillance dragnet against the very communities providing that support. Undercover agents attended meetings, secretly recorded conversations, logged attendees' license plates, and compiled dossiers on people engaged in lawful civic and political activity. As best amici can tell, the government did this not because it reasonably suspected those attending the meetings—or the churches that hosted them—of criminal wrongdoing, but rather because the government disagreed with the attendees' political opinions and/or religious beliefs.

Defendants now seek discovery into the full scope and basis of that surveillance. Amici strongly support that truth-seeking effort. This case concerns not only Defendants' prosecution, but also the federal government's surveillance of the broader community in which that prosecution arose. Amici offer three reasons why the Court should grant the motion.

---

[2] *2,000 Federal Agents Sent to Minneapolis Area to Carry Out 'Largest Immigration Operation Ever,' ICE Says*,
PBS (Jan. 6, 2026), https://www.pbs.org/newshour/politics/2000-federal-agents-sent-to-minneapolis-area-to-carry-out-largest-immigration-operation-ever-ice-says.

***First***, the government's surveillance harmed people and institutions far beyond Defendants. The government monitored peaceful gatherings at amici churches, and the resulting revelations have impaired their ability to worship, assemble, welcome newcomers, and advocate for their neighbors. The churches have incurred additional security costs, altered their operations, and seen members withdraw from in-person participation. They also reasonably fear that the disclosed reports reveal only a fraction of the surveillance. Accordingly, they have a direct interest in ensuring that the production of discovery to Defendants fully captures the scope of the federal government's surveillance, including surveillance that has not yet been disclosed.

***Second***, amici have a strong First Amendment interest in an open criminal proceeding. The public must be able to evaluate whether the government used its prosecutorial power to target people and organizations for constitutionally protected expression. Discovery is an essential first step. It will allow Defendants to develop the factual record necessary to test the government's conduct in open court, including through motions to dismiss for selective prosecution and outrageous government conduct.

***Third***, this case presents an important opportunity to create a meaningful historical record. The surveillance of religious congregations and civic organizations is not an isolated phenomenon. Rather, it is part of a recurring history of government monitoring political and religious movements with which it disagrees. A complete record can expose the scope of that conduct, facilitate meaningful public scrutiny, and help prevent its recurrence.

## ARGUMENT

### I. The Government's Surveillance Harmed Amici and Their Congregations.

#### A. The government surveilled peaceful and lawful gatherings hosted by all three amici churches.

The limited discovery produced to date establishes that the federal government surveilled each of the amici churches during Operation Metro Surge.

***First Universalist.*** On December 13, 2025, an undercover agent attended a meeting hosted at First Universalist by the Sunrise Movement. ECF 212-12 at 3. The agent's report identifies no crime planned or discussed. To the contrary, the report records that organizers described themselves as nonviolent. Nevertheless, the agent concluded that "further attendance was determined to be necessary to rule out violations of law." *Id*. at 4.

The report also identifies this peaceful church gathering as part of the justification for Operation Puppet Master—even though the operation did not formally open until six weeks later. *Id.* at 1–2. That six-week gap is significant. The government is attempting to recast an earlier, entirely peaceful gathering as justification for a surveillance operation launched weeks afterward. But the timing undermines that explanation: rather than demonstrating that the gathering gave rise to a legitimate investigative need, the report suggests that the government retroactively invoked peaceful civic and political activity to justify an operation that subjected a much broader segment of civil society to surveillance. In other words, the report identifies no objective basis for investigating First Universalist or the Sunrise Movement. Instead, it suggests that the government treated peaceful political organizing as grounds for continued surveillance.

***HAUMC.*** On February 26, 2026, at least nine HSI agents spent the day conducting "pattern of life" surveillance of individuals under investigation. ECF 231-1 at 2. Agents followed one individual to HAUMC, where they watched him meet several people who arrived in separate vehicles and load signs reading "ICE OUT" into his truck. *Id.* at 3. Agents photographed the church, the individuals, and the vehicles outside. *Id.* at 3, 16, 22. They also ran a records check on at least one vehicle and identified the registered owners of four vehicles in their report. *Id.* at 3.

The report identifies no unlawful activity at HAUMC. The conduct the government describes—meetings at a church and preparing protest signs—is protected First Amendment expression.

***St. John the Evangelist.*** On April 14, 2026, HSI agents established surveillance around St. John's while an undercover agent attended a meeting inside the church hosted by Direct Action Minnesota. ECF 212-17 at 2. Agents drove into a nearby parking lot designated for attendees, filmed their vehicles, and ran registration checks on each one. *Id.* The surveillance lasted more than two and a half hours. *Id.* The report identifies no unlawful conduct by anyone attending the meeting.

### B. Amici reasonably fear that the government may have conducted additional, undisclosed surveillance of them.

Amici do not know whether the publicly filed documents comprise the complete record of the government's surveillance of them. For example, the government has acknowledged withholding at least five Project Whipple Shield reports, which may contain additional evidence of the government's surveillance of these peaceful faith communities.

Def. Mot. at 22. The disclosures also do not account for all undercover activity in the community. *Id.* at 21. Nor do amici know whether their congregants were photographed, identified, tracked, or entered into government databases, or whether additional reports about their congregations remain in other investigative files. Given the government's documented surveillance of their churches and similar gatherings throughout Minnesota, amici have good reason to believe that the records disclosed to date may be incomplete.

***First Universalist***. ICE openly surveilled First Universalist during a memorial service on January 10, 2026. In addition, between November 2025 and April 2026, First Universalist hosted dozens of events challenging ICE's practices. These included regular discussions of ICE at monthly community dinners and Sunday worship services, as well as at least 20 gatherings that were similar to the December 13 meeting that HSI surveilled. The groups First Universalist hosted included South Uptown Mutual Aid Society, Monarca Action, and the Singing Resistance. Three days before federal agents killed Alex Pretti on January 24, 2026, moreover, First Universalist hosted faith leaders from across the country to train participants on responding to ICE activity in their own communities.

***HAUMC.*** HAUMC hosted similar gatherings. On January 7, 2026, the day federal agents killed Renée Good, the church hosted a previously scheduled Monarca legal observer training. The training went forward, and the church made space for attendees to light candles, grieve Good's death, and name their resistance to oppression. On January 24, the day agents killed Alex Pretti, the church hosted a Singing Resistance event that drew 1,400 people to sing, lament, and raise funds for impacted neighbors. The church also

opened its space to a national gathering of clergy and to a national gathering of activists learning peaceful resistance.

***St. John the Evangelist.*** St. John's likewise opened its doors to neighbors affected by immigration enforcement. During Operation Metro Surge, the church's justice team met after worship each week to organize support for community members affected by ICE. Those meetings regularly drew over 40 people. The church also hosted outside groups for community gatherings and know-your-rights trainings. And on the night federal agents killed Alex Pretti, more than 200 people, many with no connection to the parish, gathered in the church for a candlelight vigil.

Given the government's documented interest in similar gatherings, amici cannot assume that the three events cited in Section I.A were the only events the government monitored or surveilled. Indeed, the churches' peaceful advocacy efforts appear to be exactly the kinds of activities that the Administration labels "extremism on migration, race, and gender" and that the government's investigation targeted. *See* National Security Presidential Memorandum-7, Countering Domestic Terrorism and Organized Political Violence, 90 Fed. Reg. 47225-226 (Sept. 25, 2025) ("NSPM-7"). Amici thus reasonably fear that the government monitored more of their activities than the records disclosed to date reveal.

### C. The surveillance has chilled amici's ability to worship, assemble, and speak.

Surveillance of a congregation is not an abstract harm. When congregants "refuse to attend church services because they fear the government is spying on them," or otherwise

change their behavior, the church suffers an injury "because its ability to carry out its ministries has been impaired." *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989). That is precisely what happened here. Since the government's surveillance began, amici and their congregants have changed how they assemble, speak, worship, and engage with their communities.

***First Universalist***. At least one congregant resigned after news of the surveillance in this case became public because they no longer felt safe attending church. Others now only attend online services and meetings. The church hired an additional security guard, trained congregants on security procedures, and held several lengthy consultations with a security company. Whereas multiple entrances were previously open during the day, the church now keeps all but one door locked. It also asks visitors entering through that door why they are at the church.

These precautions impose a direct burden on First Universalist's religious mission. Radical hospitality and an open door are theological commitments for First Universalist. Requiring newcomers to identify themselves—and making congregants wonder whether a visitor is an undercover agent—undermines those commitments. As Senior Minister Reverend Jen Crow explained: "We're not as open as we used to be. Which isn't who we are."

The surveillance also burdens a core element of the Unitarian Universalist faith: dissent in the service of justice. In 1966, the Unitarian Universalist Association formally supported nonviolent civil disobedience as a means of working towards racial justice. Unitarian Universalist Assoc., *Consensus on Racial Justice*, 1966 Business Resolution

(July 1966), https://www.uua.org/action/statements/consensus-racial-justice. The church's resolution affirmed that "[i]ndividuals should be defended in their right to engage in nonviolent demonstrations and should be supported in the exercise of their moral choice to engage in responsible civil disobedience for greater racial justice." *Id.* The faith likewise calls for church facilities to be available to speakers with "diverse viewpoints to express themselves publicly." Unitarian Universalist Assoc., *Explainer: The UU Origins of Civil Disobedience*, In Good Faith (Jul. 23, 2026), https://www.uua.org/pressroom/ingoodfaith/civil-disobedience-thoreau-uu. By placing an undercover agent in a church meeting without an apparent criminal predicate, the government intruded into and burdened First Universalist's ability to provide the open forum its religious principles demand.

***HAUMC.*** HAUMC suffered similar harms. The church did not learn that federal agents had photographed its building and the vehicles outside until the discovery in this case became public. But the fear of federal intrusion had already reshaped its ministry. One family canceled their child's planned baptism and moved it to another church because relatives did not feel safe attending the church. Staff and volunteers at the Dignity Center, the church's ministry for neighbors experiencing poverty and homelessness, constantly had to keep an eye on the street for SUVs and masked agents. The church also diverted scarce resources to training staff on how to respond if ICE arrived, and increased its financial generosity to guests who were afraid of ICE.

HAUMC adopted extraordinary security measures as well. The Dignity Center kept its front doors locked, trained greeters only to answer the bell, and required greeters to ask each visitor their reason for entry. The church also posted signs declaring certain areas

private property "not authorized for staging, processing, operations, or similar uses for civil immigration enforcement," something it had never done before. As at First Universalist, these barriers cut against the Dignity Center's—and HAUMC's—mission. A ministry built on opening its doors to neighbors in need now must screen the people who knock.

The surveillance also constrained HAUMC's public witness. The church's guiding practices are "Reverence. Resistance. Repair." Hennepin Avenue-United Methodist Church, *About Us*, https://haumc.org/about/. Yet staff members had to weigh every public statement supporting immigrant neighbors against the risk of making HAUMC a government target. As the church explained, "We did not feel like we had freedom of speech without fear of federal retaliation" and were "keenly aware of possible surveillance." In the words of the church's lead pastor, "the trauma of this time still lives in my bones." The records show that this fear was not speculative: federal agents were photographing the church and the people gathering there. The government's surveillance thus imposed a tangible cost on the church's ability to speak and act consistently with its faith.

***St. John the Evangelist.*** St. John's has long been known as the "Church of the Open Door." After Operation Metro Surge began, it had to close that door. The church installed security cameras and, for the first time, began locking its doors on weekdays and admitting visitors only by buzzer. Volunteers monitored the entrance to screen visitors, and, like HAUMC, the church posted "no immigration enforcement permitted" signs, another first. As the parish's executive administrator wrote, "I am mourning the loss of the physical open door that I so strongly associate with St. John's." Sarah Dull, *The Church of the Open Door*

(Mar. 3, 2026), https://stjohnsstpaul.org/e-vangelist/the-church-of-the-open-door/. Those concerns proved well founded. As the discovery in this case later revealed, federal agents staked out a meeting at the church and ran registration checks on attendees' cars.

**D. The government also surveilled other churches and civic organizations.**

Amici are not outliers. The discovery produced to date reveals a broader effort to monitor houses of worship and civic institutions whose members opposed federal immigration enforcement.

An undercover agent joined a boxing class at University Baptist Church in Dinkytown, Minneapolis. ECF 212-19 at 2. At Prince of Peace Lutheran Church in Roseville, agents recorded the license plates of people attending a meeting in a church meeting room. ECF 212-21. They used those plates to identify attendees, searched social media for their photographs, and compiled an "intel workup" containing each person's name, photograph, address, family members, employer, and vehicle registration. Defs.' Mot. at 11. Agents also followed Minnesota activists to Ann Arbor, Michigan, where an undercover agent attended their presentation at Zion Lutheran Church, and recorded the names of church members who helped host it. ECF 212-18 at 1–2. These reports identify no criminal conduct by the people whose identities the government collected. Rather, they demonstrate that the government was actively surveilling individuals and institutions engaged in protected First Amendment activity, and raise serious questions about whether that surveillance continues.

The surveillance extended well beyond houses of worship. Agents attended meetings at the United Labor Center, a public library, and a city park. Defs.' Mot. at 9.

They monitored a No Kings protest and an antiwar rally unrelated to Operation Metro Surge. *Id.* at 12. The government also used administrative summonses to obtain years of financial records from labor unions, including the Service Employees International Union and the Communications Workers of America, while instructing at least one bank not to disclose the summonses "for an indefinite period of time." *Id.* at 7 & n.2. In the grand jury, the government suggested that organizations including the AFL-CIO, the Minneapolis Federation of Educators, and Veterans for Peace were part of a criminal conspiracy, on the theory that some individuals belonged both to those organizations and to Direct Action Minnesota. *Id.* at 2, 5–6.

The common thread in these activities is not any identified criminal conduct by the organizations. It is their association with people and movements opposing the government's immigration policies.

The investigation's opening documents reinforce that concern. The government described its objective as integrating undercover agents into "groups, organizations, or other gatherings identified . . . as potentially threatening to law enforcement personnel" and identifying "funding sources, organizational structures, and predicate actions behind these campaigns." *Id.* at 4. HSI cited NSPM-7 as authority to open the investigation, and Project Whipple Shield reports state that the investigation was opened "[i]n accordance with" NSPM-7. *Id.* at 2; ECF 212-21 at 1. NSPM-7 directs investigation of the "organized structures, networks, entities, organizations, funding sources, and predicate actions" behind movements the federal government associates with opposition to "traditional American views on family, religion and morality" and to "border control." Def. Mot. at 12–13.

The government's own case agent testified that federal law requires that "no one is ever investigated or looked at or even researched on for First Amendment protected activities," and that, under the law, there must be a "criminal predicate" for "[e]very single individual that" the government investigates. *Id.* at 12. That categorical assurance is difficult to reconcile with reports documenting surveillance of churches, meetings, and peaceful gatherings without identifying any unlawful activity. At a minimum, this critical discrepancy between what the law requires and what the government's reports currently demonstrate warrants discovery. The Court should not accept the government's characterization of its investigation without permitting Defendants to examine the underlying evidence.

## II. The Court Should Grant Defendants' Motion to Protect Amici's Strong First Amendment Interest in Full Disclosure of the Government's Surveillance.

Amici do not recount these experiences simply to call attention to their own injuries. They do so because the government's surveillance affected Minnesotans writ large. That community has a substantial interest in understanding how and why its institutions and members of those institutions became investigative targets. The First Amendment protects the public's ability to scrutinize criminal proceedings and evaluate the exercise of government power. Granting Defendants' motion is an essential step toward effectuating that right.

### A. The First Amendment protects public access to criminal proceedings.

The U.S. Supreme Court has long recognized a First Amendment right of public access to criminal proceedings. The freedoms guaranteed by the First Amendment "share a common core purpose of assuring freedom of communication on matters relating to the

functioning of government." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (plurality opinion). Few matters are more important to the public than "the manner in which criminal trials are conducted." *Id.*

Openness serves concrete constitutional purposes. It "g[ives] assurance that the proceedings were conducted fairly to all concerned, and it discourage[s] perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Id.* at 569 (citing M. Hale, *The History of the Common Law of England* 343–45 (6th ed. 1820); 3 W. Blackstone, *Commentaries* *372–73). The Court endorsed Jeremy Bentham's observation that "[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *Id.* (quoting 1 J. Bentham, *Rationale of Judicial Evidence* 524 (1827)).

The common law right of access serves the same purposes. It reflects "the citizen's desire to keep a watchful eye on the workings of public agencies." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). The Eighth Circuit likewise recognizes that access "bolsters public confidence in the judicial system by allowing citizens to evaluate the reasonableness and fairness of judicial proceedings, and to keep a watchful eye on the workings of public agencies." *IDT Corp. v. eBay*, 709 F.3d 1220, 1222 (8th Cir. 2013). It also provides public accountability for a judicial system funded by the public. *Id.*

These principles carry particular force here. The prosecution arose against a backdrop of government surveillance of churches and civic organizations engaged in peaceful dissent. The public has a compelling interest in knowing whether that surveillance

was justified by legitimate law enforcement objectives or instead targeted constitutionally protected activity.

**B. The First Amendment right of public access extends to pretrial proceedings.**

The right of access is not confined to trials. Under the Supreme Court's "experience and logic" test, courts ask whether the proceeding has historically been open to the public and whether public access plays a significant positive role in its functioning. *Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8–9 (1986). When both requirements are satisfied, a qualified First Amendment right of access attaches. *Id.* at 9.

Courts have applied that test to numerous criminal proceedings, including jury voir dire and suppression hearings. *See United States v. Brooklier*, 685 F.2d 1162, 1167–71 (9th Cir. 1982). Courts of appeals have also recognized a First Amendment right of access to documents filed in criminal cases, including motions to dismiss and motions to compel discovery. *In re Time Inc.*, 182 F.3d 270, 271 (4th Cir. 1999); *see also Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991) (plea agreements). The common law also independently protects a general right to inspect and copy judicial records. *Nixon*, 435 U.S. at 597; *IDT*, 709 F.3d at 1222.

The Eighth Circuit has specifically recognized that this right of access extends to material integral to the prosecution, even when the proceedings arise before trial. In *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569 (8th Cir. 1988), the Eighth Circuit recognized a First Amendment right of access to search warrant application materials because, although a warrant proceeding is itself not a criminal trial,

it is "certainly an integral part of a criminal prosecution." *Id.* at 573. Search warrants are central to suppression hearings, which often determine the outcome of prosecutions. *Id.*

The same logic applies here. Defendants seek materials bearing directly on the legality and motivation of the investigation and on the viability of the prosecution itself. Those materials may form the basis of motions to dismiss and, if filed, will become central judicial records.

### C. The values underlying the First Amendment right of public access favor granting Defendants' motion.

Amici do not ask the Court to order public disclosure of every document produced in discovery. That question is not yet ripe, and unfiled discovery is not itself a traditionally public judicial record. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984). The narrower question now is whether the government may prevent Defendants from obtaining evidence necessary to develop a record that can later be tested in open court. Under Federal Rule of Criminal Procedure 16(d)(1), the Court has broad authority to regulate discovery. The values underlying the First Amendment right of access should inform the exercise of that authority here. Three considerations strongly favor disclosure.

***First, discovery is the gateway to the public record***. Under *Gunn*, the logic of access follows materials that shape the outcome of a prosecution. The materials Defendants seek will inform their anticipated motions to dismiss for selective prosecution and outrageous government conduct. Those motions, supporting evidence, and resulting decisions will be presumptively accessible judicial records. *See Time*, 182 F.3d at 271.

Without discovery, there may be no meaningful public record to examine. If the government can withhold the evidence now, Defendants may be unable to establish the factual basis for their challenges, and the public may never learn how the government selected its targets, deployed its agents, and used the information it collected. The Court's ruling will therefore help determine whether the government's surveillance and the basis for this prosecution can ever be meaningfully tested in open court.

***Second, the core values of transparency are directly implicated***. *Richmond Newspapers* emphasized that openness discourages "perjury, the misconduct of participants, and decisions based on secret bias or partiality." 448 U.S. at 569. Each concern is present here.

The concern about inaccurate testimony is concrete: the government's case agent testified that every investigated individual had a criminal predicate, yet the disclosed reports document surveillance of peaceful church gatherings without identifying unlawful conduct. Def. Mot. at 12. The requested discovery is necessary to test that testimony against the complete investigative record.

The documents may also reveal whether misconduct or discriminatory bias influenced the investigation: which congregations and organizations were selected for surveillance, who authorized undercover agents in houses of worship, what instructions those agents received, and how the government used the information collected. These are not peripheral questions. They go directly to whether the investigation and prosecution were motivated by protected political or religious expression. *See Wayte v. United States*, 470 U.S. 598, 608 (1985) (selective prosecution requires a showing of discriminatory effect

and discriminatory purpose). The public has a substantial interest in ensuring that these questions are resolved through judicial scrutiny rather than left to the government's own account of its conduct.

***Third, the government should not be the sole judge of what is relevant.*** Thus far, the government has determined which reports it considers related to this case. It has withheld at least five Project Whipple Shield reports on the ground that they concern "a separate investigation." Def. Mot. at 22. But the government's characterization cannot substitute for independent judicial review, particularly where the investigations appear to overlap in their targets, methods, and stated objectives.

The federal government has also faced criticism for withholding information about its actions during Operation Metro Surge from local officials and the media. *See, e.g.*, *Trump Administration Stopped Sharing Evidence in Good and Pretti Killings, Minnesota Officials Say*, PBS (Oct. 23, 2026), https://www.pbs.org/newshour/nation/trump-administration-stopped-sharing-evidence-in-good-and-pretti-killings-minnesota-officials-say. Against that backdrop, allowing the government alone to decide which investigative records Defendants may examine would compound the very transparency concerns that make discovery necessary.

Amici recognize that some materials may warrant protection. The First Amendment right of access is qualified, and courts have protected legitimate interests, including ongoing investigations. *See Gunn*, 855 F.2d at 574–75. But those interests call for tailored safeguards—not categorical withholding based solely on the government's say-so.

Protective orders, redactions, and *in camera* review can protect sensitive information while allowing Defendants to obtain the evidence necessary to challenge the prosecution.

## III. The Court Should Also Grant Defendants' Motion to Ensure There Is as Complete a Historical Record of the Government's Surveillance as Possible.

The surveillance at issue belongs to a well-documented history of federal law enforcement monitoring religious, civil rights, labor, and political organizations because of their opposition to government policies. A complete record matters not only to this prosecution, but also to the public's ability to understand and prevent the recurrence of such abuses.

In 1976, the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities (the "Church Committee") found that federal agencies had investigated Americans for decades based on their political views. It concluded that "[t]oo many people have been spied upon by too many Government agencies and too much information has been collected." S. Rep. No. 94-755, bk. II, at 5 (1976). Through its COINTELPRO programs, the FBI unlawfully surveilled and sought to disrupt civil rights organizations, antiwar groups, and other lawful political movements. *Id.* at 10–12.

Religious leaders and congregations were among the targets. The FBI wiretapped and bugged Dr. Martin Luther King, Jr., a Baptist minister, and the Southern Christian Leadership Conference, an organization largely founded by Black churches and clergy. *See* S. Rep. No. 94-755, bk. III, at 79–184 (1976) ("Dr. Martin Luther King, Jr., Case Study"). The FBI also kept extensive files on labor organizers, including Cesar Chavez and the United Farm Workers. Alan C. Miller, *FBI Spied on Cesar Chavez for Years, Files Reveal*,

L.A. Times (May 30, 1995), https://www.latimes.com/archives/la-xpm-1995-05-30-mn-7622-story.html.

The pattern continued even after the Church Committee's reforms. In the 1980s, the Immigration and Naturalization Service sent informants into Arizona churches that sheltered Central American refugees, recording worship services and Bible studies. *Presbyterian Church*, 870 F.2d at 520–21. The churches alleged that the agents acted without a warrant or probable cause. *Id.* at 521. Similarly, after September 11, 2001, the New York City Police Department mapped and monitored mosques, Muslim-owned businesses, and Muslim student associations across the region, including in New Jersey, without suspicion of wrongdoing. *Hassan v. City of New York*, 804 F.3d 277, 285–86 (3d Cir. 2015). As the Third Circuit observed, "[w]e have been down similar roads before," referring to the treatment of Jewish Americans during the Red Scare, African Americans during the Civil Rights Movement, and Japanese Americans during World War II. *Id.* at 309.

The U.S. Supreme Court has repeatedly warned against this pattern. It has recognized that "[h]istory abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies." *United States v. U.S. Dist. Ct. (Keith)*, 407 U.S. 297, 314 (1972). And it cautioned that "[t]he danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.'" *Id.*

The surveillance here raises precisely those concerns. The government invoked a presidential memorandum addressing "domestic terrorism" and its "funding sources" while

monitoring churches, civic organizations, and individuals engaged in opposition to federal immigration policies. Def. Mot. at 12–13. As in earlier episodes of unlawful government surveillance, the asserted national-security rationale risks sweeping protected expression and association into the government's investigative net.

History also demonstrates why litigation and public scrutiny matter. The full scope of past surveillance abuses often emerged only through lawsuits, congressional investigations, and public reporting. Without a complete record here, the public may never know whether the government used its investigative powers to monitor constitutionally protected religious and political activity, how extensive that monitoring became, or who authorized it.

The requested discovery will help ensure that the government's latest dragnet surveillance effort does not remain obscured by incomplete investigative files and government-selected disclosures. It will permit Defendants to test the government's conduct, allow the Court to evaluate the evidence, and preserve a record through which the public can understand what happened. The importance of that record extends beyond this prosecution: it will help ensure that the surveillance of religious congregations and civic organizations engaged in peaceful dissent is subject to meaningful judicial and public scrutiny.

## CONCLUSION

For the reasons set forth above and based on the entire record in this matter, amici respectfully urge the Court to grant Defendants' motion for discovery.

DATED: November 18, 2026

Respectfully submitted,

*<u>/s/ Alicia Granse</u>*
Alicia Granse (MN #0400771)
Anderson Tuggle (MN #0400277)
Chelsea Walcker (MN#0396792)
Irina Vaynerman (MN #0396759)
**GROUNDWORK LEGAL**
1650 West End Blvd., Suite 100
St. Louis Park, MN 55416
(612) 208-9349
alicia@groundworklegal.org
anderson@groundworklegal.org
chelsea@groundworklegal.org
irina@groundworklegal.org

*Attorneys for Amici Curiae Minnesota Churches*