UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

Plaintiff,

v.

Isaac Sant,

Defendant.

Court File No. 26-cr-115 (KMM/DTS)

**DEFENDANT'S
POST-HEARING BRIEF**

---

## INTRODUCTION

Defendant has filed a Motion for Discovery seeking disclosure of seven different categories of discovery. *See* ECF 212 at 21-26. One of those categories includes documents related to Certified Undercover Operation ("CUC") Keyhole. *Id.* at 23. Per the government, CUC Keyhole is a funding mechanism through which HSI can pay for the expenses of specific undercover operations. On October 20, 2026, the Court held an evidentiary hearing at which HSI Assistant Special Agent in Charge Joshua Brenner testified regarding the scope and operations of CUC Keyhole. Brenner's testimony confirmed that documents related to the authorization of Operation Puppet Master and Project Whipple Shield under CUC Keyhole, and the oversight of those operations by Keyhole supervisors, are discoverable under Rule 16 and *Brady/Giglio* and should be produced.

Despite his role as overseer of Keyhole – and the investigations it funds – Brenner could provide little detail about what the undercover agents ("UCAs") staffing Puppet Master and Whipple Shield were actually doing or why they were doing it. Brenner testified

that Puppet Master and Whipple Shield were authorized for Keyhole expenditures because they fell within the "financial crimes" category of investigations that Keyhole was approved to fund. But he could not explain what financial crimes had been committed that supported Keyhole funding authorization, nor has the government produced any discovery (at least none Defendant has seen) even suggesting any such financial crimes were being committed at the time Puppet Master and Whipple Shield were authorized.

Discovery produced by the government has confirmed, however, that UCAs funded by Keyhole engaged in widespread unconstitutional surveillance and "intelligence gathering" of protesters and others engaged in protected First Amendment activity – something prohibited by DHS policy and outside the scope of Keyhole's approved investigative activities. Thus, documents and communications related to Keyhole authorization, and oversight, of Puppet Master and Whipple Shield will either show: (1) that UCAs operated outside the scope of what was approved by Brenner and other Keyhole supervisors, or (2) that those same supervisors authorized and ratified UCA surveillance of First Amendment protected conduct. Either way, this evidence will be helpful to the defense and constitutes classic impeachment material, and it should therefore be produced.

## BACKGROUND

### I. THE HEARING TESTIMONY.

#### A. CUC KEYHOLE AUTHORIZATION.

The government called Agent Brenner to testify at the evidentiary hearing. Brenner is an Assistant Special Agent in Charge in HSI's Saint Paul office. Tr. 54:9-13. Brenner has held that position since Fall 2025. Tr. 56:1-7. Brenner's duties as ASAC include serving as "administrative overseer" of CUC Keyhole. Tr. 55:12-18. As administrative overseer, Brenner "oversee[s] the day-to-day operations" of Keyhole. Tr. 55:16-18. CUC operations like Keyhole are governed by an Undercover Operations Handbook. Tr. 74:17-21. Brenner uses the Handbook as "a reference guide and a guiding principle" in conducting his oversight. Tr. 74:29-75:1.[1]

Brenner testified that CUC Keyhole was initially certified in 2008 and has been operating continuously since then. Tr. 64:12-14. It is subject to reauthorization every six months. Tr. 64:7-11. Per Brenner, CUCs are certified for broad categories of investigation. *Id.* In the most recent reauthorization periods, Keyhole has been certified for "financial, cyber, and narcotics" investigations. *Id.*

Brenner testified that St. Paul personnel prepare a CUC recertification proposal when the time for recertification occurs. The proposal is sent to the U.S. Attorneys' office for concurrence, and then is sent to DHS headquarters for review and approval, where

[1] A publicly available version of DHS' Undercover Operations Handbook is attached as Ex. 1. It is unclear whether this version has been superseded by a newer Handbook. Nonetheless, the rules and guidelines it contains are consistent with Agent Brenner's testimony about the rules and guidelines governing CUC operations.

senior leadership has final approval and sign-off of the recertification. Tr. 65:13-21. HSI maintains the records related to the proposal and approval of CUC operations. Tr. 89:10-90:7. Undercover investigations must fall within the proper scope of the CUC to be approved for use of CUC funds. Tr. 115:20-116:11.

As administrative overseer, Brenner's role includes ensuring any undercover operation is properly authorized under Keyhole before dispensing CUC funds. Tr. 75:19-23. This includes ensuring that any investigations involving "sensitive circumstances" as defined by DHS receive the appropriate additional scrutiny and special authorization from DHS management. Tr. 75:24-76:3; 86:22-87:1; 88:2-5. Per Brenner, an undercover investigation encompassing a religious or political organization would fall within DHS's definition of "sensitive circumstances." Tr. 88:6-9. This is consistent with the definition of "sensitive circumstances" in the publicly available version of DHS' Undercover Operations Handbook. *See* Ex. 1 at 205-206 (defining "sensitive circumstances" to include "an investigation of possible criminal conduct by any . . . religious organization, political organization, or the news media").

Brenner testified that he received an email proposal to include Project Whipple Shield under CUC Keyhole in December 2025. Tr. 110:19-111:1. Per Brenner, it was framed as "a request to conduct undercover activity." Tr. 111:6-9. This testimony is inconsistent with Project Whipple's case opening memorandum, which indicates it was opened on February 11, 2026. ECF 212-2. Brenner nonetheless testified he met in November or December 2025 with HSI supervisory agent David Whalen, and the investigating undercover agent proposing Project Whipple Shield, to discuss the nature and

purpose of the request. Tr. 113:18-114:5. Brenner recalled that Operation Puppet Master was opened and authorized under Keyhole in January 2026, consistent with the case opening memorandum for that investigation. Tr. 83:2-18; ECF 212-1.

Brenner testified that Operation Puppet Master did not involve any "sensitive circumstances" and thus was not subject to the requisite heightened review for such operations. Tr. 86:15-21. Brenner testified that Operation Puppet Master was initiated "as a financial investigation," because "there was information that was received that the agitators were being funded from outside sources and their funding source was not of their own means." Tr. 57:23-58:2. Brenner stated: "the agitators that were being investigated in this case were the people that were protesting in and outside the Whipple Building." Tr. 58:8-10. Defendant has not seen any discovery even suggesting, let alone confirming, that "agitators" protesting outside the Whipple Building were "being funded from outside sources."

Brenner offered a slightly tortured explanation of how the "agitators" being investigated pursuant to Puppet Master and Whipple Shield were committing "financial crimes" such that Keyhole funds could be used to pay for their undercover surveillance:

> Q. What information was presented to you to identify this as being a potential financial crime?
>
> A. The funding mechanisms, whether people were using Paypal or Waymo or any other source of funding, they would begin to violate the financial aspects of it, the outside funding sources, whether it be from, you know, charity sources or other means.
>
> Q. But sending somebody a wire or money over Venmo isn't a crime in and of itself, right?

A. No.

Q. So how would you guys have got to the point where you were allowing Keyhole to help with Puppet Master and Whipple Shield under the financial side of this?

A. Well, all of those aspects go through the banking systems, which would then make it illegal if they were using illicit funds to fund illegal activity.

Q. Okay. And what type of illegal activity are you talking about here?

A. That of the crimes that they were committing.

Q. Okay. But how are they committing them.

A. (No response.)

Tr. 59:2-22.

### B. CUC OVERSIGHT

Brenner testified that his role as Keyhole's administrative overseer includes oversight of undercover agents to ensure they are in compliance with undercover policies and procedures, and that any CUC money spent by the agents is necessary and reasonable for the undercover operation. Tr. 76:4-11. The Special Agent in Charge ("SAC") also has specific duties with respect to undercover investigation oversight. This includes ensuring that the appropriate federal prosecutor is consulted on a continuing basis with respect to the legal sufficiency and quality of evidence being produced by an undercover operation. Tr. 76:12-25. The SAC has the ultimate responsibility to ensure that undercover activities and operations are conducted and supervised in compliance with the Undercover Operations Handbook. Tr. 77:8-13. This means that the SAC is responsible for periodic review of the conduct of the UCAs participating in an undercover operation. Tr. 78:14-21.

Brenner regularly communicated with the SAC regarding Keyhole, and he maintained those communications. Tr. 90:9-18.

In addition to SAC and ASAC supervision of an undercover operation, there is also a "CUC Lead" who serves as the group supervisor of the UCAs in a given operation. Tr. 80:21-4. The CUC Lead ensures that all required records of the undercover operation are established and properly maintained. Tr. 80:21-24. The CUC Lead also performs day-to-day supervision of the undercover operation. Tr. 80:25-81:2

CUC funds come from appropriated sources, as well as through funds collected during undercover work not subject to the normal cash seizure process. Tr. 64:7-70:14. Brenner used the "CUFFS" accounting system to maintain records of Keyhole expenditures. Tr. 92:16-23. Brenner testified that one of the Operation Puppet Master UCAs operated a shell company called Midwest Transfer Companies LLC, and that other monies may have flowed into that company and out of that company that ended up being distributed as part of Operation Puppet Master. Tr. 105:5-12.[2]

Brenner testified that Puppet Master and Whipple Shield spent roughly $8,000 on items including rental cars, travel expenses, specialized radio equipment and other materials. Tr. 56:19-57:13. The government has produced purported receipts from Keyhole

[2] This was UCA 9843, whose undercover laptop included a file of documents related to Midwest Transfer Companies LLC. *See* Ex. 3. UCA 9843 was among the most active UCA involved in Operation Puppet Master, and as early as December 2025 was surveilling numerous community groups and protest gatherings, as well as collecting hundreds of Signal chat screenshots of obviously First Amendment protected activity and communications. *See, e.g.,* 212-12, 297-3, 297-21, 297-22, 297-23; *see also* Def. Ex. 20 (submitted to chambers via USB drive) at Lines 5274, 6146, 6167, 6329, 6348, 39424, 72637.

related to Puppet Master and Whipple Shield, though some are illegible. *See* Ex. 2. Brenner testified that no Keyhole funds were used to investigate "agitators" prior to the initiation of Operation Puppet Master, which is inconsistent with his testimony that he authorized Keyhole funds for use in Project Whipple Shield more than a month before Operation Puppet Master was initiated. Tr. 92:24-93:7.

Despite his oversight responsibility – and specific duty of ensuring all expenditures were reasonable and necessary to the undercover operation – Brenner claimed to have no knowledge of the operations of Puppet Master and Whipple Shield and seemed to have no idea what the undercover agents were actually doing. For example, he could not explain why thousands of Keyhole dollars were spent on travel expenses for an undercover agent in from Utah, let alone confirm that these expenditures were reasonable and necessary more than a month after the Indictment in this case was unsealed. Tr. 91:1-9; 95:10-21; Ex. 2 at 7 (listing July 2026 travel expenses for Utah undercover agent). Brenner could not even identify which agents were in charge of the day-to-day operations of Puppet Master or Whipple Shield during Metro Surge. Tr. 80:5-14.

Brenner testified that the UCAs operating under Keyhole authorization did not gather "intel" on protesters unless they were collecting evidence related to a criminal investigation. Tr. 92:18-98:15. But that testimony is at odds with the copious discovery already filed as exhibits to Defendant's discovery motion, which shows widespread undercover surveillance of peaceful, lawful protest activity and political organizing around the Twin Cities during Operation Metro Surge. *See, e.g.,* ECF Nos. 212-11 through 212-20; 297-2; 297-3; 297-17.

This testimony from Brenner is also inconsistent with evidence that DHS leadership directed DHS personnel, including UCAs, to collect information on protesters to be fed into an internal DHS database.[3] Specifically, agents were instructed to gather information and input it into a specific form entitled "INTEL COLLECTION – Non-Arrests," which included narrative summaries of protest activity, descriptions of protesters, and the uploading of "pictures, identifications, license plates, social media pictures describing protests, etc." ECF 297-13; Ex. 4 at 16, n. 84 (describing direction from HSI to Minnesota agents to use the INTEL COLLECTION form "to capture all images, license plates, identifications, and general information on hotels, agitators, protesters, etc.," with the goal to collect this information "in one consolidated form and not just blindly dump [it] into signal chats").[4]

---

[3] Notably, this "intel collection" on protesters, as well as much of the UCA activity conducted under the Keyhole authorization violates DHS' stated prohibition on collecting and maintaining: "Information about an individual's associations with others for lawful purposes, including participation in protests or other non-violent demonstrations against government policy or actions." ECF 271-1 at 2.

[4] *See also* ECF 297-14 (sworn declaration from a legal observer describing an incident in which an agent "took a photo of my license plate and a photo of my face and said that I would be added to a list of domestic terrorists"); ECF 297-15 (explaining that, "in Minnesota, HSI agents maintained an official 'Agitator Master List' with personal details about individuals viewed as protesting or observing ICE operations").

## ARGUMENT

### I. DEFENDANT SEEKS DISCOVERABLE INFORMATION REGARDING OPERATION KEYHOLE.

As noted above, Defendant does not seek information or documentation about undercover operations certified under Operation Keyhole unrelated to this case or surveillance of protesters and legal observers during Operation Metro Surge. Defendant seeks only information and documentation of Keyhole materials to the extent they relate to this case or other surveillance of Metro Surge protesters. Such evidence is discoverable and should be produced.

Specifically, based on Agent Brenner's testimony and the other discovery disclosed by the government, the following categories of Keyhole documents[5] are discoverable and should be produced:

- The current Undercover Operations Handbook;
- All documentation and communications related to the proposals to authorize Operation Puppet Master and Project Whipple Shield under CUC Keyhole;
- All documents and communications regarding requests for and approval of Operation Puppet Master and Project Whipple Shield expenses under CUC Keyhole;
- All documents and communications submitted to Agent Brenner or other Keyhole supervisors by UCAs or other field agents related to the day-to-day operations of Operation Puppet Master and Project Whipple Shield;

[5] To the extent these documents contain the actual names of UCAs, Defendant does not object to redacting those names, but in stipulating to these redactions he does not waive the right to seek identification of these UCAs at a later date.

- All documents and communications related to the use of funds from Midwest Transfer Companies LLC for Operation Puppet Master and Project Whipple Shield.

The Keyhole documents Defendant seeks will be helpful to his defense. *United States v. Vue*, 13 F.3d 1206, 1208 (8th Cir. 1994) (explaining Rule 16 requires production of material "helpful to the defense"). Among other things, they will confirm either (1) that agents violated HSI and DHS policies and the scope of CUC Keyhole's authorization by engaging in widespread surveillance of protesters, unions, and non-profit organizations, or (2) that HSI supervisors and leadership ratified the UCAs First Amendment violations. Either way, this evidence will be helpful to the defense.

Evidence of law enforcement policy violations or bad faith investigation is classic impeachment evidence. *E.g., Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (explaining that *Brady* requires disclosure of evidence that "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation," or could have been used to "attack[ ] . . . the investigation as shoddy"); *United States v. Sandoval*, 154 F.4th 186, 199 (4th Cir. 2025) (explaining that evidence of officer policy violations was impeachment material).

Evidence that UCAs and their supervisors violated HSI policy with respect to Keyhole authorization and oversight of Puppet Master and Whipple Shield could be used for impeachment at trial. Similarly, evidence that HSI leadership encouraged and authorized funding for activities that violated the First Amendment rights of protesters and legal observers will support Defendant's First Amendment defense at trial as well as

Defendant's forthcoming Motion to Dismiss for Selective and Vindictive Prosecution, and it will generally support impeachment for conducting a shoddy and bad faith investigation.

Producing these materials would not prejudice the government. To the extent the government has concerns about maintaining confidentiality of unrelated undercover operations, Defendant has repeatedly stated he does not seek materials unrelated to Operation Puppet Master, Project Whipple Shield, or other undercover surveillance of protesters or so-called "agitators" during Metro Surge. Nor does Defendant seek the identification at this time of any UCA's actual identity.

With respect to the burden of production, to the extent that is even relevant in a criminal prosecution, given the purportedly limited intersection between Operation Puppet Master, Project Whipple Shield, and CUC Keyhole, any burden should be comparably limited. When compared to the importance of this information in preparing Defendant's pretrial motions and defenses at trial, as well as the impeachment of testifying agents, any burden is *de minimis*. The Court should order production of the requested materials.

## CONCLUSION

For the above-stated reasons, Defendant respectfully requests that the Court grant his Motion for Discovery.

Respectfully submitted,

DATED: November 20, 2026

*<u>/s/ Kevin C. Riach</u>*
Kevin C. Riach, #389277
Charlotte Colantti, #506801
125 Main St. SE, Suite 339
Minneapolis, MN 55412
Telephone: 612.203.8555
kevin@riachlaw.com
charlotte@riachlaw.com
*Attorneys For Defendant Isaac Sant*