Department of Homeland Security

U.S. Immigration and Customs Enforcement

## Office of Investigations

# Undercover Operations Handbook

OI HB 08-04

April 14, 2008

**OFFICIAL USE ONLY**

# Foreword

The Undercover Operations Handbook provides a single source of national policies, procedures, responsibilities, guidelines, and controls for U.S. Immigration and Customs Enforcement (ICE), Office of Investigations (OI) personnel when conducting undercover activities, investigations, and operations. This Handbook contains instructions and guidance that will help to ensure uniformity and operational consistency for personnel at OI field offices and OI Headquarters. Policy and administrative oversight of OI undercover activities, investigations, and operations is the purview of the Unit Chief, Undercover Operations Unit, Investigative Services Division, OI. This Handbook is available in the Handbook section of the OI Proprietary Web site.

Undercover operation resources designated for a specific certified undercover operation may be used only when the desired expenditure is "reasonable and necessary for the conduct of the certified undercover operation." Any deviation from the OI statutory authority (19 U.S.C. § 2081 and 8 U.S.C. § 1363a) will not be tolerated by OI management. Failure to comply with the provisions of the OI Undercover Operations Handbook or subsequent policies may result in disciplinary action, including written reprimand up to removal. (See the ICE Table of Offenses and Penalties, Section I-2, entitled "Neglect of Duty.")

The ICE OI Interim Undercover Operations Handbook dated September 2003, and all previous policies, directives, handbooks, and other issuances regarding undercover operations are hereby superseded. (See Appendix I for a more detailed list.)

The policies contained in this Handbook do not supersede any requirements of OI directives or policies related to general investigative activities unless specifically stated.

The mere existence of an undercover operation is considered law enforcement sensitive; sharing of any information relating to an operation or this Handbook is restricted to a need-to-know basis. Individuals who are not engaged in the conduct of operational investigations (or the direct support thereof) shall not be permitted to have access to undercover assets, accounts, identifications, methods, techniques, facilities, personas, or vehicles (leased via the undercover operation or Government-owned).

The Undercover Operations Handbook is an internal policy of OI and is not intended to confer any right or benefit on any private person or party. If disclosure of this Handbook or any portion of it is demanded in any judicial or administrative proceeding, the OI Information Disclosure Unit, Mission Support Division (MSD), as well as the appropriate ICE Counsel and/or U.S. Attorney shall be consulted so that appropriate measures can be taken to invoke privileges against disclosure. This Handbook contains information which may be exempt from disclosure to the public. Any further request for disclosure of this Handbook or information contained herein should be referred to the OI Information Disclosure Unit.

The OI Policy Unit, MSD, is responsible for coordinating the development and issuance of OI policy. All suggested changes or updates to this Handbook should be submitted to the OI Policy Unit which will coordinate all needed revisions with the OI Undercover Operations Unit.

Approved ______________________      4/14/08
Marcy M. Forman      Date
Director, Office of Investigations

# UNDERCOVER OPERATIONS HANDBOOK

## Table of Contents

**Chapter 1 PURPOSE AND SCOPE**....................1

**Chapter 2 BACKGROUND AND AUTHORITY**....................1

- 2.1 Objectives of Undercover Activities....................2
- 2.2 Statutory Authority....................2
- 2.2.1 Certification and Exemptions....................3
- 2.2.2 Misuse of Certification and Exemptions....................3
- 2.3 Department of Homeland Security Policy....................3
- 2.4 Sensitive Circumstances....................4
- 2.4.1 DHS Sensitive Circumstances....................4
- 2.4.2 ICE Sensitive Circumstances....................4
- 2.4.3 Use of Approved Electronic Documentation....................4

**Chapter 3 LEGAL/LIABILITY ISSUES**....................4

- 3.1 Procedures for Obtaining Legal Guidance....................4
- 3.2 Participation in Otherwise Illegal Activities....................5
- 3.2.1 Justification....................5
- 3.2.2 Minimization....................5
- 3.2.3 Prohibitions....................6
- 3.2.4 Self-Defense....................6
- 3.2.5 General Authorization to Engage in Otherwise Illegal Activity....................6
- 3.2.5(1) Specific Authorization to Engage in Otherwise Illegal Activity....................7
- 3.2.6 Authorization of Unforeseen Otherwise Illegal Activity....................7
- 3.3 Criminal Activities that Result in Violence....................8
- 3.4 Entrapment Issues....................8
- 3.4.1 Inducements to Engage in Criminal Activity (Authorization Requirements)....................8
- 3.4.2 Exception to Inducement Policy (Waiver)....................9
- 3.5 Search Authority of Undercover Operatives....................9
- 3.5.1 Suspect's Premises....................10
- 3.5.2 Oral Communications....................10
- 3.5.3 Removal/Copying of Documents or Property....................10
- 3.6 Alterations to Conveyances....................11
- 3.6.1 Documentation Required....................11
- 3.6.2 Transfer or Destruction....................12
- 3.6.3 Non-Recovery....................12
- 3.7 Third-Party Assistance....................12



Post-Hearing Brief Exhibit 1

- 3.7.1 Offers of Third-Party Gifts or Bequests....12
- 3.7.2 Indemnification and Hold Harmless Agreements....13
- 3.8 Personal Assistance Agreement....13
- 3.8.1 PAA (When One is Required for an Undercover Operation)....14
- 3.8.2 PAA (When One is Not Required for an Undercover Operation)....14
- 3.9 The Use of Private Insurance Within Certified Undercover Operations 14
- 3.9.1 Automobile Insurance....14
- 3.9.2 Other Insurance....15
- 3.9.3 Insurance Claims to Maintain Covertness....15
- 3.10 Confidentiality....15

**Chapter 4 ROLES AND RESPONSIBILITIES ....16**

- 4.1 Assistant Secretary of ICE....17
- 4.2 Director of OI....18
- 4.3 Undercover Review Committee (DHS and ICE)....19
- 4.3.1 DHS URC....19
- 4.3.2 ICE URC....19
- 4.4 Deputy Assistant Director, Investigative Services Division....20
- 4.5 Assistant Directors, Operations, and Deputy Assistant Directors, Investigative Programs....21
- 4.6 Unit Chief, Undercover Operations Unit....22
- 4.7 Undercover Liaison Coordinators....23
- 4.8 Unit Chiefs in ISD, Investigative Programs, and Operations....23
- 4.9 Special Agent in Charge....24
- 4.10 CUC Administrative Overseer(s)....28
- 4.11 CUC Lead/Administrative Group Supervisor....29
- 4.12 Investigative Group Supervisor....30
- 4.13 CUC Program Manager....31
- 4.14 Case Agent....32
- 4.15 Undercover Operative....33
- 4.16 Cover Agent....35
- 4.17 Contact Agent....36
- 4.18 CUFFS Administrator....36
- 4.18.1 CUFFS Administrator – Rotation....37
- 4.19 Separation of Duties....37
- 4.19.1 Waiver of Requirement for Separation of Duties....38
- 4.20 Position Titles (Savings Provision)....38




Post-Hearing Brief Exhibit 1

**Chapter 5 UNDERCOVER OPERATION APPLICATION AND APPROVAL PROCESS ....................39**

- 5.1 Assessing the Need for an Undercover Operation ....................39
- 5.2 Who May Make Application for and Conduct Undercover Operations ....................39
- 5.3 Types of Undercover Investigations/Operations and Approval Levels ....................40
- 5.3.1 Group Supervisor-Approved Undercover Investigations ....................40
- 5.3.2 SAC-Approved Investigations/Projects ....................40
- 5.3.3 Director of OI-Approved Operations ....................40
- 5.3.3(1) More Than 6 but Less Than 12 Months ....................40
- 5.3.3(2) Sensitive Circumstances Requiring Review by the URC ....................41
- 5.4 Undercover Operation Flow Chart ....................42
- 5.5 Certified Undercover Operation Application and Reauthorization Procedures ....................43
- 5.5.1 Expansion to Additional Investigative Program Areas ....................43
- 5.5.2 Application and Reauthorization Proposal Format ....................43
- 5.5.2(1) Application ....................43
- 5.5.2(2) Reauthorization ....................45
- 5.5.3 Application and Reauthorization Procedures: Steps ....................45
- 5.5.3(1) Application and Reauthorization Procedures: Scrub Meeting ....................46
- 5.5.3(2) Application and Reauthorization Procedures: Additional Documents Required with Proposal ....................47
- 5.5.3(3) Applications and Reauthorization Procedures: Presentation to the URC ....................47
- 5.5.4 Review and Final Approval ....................48
- 5.5.4(1) Review by the ICE URC ....................48
- 5.5.4(2) Review by the DHS URC ....................49
- 5.5.4(2.1) Review by the DHS URC: Department of Justice Non-Concurrence ....................49
- 5.5.5 Title 21 Operations – Memorandum of Understanding with DEA ....................50
- 5.5.5(1) Title 21 Operations – DEA Non-Concurrence ....................51
- 5.6 Records of the URC to Be Maintained by the Undercover Operations Unit ....................52
- 5.7 Exigent Approval ....................52
- 5.7.1 Exigent Approval – Procedures ....................52
- 5.7.2 Exigent Approval – Procedures – Activities Involving the DEA MOU ....................53
- 5.8 Emergency Approval ....................54
- 5.9 Program Code Assignment/Case Tracking ....................55
- 5.10 Duration of Authorization ....................56
- 5.11 Unforeseen Circumstances ....................56
- 5.11.1 Unforeseen Circumstances: Operational Enhancements ....................56
- 5.11.2 Unforeseen Circumstances: Additional Sensitive Circumstances ....................56



Post-Hearing Brief Exhibit 1

- 5.11.3 Unforeseen Circumstances: Legal Issues ....57
- 5.12 Joint Undercover Operations ....57

**Chapter 6 ADMINISTRATIVE AND FINANCIAL MANAGEMENT OF UNDERCOVER OPERATIONS ....58**

- 6.1 Certification Authority ....58
- 6.2 Expending Funds from Certified Undercover Operations ....58
- 6.2.1 Expenditures Must be Necessary and Reasonable for the Conduct of the Operation ....59
- 6.2.2 Expenditure Authorization (6-Month Expenditure Authorization Plan) for Certified Undercover Operations ....59
- 6.2.3 Unforeseen Expenses that Will Exceed the Limit of the 6-Month Expenditure Authorization Plan for Certified Undercover Operations ..60
- 6.2.4 Expenditure Flow Chart ....61
- 6.2.5 Use of Funds and Business/Purchase Exemptions (Purchases Outside FAR) ....62
- 6.3 Use of CUC-Appropriated Funds ....62
- 6.4 Use of Proceeds ....62
- 6.4.1 Control of Proceeds ....62
- 6.4.1(1) Reimbursement of Supporting Operations (within OI) ....63
- 6.4.1(2) Reimbursement of Other Participating Agencies ....63
- 6.4.1(3) Splitting Proceeds with Another OI Certified Undercover Operation ....64
- 6.4.1(4) Splitting Proceeds with Other Participating Agencies ....64
- 6.4.1(5) Splitting Proceeds with Foreign Law Enforcement Agencies ....65
- 6.4.2 Purchase of Information Using Proceeds ....65
- 6.4.3 Purchase of Evidence Using Proceeds ....66
- 6.4.4 Payment of Overtime Using Proceeds ....66
- 6.4.5 Payment of Travel Expenses Associated with Field Reviews of Undercover Operations Using Proceeds ....67
- 6.5 Regulating the Amount of Proceeds Held by an Operation ....68
- 6.5.1 Limit on Amount of Proceeds Held ....68
- 6.5.2 SAC Review of Proceeds Held ....68
- 6.5.3 Seizure of Proceeds from Ongoing Operations ....69
- 6.5.4 Deposit of Proceeds into the U.S. Treasury ....70
- 6.6 Petty Cash Fund ....70
- 6.7 Cash Advances ....70
- 6.7.1 SAC-Approved 30-Day Cash Advances ....71
- 6.7.2 Advances to Confidential Informants ....71
- 6.8 Transactions Involving Confidential Informants ....72
- 6.8.1 Transactions Involving CIs – Payment of Stipends and/or Commissions ....72




Post-Hearing Brief Exhibit 1

- 6.8.2 Transactions Involving CIs – Approval of Stipend and/or Commission Payments....73
- 6.8.3 Transactions Involving CIs – Methods for Paying Stipends and/or Commissions....73
- 6.8.4 Transactions Involving CIs – Tracking and Documentation of Stipends and/or Commissions....74
- 6.8.5 Transactions Involving CIs – POI....74
- 6.8.6 Transactions Involving CIs – Operational Expenses Incurred by a CI...75
- 6.8.7 Transactions Involving CIs – Payments to Third-Parties for Illegal Services and/or POE....76
- 6.8.7(1) Transactions Involving CIs – Payments to CIs by Third-Parties....76
- 6.9 Currency Pick-up Operations....77
- 6.9.1 Currency Pick-up Log....77
- 6.9.2 Currency Pick-up Transaction Approval....77
- 6.9.3 Currency Pick-up/Target Directed Funds....77
- 6.10 File Systems Required for Undercover Activity....78
- 6.10.1 Undercover Operations Unit File Requirements....78
- 6.10.2 SAC Office File Requirements....78
- 6.10.3 Certified Undercover Operation File Requirements....79
- 6.11 Financial Records of a Certified Undercover Operation....80
- 6.11.1 Required Details (CUFFS Transactions)....81
- 6.11.2 Backup of Data for CUFFS....82
- 6.12 CUFFS Administrator for Certified Undercover Operations....83
- 6.12.1 CUFFS Administrator – Separation of Duties....83
- 6.13 Use of Undercover Credit Cards in Certified Undercover Operations....83
- 6.14 Bank Accounts (Covert and Overt)....84
- 6.14.1 Control of Bank Accounts....85
- 6.14.2 Bank Accounts with On-line Access....86
- 6.14.3 Reconciliation of Operational Bank Accounts....86
- 6.14.4 Accounts in the Name of OI (Overt)....87
- 6.14.5 Foreign Bank Accounts....87
- 6.14.5(1) Establishing a Foreign Bank Account....88
- 6.14.5(2) Control of Funds in Foreign Bank Accounts....89
- 6.15 Deposit of Foreign Government Law Enforcement Funds into ICE Undercover Accounts (Covert and Overt)....89
- 6.16 Safeguarding Funds....90
- 6.16.1 Funds Deposited in Financial Institutions....90
- 6.16.2 Safeguards Related to the Investment of Funds....91
- 6.16.2(1) Authorization Required to Place Funds in High-Risk Investments....91
- 6.17 Expenditure Approval Levels (FAR and Non-FAR)....91
- 6.17.1 Levels of Approval for Non-Property (Items That Will Not Be Inventoried)....92
- 6.17.2 Levels of Approval for Property (Items That Will Be Inventoried)....92




Post-Hearing Brief Exhibit 1

- 6.18 Approval of Expenditures ....92
- 6.18.1 Approval of Expenditures (Exigent Circumstances) ....93
- 6.18.2 Receipts for Expenditures ....93
- 6.18.3 Substitute Receipts for Expenditures ....94
- 6.19 Operational Purchases ....94
- 6.19.1 Purchases Outside the Scope of FAR Using the Business/Purchase Exemption (Covert) ....94
- 6.19.2 Purchases Under FAR (Overt) ....95
- 6.19.2(1) FAR Purchases Under $2,500 for Services or $3,000 for Supplies ....95
- 6.19.2(2) FAR Purchases Over $2,500 for Services or $3,000 for Supplies ....95
- 6.20 Prohibited Expenditures ....96
- 6.21 Accounting for Certified Undercover Operation Property ....97
- 6.22 Travel in Support of Undercover Operations ....98
- 6.22.1 Travel at Actual Expense (Approval and Documentation) ....98
- 6.22.2 Premium (Including First and Business) Class Travel ....99
- 6.22.3 Travel by Confidential Informants ....100
- 6.23 Covert Expenditures for Safety and Security ....100
- 6.23.1 Cover Agent Expenses ....100
- 6.24 Funding Sources for Certified Undercover Operations ....101
- 6.24.1 Proceeds ....101
- 6.24.2 CUC-Appropriated Funds ....102
- 6.24.2(1) Reallocation (Reprogramming) of CUC-Appropriated Funds ....102
- 6.24.3 Recoverable Funds for Money Laundering ....102
- 6.24.4 SAC Funds ....103
- 6.24.5 Other ICE Funds ....103
- 6.24.6 Non-Agency Funds ....103
- 6.25 Lease Agreements ....103
- 6.26 Leased Vehicles ....104

**Chapter 7 MANAGEMENT CONTROLS AND REPORTING REQUIREMENTS FOR UNDERCOVER OPERATIONS ....104**

- 7.1 SAC Monthly Reports (Financial) ....105
- 7.1.1 SAC Financial Reporting - Operation’s Financial Records to Headquarters ....106
- 7.2 SAC Petty Cash Review ....107
- 7.3 Headquarters Oversight ....107
- 7.3.1 Headquarters Oversight – Programmatic Units ....108
- 7.3.2 Headquarters Oversight – Undercover Operations Unit ....108
- 7.3.2(1) National Program Managers - Undercover Operations Unit ....108
- 7.4 On-site Field Reviews of Certified Undercover Operations ....108
- 7.4.1 Frequency of On-site Field Reviews ....109
- 7.4.2 On-site Field Reviews (Interviews) ....110
- 7.4.3 On-site Field Reviews (Assessment) ....111




Post-Hearing Brief Exhibit 1

- 7.4.4 Independent Audits of Certified Undercover Operations .....................112
- 7.5 Financial Reporting – Headquarters Internal .......................................112
- 7.6 Reporting Investigative Activities ......................................................112
- 7.7 Use of TECS CUC Program Codes ....................................................113
- 7.7.1 Primary Case File (TECS) ..............................................................113
- 7.7.2 Case Reports (ROI, Incident Reports) ..............................................113
- 7.8 Property Inventories of Certified Undercover Operations...................113
- 7.9 Undercover Identification Annual Inventory.......................................115
- 7.10 Managing Transgressions Within Certified Undercover Operations....115

**Chapter 8 TRAINING.......................................................................................116**

- 8.1 Undercover Operatives School ..........................................................116
- 8.1.1 Requirements ...................................................................................116
- 8.1.2 Supervisors Acting in an Undercover Capacity..................................116
- 8.1.3 Non-ICE Employees Acting in an Undercover Capacity .....................117
- 8.1.4 Waiver for Undercover Operatives School.........................................117
- 8.1.5 Exemption for Equivalent Training for Other Federal and State Agency Undercover Operatives..........................................................118
- 8.1.6 Failure to Become Accredited ...........................................................118
- 8.2 Undercover Managers School............................................................118
- 8.2.1 Waiver for Undercover Managers School ..........................................119
- 8.3 Undercover Liaison Coordinator School ............................................119
- 8.3.1 Requirements ...................................................................................119
- 8.4 CUFFS Administrator School.............................................................119
- 8.4.1 Waiver for CUFFS Administrator School ..........................................119
- 8.5 Undercover Operations Unit Jump Team ...........................................119

**Chapter 9 UNDERCOVER IDENTIFICATION AND BACKSTOPPING.....................120**

- 9.1 Personal Undercover Identification ....................................................120
- 9.1.1 Who May Obtain Personal Undercover Identification ........................121
- 9.1.1(1) Undercover Identification for CIs/Cooperating Defendants................121
- 9.1.2 Federally-Issued Identification ..........................................................121
- 9.1.3 State-Issued Identification ................................................................122
- 9.1.4 Foreign Government-Issued Identification.........................................122
- 9.1.5 Private Business-Issued Identification................................................123
- 9.1.6 Control of Personal Undercover Identification....................................123
- 9.2 Maintaining a Personal Financial History............................................125
- 9.2.1 Individual (Personal) Undercover Bank Accounts ...............................125
- 9.2.2 Individual (Personal) Undercover Credit Cards ..................................127
- 9.3 Corporate Backstopping.....................................................................128
- 9.3.1 Using Multiple Undercover Businesses...............................................129




Post-Hearing Brief Exhibit 1

**Chapter 10 UNDERCOVER LIAISON COORDINATOR PROGRAM........................129**

- 10.1 National ULC........................................................................130
- 10.2 Primary/Secondary Field ULC ..........................................................130
- 10.2.1 Primary/Secondary Field ULC – Prerequisites....................................130
- 10.2.2 ULC Responsibilities..............................................................131
- 10.3 Selection Procedures for Undercover Operatives (ULC's Role)..........133
- 10.3.1 Exempt from Training Waiver for Operative Candidates....................134

**Chapter 11 TRAUMATIC INCIDENT RESPONSE (PSYCHOLOGICAL SERVICES) ....................................................................................134**

- 11.1 ULC Assistance ........................................................................134
- 11.1.1 Contract Psychologist ..............................................................135
- 11.2 Employee Assistance Program ..........................................................135
- 11.2.1 Use of the EAP to Cope with Traumatic Incidents...............................135
- 11.2.2 EAP Assistance for Managers ..........................................................135

**Chapter 12 UNDERCOVER ACTIVITY IN FOREIGN COUNTRIES.........................136**

- 12.1 Domestic Undercover Investigations Involving Undercover Activity in Foreign Locations ...........................................................136
- 12.2 Certified Undercover Operations Conducted in Foreign Locations .....136

**Chapter 13 UNDERCOVER INTERNET ACTIVITY...................................................137**

- 13.1 Limited Undercover Internet Investigative Activities ..........................137
- 13.2 Certified Undercover Internet Investigative Activities.........................138
- 13.3 Maintenance of Electronic Subject Records........................................139
- 13.4 Special Circumstances .................................................................139

**Chapter 14 PROCEDURES FOR CLOSING CERTIFIED UNDERCOVER OPERATIONS.........................................................................................139**

- 14.1 Notification of Intent to Close ..........................................................140
- 14.2 Closeout Report .........................................................................140
- 14.3 Liquidation of Assets ..................................................................141
- 14.3.1 Monetary Assets (Proceeds and CUC-Appropriated Funds)...............142
- 14.3.1(1) Proceeds ..............................................................................142
- 14.3.1(1.1) Forfeiture.............................................................................142
- 14.3.1(1.2) Deposit of Proceeds as Miscellaneous Receipts ..................................142
- 14.3.1(2) Return of CUC-Appropriated Funds...................................................143
- 14.3.2 Property.................................................................................144
- 14.3.2(1) Purchases Outside the Scope of FAR Using the Business/Purchase Exemption (Covert) .................................................................144

- 14.3.2(1.1) Sale .......... 144
- 14.3.2(1.2) Transfer .......... 144
- 14.3.2(1.3) Forfeiture .......... 146
- 14.3.2(1.4) Destruction .......... 146
- 14.3.2(2) Property Acquired Through the Use of the FAR Requirements (Overt) .......... 146
- 14.4 Closeout Audits .......... 146
- 14.5 Closeout of CUFFS .......... 147


**APPENDICES**


Appendix A Authorities .......... A-i
Appendix B CUFFS Expense/Advance Approval Form .......... B-i
Appendix C Pick-Up Log for Undercover Operations .......... C-i
Appendix D Property/Equipment Log for Undercover Operations .......... D-i
Appendix E Undercover Operation Monthly Financial Review Worksheet .......... E-i
Appendix F Table of Transgressions and Corrective Actions .......... F-i
Appendix G Glossary .......... G-i
Appendix H Index .......... H-i
Appendix I Superseded Documents .......... I-i
Appendix J Acronyms .......... J-i




Post-Hearing Brief Exhibit 1

# UNDERCOVER OPERATIONS HANDBOOK

## Chapter 1. PURPOSE AND SCOPE

The Undercover Operations Handbook establishes the United States (U.S.) Immigration and Customs Enforcement (ICE), Office of Investigations (OI) policies and procedures for the conduct of undercover activities, investigations, and operations within OI. *(Note: For the purposes of this Handbook, the term "covert" will be used interchangeably with the term "undercover.")*

The policies in this Handbook will:

A. provide the greatest degree of flexibility to conduct undercover investigations within the limits of the law and applicable regulations;

B. establish uniform and effective standards of oversight and accountability for undercover activities; and

C. promote innovation and creativity to develop effective and successful undercover investigations and operations.

The ICE OI Interim Undercover Operations Handbook dated September 2003, and all previous policies, directives, handbooks, and other issuances regarding undercover operations are hereby superseded. (See Appendix I for a list of additional documents that are being superseded by this Handbook.)

The policies contained in this Handbook do not supersede any requirements of OI directives or policies related to general investigative activities unless specifically stated.

## Chapter 2. BACKGROUND AND AUTHORITY

With the enactment of the Homeland Security Act of 2002, Congress authorized ICE to conduct undercover investigative operations to obtain evidence or information concerning violations of laws enforced by ICE and stemming from the authorities of its legacy agencies, the U.S. Customs Service (USCS) and the Immigration and Naturalization Service (INS). Historically, ICE and its legacy agencies have effectively conducted undercover operations that have resulted in some of their most successful investigations. Undercover operations are highly effective tools when proper planning and resources are available to support the inherent demands placed on operational personnel. It is essential to recognize that the frequently changing scenarios influence the operational and administrative needs of undercover operations. A commitment to provide adequate support and managerial oversight is vital to the success of such endeavors. OI is committed to targeting the highest level of organized criminal activity possible while employing statutory exemptions and certifications found in Title 8, United



Post-Hearing Brief Exhibit 1

States Code (U.S.C.), Section 1363a and 19 U.S.C. § 2081. Additionally, OI is committed to adhering to policy authorizations necessary to conduct these types of undercover operations.

### 2.1 Objectives of Undercover Activities

The following are potential objectives for conducting undercover activities or operations:

A. determine if a violation of law has occurred or is in progress;

B. identify specific violations of law;

C. identify violators, conspirators, and their methodologies;

D. disrupt and/or dismantle criminal organizations;

E. locate the violation sites and equipment used;

F. obtain evidence for prosecution and asset forfeiture;

G. determine the safest and most advantageous time to make arrests, execute search warrants, and make seizures;

H. identify witnesses and cooperating individuals;

I. identify associations between conspirators;

J. check the reliability of sources of information and cooperating defendants; and

K. gather intelligence that allows management to evaluate threats, reallocate resources, and organize enforcement activity.

### 2.2 Statutory Authority

USCS was vested with the authority to conduct certified undercover (CUC) operations through the Anti-Drug Abuse Act of 1986, which enacted 19 U.S.C. § 2081; INS received similar authority through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, specifically 8 U.S.C. § 1363a. With the enactment of the Homeland Security Act of 2002, these statutory authorities transferred to the newly-created Department of Homeland Security (DHS) and delegated to the Assistant Secretary of ICE in DHS Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement," and further redelegated to the Director of OI in ICE Delegation Order 04-002 entitled, "Authority to Certify the Exemption of Undercover Operations From Certain Laws Within U.S. Immigration and Customs Enforcement." In addition to granting the authority to engage



Post-Hearing Brief Exhibit 1

in certain undercover activities without regard to particular provisions of the United States Code, certain requirements were included that must be met when conducting certified undercover operations.

### 2.2.1 Certification and Exemptions

8 U.S.C. § 1363a and 19 U.S.C. § 2081 provide for the granting of specific statutory exemptions which allow ICE to engage in certain activities when conducting undercover operations without violating particular federal statutes that would otherwise apply.

These exemptions may be employed only when the Assistant Secretary or designee as allowed by statute (i.e., the Director of OI) certifies in writing that any actions authorized under the exemptions are necessary for the conduct of the undercover operation. This certification occurs through the application and approval process described in Chapter 5 of this Handbook. When it is necessary for the detection and prosecution of offenses against the United States that are within the jurisdiction of the Secretary of Homeland Security, the exemptions in 19 U.S.C. § 2081 and 8 U.S.C. § 1363a (see Appendix A for the exact statutory language) allow ICE to:

A. use appropriated funds and/or proceeds to purchase/lease property, buildings, and other facilities;

B. establish or acquire proprietary corporations or business entities as part of an undercover operation, and to operate them on a commercial basis;

C. deposit appropriated funds and proceeds in financial institutions; and

D. expend proceeds from the operation to offset necessary and reasonable expenses incurred in the operation.

### 2.2.2 Misuse of Certification and Exemptions

The use of a certified undercover operation's operational assets acquired by and within the operation for other than the conduct of the operation is strictly prohibited. The Assistant Secretary may approve, in writing, the use of operational assets for other than the conduct of the undercover operation in cases of national emergency.

## 2.3 Department of Homeland Security Policy

OI will comply with all DHS policy and procedures governing undercover operations.

Any DHS policy for undercover operations conducted by enforcement agencies within DHS promulgated after the date of this Handbook must be complied with upon issuance.



Post-Hearing Brief Exhibit 1

### 2.4 Sensitive Circumstances

A certified undercover operation is required for all undercover activities, investigations, and operations involving DHS and/or ICE sensitive circumstances (defined in the Glossary of this Handbook; see "Sensitive Circumstances – DHS and ICE").

#### 2.4.1 DHS Sensitive Circumstances

For the purposes of this Handbook, DHS sensitive circumstances will apply only to OI undercover activities, investigations, and operations involving DHS employees, as well as federal, state, and local task force officers (TFOs) or confidential informants (CIs) acting under the direct and immediate supervision of an OI agent or TFO.

#### 2.4.2 ICE Sensitive Circumstances

For the purposes of this Handbook, ICE sensitive circumstances will apply only to OI undercover activities, investigations, and operations involving DHS employees, as well as federal, state, and local TFOs or CIs acting under the direct and immediate supervision of an OI SA or TFO.

#### 2.4.3 Use of Electronic Documentation

The Unit Chief, Undercover Operations Unit, may approve the use of electronic documentation to meet the requirements set forth in this Handbook.

## Chapter 3. LEGAL/LIABILITY ISSUES

The nature of undercover operations often requires an agent of the U.S. Government to appear to be engaged in a criminal enterprise. While this is crucial to the successful integration of undercover operatives (defined in the Glossary of this Handbook) with those who commit illegal acts, it also creates unique legal issues. Managers and undercover operatives must be cognizant of these issues to minimize legal challenges and ensure successful prosecutions.

### 3.1 Procedures for Obtaining Legal Guidance

Undercover operations involve unique operational and administrative situations that have resulted in many questions related to the practical application of legal principles. Policies and procedures that address these questions must incorporate:

A. management's obligation to ensure that adequate controls are in place; and

B. legal opinions and guidance obtained from ICE Counsel.



Post-Hearing Brief Exhibit 1

This Handbook provides policies and procedures developed in consultation with ICE Counsel. However, new situations and questions develop continually.

When questions arise related to legal matters and associated undercover policies,

A. OI operational management will contact the Undercover Operations Unit to determine whether the issue has been previously addressed by Headquarters ICE Counsel and/or existing policy; and

B. if the issue has not been addressed and the question implicates a national policy or an issue likely to occur in more than one area, the Undercover Operations Unit will request that Headquarters ICE Counsel provide an opinion and/or develop new policies as needed; or

C. if the issue is determined to be of local concern, operational management will contact the local ICE Counsel to request guidance. The local ICE Counsel will coordinate with Headquarters ICE Counsel as necessary.

## 3.2 Participation in Otherwise Illegal Activities

Except when authorized pursuant to ICE policy and this Handbook, no undercover operative will participate in any activity that would constitute a crime under federal, state, or local law if engaged in by a private person acting without authorization. For the purposes of this Handbook, such activity is referred to as an "otherwise illegal activity." The Special Agent in Charge (SAC) will consider, and approve when appropriate, participation by an undercover operative in otherwise illegal activity only when such participation is justified.

### 3.2.1 Justification

Possible justifications for otherwise illegal activity include the need to:

A. obtain information or evidence necessary to the success of an investigation not reasonably available without participation in the otherwise illegal activity;

B. establish or maintain credibility of a cover identity where that credibility is required for the investigative and/or operational activity and/or the safety of the undercover agent or any other person; or

C. prevent death or serious bodily injury to any person.

### 3.2.2 Minimization

The SAC shall ensure that reasonable steps are taken to minimize the participation of an undercover operative in any otherwise illegal activity.

### 3.2.3 Prohibitions

Except as provided in this Section, an undercover operative shall not:

A. participate in any act of violence except in self-defense or the defense of others (see the Interim ICE Use of Force Policy, dated July 7, 2004, or as updated);

B. initiate, instigate, or induce others to initiate or instigate any plan to commit criminal acts, except in accordance with Section 3.4.1 of this Handbook, "Inducements to Engage in Criminal Activity (Authorization Requirements)"; or

C. participate in conduct that would normally constitute unlawful investigative techniques (e.g., illegal wiretapping, illegal mail openings, breaking and entering, or trespass), unless approved by the local U.S. Attorney's Office.

### 3.2.4 Self-Defense

Nothing in this Handbook prohibits an undercover operative from taking all reasonable measures of self-defense in any emergency to protect his or her own life or the lives of others.

Reasonable measures of self-defense include engaging in proscribed conduct when there is a reasonable belief that to do otherwise would seriously endanger the life of an undercover operative or another person. All incidents of self-defense or defense of others involving such proscribed conduct must be reported through the local OI chain of command to the SAC as soon as possible. In addition, the local ICE Counsel should be notified. The SAC must immediately report such activity to the appropriate U.S. Attorney's Office as well as the Director of OI, who will in turn inform the ICE Assistant Secretary and Headquarters ICE Counsel as appropriate.

### 3.2.5 General Authorization to Engage in Otherwise Illegal Activity

Approval of an undercover investigation or operation utilizing the appropriate procedures described in this Handbook shall constitute authorization to participate in certain otherwise illegal activity that is considered a crime under federal, state, or local law except *malum in se* crimes (e.g., murder, rape, robbery, aggravated assault). Otherwise illegal activity includes:

A. the purchase of stolen or contraband goods;

B. the purchase of illegal and/or fraudulent immigration documents;

C. the delivery, sale, use, ownership, or possession by the U.S. Government of contraband or stolen property whose ownership cannot be determined;

D. the controlled delivery of drugs or other contraband that will not enter the commerce of the United States;

E. the domestic transportation or concealment of illegal aliens when the undercover operative does not have substantial control or direction of the scheme involving the domestic transportation or concealment of illegal aliens (contact the Human Smuggling and Trafficking Unit for the current policy and procedures related to human smuggling and trafficking);

F. the payments of bribes which are not included in the other sensitive circumstances;

G. the making of false representations to third parties in the concealment of personal identity or the true ownership of a proprietary business (this exception does not include any statement under oath or subject to the penalties of perjury); and

H. consensual monitoring of communications, even if it is a crime under state or local law.

### 3.2.5(1) Specific Authorization to Engage in Otherwise Illegal Activity

Additional specific authorization to engage in otherwise illegal activity can be obtained through the certified undercover operations process. (Refer to Sensitive Circumstances (DHS and ICE) defined in the Glossary of this Handbook.)

### 3.2.6 Authorization of Unforeseen Otherwise Illegal Activity

If an undercover operative believes that it is necessary and appropriate, under the standards set out in Section 3.2.1 above, "Justification," to participate in otherwise illegal activity that was not foreseen or anticipated, he or she should make every effort to consult with the SAC who shall:

A. make all reasonable efforts to confer with the appropriate U.S. Attorney's Office;

B. seek approval following the standard procedures in this Section; and/or

C. approve the activities under exigent authorization, as appropriate.

If consultation with the SAC is impractical and the undercover operative concludes that there is an immediate and grave threat to life, physical safety, or property, the undercover operative may participate in the otherwise illegal activity, as long as the operative does not take part in, and makes every effort to prevent, any act of violence. In cases where a life or personal safety is immediately threatened, all reasonable force (discussed in the Interim ICE Use of Force Policy, dated July 7, 2004, or as updated) may be employed in self-defense or the defense of others to prevent death or serious injury.



Post-Hearing Brief Exhibit 1

Reckless disregard for undercover policy may be grounds for disciplinary action or criminal sanctions. If an undercover operative participates in such unforeseen otherwise illegal activity, the following steps shall be taken:

A. The incident shall be reported through the local OI chain of command to the SAC as soon as possible.

B. The SAC shall promptly submit a written report to the Deputy Assistant Director (DAD), Investigative Services Division (ISD).

C. If necessary, the DAD, ISD, shall promptly present a request for retroactive authorization to the Director of OI.

### 3.3 Criminal Activities that Result in Violence

If, during the course of an otherwise illegal activity, an undercover operative participated in any manner in activities that resulted in violence, including injury to any person, the events must be reported through the local OI chain of command as soon as possible. The local ICE Counsel office shall also be notified. The SAC shall immediately thereafter inform the appropriate U.S. Attorney's Office and the Director of OI. The Director of OI shall in turn notify the ICE Assistant Secretary and Headquarters ICE Counsel as appropriate.

### 3.4 Entrapment Issues

Entrapment (as defined in the Glossary of this Handbook) is a complete defense to a criminal charge and must be vigorously avoided to ensure that criminal prosecutions are not adversely affected.

To succeed with an entrapment defense, the defendant must establish (1) government inducement and (2) lack of predisposition to commit the crime.

Mere solicitation to commit a crime is not inducement, nor does the government's use of deceit or pretense establish inducement. Rather, inducement requires a showing of at least persuasion or mild coercion. For purposes of inducements and entrapment, government conduct includes conduct by government employees and contractors, as well as CIs.

Additionally, the act of inducing a target to participate in a specific course of action does not always give rise to the legal defense of entrapment. While the two are similar, an inducement is an element of entrapment and, as such, does not in and of itself constitute entrapment.

#### 3.4.1 Inducements to Engage in Criminal Activity (Authorization Requirements)

Generally, no undercover operation may induce a person to engage in criminal activity.



Post-Hearing Brief Exhibit 1

Exceptions to the general rule may be made under certain circumstances with specific limitations:

A. The SAC must authorize all inducements. No undercover activity involving an inducement to an individual to engage in a crime shall be authorized, unless the SAC is satisfied that:

1) the illegal nature of the activity is reasonably clear to potential subjects;

2) the nature of any inducement offered is justifiable in view of the character of the illegal transaction in which the individual is invited to engage;

3) there is a reasonable expectation that offering the inducement will produce evidence of other illegal activities; and

4) one of the following criteria is met:

a) there is a reasonable indication that the subject is engaging, has engaged, or is likely to engage in the illegal activity proposed or in similar illegal conduct; or

b) the opportunity for illegal activity has been structured so that there is a reasonable expectation that any persons drawn to the opportunity, or brought to it, are predisposed to engage in the contemplated conduct.

B. All inducements should be closely coordinated with the appropriate U.S. Attorney's Office.

### 3.4.2 Exception to Inducement Policy (Waiver)

While not required by law, the requirement to meet one of the two criteria set forth in Section 3.4.1(A)(4) is imposed to ensure that ICE does not offer inducements to engage persons in criminal activity who are not predisposed to do so. These standards may be waived by the Director of OI upon a written finding that the activities are necessary to protect life or prevent other serious harm. The SAC should consult with the appropriate U.S. Attorney's Office concerning the need for any such waiver.

## 3.5 Search Authority of Undercover Operatives

It is constitutionally permissible for law enforcement officers to conduct criminal investigations without revealing their official status or their clandestine purpose. However, the extent of a search, the ability to seize or copy evidence, and the recording of oral communications raise numerous complex legal issues. The courts have addressed many of these issues, while others remain untested. If legal questions arise, managers should obtain legal guidance from ICE Counsel (through the Undercover Operations Unit

when national issues are involved) and/or the U.S. Attorney's Office when appropriate. This Section provides general guidelines in this area.

### 3.5.1 Suspect's Premises

An undercover operative may legally enter a suspect's premises if that operative has the suspect's consent, whether expressed or implied.

An operative may obtain evidence:

A. within the scope of the consent by which the operative gains entry; and/or

B. that is voluntarily revealed by the suspect (i.e., the plain view doctrine).

Free access to an area over a period of time may significantly expand the scope of a legal search to those items to which the operative has reasonable access by virtue of the scope of the suspect's consent. For example, if an operative were a houseguest, it would be reasonable to have access to the closet in the room where he or she was to sleep.

Under certain circumstances where an operative may have access to customer information in a financial institution, a subpoena may be required to comply with the Right to Financial Privacy Act. In these circumstances, consultation with the appropriate U.S. Attorney's Office and/or ICE Counsel is recommended.

### 3.5.2 Oral Communications

All conversations:

A. in which the operative participates; and/or

B. which can be overheard by an operative who has a legitimate right to be in a location and where the person being overheard has no reasonable expectation of privacy

can be testified to or recorded.

OI policy for obtaining approval regarding consensual monitoring and recordings shall be followed. The current OI technical surveillance handbook should be consulted for further legal and procedural guidance.

### 3.5.3 Removal/Copying of Documents or Property

Documents or property may be removed or copied:



Post-Hearing Brief Exhibit 1

A. under the plain view doctrine if the operative has a lawful right to be in a location and there is probable cause to believe that the item removed or copied is seizeable (e.g., evidence of a criminal violation); or

B. if consent has been granted to be in that location or on the premises, and the scope of the consent allows access to, and/or removal of, the documents and/or property.

Examples include: (1) an operative employed as an accountant for a business or company who is allowed access to records and documents; and (2) an operative acting as an employee responsible for cleaning the warehouse or office and removing company trash.

### 3.6 Alterations to Conveyances

Sometimes, during the course of an undercover investigation, it becomes necessary to make alterations to vehicles, vessels, or aircraft. Whenever such alterations are made, a Report of Investigation (ROI) shall be written which will include:

A. the reason for the alteration;

B. the specific description of the conveyance (vehicle, vessel, or aircraft) including identification numbers;

C. a specific description of the changes made;

D. the names of any individuals involved in approving and making the alterations; and

E. the applicable qualifications of the individual performing the work (alterations).

#### 3.6.1 Documentation Required

All documentation concerning the conveyance must reflect the use and maintenance which occurred while the conveyance was used in support of an operation. When a conveyance is no longer needed for an operation, it must be returned to its original state, meeting all applicable federal, state, and local safety and administrative requirements. When an aircraft is returned to its original state for general use, the flight logs to the aircraft and service records must be modified to reflect activity during the operation.

All modifications and/or alterations to any aircraft must be completed by a Federal Aviation Administration (FAA) certified mechanic (see the Federal Aviation Regulations, Code of Federal Regulations, Title 14, Parts 43, 91[e], and 135, Maintenance and Alterations). No alterations and/or modifications are authorized to any vehicle or



Post-Hearing Brief Exhibit 1

conveyance if the alteration will cause risk to the life or safety of the violators or innocent third parties without the written approval of the ICE Assistant Secretary.

#### 3.6.2 Transfer or Destruction

If a conveyance that was altered for an ICE operation permanently leaves the control of ICE because it is turned over to another authorized agency or was destroyed, the circumstances of the loss of custody must immediately be recorded in an ROI. All effort shall be made to acquire documentation that demonstrates that the altered conveyance will not end up in the possession of an innocent third party (e.g., photographs of a crashed aircraft or a written agreement from another agency).

#### 3.6.3 Non-Recovery

If an altered conveyance is not recoverable because it is in the possession of a violator or because it was inadvertently lost, the appropriate lookouts must be entered into the National Crime Information Center and the Treasury Enforcement Communication System (TECS) Case Management and linked to the case record. A copy of the lookout will be included in the case file.

### 3.7 Third-Party Assistance

During the course of an undercover operation, ICE is sometimes in a position to benefit from the assistance of private individuals or corporations. Although the assistance of third parties can greatly facilitate the conduct of the operation, it can also raise serious legal, ethical, and liability issues. Managers must ensure that, if third party assistance is accepted, it conforms to legal limitations and does not give the appearance of conflict or impropriety. It is recommended that any such assistance be discussed with ICE Counsel prior to acceptance.

#### 3.7.1 Offers of Third-Party Gifts or Bequests

A federal agency may not accept gifts or donations that would augment its appropriation without specific statutory authority. Consequently, ICE cannot accept gifts of money or property that aid and facilitate its work without congressional approval. Due in part to legal considerations and, in particular, the appearance that private entities may be influencing federal prosecutions, ICE may be reluctant to seek congressional approval.

Accordingly, all offers of gifts or bequests must have appropriate approval. To request consideration for acceptance of property or money offered by a third party, a memorandum from the SAC requesting concurrence will be sent to the Director of OI. The memorandum shall include:

A. the name of the potential donor;

B. the donor’s past or present business and/or relationship with DHS;

C. any restrictions on the use of the gift offered;

D. a statement of how acceptance of the gift will facilitate the work of DHS;

E. if the gift is physical property, the estimated fair market value at the time of the donation;

F. a statement regarding the reason ICE is not paying for the item; and

G. a statement advising of the concurrence on the acceptance of the proposed gift by both the local U.S. Attorney's Office and the local ICE Counsel.

If the Director of OI concurs, a cover memorandum recommending approval will be issued and the package will be forwarded to the Assistant Secretary for approval.

### 3.7.2 Indemnification and Hold Harmless Agreements

As a practical matter, indemnification and hold harmless agreements raise similar issues. The legal effect of each is to provide security or protection against loss, damage, or liability by creating an obligation or duty for one party to be responsible to the other.

Absent express statutory authority to the contrary, the U.S. Government may not enter into an agreement to indemnify an individual, business, or other entity where the Government's liability is indefinite, indeterminate, or potentially unlimited. Such an agreement would violate both the Anti Deficiency Act, 31 U.S.C. § 1341 *et seq*., and the Adequacy of Appropriations Act, 41 U.S.C. § 11, because it would be uncertain if sufficient funds would be appropriated to cover the contingency.

Certified undercover operations are exempt from the application of specific laws, including, under certain circumstances, those governing indemnification and hold harmless agreements. If there is a demonstrated need for such an agreement, the SAC shall contact local ICE Counsel, which will coordinate with Headquarters ICE Counsel as appropriate.

Undercover operations or activities that include indemnification and/or hold harmless agreements in which the U.S. Government is agreeing to indemnify or hold harmless a third party are listed as an ICE sensitive circumstance and should be treated as such.

## 3.8 Personal Assistance Agreement

A Personal Assistance Agreement (PAA) is an agreement between a CI and a SAC that must be approved and signed by the Unit Chief, Investigative Support Unit (ISU), ISD, which details the general activities and responsibilities expected of the CI. (See the ICE Memorandum entitled, "*New Headquarters Guidance on Confidential Informants*," dated March 17, 2004, or as updated). The PAA places limitations on the CI's behavior and

states the amounts and methods of compensation, monetary or otherwise, which the CI may receive if he or she adheres to the PAA.

The principal reason for a PAA is to limit the U.S. Government's liability arising out of a CI's activities in connection with an undercover operation or investigation. Generally, PAAs are recommended for all CIs who are working for a certified undercover operation. (The ISU, ISD, should be contacted for the current policy regarding the documentation of CIs.)

### 3.8.1 PAA (When One is Required for an Undercover Operation)

A PAA is required when a CI participates in an undercover activity associated with a certified undercover operation and he or she receives a stipend or commission as a result of services rendered in furtherance of that operation. In the case of a CI who receives payments by electronic funds transfer (EFT), the PAA must contain the details of the EFT (i.e., the CI's bank name, address, and account number).

### 3.8.2 PAA (When One is Not Required for an Undercover Operation)

A PAA is not required when a CI is only providing information or participating in the activity without receiving a stipend or commission as a result of services rendered in furtherance of the operation.

*Note: This Handbook does not supersede any requirements of ICE or OI policy related to meeting with and debriefing sources of information or source file requirements. The requirements and policies related to sources of information/CIs are the purview of the ISU, ISD.*

## 3.9 The Use of Private Insurance Within Certified Undercover Operations

The U.S. Government is "self insured"; as such, **government funds are not to be used to purchase insurance in order to protect against financial loss**. This long-standing government policy is based on guidance from the Comptroller General of the Government Accountability Office. The magnitude of the U.S. Government's resources makes it more advantageous for the government to carry its own risk. (See 19 Comp. Gen. 211, 214 (1939) and 798, 800 (1940).) However, the Comptroller General has recognized exceptions to this general rule, including the purchase of insurance within undercover operations, if the purpose is to maintain the cover and security of the operation, not to protect against financial loss. (See Comp. Gen. B-204486, Jan. 19, 1982.) OI certified undercover operations may acquire minimal undercover insurance policies to protect the covertness of their undercover endeavors.

### 3.9.1 Automobile Insurance

Operational personnel may have undercover vehicles (leased and/or owned) covered by minimal insurance so that, if necessary, an undercover operative will not have to break



Post-Hearing Brief Exhibit 1

from an undercover role and potentially compromise the operation or an investigation. The undercover insurance policy should guard against exposure of the operation in cases involving losses caused (or claimed to be caused) by an undercover vehicle.

When an accident involves serious bodily injury or death, the operator of the undercover vehicle should identify himself or herself as a U.S. Government employee. However, if circumstances are such that the immediate revelation of the operative's true identity would subject the operative or others to an immediate risk of bodily harm, then covertness may continue.

### 3.9.2 Other Insurance

In situations (other than automobile) that require insurance policies in order to protect the covert nature of the operation, operational personnel should follow the guidance above. Undercover operations that have propriety storefronts and/or warehouses may purchase adequate minimal undercover insurance policies in order to protect the operation's covertness and security.

### 3.9.3 Insurance Claims to Maintain Covertness

Filing a claim for financial loss against an undercover insurance policy requires additional consideration under proper management discretion. During the course of an undercover operation, the filing of an insurance claim against an undercover insurance policy can be done when operational personnel can articulate the need to protect the covertness and security of the operation. OI personnel have the authority to continue in an undercover role in order to avoid compromising the operation.

<u>Filing an insurance claim in an undercover capacity is an unresolved legal issue.</u> Each claim should be reviewed on a case-by-case basis. The SAC shall contact the Undercover Operations Unit and local ICE Counsel prior to filing a claim in an undercover capacity.

In situations where there is a management decision to remove the undercover persona (e.g., there is absolutely no need at the time to maintain cover), claims against the undercover insurance policy would not be proper. In these situations, operational funds may be used (depending on the circumstances) to reimburse financial loss (U.S. Government or third party), as the expense may be necessary and reasonable for the conduct of the operation.

## 3.10 Confidentiality

The mere existence of an undercover operation is considered law enforcement sensitive; sharing of any information relating to an operation or this Handbook is restricted to a need-to-know basis. Individuals who are not engaged in the conduct of operational investigations (or the direct support thereof) shall not be permitted to have access to

undercover assets, accounts, identifications, methods, techniques, facilities, personas, or vehicles (leased via the undercover operation or Government-owned).

The Undercover Operations Handbook is an internal policy of OI and is not intended to confer any right or benefit on any private person or party. If disclosure of this Handbook or any portion of it is demanded in any judicial or administrative proceeding, the OI Information Disclosure Unit, Mission Support Division (MSD), as well as the appropriate ICE Counsel and/or U.S. Attorney shall be consulted so that appropriate measures can be taken to invoke privileges against disclosure. This Handbook contains information which may be exempt from disclosure to the public. Any further request for disclosure of this Handbook or information contained herein should be referred to the OI Information Disclosure Unit.

## Chapter 4. ROLES AND RESPONSIBILITIES

This Chapter details the roles and responsibilities of those individuals involved in undercover activities, investigations, and operations. It is intended to clearly define areas of responsibility (AORs) to ensure that undercover activity is well-coordinated, conducted safely, and conforms to policy.

**Undercover Investigations/Operations Management Organization Chart**




*Note: The URC advises the Director of OI on matters related to certification and authorization. The Undercover Liaison Coordinator (ULC) is responsible for matters related to the well-being of the undercover operative, as enumerated in Section 10.2.2.*

## 4.1 Assistant Secretary of ICE

The Assistant Secretary has the statutory authority to:



Post-Hearing Brief Exhibit 1

A. provide written certification for any of the exemptions contained in 8 U.S.C. § 1363a and 19 U.S.C. § 2081 (delegated to the Assistant Secretary of ICE in DHS Delegation Order Number 7030.2, entitled, "Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement," dated March 1, 2003);

B. delegate this authority (delegated to the Director of OI in ICE Delegation Order 04-002, entitled, "Authority to Certify the Exemption of Undercover Operations From Certain Laws Within U.S. Immigration and Customs Enforcement.")

### 4.2 Director of OI

The Director of OI is responsible for:

A. providing written certification for the exemptions contained in 8 U.S.C. § 1363a and 19 U.S.C. § 2081 (delegated by the Assistant Secretary in ICE Delegation Order Number 04-002);

B. approving, amending, or disapproving undercover operations involving sensitive circumstances after considering the recommendations of the DHS or ICE Undercover Review Committee (URC);

C. granting exigent certification for 30 days or less (with one additional 30-day extension) in the event of exigent factors within an investigation/undercover operation which otherwise requires review by the DHS or ICE URC;

D. approving the expense plan (6-month expenditure authorization) contained in an operation's undercover proposal and any subsequent revisions to a previously approved level of expense authorization;

E. determining if expenses associated with an undercover operation are necessary and reasonable for the conduct of the operation;

F. determining if any sensitive investigative matter not requiring review under the current guidelines should be referred to the URC for review and recommendations;

G. informing the Assistant Secretary, as appropriate, of incidents where an undercover operative was required to use deadly force in the course of an undercover assignment;

H. informing the Assistant Secretary, as appropriate, if an undercover operational activity resulted in violence in the course of criminal activity, and if an undercover operative participated, in any manner, in the criminal activity; and

I. reporting to the Assistant Secretary, on a monthly basis, all premium class travel approved by the Director of OI for undercover operations.

## 4.3 Undercover Review Committee (DHS and ICE)

### 4.3.1 The DHS URC is responsible for:

A. considering proposals, including funding requests and expenditure authorization requests, for undercover operations that involve DHS sensitive circumstances;

B. making recommendations, through the chairperson (DAD, ISD), to the Director of OI regarding the approval, amendment, or disapproval of undercover proposals;

C. when appropriate, recommending changes or additions to the undercover operation's administration and/or operational activities;

D. consulting with ICE Counsel about any significant and/or unsettled legal issues concerning the authority for, or the conduct of, proposed undercover operations;

E. considering any undercover operation that has been approved, reauthorized, expanded or enhanced under exigent circumstances and making recommendations per (A) and (B);

F. reviewing ongoing operations that have had or are planned to have a significant change in direction or objective and making recommendations per (A) and (B); and

G. considering any other business related to undercover operations assigned by the Director of OI.

### 4.3.2 The ICE URC is responsible for:

A. considering proposals, including funding requests and expenditure authorization requests, for undercover operations that involve ICE sensitive circumstances;

B. making recommendations, through the chairperson (DAD, ISD), to the Director of OI regarding approval, amendment, or disapproval of undercover proposals;

C. when appropriate, recommending changes or additions to the undercover operation's administration and/or operational activities;



Post-Hearing Brief Exhibit 1

D. consulting with ICE Counsel about any significant and/or unsettled legal issues concerning the authority for, or the conduct of, proposed undercover operations;

E. considering any undercover operation that has been approved, reauthorized, expanded, or enhanced under exigent circumstances and making recommendations per (A) and (B);

F. reviewing ongoing operations that have had or are planned to have a significant change in direction or objective and making recommendations per (A) and (B);

G. considering any other business related to undercover operations assigned by the Director of OI; and

H. reviewing and making recommendations to the Director of OI regarding retention requests for forfeited property that will be utilized in an undercover operation.

## 4.4 Deputy Assistant Director, Investigative Services Division

The DAD, ISD, is responsible for:

A. ensuring full compliance with the OI undercover operations policy;

B. chairing the DHS and ICE URC and providing recommendations of the URC to the Director of OI;

C. when appropriate, making recommendations to the SACs regarding proposals for the establishment or reauthorization of an undercover operation prior to its presentation to the URC;

D. making recommendations to the Director of OI regarding exigent requests for approval, reauthorization, expansion, enhancement, or addition of sensitive circumstances to an undercover investigation/operation;

E. making recommendations to the Director of OI regarding the allocation of funding for undercover operations, including expenditure plans (6-month expenditure authorization);

F. reporting to the Director of OI any known violation of law by an undercover operative, employee, or source outside the scope of their authorization;

G. providing administrative and operational support to the SACs relating to undercover investigative and operational needs and approvals; and



Post-Hearing Brief Exhibit 1

H. approving waivers for separation of duties and training requirements related to undercover activities.

## 4.5 Assistant Directors, Operations, and Deputy Assistant Directors, Investigative Programs

The Assistant Directors (ADs), Operations (East and West), and the DADs, Investigative Programs (National Security Investigations; Financial, Narcotics and Public Safety; and Critical Infrastructure and Fraud), working in conjunction with the DAD, ISD, are responsible for:

A. participating and voting in meetings of the DHS and ICE URC and ensuring that appropriate personnel from their AOR attend the DHS and ICE URC;

B. making recommendations, through the DAD, ISD, to the Director of OI regarding exigent requests for approvals, reauthorizations, expansions, or enhancements of undercover operations;

C. when appropriate, making recommendations to the SACs regarding proposals for the establishment or reauthorization of an undercover operation prior to presentation to the URC;

D. making recommendations, through the DAD, ISD, to the Director of OI regarding the funding and expenditure plan (6-month expenditure authorization) for undercover operations;

E. coordinating administrative and operational matters with the SACs regarding the creation and submission of proposals for undercover operations within their respective AORs;

F. providing input at the scrub meeting on proposals in light of current programmatic priorities and initiatives;

G. ensuring that all ongoing undercover operations are monitored regarding each operation's stated operational and programmatic objectives and that they are being conducted within the required operational and programmatic policy limitations (as applicable);

H. providing support to the SACs relating to undercover operational needs and approvals; and

I. ensuring staff availability for participation in the undercover operation application and reauthorization process, as well as undercover operation field reviews.

### 4.6 Unit Chief, Undercover Operations Unit

The Unit Chief, Undercover Operations Unit, is responsible for:

A. the development and interpretation of OI's undercover operations policy, including conflict resolution, and for ensuring compliance with OI's undercover operations policy;

B. coordinating the authorization and certification of undercover operations by:

   1) tracking the progress of the application and reauthorization process for undercover operations;

   2) scheduling and administering the scrub meeting related to application and reauthorization proposals;

   3) distributing copies of application and reauthorization proposals received from the SACs to URC members prior to the URC meeting;

   4) scheduling and coordinating URC meetings; and

   5) maintaining the records of the URC;

C. providing input and advising SACs concerning the application and reauthorization proposals in light of current policies, procedures, and programmatic experience;

D. ensuring that individuals making presentations before the URC are properly prepared;

E. conducting, maintaining the records of, and providing support to the field for undercover programs related to the:

   1) Certified Undercover Fundamental Financial System (CUFFS);

   2) Undercover Backstopping and Identification Program;

   3) Undercover Liaison Coordinators;

   4) Undercover Field Review Program;

   5) Undercover Training Program;

   6) Undercover Policies;

   7) Undercover Review Committee; and

8) other undercover programs as directed;

F. liaise with other agencies on policy and procedural matters related to undercover operations that require other agency Headquarters participation;

G. ensuring the appropriate dissemination of programmatic information that may come directly to the Undercover Operations Unit at Headquarters; and

H. providing the DAD, ISD, with an assessment of administrative and investigative performance through:

1) participation in the review, approval, and recertification process for undercover operations;

2) review of monthly financial reports and related documentation;

3) participation in on-site field reviews of ongoing undercover operations;

4) review and evaluation of closeout reports and closeout audits; and

5) creation of undercover programmatic management reports as needed.

## 4.7 Undercover Liaison Coordinators

A. The National ULC is a Program Manager in the Undercover Operations Unit is responsible for overseeing all aspects of the ULC Program.

B. The Primary Field ULC is responsible for overseeing the ULC Program within the SAC's AOR.

C. The Secondary Field ULC is responsible for reporting to the Primary Field ULC.

*Note: The ULC Program, along with its roles and responsibilities, are discussed in detail in Chapter 10 of this Handbook.*

## 4.8 Unit Chiefs in ISD, Investigative Programs, and Operations

The Unit Chiefs, ISD, Programs, and Operations (East and West), are responsible for:

A. participating in, and voting at, the DHS and ICE URC;

B. coordinating all programmatic area concerns with the SACs regarding the creation and submission of proposals for undercover operations within their respective AORs;

C. participating in the scrub meeting and providing input regarding the application and reauthorization proposals in light of current programmatic priorities and initiatives;

D. advising the SACs of the results of the scrub meeting for proposals for which they are the designated lead program;

E. ensuring that personnel representing their AORs who are making presentations before the URC are properly prepared and on time for the presentation;

F. monitoring all ongoing undercover operations within their program area to ensure that they are addressing national strategy goals and stated programmatic objectives and that they are being conducted within any set limitations, as applicable;

G. ensuring staff availability for participation in the undercover field reviews, as needed;

H. providing the Undercover Operations Unit with all information related to the administration of ongoing undercover operations as it relates to policy and the review and approval/reauthorization process; and

I. making recommendations to the DAD, ISD, regarding funding of, and expenditure authorizations for, undercover operations.

### 4.9 Special Agent in Charge

The SAC is responsible for every aspect of undercover activity, investigations, and operations within his or her AOR. This responsibility encompasses all administrative and operational aspects of an undercover operation.

The SAC is responsible for ensuring that all undercover investigative activity complies with current policy and procedure, as well as overseeing OI's obligation to utilize the undercover statutory authority of 8 U.S.C. § 1363a and 19 U.S.C. § 2081 within his or her AOR in a prudent and judicious manner.

The statutory authority and architecture of OI undercover operations allow extreme field flexibility and discretion in order to maximize the use of OI's resources while adhering to statutory and policy requirements.

During the course of an undercover operation, the SAC is responsible for the periodic review of the conduct (including any proposed or reasonably foreseeable conduct) of the undercover operation, operational personnel, undercover employees, and others participating in the undercover operation, and for:



Post-Hearing Brief Exhibit 1

A. discussing any findings of impermissible conduct with the individuals involved;

B. reporting any findings of impermissible conduct to the DAD, ISD; and

C. consulting with ICE Counsel on pertinent legal issues, especially agent/agency liability.

Issues Related to the Administration of Undercover Operations

D. approving undercover operations that do not exceed his or her emergency approval authority (as specified in Section 5.8 of this Handbook, "Emergency Approval") when emergency circumstances exist;

E. ensuring that all applications for undercover operations and proposals for the reauthorization of current operations are in the correct format, contain all information required, and are transmitted to OI Headquarters in a timely fashion;

F. ensuring that all additional required documentation related to undercover activity is forwarded to OI Headquarters in a timely fashion;

G. appointing the CUC Administrative Overseer(s);

H. reviewing and certifying the monthly financial statement of operations (see Chapter 7, "Management Controls and Reporting Requirements for Undercover Operations");

I. determining that expenditures are necessary and reasonable for the conduct of the operation, as well as within the spending levels (6-month expenditure authorization) approved by the Director of OI;

J. ensuring that the CUFFS (QuickBooks) monthly financial email report is transmitted to the Headquarters Undercover Operations Unit (see Chapter 7, "Management Controls and Reporting Requirements for Undercover Operations");

K. reviewing and approving requests for operational travel regarding actual expenses and/or expenses exceeding 150% of per diem (this authority may not be delegated);

L. ensuring that all undercover operations are in compliance with reporting requirements and internal controls established to provide financial and administrative accountability, and that all damaged, lost or stolen CUC property and lost or stolen monies is reported in a timely and accurate manner.

M. providing timely notification to the DAD, ISD, of an intent to close a certified undercover operation;

N. approving the operational necessity for the use of leased vehicles (every 6 months).

Issues Related to the Undercover Investigative Activity

O. ensuring that all investigations under a certified undercover operation involve undercover activity or a direct nexus to undercover activity;

P. ensuring that the appropriate federal prosecutor is consulted on a continuing basis by the appropriate OI manager, particularly with respect to legal sufficiency and quality of evidence being produced;

Q. ensuring that adequate manpower and resources are provided for the safety and security of the operation;

R. ensuring that undercover activities, investigations, and operations are conducted and supervised in compliance with these guidelines.

Issues Related to Employees Acting in an Undercover Capacity

Prior to an undercover activity or operation (other than limited undercover work), the SAC will ensure that employees acting in an undercover capacity:

S. are aware of the conduct that they are expected to adopt, as well as their responsibilities enumerated in Section 4.15, "Undercover Operative";

T. have successfully completed the Undercover Operatives School (UCOS), except when a written exemption for completion of the UCOS has been obtained from the DAD, ISD;

U. are fully aware of any of the sensitive circumstances (as defined in the Glossary of this Handbook) that are reasonably likely to occur;

V. have been instructed in the law of entrapment;

W. are aware, if they learn that persons under investigation intend to commit a violent crime, that they will make every reasonable effort to avert the violence and shall report the information in an expeditious manner to OI management;

X. are instructed not to participate in any act of violence, initiate or instigate any plan to commit violent criminal acts, use unlawful investigative techniques to obtain information or evidence, or, except in an emergency situation as set out

in Chapter 3 of this Handbook, engage in any otherwise illegal activity for which prior authorization has not been obtained; and

Y. ensure that each undercover operative is assigned to, is aware of, and has access to a SAC ULC.

In consultation with the Primary Field ULC, Deputy SAC, Assistant SAC (ASAC), Resident Agent in Charge (RAC) (as appropriate), and Group Supervisor (GS), the SAC will:

AA. nominate qualified candidates for the UCOS;

BB. select SAs, after consultation with the Primary Field ULC, for specific undercover assignments, based on careful consideration of temperament, type of investigation, and role to be undertaken, as well as the number of recent undercover projects in which the agent has participated;

CC. submit requests for a waiver from undercover training requirements for potential undercover operatives to the DAD, ISD, through the Unit Chief, Undercover Operations Unit. This requirement applies to both OI agents and any other law enforcement officers working under or attached to OI (see Section 8.1, "Undercover Operatives School");

DD. ensure that undercover operatives are not utilized to such an extent that the stress of undercover work or their repeated use as undercover operatives adversely affects their psychological well-being, safety, or career;

EE. approve all requests for undercover identification;

FF. ensure that a file containing all undercover identification is maintained and that an annual inventory of undercover identification is completed. The file shall have all original undercover identification not currently being used by the undercover operative, as well as copies of all undercover identification currently being used by the undercover operative; the file should also include (as appropriate) a memorandum, signed by the SAC, approving the retention of undercover identification and the issuance of any personal undercover bank accounts and credit cards, including their account numbers (see Section 9.1, "Personal Undercover Identification"); and

GG. ensure that all federally-issued undercover identification which is no longer needed is returned to the Undercover Operations Unit and that any loss of federally-issued identification is promptly reported via memorandum to the Undercover Operations Unit.

### 4.10 CUC Administrative Overseer(s)

The SAC-appointed CUC Administrative Overseers shall be second-line supervisors (ASACs or higher-graded officials) with undercover investigative/operational management experience. This position is mandatory in SAC Offices that maintain certified undercover operations. The CUC Administrative Overseer(s) is responsible for:

A. serving as the primary decision-maker for matters which relate to the administration (including operational expenditures) and oversight of certified undercover operations assigned by the SAC;

B. ensuring that an operation’s resources are used for the greatest benefit of the OI mission;

C. ensuring that the operation has the authorization to conduct investigations involving DHS and/or ICE sensitive circumstances that are involved or are reasonably likely to be involved;

D. oversight of the Undercover Operation’s CUC Lead/Administrative GS related to the administration of the certified undercover operation;

E. ensuring that all operational personnel are aware of, and in compliance with, current undercover policies and procedures;

F. advising the SAC of needed changes to any local undercover policies and procedures;

G. ensuring that the required separation of duties is maintained within the undercover operation;

H. ensuring that a complete annual physical inventory of all items on the Property/Equipment Log for the certified undercover operations (Appendix D) is conducted in a timely manner;

I. ensuring that expenditures are necessary and reasonable for the conduct of the operation, as well as within the spending levels (6-month expenditure authorization plan) approved by the Director of OI;

J. ensuring that assigned undercover operations are in compliance with reporting requirements and internal controls established to provide financial and administrative accountability; and

K. ensuring that the CUC Lead/Administrative GS and Investigative GS(s) carry out their respective roles and responsibilities.

### 4.11 CUC Lead/Administrative Group Supervisor

The CUC Lead/Administrative GS is a first-line supervisor, appointed by the SAC, with the responsibility and authority to manage, monitor, coordinate, and direct all administrative aspects of the certified undercover operation.

*Note: This supervisor may, and presumably will, have the dual role of CUC Lead/Administrative GS and Investigative GS (see Section 4.12, "Investigative Group Supervisor").*

*Note: In certified undercover operations that involve more than one GS or multi-investigative group operations, it is recommended that the CUC Lead/Administrative GS report directly to the CUC Administrative Overseer on matters related to the certified undercover operation. It is highly recommended that the CUC Lead/Administrative GS be in the CUC Administrative Overseer's direct chain of command.*

The CUC Lead/Administrative GS is responsible for:

A. ensuring the development and submission of undercover application and reauthorization proposal which conforms to current policy;

B. ensuring that the proposal for application or reauthorization is complete and transmitted to Headquarters in a timely fashion;

C. reviewing the CUFFS monthly financial report prior to transmittal to OI Headquarters and ensuring the proper maintenance and updating of the CUFFS (QuickBooks) record-keeping system;

D. reviewing monthly financial reports for the proper use of funds, the accuracy of their recordation, and making recommendations to the SAC regarding the approval of the monthly financial reports;

E. ensuring that reports, fiscal requests, and recertification proposals are submitted in a timely manner;

F. ensuring that the records and files specified in Section 6.10.3, "Certified Undercover Operation File Requirements," are established and properly maintained;

G. ensuring that the expenditures are necessary and reasonable for the conduct of the operation as well as within the spending levels (6-month expenditure authorization plan) approved by the Director of OI;

H. ensuring that the information necessary to comply with undercover policy is provided to the CUC Administrative Overseer;



Post-Hearing Brief Exhibit 1

I. ensuring that the CUFFS Administrator for the operation is changed at an appropriate time (see Section 4.18.1, "CUFFS Administrator – Rotation").

J. Ensuring that, for the purposes of deconfliction, undercover operational bank account numbers are placed in TECS Case Management, as appropriate (only the UC account number and SAC contact information are required).

K. assigning a property officer and ensuring that proper documentation pertaining to the permanent assignment or temporary use of property listed in the Property/Equipment Log for Undercover Operations is in accordance with the provisions of this Handbook.

### 4.12 Investigative Group Supervisor

The Investigative GS is a first-line supervisor responsible for managing, coordinating, and directing investigations within his or her supervisory control that are using the statutory exemptions and sensitive circumstances authorization of a certified undercover operation.

<u>Note:</u> *The CUC Lead/Administrative GS who administers the certified undercover operation may have a dual role of both Lead and Investigative GS.*

The Investigative GS is responsible for:

A. providing supervision relating to day-to-day operational and strategic decisions and on-site guidance relating to undercover policies and procedures for undercover activities conducted under his or her supervisory control;

B. ensuring that full and complete operational plans are generated and approved, and for conducting complete operation briefings prior to any undercover activity;

C. ensuring that the operation has the authorization to conduct investigations involving DHS and/or ICE sensitive circumstances that are involved or are reasonably likely to be involved within investigations under his or her authority; immediately advising the undercover operation's CUC Lead/Administrative GS of any anticipated additional sensitive circumstances that are not included in the operation's authorization;

D. ensuring that all investigations under his or her control involve undercover activity or a direct nexus to undercover activity prior to being placed under the certified undercover operation;

E. ensuring that sufficient resources are in place to provide necessary safety and security measures prior to undercover activities, including making sure that an



Post-Hearing Brief Exhibit 1

undercover activity pre-briefing is held and attended by all law enforcement officers who will be involved in the activity;

F. monitoring the overall health of the undercover operatives, in consultation with the Primary Field ULC, to ensure that investigative objectives do not take precedence over the well-being of the operative;

G. ensuring proper coordination of undercover operational activities with OI Headquarters, foreign offices, and other agencies;

H. ensuring that all activities and enforcement results under his or her control related to an operation are promptly entered into TECS Case Management and linked to the program code of the undercover operation;

I. ensuring that information under his or her control needed for reports, budget requests, and recertification proposals are provided to the operational CUC Lead/Administrative GS in a timely manner;

J. ensuring that all expenditures under his or her control are properly approved, documented, and transmitted to the CUC Lead/Administrative GS (all operational expenses should be coordinated with the CUC Lead/Administrative GS prior to the expense);

K. ensuring full coordination with the SAC Asset Identification and Removal Group (AIRG), as applicable;

L. ensuring that target telephone numbers are provided to the OI Special Operations Unit personnel, as appropriate;

M. ensuring that all undercover related telephone numbers, including but not limited to, numbers established in ICE offices, at undercover off-sites, or under the control of undercover operatives, informants, and cooperating defendants are provided to the OI Special Operations Unit for inclusion into its Undercover Database for the purpose of deconfliction; and

N. ensuring that target bank and other financial account numbers are entered into TECS Case Management, as appropriate.

## 4.13 CUC Program Manager

The CUC Program Manager is a Senior Special Agent (GS-1811-13) selected by the CUC Lead/Administrative GS and/or the CUC Administrative Overseer(s) and approved by the SAC. The CUC Program Manager will be in the CUC Lead/Administrative GS's chain of command. The CUC Program Manager will have the responsibility and authority (through the CUC Lead/Administrative GS) to coordinate all administrative aspects of a particular certified undercover operation. If the individual holding this



Post-Hearing Brief Exhibit 1

position does not have approval authority within an operation, he or she will coordinate approvals with the appropriate supervisor.

*Note: If no CUC Program Manager is designated for an operation, the responsibilities enumerated fall to the CUC Lead/Administrative GS.*

The CUC Program Manager is responsible for:

A. developing and submitting to the CUC Lead/Administrative GS the undercover proposal for reauthorization which conforms to current policy;

B. providing guidance relating to the day-to-day operational and strategic decisions and on-site guidance relating to undercover policies and procedures for undercover activities conducted under the operation;

C. reporting any issues regarding the overall health of the undercover operatives to the appropriate supervisor and Primary Field ULC;

D. monitoring the maintenance and updating of the CUFFS (QuickBooks) record-keeping system;

E. advising the CUC Lead/Administrative GS regarding the appropriate time for changing the operation’s CUFFS Administrator as appropriate and required by policy (see Section 4.18.1, “CUFFS Administrator – Rotation”);

F. facilitating the investigative GS’s responsibility for the proper coordination of operational activities with OI Headquarters, foreign offices, and other agencies;

G. reviewing monthly financial reports for proper use of funds and accuracy;

H. monitoring all activities and enforcement results related to an operation and facilitating their proper placement in TECS Case Management;

I. determining that required reports, budget requests, review/audit responses, and recertification proposals are submitted in a timely manner;

J. determining that the records and files specified in Section 6.10.3, “Certified Undercover Operation File Requirements”, are established and properly maintained; and

K. determining that all expenditures are properly approved and documented.

## 4.14 Case Agent

The Case Agent (including any assigned TFO) is responsible for:

A. making the day-to-day operational and strategic decisions involving undercover investigations and activities in conjunction with the undercover operation's management;

B. ensuring that full and complete operational plans are generated and approved and complete operation briefings take place prior to any undercover activity;

C. preparing and presenting investigative findings to the U.S. Attorney's Office for prosecution;

D. making frequent contact with the undercover operative to monitor case activities and identify operational requirements (except in cases of deep, isolated undercover (see Section 4.17, "Contact Agent"));

E. continually directing case activities toward a successful conclusion;

F. reporting all case activities and statistics in TECS Case Management in a timely manner;

G. providing target telephone numbers to the OI Special Operations Unit, as appropriate;

H. ensuring that target bank and other financial account numbers are entered into TECS Case Management, as appropriate;

I. keeping his or her Investigative GS apprised of all case-related activities;

J. immediately advising his or her Investigative GS and the undercover operation's CUC Lead/Administrative GS of any anticipated additional sensitive circumstances that are not included in the operation's authorization; and

K. providing a written case summary to his or her Investigative GS for inclusion in the operation's reauthorization proposal.

### 4.15 Undercover Operative

An undercover operative is most often an OI agent (or any other ICE officer approved in writing by the Director of OI) acting in an undercover capacity. An undercover operative may also be a law enforcement officer of another federal, state, or local law enforcement agency who voluntarily works under the direction and control of OI in a particular investigation. An undercover operative's relationship with law enforcement is concealed from third parties during the course of an investigative operation.

The performance of an undercover role is a voluntary activity, and refusal to perform in such a role is not grounds, in and of itself, for disciplinary action. The undercover operative, in consultation with the Investigative GS, must be familiar with the safety precautions to be utilized for a particular undercover activity.

No ICE employee will perform in an undercover role (except in limited undercover activities, as defined in the Glossary of this Handbook – see "Undercover Activity") without (1) attending, passing, and being accredited through an undercover operative training course sanctioned by the OI Undercover Operations Unit (see Section 8.1, "Undercover Operatives School"), or (2) a temporary waiver signed by the DAD, ISD. (See Section 8.1, "Undercover Operatives School.")

*<u>Note:</u> OI SAs are required to have 3 years of criminal investigative experience prior to attending the ICE OI Undercover Operatives School and performing in an undercover role other than limited undercover activity. (See Section 8.1, "Undercover Operatives School.")*

With the exception of OI personnel, no employee of a government and/or law enforcement organization shall perform the functions of an undercover operative (except limited undercover activities) within an ICE undercover investigation without written approval from <u>both</u> the Director of OI (such approval may be delegated to the DAD, ISD) and a senior manager who is equivalent to a second-line supervisor (ASAC or higher) from the organization where the operative is employed. Attendance and successful completion of the UCOS shall constitute such approval.

OI supervisors and managers shall not act as undercover operatives except in situations of extraordinary circumstances and need, and with the written approval of the DAD, ISD.

The undercover operative is responsible for:

A. immediately advising his or her supervisor, as well as the Case Agent and the Field ULC, of any reluctance to continue participation in undercover activities;

B. understanding what activities are expected;

C. understanding what activities are likely to occur in undercover scenarios;

D. knowing the objectives and strategy of the undercover activities;

E. knowing the elements of the crimes being investigated;

F. understanding all legal and policy matters related to undercover investigations, in particular those relating to:

    1) sensitive circumstances;



Post-Hearing Brief Exhibit 1

2) proper conduct;

3) entrapment;

4) search authority;

5) acts of violence; and

6) the carrying of a firearm and the use of alcohol in an undercover capacity as defined in the Interim ICE Firearms Policy and the Interim ICE Use of Force Policy, both dated July 7, 2004, or as updated.

G. immediately informing his or her GS of participation in otherwise illegal activity that was unforeseen and not previously authorized in accordance with Chapter 3, "Legal/Liability Issues";

H. immediately informing the appropriate law enforcement authority of credible information suggesting that the life or safety of any person is in serious danger;

I. refraining from undercover activities (excessive drinking, immoral acts, and misconduct) that could jeopardize the prosecution of targets of undercover investigations;

J. ensuring that an undercover activity pre-briefing is held and attended by all law enforcement officers who will be involved in the activity; and

K. being cognizant of possible issues with inadvertent meetings with undercover targets.

## 4.16 Cover Agent

The cover agent is an SA or TFO whose primary purpose during an undercover meeting is to ensure the security of the undercover operative. The cover agent is responsible for:

A. placing the safety and security of the undercover operative first;

B. ensuring that his or her role in the security of undercover activities is clearly understood for all operational contingencies, including the use of pre-briefings attended by all law enforcement officers who will be involved in the activity;

C. reporting any relevant case activities in TECS Case Management in a timely manner; and

D. keeping the Case Agent apprised of all case-related activities.

## 4.17 Contact Agent

The contact agent is a Senior SA or higher-graded official (with undercover identity and experience) used in deep undercover (as defined in the Glossary of this Handbook) situations and responsible for maintaining regular contact with the undercover operative to:

A. pass on and receive information relating to investigative activity and strategies without compromising the undercover operative's role;

B. relay to management any instances of unforeseen illegal activity or threat to the safety of the undercover operative and/or third persons; and

C. monitor the undercover operative for safety concerns, signs of stress, or any reluctance to continue, and report these to the appropriate manager(s) and the ULC.

## 4.18 CUFFS Administrator

The CUFFS Administrator is an OI employee who maintains the books and records of the certified undercover operation.

Note: *The CUFFS Administrator (Record-Keeper) of a certified undercover operation must be an OI employee. The Director of OI may waive this requirement on a case-by-case basis.*

CUFFS Administrators who occupy the position as a collateral duty are prohibited from simultaneously being the CUFFS Administrator for more than one certified undercover operation. Upon a showing of compelling need, the DAD, ISD, may waive this prohibition on a case-by-case basis for a period not to exceed 1 year. It is highly recommended that the CUFFS Administrator be in the chain of command of the CUC Lead/Administrative GS.

For financial control and oversight in a certified undercover operation, it is imperative to maintain a separation of duties between the requesting, approving, and recording functions of/for expenditures within an operation; therefore, no waiver shall be issued for the separation of these functions.

The CUFFS Administrator is responsible for:

A. maintaining the financial books and records of the certified undercover operation in compliance with the CUFFS Manual;

B. ensuring that all financial transactions are entered into CUFFS in an accurate and timely manner;



Post-Hearing Brief Exhibit 1

C. ensuring that sufficient documentation (i.e., receipts, invoices, memoranda, etc.) is maintained for each expenditure in order to meet audit requirements;

D. immediately notifying the CUC Lead/Administrative GS and/or the CUC Program Manager of any improper expenditures;

E. generating the required monthly financial reports and providing them to the CUC Lead/Administrative GS and/or the CUC Program Manager for review;

F. ensuring that all property purchased with operational funds is properly listed in the Property/Equipment Log for Undercover Operations (Appendix D);

G. reporting any gross violations of OI undercover operational financial policy to the Headquarters Undercover Operations Unit.

### 4.18.1 CUFFS Administrator – Rotation

Because of the high demands that can be associated with the job of CUFFS Administrator, managers need to ensure that the CUFFS Administrator is not kept in a position where either stress-related problems or career stagnation occurs. To guard against these possibilities, the CUFFS Administrator shall have the option of being rotated out of that position without any adverse effects. Recommended rotations are as follows: SA or Criminal Research Specialist, 2 years; administrative or clerical series personnel, 4 years. This time limitation may be waived by the Unit Chief, Undercover Operations Unit, on a case-by-case basis upon written request of the SAC and a showing of extreme resource limitations.

The CUFFS Administrator will have the option of remaining in the position if he or she so desires. If the CUFFS Administrator is an agent or a Criminal Research Specialist, he or she must submit a written request to remain as CUFFS Administrator, through the appropriate channels, to the Unit Chief, Undercover Operations Unit. The request must be approved in writing by the Unit Chief, Undercover Operations Unit, for the requesting employee to remain as CUFFS Administrator for more than 2 years. If the CUFFS Administrator is from an administrative or clerical series, a written request by the employee must be submitted through the appropriate channels to the Unit Chief, Undercover Operations Unit, and approved in writing in order to remain as CUFFS Administrator for more than 4 years.

This policy regarding time limitations on the CUFFS Administrator position does not apply if the position description of the employee includes financial CUFFS Administrator duties.

## 4.19 Separation of Duties

Due to the intensive requirements of the positions and the need for internal controls, a separation of duties must be maintained between the following operational roles:

A. CUC Administrative Overseer(s)

B. GS (Lead and Investigative) and CUC Program Manager

C. Case Agent(s)

D. Undercover Operative(s) (other than limited undercover activity)

E. CUFFS Administrator

### 4.19.1 Waiver of Requirement for Separation of Duties

If the SAC determines that, because of resource limitations and the nature of the undercover operation, an exception to the separation of duties policy is warranted, a justification and waiver request memorandum must be prepared and forwarded to the DAD, ISD, through the Unit Chief, Undercover Operations Unit, requesting a waiver and providing the need and a justification for the non-separation of duties.

If approved, a memorandum documenting the waiver will be transmitted to the initiating SAC and maintained by operational personnel. Additionally, a copy of the waiver will be maintained in the undercover operation's master file maintained by the Undercover Operations Unit.

Unless otherwise stated, waivers for separation of duties will expire 1 year from the date of the approval. Continuation of dual roles will require a renewal of the waiver prior to its expiration.

Except in extraordinary circumstances, the following will apply:

A. a separation of duties waiver will not be granted for a GS and undercover operative.

B. a separation of duties waiver will not be granted for a Case Agent and undercover operative (other than an operative involved in limited undercover activity for which no waiver is required) within the same investigation.

## 4.20 Position Titles (Savings Provision)

The position titles (job titles) used in this Handbook shall be changed as the Agency's position titles change; this savings provision allows for the transition of position titles. In the event of position title and management structure changes, the position titles in this Handbook will be assumed by the new position titles that have the responsibilities of the previous position titles. When position responsibilities are split or when there is no logical position responsibility migration, the Director of OI shall identify, by means of a memorandum, the new position titles for the previous position titles' responsibilities.

# Chapter 5. UNDERCOVER OPERATION APPLICATION AND APPROVAL PROCESS

## 5.1 Assessing the Need for an Undercover Operation

When considering the development of an undercover operation, the risks and benefits of the operation must be considered. Some of the factors managers must consider are the:

A. risk of personal injury to individuals, property damage, financial loss to persons or businesses, damage to reputation, or other harm to innocent persons;

B. risk of civil liability or other loss to the U.S. Government;

C. risk that individuals engaged in undercover operations may become involved in illegal activity that is not essential for producing the expected operational results; and

D. suitability of law enforcement participation in the type of activity that is expected to occur.

Undercover operations should be planned to minimize sensitive circumstances and reduce the risks of harm and intrusion that are created by such circumstances.

Other factors to consider are:

A. coordination with other DHS agencies regarding the availability and suitable use of DHS assets (e.g., U.S. Customs and Border Protection (CBP) air and marine assets);

B. coordination with the CBP National Law Enforcement Communications Center when undercover activity is anticipated; and

C. coordination with the appropriate ICE Attaché (1811 series) regarding undercover activity issues relating to foreign travel, the use of foreign bank accounts, and the conduct of undercover activities in foreign countries (see Chapter 12, "Undercover Activity in Foreign Countries").

## 5.2 Who May Make Application for and Conduct Undercover Operations

Only OI agents (1811-series employees), under the supervision of a SAC, may make application for and conduct undercover operations controlled by this Handbook.

<u>*Note:*</u> *In the case of Headquarters-run undercover operations, "SAC" should be replaced with "Unit Chief" throughout this Handbook.*



Post-Hearing Brief Exhibit 1

## 5.3 Types of Undercover Investigations/Operations and Approval Levels

### 5.3.1 Group Supervisor-Approved Undercover Investigations

The GS (through the authority of the SAC) may approve, in TECS Case Management or otherwise in writing, undercover investigations/projects which:

A. are anticipated to last less than 6 months from the first undercover activity;

B. do not involve DHS and/or ICE sensitive circumstances (defined in the Glossary of this Handbook); and

C. do not require the use of any of the statutory exemptions contained in 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.

*Note: The SAC must approve requests for the use of consensual monitoring.*

### 5.3.2 SAC-Approved Investigations/Projects

The SAC may approve, in TECS Case Management or otherwise in writing, undercover investigations/projects that require the use of consensual monitoring and/or electronic audio surveillance of undercover conversations or activities and that do not involve sensitive circumstances or the use of the statutory exemptions.

When it becomes apparent that an ongoing investigation/project will continue for more than 6 months beyond the first undercover activity, the SAC must request the authorization to continue the investigation/project from the Director of OI. This is accomplished by submitting a memorandum, in the standard format, through the Unit Chief, Undercover Operations Unit, to the Director of OI. The memorandum should contain a synopsis of the relevant facts and a request for the authorization to continue the investigation/project.

### 5.3.3 Director of OI-Approved Operations

#### 5.3.3(1) More Than 6 but Less Than 12 Months

The Director of OI may approve undercover investigations/projects without review by the URC when the activities:

A. do not involve DHS and/or ICE sensitive circumstances (defined in the Glossary of this Handbook);

B. do not require certification for any of the exemptions contained in 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a; and

C. the investigation/project will last longer than 6 months for the first undercover activity.

The SAC shall submit a memorandum for review and approval of such investigations/projects to the Director of OI, through the Unit Chief, Undercover Operations Unit. The memorandum, in the standard format, should contain a synopsis of the relevant facts and a request for the authorization for the investigation/project.

### 5.3.3(2) Sensitive Circumstances Requiring Review by the URC

The Director of OI may certify and approve undercover operations after review by the URC when the activities:

A. involve DHS and/or ICE sensitive circumstances (as defined in the Glossary of this Handbook); and

B. may or may not require certification for the exemptions contained in 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a.

Undercover activities and operations that involve sensitive circumstances must be reviewed by the appropriate DHS or ICE URC as described in Section 4.3, "Undercover Review Committee (DHS and ICE)," and Section 5.5.4, "Review and Final Approval." When ongoing activities will include sensitive circumstances, a proposal in the standard format must be submitted by the SAC for the URC's review and forwarded to the Director of OI for authorization and certification.

## 5.4 Undercover Operation Flow Chart




* CERTIFICATION FOR STATUTORY AUTHORITY / AUTHORIZATION TO CONDUCT INVESTIGATIONS THAT INCLUDE SENSITIVE CIRCUMSTANCES.

## 5.5 Certified Undercover Operation Application and Reauthorization Procedures

Depending on the circumstances involved and the requisite level of approval, the procedures for the review and approval process of undercover operations will vary (see Section 5.4, "Undercover Operation Flow Chart").

Unless otherwise indicated, the procedures described in this Section are applicable to both applications for new operations and requests for reauthorization of existing operations.

Each office proposing an undercover operation must maintain files that include copies of:

A. operation proposals; and

B. correspondence to and from OI Headquarters regarding authorization and certification.

Field managers are encouraged to work closely with the appropriate Headquarters Program Managers/Desk Officers, the Undercover Operations Unit, and local ICE Counsel when considering the submission of an undercover proposal. The Headquarters Program Managers/Desk Officers will assist by providing advisory assistance to ensure that the proposal adequately addresses national priorities and strategies. The Undercover Operations Unit will provide advisory assistance to ensure that the application is thorough and complete.

### 5.5.1 Expansion to Additional Investigative Program Areas

When an existing operation requires expansion to include additional programmatic areas, the SAC will submit an expansion request in the appropriate format required by the Undercover Operations Unit. An operational expansion can be accomplished concurrent with the operation's reauthorization. An expansion authorization may also be accomplished under exigent circumstances following the requirements for exigent approval specified in Section 5.7, "Exigent Approval."

*Note: Since the format for submitting expansion requests is subject to change, the Undercover Operations Unit should be contacted to obtain the most recent version.*

### 5.5.2 Application and Reauthorization Proposal Format

#### 5.5.2(1) Application

Proposals for the initial authorization of certified undercover operations must conform to the format dictated by the Unit Chief, Undercover Operations Unit. The proposals should be concise but contain enough details to identify, to the extent possible, known targets and expected violations. The following information must be included in all proposals:



Post-Hearing Brief Exhibit 1

A. date the application will be presented to the URC;

B. proposed name of the operation (the name must be vetted through the Undercover Operations Unit to avoid duplication of operational names);

C. investigative programmatic area(s);

D. short overview (for each investigative programmatic area) concerning the undercover methods to be employed by the operation to infiltrate the target individual(s)/organization(s), including the specific investigative focus of the operation (i.e., a contraband smuggling investigation that provides drug transportation services);

E. identification of the targets (individuals, organizations, or systems) of the operation and the significance of those targets and the illegal activities;

F. the objective(s) of the operation;

G. the investigative strategy which will be employed;

H. the need for the use of exemptions under 8 U.S.C. § 1363a and 19 U.S.C. § 2081 necessary for the conduct of the operation (justifications for the use of each of the exemptions requested must be included);

I. a description of both DHS and ICE sensitive circumstances (defined in the Glossary of this Handbook) likely to occur in the operation;

J. the results anticipated over the next 6 months;

K. expenditure authorization and funding requested;

L. source information;

M. the extent to which the operation can continue without compromise;

N. the extent to which the continuation of the operation may cause injury, financial or otherwise, to the operatives or innocent third parties; and

O. other information required by the Director of OI and/or the URC.

*Note: Since the format for submitting a proposal for the initial authorization of a certified undercover operation is subject to change, the Undercover Operations Unit should be contacted to obtain the most recent version.*

### 5.5.2(2) Reauthorization

Proposals for the reauthorization of certified undercover operations must conform to the format dictated by the Unit Chief, Undercover Operations Unit. The proposals should be concise but contain enough details to identify, to the extent possible, known targets and expected violations. The following information must be included in all proposals:

A. items listed in Section 5.5.2(1), “Application”;

B. a narrative incorporating any changes to the original proposal;

C. a summary of the preceding 6 months’ operational activity;

*Note:* *Significant emphasis will be given by the URC only to those events or enforcement activities occurring within the 6 months preceding reauthorization and the enforcement activity anticipated in the following 6 months. The application for reauthorization should not reiterate the activity reported in the initial application or previous reauthorization proposals.*

D. the extent to which the operation has produced the results initially anticipated;

E. the potential for future success;

F. the extent to which the investment of resources is warranted in light of identified targets of the operation and investigative priorities; and

G. other information required by the Director of OI and/or the URC.

*Note:* *Since the format for submitting a proposal for the reauthorization of certified undercover operations is subject to change, the Undercover Operations Unit should be contacted to obtain the most recent version.*

### 5.5.3 Application and Reauthorization Procedures: Steps

A. The SAC writes the proposal (Application/Reauthorization).

B. The SAC forwards the proposal to the Undercover Operations Unit and Investigative Programmatic Unit(s).

C. The Undercover Operations Unit conducts the scrub meeting.

D. The SAC edits the proposal, based on the scrub meeting, and forwards it to the Undercover Operations Unit.

E. The URC makes recommendations.

F. authorization and certification are obtained from the Director of OI.

**5.5.3(1) Application and Reauthorization Procedures: Scrub Meeting**

The proposal and any other documentation not available in TECS Case Management, including a memorandum from the appropriate ICE Counsel, letter(s) of support from the appropriate U.S. Attorney's Office, and a Drug Enforcement Administration (DEA) SAC concurrence letter (if applicable) must be provided to the Unit Chief, Undercover Operations Unit, and simultaneously to the appropriate Operations Chief and/or Investigative Programmatic Unit Chief. (See Section 5.5.3(2), "Application and Reauthorization Procedures: Additional Documents Required with Proposal.")

The primary purpose of the scrub meeting is to determine if proposals meet the minimum requirements for:

A. sufficiency of content and form;

B. compliance with programmatic priorities;

C. legality; and

D. specificity of operational mission.

The scrub meeting will take place on the first Wednesday of each month (unless rescheduled by the Unit Chief, Undercover Operations Unit). Participants in the scrub meeting will review the proposal and related documentation available in TECS Case Management. During this initial Headquarters review of undercover proposals, the Undercover Operations Unit, in conjunction with the appropriate Unit Chief(s), will be responsible for assessing any request for appropriated funds as well as any expenditure authorization being requested.

The reviewers will also recommend the appropriate level of URC review (DHS or ICE) of the proposal, according to the operation's sensitive circumstances.

If the scrub meeting reveals issues that require a revision of the proposal:

A. the designated programmatic/operations Unit Chief will provide a detailed account of the required changes via email (or memorandum) to the SAC, incorporating the combined comments of the scrub meeting reviewers;

B. copies of the email or memorandum, along with the proposal, will be retained by the appropriate programmatic/operations Unit Chief and by the Undercover Operations Unit;

C. the SAC will provide a revised proposal to the designated programmatic/ operations Unit Chief and the Unit Chief, Undercover Operations Unit; and

D. the SAC will ensure that ICE Counsel, the U.S. Attorney's Office, and/or any other agency are notified of any substantive changes that are made to the application and/or reauthorization package after the scrub meeting.

**5.5.3(2) Application and Reauthorization Procedures: Additional Documents Required with Proposal**

A. SAC memorandum to the Director of OI requesting certification and authorization/recertification and reauthorization.

B. U.S. Attorney concurrence letter (from the core U.S. Attorney's Office) to the SAC stating that:

1) the office has reviewed the proposed operation, including the sensitive circumstances reasonably expected to occur;

2) the office concurs with the proposal and its legality; and

3) the office will prosecute meritorious cases that are developed;

C. U.S. Attorney acknowledgement letter(s) (from the U.S. Attorney's Office that has venue and is reasonably expected to prosecute operational cases) to the SAC stating that:

1) the office understands that certified undercover operational assets will be utilized in the U.S. Attorney's AOR; and

2) the office will prosecute meritorious cases developed in the U.S. Attorney's venue.

D. ICE Counsel legal opinion memorandum to the SAC stating that there are no legal impediments to the certification/authorization.

E. Local DEA SAC concurrence letter to the ICE OI SAC, if applicable.

F. Any additional documents as may be required.

**5.5.3(3) Application and Reauthorization Procedures: Presentation to the URC**

A. The individuals making the presentation of the proposal to the URC will be determined by the DAD, ISD, in consultation with the Unit Chief, Undercover Operations Unit, and the affected investigative programmatic Unit Chiefs, along with the SAC.



Post-Hearing Brief Exhibit 1

B. Presentations to the URC that require SAC personnel will be made by an ASAC or higher. The Headquarters Program Manager(s) will make presentations not requiring SAC personnel.

*Note:* *Although it is not required, the SAC and the U.S. Attorney or any member of their staff may attend URC meetings to provide additional details about an undercover proposal.*

### 5.5.4 Review and Final Approval

The appropriate procedure for review and approval of an undercover proposal is based on the need for authorization to conduct investigations that include sensitive circumstances (see Section 5.4, "Undercover Operation Flow Chart").

#### 5.5.4(1) Review by the ICE URC

The ICE URC will be chaired by the DAD, ISD, and will consist of the members specified in the Glossary of this Handbook. The ICE URC will meet and review proposals that involve ICE sensitive circumstances but not DHS sensitive circumstances. The ICE URC will meet on the third Wednesday of every month unless rescheduled by the Unit Chief, Undercover Operation Unit.

The following procedures will apply:

A. Following the satisfactory completion of the scrub meeting, the Undercover Operations Unit will provide copies of the proposal to the members of the ICE URC.

B. The ICE URC will meet, hear presentations, and review the proposal.

C. The ICE URC shall vote to recommend to the Director of OI the approval, amendment, or denial of authorization and certification.

D. At the conclusion of the meeting, the Chairperson shall prepare a memorandum documenting the recommendations of the URC and forward it to the Director of OI for action (i.e., certification and authorization).

E. After action by the Director of OI, the SAC will be notified of the decision in writing by the Undercover Operations Unit;

F. A copy of all relevant documents will be retained in the SAC office's undercover operation's permanent records.

G. A copy of the complete proposal and certification package will be retained in the Undercover Operations Unit's permanent records.

**5.5.4(2) Review by the DHS URC**

The DHS URC will be chaired by the DAD, ISD, and will consist of the members specified in the Glossary of this Handbook. The DHS URC will meet and review proposals that involve DHS sensitive circumstances. The DHS URC will meet on the third Wednesday of every month unless rescheduled by the Unit Chief, Undercover Operations Unit. ICE will have the final decision on operational matters such as investigative techniques and resource allocation.

The following procedures will apply:

A. Following the satisfactory completion of the scrub meeting, the Undercover Operations Unit will provide copies of the proposal to the members of the DHS URC (non-DHS members will not receive expenditure (budget) and source information).

B. The DHS URC will meet, hear presentations, and review the proposal.

C. The DHS URC shall vote to recommend to the Director of OI the approval, amendment, or denial of authorization and certification.

D. At the conclusion of the meeting, the Chairperson shall prepare a memorandum documenting the recommendations of the URC and forward it to the Director of OI for action (i.e., certification and authorization).

E. After action by the Director of OI, the SAC will be notified of the decision in writing by the Undercover Operations Unit.

F. A copy of all relevant documents will be retained in the SAC office's undercover operation's permanent records.

G. A copy of the complete proposal and certification package will be retained in the Undercover Operations Unit's permanent records.

**5.5.4(2.1) Review by the DHS URC: Department of Justice Non-Concurrence**

If a DHS URC Department of Justice (DOJ) representative does not concur in the recommendation for approval of a proposed operation based on legal or prosecutorial considerations, the following procedures apply:

A. The Chairperson of the DHS URC shall promptly notify the Director of OI.

B. The DOJ representative shall promptly advise the Assistant Attorney General for the Criminal Division.

C. Within 2 business days, the DOJ representative to the DHS URC will provide written notice to the DHS URC Chairperson regarding the nature and specific reason for the non-concurrence.

D. No further action shall be taken on the proposal (except as required to ensure compliance with any statutory requirements and/or to preserve investigative accomplishments as they relate to the reauthorization of an ongoing operation) until the Director of OI consults with the Assistant Attorney General, Criminal Division.

E. If the Director of OI and the Assistant Attorney General, Criminal Division, cannot resolve outstanding issues, the undercover operation must be authorized and certified by the Assistant Secretary of ICE, in consultation with DHS management, as appropriate.

### 5.5.5 Title 21 Operations – Memorandum of Understanding with DEA

Undercover operations that fall under the provisions (Title 21 of the United States Code) of the current Memorandum of Understanding (MOU) between the former USCS and DEA require additional considerations when determining the necessary steps for approval. The Homeland Security Act of 2002 transferred USCS' responsibilities within the MOU to ICE through 6 U.S.C. § 552. ICE OI SACs will consult with their appropriate DEA counterparts to initiate the necessary procedures required by the MOU. It is highly recommended that ICE OI SACs establish local procedures with their DEA counterparts for the coordination of these provisions.

When the proposal falls under the above-mentioned MOU, the following procedures apply:

<u>APPLICATIONS</u>

A. Prior to submission to the scrub meeting, the new undercover proposal (application for undercover operation) will be forwarded to the Unit Chief, Contraband Smuggling Unit, and will undergo an initial review. DEA should not be provided a copy at this time.

B. When this initial review is completed, the SAC will be notified by the Unit Chief, Contraband Smuggling Unit, that the proposal (excluding budget and source information) may be submitted to the local DEA SAC for concurrence.

<u>APPLICATIONS and REAUTHORIZATIONS</u>

C. The ICE OI SAC will send a copy of the sections of the proposal (excluding budget and source information) related to Title 21 investigations to the local DEA SAC, requesting written concurrence with the Title 21 aspects of the



Post-Hearing Brief Exhibit 1

operation. (*Note:* *In the case of multi-programmatic operations, only the relevant Title 21 portions of the proposal should be sent to the DEA SAC.)*

D. The local DEA SAC will review the proposal.

   1) In case of concurrence, the DEA SAC will transmit a concurrence letter to the ICE SAC.

   2) In case of non-concurrence, see Section 5.5.5(1), "Title 21 Operations – DEA Non-Concurrence".

E. The OI SAC will forward the DEA concurrence letter, if received, to the Undercover Operations Unit.

F. Prior to the URC meeting, the Unit Chief, Undercover Operations Unit, will provide a copy of the proposal (excluding budget and source information) and the DEA SAC concurrence letter to the appropriate DEA Headquarters Unit. The DEA Headquarters Unit will provide comments concerning the sections of the proposal relating to Title 21 to the Unit Chief, Undercover Operations Unit, or to the URC, as applicable.

G. Depending on the degree of sensitive circumstances involved, one of two procedures will be employed:

   1) review by the ICE URC, including a DEA representative, as described in Section 5.5.4(1), "Review by the ICE URC"; or

   2) review by the DHS URC, including a DEA representative, as described in Section 5.5.4(2), "Review by the DHS URC".

**5.5.5(1) Title 21 Operations – DEA Non-Concurrence**

If the DEA Headquarters representative to the ICE or DHS URC does not concur with the recommendation for approval of a proposed operation for any reason (including non-concurrence by the local DEA SAC), the following will occur:

A. The Chairperson of the URC shall promptly notify the Director of OI.

B. The DEA Headquarters representative to the URC shall promptly notify the Director of Operations, DEA.

C. Within 2 business days, the DEA representative will provide written notice to the URC Chairperson regarding the nature and specific reasons for the non-concurrence.

D. No further action shall be taken on the Title 21 aspects of the proposal (except as required to ensure compliance with any statutory requirements and/or to preserve investigative accomplishments as they relate to the reauthorization of an ongoing operation) until the Director of OI consults with the Director of Operations, DEA.

E. If the Director of OI and the Director of Operations, DEA, cannot resolve the outstanding issues, the undercover operation must be authorized and certified by the Assistant Secretary of ICE, in consultation with DHS Management, as appropriate.

*Note:* *These DEA non-concurrence procedures may be superseded by procedures agreed to by the ICE Director of OI and the DEA Director of Operations.*

### 5.6 Records of the URC to Be Maintained by the Undercover Operations Unit

The Undercover Operations Unit shall retain a record of:

A. all proposals for approval of undercover operations submitted to the URC;

B. a written record of the URC's action regarding the application/reauthorization requests; and

C. a record of the certifications or other disposition by the approving official.

### 5.7 Exigent Approval

These procedures apply to the approval of undercover activities and operations under exigent circumstances (defined in the Glossary of this Handbook). Failure to submit a timely proposal for the recertification of an ongoing undercover operation does not constitute exigent circumstances. The procedures detailed below generally require a 2-business day turnaround in Headquarters after receipt of the request by the Undercover Operations Unit.

Proposals that involve exigent circumstances pertaining to the MOU with DEA require additional steps set forth in Section 5.7.2, "Exigent Approval – Procedures – Activities Involving the DEA MOU."

### 5.7.1 Exigent Approval – Procedures

A. The SAC will submit a memorandum to the Director of OI through the Unit Chief, Undercover Operations Unit, requesting exigent approval and/or certification.

B. The memorandum shall detail the circumstances warranting exigent approval, but need only include enough information regarding past activity and potential



Post-Hearing Brief Exhibit 1

to satisfy the need for exigent approval. A more detailed final proposal shall be submitted through the URC for certification and will determine the full scope of any long-term undercover operation.

C. The memorandum shall contain contact information (name, phone number, email) of the Assistant U.S. Attorney (AUSA) who has verbally concurred with the exigent approval.

D. The Unit Chief, Undercover Operations Unit, will provide a copy of the memorandum to the appropriate Headquarters managers and ICE Headquarters Counsel and request immediate review and comments, as appropriate.

E. An immediate initial review will be conducted and the appropriate documents will be prepared for consideration for exigent approval by the Director of OI.

F. After considering the recommendation of the DAD, ISD, and any other appropriate AD and/or DAD, the Director of OI will make a final determination as to whether or not an exigent approval is warranted. If approved, the Director of OI will authorize the operation in writing, on an interim basis, not to exceed 30 days. An exigent reauthorization of an existing operation will expire 30 days from the original expiration date of the operation.

G. The authority to conduct investigations with sensitive circumstances granted under these provisions must be reviewed by the ICE or DHS URC, as applicable, at the earliest reasonable time.

### 5.7.2 Exigent Approval – Procedures – Activities Involving the DEA MOU

In addition to the above requirements for exigent approval, the following will apply when Title 21 activities are involved. (See Section 5.5.5, "Title 21 Operations – Memorandum of Understanding with DEA," for more information on requirements in Title 21 operations.)

In undercover operations requiring exigent approval that include Title 21 investigative issues, the following additional requirements will apply:

A. The ICE OI SAC will contact the local DEA SAC and relay all pertinent information regarding the undercover activity and exigent circumstances.

B. The DEA SAC will advise the ICE OI SAC of any objections to the proposed undercover operation in a timely manner.



Post-Hearing Brief Exhibit 1

C. The memorandum requesting exigent approval will include information regarding the communication with, and the concurrence (as applicable) of, the local DEA SAC.

If an operation is initiated under the above-mentioned requirements (in Subsections A-C), a written proposal in the standard format must be provided within 48 hours to the DEA SAC and the OI Unit Chief, Contraband Smuggling Unit.

### 5.8 Emergency Approval

The SAC may approve undercover activities or operations involving sensitive circumstances when emergency circumstances (defined in the Glossary of this Handbook) exist. Emergency approval may be granted for a limited period, not to exceed 48 hours, only when the SAC has determined that, without immediate initiation, extension, or renewal of an operation:

A. life and/or the personal safety of an individual would be placed in jeopardy;

B. danger that the security of the operation would be irreversibly damaged;

C. high value property would be placed in serious jeopardy; or

D. other potential emergency circumstances (defined in the Glossary of this Handbook) exist.

Under these circumstances, the SAC shall make all reasonable attempts to consult with the Director of OI for verbal emergency authorization. However, if attempts to contact the Director of OI are unsuccessful or consultation would be impractical based on time constraints, the SAC may authorize the required activities.

These provisions **do not** provide the SAC with the authority to:

A. approve or extend the certification requirement for the use of statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a;

B. approve activities which may require additional review and/or approval under the provisions of the MOU with DEA; or

C. delegate the authority to approve sensitive undercover activities under emergency circumstances.

Emergency authorizations of sensitive undercover activities or operations differ from approvals under exigent circumstances in that emergency authorizations are granted before documentation is submitted to Headquarters. If an operation is initiated or extended under these emergency guidelines, the following will apply:



Post-Hearing Brief Exhibit 1

A. A written memorandum to the Director of OI in the standard format must be provided through the Unit Chief, Undercover Operations Unit, within 48 hours.

B. The memorandum must include the following information:

1) the initial findings and description of the emergency situation;

2) an account of the steps taken to contact the Director of OI or an account of the circumstances that made this impractical;

3) a description of the activities that resulted from the emergency authorization; and

4) a request for continued authorization, if required. (See Section 5.7, "Exigent Approval.")

If an emergency authorization requires a review by the ICE or the DHS URC, as described in Section 5.5, "Certified Undercover Operation Application and Reauthorization Procedures," the SAC will prepare and submit a proposal in the standard format for presentation to the next available URC.

If the proposal for approval of an operation that was initiated or extended under these provisions is later denied during the review process, a full report of all activity undertaken during the course of the operation must be submitted to the Director of OI within 5 business days. If such a denied operation required review by the DHS or ICE URC as described in Section 5.5.4, "Review and Final Approval," the Director of OI will promptly inform the Assistant Secretary of ICE, as applicable.

## 5.9 Program Code Assignment/Case Tracking

When a new certified undercover operation has received final approval/certification, a program code from TECS Case Management will be assigned through the TECS System Manager in the Executive Information Unit (EIU), MSD. This code transmits the authorization and the certification of the operation to operational investigations. Additionally, the code identifies all related case activities and enables the retrieval of all case reports and statistics. It is the responsibility of the operation's CUC Lead/Administrative GS to ensure that a program code is obtained from the TECS System Manager. It is the responsibility of operational personnel to ensure the proper use of the program code when required (e.g., Case Management, ROIs, Incident Reports, Purchase of Information (POI)/Purchase of Evidence (POE), etc.).

The following procedures apply after initial certification:

A. Operational personnel will request the TECS program code from EIU, MSD.

B. Operational personnel shall provide a copy of the operation's certification signed by the Director of OI, to EIU, MSD.

C. The EIU, MSD, will ensure that a TECS program code is created with the following description format:

CUC OPERATION [NAME].

### 5.10 Duration of Authorization

Except pursuant to extension under exigent or emergency circumstances as described in Section 5.7, "Exigent Approval" and Section 5.8, "Emergency Approval," no undercover operation may continue longer than is necessary to achieve the objectives of the operation, nor in any event longer than 6 months, without reauthorization.

### 5.11 Unforeseen Circumstances

If, during the course of the 6-month authorization period, there is significant change in either the direction or objectives of an undercover operation, the SAC will submit an amended proposal for review by the URC and action by the Director of OI.

### 5.11.1 Unforeseen Circumstances: Operational Enhancements

When unforeseen operational opportunities arise that require a substantial deviation from the approved operational activities (e.g., a financial currency pick-up operation that wishes to open an undercover real estate company), the SAC shall promptly submit a memorandum in the standard format to the Unit Chief, Undercover Operations Unit, for review by the appropriate URC. This enhancement authorization may be granted under exigent circumstances by complying with the requirements for exigent approval stated in Section 5.7, "Exigent Approval," or, in emergency circumstances, with the requirements in Section 5.8, "Emergency Approval."

### 5.11.2 Unforeseen Circumstances: Additional Sensitive Circumstances

When unforeseen sensitive circumstances arise in an ongoing undercover operation, the SAC shall promptly submit a memorandum and a modified authorization, including a request in the standard format for the authority to conduct investigations with the new sensitive circumstances to the Unit Chief, Undercover Operations Unit, for review by the URC. This additional sensitive circumstances authorization may be granted under exigent circumstances by complying with the requirements for exigent approval stated in Section 5.7, "Exigent Approval," or, in emergency circumstances, with the requirements in Section 5.8, "Emergency Approval."

### 5.11.3 Unforeseen Circumstances: Legal Issues

The SAC shall consult with the DAD, ISD, whenever a serious legal, ethical, prosecutorial, or Departmental policy question arises in any undercover operation. The DAD, ISD, shall consult with the members of the appropriate URC on whether to recommend the modification, suspension, or termination of the operation to the Director of OI.

## 5.12 Joint Undercover Operations

OI may take part in a joint undercover operation (defined in the Glossary of this Handbook) with another law enforcement agency only when the other agency has obtained its own agency certification and agrees to comply with applicable OI policies and procedures. Approval of an undercover operation by a participating law enforcement agency does not constitute approval for OI purposes.

When participating in joint undercover operations, managers should consider that the statutory exemptions granted under 19 U.S.C. § 2081 and 8 U.S.C. § 1363a can be applied only to the detection and prosecution of offenses within the jurisdiction of the Secretary of Homeland Security. Accordingly, joint undercover investigations that take advantage of these statutory exemptions must have a reasonable likelihood of disclosing a violation of laws enforced by ICE.

The approval process for joint undercover operations is the same as the approval process for any other operation. As such, the SAC may approve a joint operation that does not involve sensitive circumstances (defined in the Glossary of this Handbook) and does not require certification. However, the URC must review, and the Director of OI must certify, all undercover operations that require the use of ICE's statutory exemptions and/or that involve sensitive circumstances.

Proceeds can be shared only with other agencies if they have received the proper certification to use proceeds to offset necessary and reasonable expenses (see Section 6.4.1, "Control of Proceeds"). Participation with ICE in a joint operation does not constitute authority for other agencies to engage in activities where existing laws and regulations would otherwise forbid such activities. Agencies participating in joint operations with ICE are governed by their applicable laws, policies, and procedures.

During the course of a joint undercover operation, OI SAs must adhere to all applicable OI policies and procedures. OI managers must be cognizant of sensitive circumstances that arise during the course of an operation that involves an OI undercover operative, whether initiated by OI or not, as these must be reviewed by the URC and approved by the Director of OI.



Post-Hearing Brief Exhibit 1

# Chapter 6. ADMINISTRATIVE AND FINANCIAL MANAGEMENT OF UNDERCOVER OPERATIONS

Due to the unique statutory authority granted in 19 U.S.C. § 2081 and 8 U.S.C. § 1363a, certified undercover operations are able to use funds and engage in transactions outside of usual governmental policies and procedures. This authorization requires that personnel involved in a certified undercover operation ensure that all expenditures are properly executed and documented. All personnel involved in a certified undercover operation should be aware that accountability and control over these undercover operations must be exercised in order to ensure the continued use of these statutory exemptions, which are vital and powerful law enforcement tools.

The policy detailed below is intended to provide managers with a working concept of the scope of the allowances provided by the statutory exemptions for undercover operations. The policy will also serve to standardize record-keeping systems, enhance accountability, and strengthen management controls.

## 6.1 Certification Authority

The provisions authorizing the use of the exemptions from certain laws, codified in 19 U.S.C. § 2081 and 8 U.S.C. § 1363a, are qualified by a stipulation which requires written certification that the use of an exemption is necessary for the conduct of a given undercover operation. The authority to provide that certification does not rest in the field and cannot be delegated below the level of the Director of OI. Within ICE, this authority is delegated to the Assistant Secretary or designee, as permitted by statute, in DHS Delegation 7030.2, and redelegated to the Director of OI in ICE Delegation Order 04-002.

## 6.2 Expending Funds from Certified Undercover Operations

The exemptions contained in 19 U.S.C. § 2081 and 8 U.S.C. § 1363a allow for procurement outside the Federal Acquisition Regulation (FAR). They also limit the use of proceeds to necessary and reasonable expenses connected directly with a specific approved/certified undercover operation. Accordingly, the use of proceeds or of equipment, leased vehicles, cellular phones, and other property acquired with proceeds must be limited to the needs of the operation that acquired them and may not be used for general office purposes. Property acquired with proceeds and dedicated for use within the operation can be legally transferred to another certified undercover operation (see Section 14.3.2, “Property.” The transferred property must be liquidated at the conclusion of the operation or transferred to another certified undercover operation. Any fees associated with the transfer must be paid by the receiving operation.



Post-Hearing Brief Exhibit 1

### 6.2.1 Expenditures Must Be Necessary and Reasonable for the Conduct of the Operation

Under the statutory framework, OI officials have reasonably broad discretion in making the determination of what are necessary and reasonable expenses. The following definitions of "necessary and reasonable" shall be utilized.

"Necessary" is defined as those expenses that are directly related to the purposes and objectives of the undercover investigative operation (e.g., an undercover cellular phone for an undercover agent would be a necessary operational expense, whereas a cellular phone for every SA in the SAC office would not be a necessary operational expense).

"Reasonable" is defined as those expenses which, given the circumstances of the undercover operation, are logical, judicious, and justifiable (e.g., if an operation needs a sedan for general surveillance and undercover security, leasing a $20,000 Toyota Camry would be a reasonable expense, whereas, under these circumstances, leasing a $45,000 Porsche Boxster would not be a reasonable expense).

### 6.2.2 Expenditure Authorization (6-Month Expenditure Authorization Plan) for Certified Undercover Operations

Every certified undercover operation will operate on a 6-month expenditure authorization plan. This expenditure authorization plan will be part of the application/reauthorization proposal and will be approved by the Director of OI as part of the certification of the undercover operation.

The 6-month expenditure authorization plan will be included as part of the application/ reauthorization proposal. This 6-month expenditure authorization plan is reviewed by the URC and approved by the Director of OI. During the 6-month authorization period, operational personnel are prohibited from exceeding the spending limits set by the expenditure authorization, except as detailed in Section 6.2.3, "Unforeseen Expenses that Will Exceed the Limit of the 6-Month Expenditure Authorization Plan for Certified Undercover Operations."

The CUFFS Administrator is required to monitor expenditures in order to ensure that they do not exceed the 6-month expenditure authorization plan. The operation's management personnel are responsible for ensuring compliance with the 6-month plan limits.

*Note: All problematic certified undercover operation expenditure issues should be directed to the Undercover Operations Unit.*

### 6.2.3 Unforeseen Expenses that Will Exceed the Limit of the 6-Month Expenditure Authorization Plan for Certified Undercover Operations

If it becomes apparent that there will be previously unforeseen expenses during the 6-month expenditure authorization plan period, operational personnel can request an increase as appropriate. The authorization levels are as follows:

A. Any expenditure 10 % ABOVE the authorization level requires further approval.

   1) Expenditures that will exceed any four digit object class code (OCC) by 10 % or more require the written approval of the SAC.

   2) Expenditures that will exceed any two digit OCC (subtotal) by 10 % or more (or more than $10,000) require the written approval of the DAD, ISD.

   3) Expenditures that will exceed the total 6-month expenditure authorization plan by 10 % or more require the written approval of the Director of OI.

B. Expenditures less than 10 % above the authorization level require no additional approval.

*Note: Requests for increases to the 6-month expenditure authorization plan requiring the written approval of the DAD, ISD, or the Director of OI will be routed though the Undercover Operations Unit. (Agents should contact the Undercover Operations Unit for the standardized memorandum format.)*

### 6.2.4 Expenditure Flow Chart

**UNDERCOVER OPERATION EXPENDITURES**




*Other funding sources (i.e., SAC funds, High Intensity Drug Trafficking Area (HIDTA) funds) require only that the funds be expended for the purpose for which the funds were appropriated. All operational expenditures, regardless of the source of the funds, must be recorded in CUFFS and be within the limits of the 6-month expenditure authorization plan.



Post-Hearing Brief Exhibit 1

### 6.2.5 Use of Funds and Business/Purchase Exemptions (Purchases Outside FAR)

19 U.S.C. § 2081 and 8 U.S.C. § 1363a authorize the payment of any necessary and reasonable expenses of a certified undercover operation from proceeds or appropriated funds. However, only those expenditures that directly support the undercover operation's covertness can properly be made outside FAR under the statutes' business/purchase exemption (exemptions 1 and 2) (defined in the Glossary of this Handbook). Generally, FAR must be used when purchasing equipment or services related to the operation (see Section 6.19, "Operational Purchases"). However, acquisitions of equipment and services may be made outside FAR when necessary to protect the safety, security, covertness, secrecy, and integrity of the undercover operation.

Under 19 U.S.C. § 2081 and 8 U.S.C. § 1363a, a proprietary undercover business (defined in the Glossary of this Handbook) is authorized to operate on a commercial basis, in order to engage in covert business transactions necessary for the detection and prosecution of offenses against the United States, as well as for the safety and security of the operation. A proprietary business can be established as a covert business entity for the safety and security of an operation to do the business of the operation and/or conceal the true identity of the operation from the public, the targets of the operation, and the private sector.

*Note: If a manager cannot articulate a legitimate need to conceal the involvement of the Government in a particular transaction necessary for the operation, then the transaction must be made in compliance with FAR.*

### 6.3 Use of CUC-Appropriated Funds

CUC-appropriated funds (defined in the Glossary of this Handbook) designated for a certified undercover operation may be used for any necessary and reasonable expense (defined in Section 6.2.1, "Expenditures Must Be Necessary and Reasonable to the Conduct of the Operation") for the conduct of the operation. These funds may not be used for general SAC office expenses. CUC-appropriated funds may be used for any expense that can be paid with proceeds, except as otherwise stated in this Handbook.

### 6.4 Use of Proceeds

When an undercover operation has been certified to expend proceeds, that operation's proceeds may be used for any necessary and reasonable expense for the conduct of the operation, except as otherwise stated in this Handbook.

### 6.4.1 Control of Proceeds

The use of proceeds is limited to offsetting necessary and reasonable expenses of the specific certified undercover operation that generated them. Proceeds may be used only by the operation that generated them and may not be transferred to, or used by, other



Post-Hearing Brief Exhibit 1

operations, or used for general office purposes outside the operation, except in the following circumstances:

**6.4.1(1) Reimbursement of Supporting Operations (within OI)**

To the extent that one operation may incur expenses in direct support of another operation, the operation receiving the support may reimburse the assisting operation with proceeds, provided that:

A. both operations have the proper certifications;

B. the amount of reimbursement does not exceed the actual expenses incurred;

C. no reimbursement is made based on an estimated rate for services performed;

D. both operations retain copies of receipts documenting the expense; and

E. both operations reflect all transactions and the transfer of funds in CUFFS.

**6.4.1(2) Reimbursement of Other Participating Agencies**

In a properly certified undercover operation, proceeds may be used to pay and/or reimburse necessary and reasonable expenses, regardless of which participating agency incurred the expenses, provided that the expenses were:

A. for the investigation of violations of law within the investigative jurisdiction of ICE; and

B. incurred in furtherance of the OI undercover operation's mission.

When paying for travel or small incidental expenses incurred by personnel from other agencies who are assigned to work in an ICE certified undercover operation, a normal advance or reimbursement should be made and properly documented in CUFFS.

If another federal agency is to receive proceeds obtained in an ICE certified undercover operation to offset expenses, consideration should be given to this other federal agency's authority to offset expenditures from its appropriation. If the agency does not have this authority, it may be required to deposit the reimbursement in the U.S. Treasury. A reimbursable agreement, pursuant to 31 U.S.C. § 1535, wherein ICE agrees to pay the agency for services performed on ICE's behalf, could be used to remedy this. Such an agreement is subject to the following limitations:

A. The certified undercover operation will reimburse only expenses that were incurred in furtherance of the undercover operation and the ICE mission.

B. Expenses subject to reimbursement will be delineated in the agreement.



Post-Hearing Brief Exhibit 1

C. Reimbursement amounts are limited to funds that the operation has available from proceeds, **not CUC-appropriated funds**.

Managers are encouraged to coordinate the establishment of reimbursement agreements with ICE Counsel prior to reimbursing other agencies.

### 6.4.1(3) Splitting Proceeds with Another OI Certified Undercover Operation

When splitting proceeds with other OI certified undercover operations, a sharing agreement (approved by the appropriate SAC(s)) will be drawn up in advance detailing the amount or percentage of proceeds each operation expects to receive. This method should be used only when a joint investigation exists and each operation has contributed to such a degree toward an expected delivery of proceeds that it would be inappropriate for one operation to claim the whole amount. Under this method, the proceeds retained by each operation are not to be considered as having been generated by the other operation.

Ideally, the procedure for splitting proceeds is to divide the amount received between the operations immediately after their receipt (or as soon thereafter as possible) and before the money is recorded by the operation in CUFFS. (This procedure will avoid any audit-trail confusion associated with paying out a lump sum to another operation.)

In cases where the proceeds are received directly into an operation's undercover bank account, a CUFFS entry for the entire amount is required. The amount representing the agreed split will immediately be given to the other operation and a CUFFS entry documenting the transaction will be made. A detailed note will be placed in the CUFFS entry, documenting the reason for the transaction.

Each operation will then record its respective share of the proceeds. This includes recording the proceeds in CUFFS. A copy of the sharing agreement, a SAC memorandum authorizing the specific instance of sharing and documenting the rationale, and a copy of an ROI detailing the total amounts received and subsequently split will be placed in each of the operation's financial records.

### 6.4.1(4) Splitting Proceeds with Other Participating Agencies

When splitting proceeds with other agencies, a written Memorandum of Agreement (MOA) between ICE and the other agency office head should be drawn up in advance detailing the amount or percentage of proceeds each agency expects to receive. In accordance with OI Delegation Order 06-003, entitled, "Authority to Sign Memoranda of Understanding and Memoranda of Agreement Within the Office of Investigations," the authority to sign Memoranda of Understanding (MOUs) and MOAs is delegated by the Director of OI to the OI ADs, DADs, and SACs, provided that the MOUs or MOAs are first reviewed and concurred in writing by ICE Counsel, the Director of OI, and the Deputy Assistant Secretary for Operations. Such MOAs can be entered into only with agencies that have independent authority to take in proceeds. This method should be

used only when a joint operation exists and each agency has contributed to such a degree toward an expected delivery of proceeds that it would be inappropriate for one agency to claim the whole amount and attempt to reimburse the other. Under this method, any proceeds that have been retained by another agency are not to be considered as having been generated by OI.

Ideally, the procedure for splitting proceeds is to divide the amount received between agencies as close to their receipt as possible and before the money is recorded by the operation in CUFFS. (This procedure will avoid any audit trail confusion associated with paying out a lump sum to another agency.)

In cases where the proceeds are received directly into an ICE undercover bank account, a CUFFS entry for the entire amount is required. The amount representing the agreed split will immediately be given to the other agency and a CUFFS entry will be made to document the transaction. A detailed note will be placed in the CUFFS entry documenting the reason for the transaction.

Each agency will then record its respective share in accordance with its own policies and procedures for handling proceeds. For ICE, this includes recording ICE's share in CUFFS. A copy of the MOA between ICE and the other agency, the SAC memorandum authorizing the specific instance of sharing and documenting the rationale, as well as a copy of the ROI detailing the total amounts received and subsequently split, are to be placed in the operation's financial files.

### 6.4.1(5) Splitting Proceeds with Foreign Law Enforcement Agencies

In cases involving the splitting of proceeds with a foreign law enforcement agency, the prior written approval of the Director of the Office of International Affairs (OIA) and the prior written concurrence of ICE Counsel must be obtained. All other requirements for splitting proceeds remain the same.

### 6.4.2 Purchase of Information Using Proceeds

Like any other necessary expense in support of a certified undercover operation, POI expenses may be paid with proceeds, provided that:

A. the approval process outlined in the current OI policy regarding informants is followed;

B. the information obtained and the resulting enforcement activities are in direct support of the certified undercover operation which generated the proceeds;

C. the transaction is documented on an Expense/Advance Approval Form (Appendix B) and properly posted in CUFFS; and



Post-Hearing Brief Exhibit 1

D. the Confidential Source Payment and Benefit Transaction Receipt (ICE Form 73-293)

1) is authorized, processed, and filed in accordance with OI policy;

2) includes the TECS Case Management program code for the operation making the payment;

3) is annotated “Paid With Proceeds”; and

4) the copy that is normally sent to the Dallas Finance Center is included in the operation’s financial records.

### 6.4.3 Purchase of Evidence Using Proceeds

Proceeds may be used to purchase evidence that is necessary for the support of a certified undercover operation, provided that:

A. the approval process outlined in the current OI policy regarding POE is utilized;

B. the evidence purchased is in direct support of the certified undercover operation which generated the proceeds;

C. the transaction is documented on an EAF (Appendix B) and properly posted in CUFFS; and

D. ICE Form 73-293

1) is authorized, processed, and filed in accordance with OI policy;

2) includes the TECS Case Management program code for the operation making the payment;

3) is annotated “Paid With Proceeds”; and

4) the copy that is normally sent to the Dallas Finance Center is included in the operation’s financial records.

### 6.4.4 Payment of Overtime Using Proceeds

Proceeds may be used to offset overtime costs for **DHS employees only** that are directly attributable to an undercover operation with the proper certification. To ensure that appropriate deductions for taxes, withholding, retirement considerations, etc., are applied, these payments must be processed through the Dallas Finance Center. The following procedures will apply:



Post-Hearing Brief Exhibit 1

A. The use of proceeds to pay overtime must be approved by the Director of OI as part of the certification/authorization process or in a memorandum requesting the enhancement of the operation and the operation's expenditure authorization plan.

B. The SAC must approve, in writing, the use of proceeds to offset specific overtime costs.

C. Overtime payments will be paid from SAC funds.

D. When the expense is posted to the SAC's budget plan, the operation will arrange its reimbursement via appropriate means to the Dallas Finance Center, accompanied by a memorandum identifying the account to be credited.

E. The expense will be posted in CUFFS.

If another agency has incurred overtime costs in a joint undercover operation with ICE, operational personnel may use the procedures outlined in Section 6.4.1(2), "Reimbursement of Other Participating Agencies." Additionally, ICE has the authority under 19 U.S.C. § 1616(a) to share assets after forfeiture.

### 6.4.5 Payment of Travel Expenses Associated with Field Reviews of Undercover Operations Using Proceeds

Undercover operations that continue longer than 1 year require a field review by the Undercover Operations Unit. These undercover operation reviews, under the supervision of the Unit Chief, Undercover Operations Unit, are undertaken to determine whether the operation is adhering to DHS and ICE operational policy and guidelines. Therefore, the use of the operation's proceeds to offset review expenses by the Undercover Field Review Team is necessary to the conduct of such operation in part because such procedures or reviews are required under DHS and ICE policy.

When proceeds of certified undercover operations are sufficient and available, they may be utilized to pay for the travel and related expenses of the Undercover Field Review Team. The following procedure will be utilized when undercover proceeds are to be used to pay for the travel and expenses of the Undercover Field Review Team:

A. The field review team leader will complete a manual travel authorization for each member of the Undercover Field Review Team, using the standard manual travel authorization process, and forward the same to the operation's SAC office for approval.

B. Following the field review, a manual travel voucher will be completed by each member of the Undercover Field Review Team and forwarded to the SAC.



Post-Hearing Brief Exhibit 1

C. The SAC will review the manual travel voucher of each member of the Undercover Field Review Team and authorize payment.

D. The travel of each Undercover Field Review Team member shall be paid from the operation's overt bank account or by cashier/bank check. The use of the overt bank account or bank check will avoid any potential compromise of the undercover operation.

## 6.5 Regulating the Amount of Proceeds Held by an Operation

19 U.S.C. § 2081(c) and 8 U.S.C. § 1363a(b) require that, upon completion of a certified undercover operation, the proprietary business must be liquidated, sold, or otherwise disposed of (see Section 14.3, "Liquidation of Assets"). Following satisfaction of all obligations, the proceeds are to be deposited in the U.S. Treasury as miscellaneous receipts, unless an independent basis for forfeiture exists. If an independent basis for forfeiture exists, the forfeited funds should subsequently be deposited into the appropriate forfeiture fund. The following rules apply to proceeds held by an undercover operation:

### 6.5.1 Limit on Amount of Proceeds Held

In order to ensure the safety of the government funds and to promote uniformity across ICE, no certified undercover operation will hold in excess of $500,000, except for the following:

A. Upon the recommendation for approval by the URC and subsequent approval by the Director of OI, through the process of Application or Reauthorization for Certification, the operation may retain up to $750,000 in proceeds. The Application or Reauthorization for Certification proposal must contain a detailed accounting of the compelling need for retaining funds above the $500,000 limit.

B. Upon a specific written request from the SAC, the Director of OI may authorize approval for an operation to retain in excess of $750,000 in proceeds. The written request must contain the identifying data for the operation, the amount requested to be retained in excess of $750,000, and a detailed accounting of the compelling need for retaining funds at the higher level.

The above limits may be periodically reviewed and modified by the Director of OI in order to meet the needs of ICE.

### 6.5.2 SAC Review of Proceeds Held

In addition to approving the Monthly Financial Review Worksheet (see Section 7.1, "SAC Monthly Reports (Financial)"), each SAC is required to periodically review each undercover operation to determine:

A. the amount of proceeds available in the operation; and

B. the reasonable amount of proceeds necessary for continuance of that particular operation (as this amount may be substantially lower than the $500,000 limit).

### 6.5.3 Seizure of Proceeds from Ongoing Operations

A. Should the review determine that excess proceeds have been accumulated, the SAC should direct the seizure of the excess funds and have them transmitted to the appropriate forfeiture officer (currently CBP Fines, Penalties and Forfeitures (FP&F)) for the initiation of forfeiture proceedings in cases where forfeiture proceedings would pose no risk of exposing the undercover operation. This requires OI to establish the elements of the offense which provide the basis for forfeiture of the property or proceeds. Statutes that provide for forfeiture of traceable proceeds include 18 U.S.C. § 981, 31 U.S.C. § 5317, and 21 U.S.C. § 881.

The law does not require notice to an individual if the individual who provided the proceeds no longer has a legal interest in the proceeds. For example, if an individual paid proceeds to undercover agents in return for a service, albeit illegal, performed by ICE as part of the undercover operation, the person would no longer have a legal interest in the proceeds.

1) This situation is distinguished from one where the individual retained an interest in the proceeds (i.e., an investment in illegal undercover business or activity). In such a case, notice of the forfeiture must be provided to the individual. Accordingly, each SAC shall determine whether persons may have a legal interest in the property or proceeds to be forfeited.

2) While no notice to the individual may be required, statutory forfeiture provisions require satisfaction of certain procedural elements, including publication in a newspaper of general circulation for 3 consecutive weeks, pursuant to 19 U.S.C. § 1607.

B. Prior to the submission of the Incident Report (formerly known as the Search/Arrest/Seizure Report) to the FP&F Officer, the seizing officer must ensure that the probable cause basis and/or circumstances regarding the seizure and forfeiture of the money or property is articulated in the "Circumstances/ Remarks" portion of the Incident Report. In addition, the Incident Report must have all the appropriate project codes listed in the "Summary Data Section."

C. Any forfeiture proceeding may result in a claim. Therefore, prior to initiating a forfeiture proceeding related to an ongoing undercover operation, management must be cognizant of any potential operational exposure if the forfeiture is contested.



Post-Hearing Brief Exhibit 1

See also Section 14.3.1, "Monetary Assets (Proceeds and CUC-Appropriated Funds)."

### 6.5.4 Deposit of Proceeds into the U.S. Treasury

If it is determined that proceeds are to be deposited into the U.S. Treasury as miscellaneous receipts, a check (from the overt account) and a memorandum requesting this action should be sent to:

U.S. Immigration and Customs Enforcement
Dallas Finance Center
P.O. Box 561587
Dallas, TX 75356-1587
Attention: U.S. Treasury Accounts Team

## 6.6 Petty Cash Fund

Undercover operations may have a need to maintain a petty cash fund to cover incidental operational expenses. The establishment of a fund is at the discretion of the SAC. If a petty cash fund is created, it shall be maintained in accordance with DHS Imprest Fund guidelines. (See the DHS Imprest Fund Manual of Procedures and Instructions for Cashiers (Cashiers Manual), Office of Financial Management, Cash Management Section, February 2003, or as updated.)

The principal reason for the petty cash fund is to support covert transactions that are covered by the business/purchase exemption allowing purchases outside FAR. The exemption enables the undercover operation to make purchases without revealing the involvement of the U.S. Government and without regard to many normal Government restrictions on purchases.

If expenditures are not covered by the business/purchase exemption, cash from the petty cash fund may be used to make FAR purchases. If a FAR purchase exceeds $2,500 limit (for services) or $3,000 (for supplies), the currently required standard government procurement form and the procedures in Section 6.19, "Operational Purchases," must be used.

## 6.7 Cash Advances

Advances from operational funds may be issued to ensure that employees are not required to expend personal funds for operational transactions. The following guidelines will apply:

A. Advances will be issued for a specific purpose using a CUFFS Expense/Advance Approval Form (Appendix B) approved by a properly authorized manager (or higher-level manager).



Post-Hearing Brief Exhibit 1

B. The CUFFS Expense/Advance Approval Form indicating the outstanding advance will be retained by the CUFFS Administrator or petty cash fund cashier as an interim receipt.

C. The individual receiving the advance will present original receipts and any remaining funds to the CUFFS Administrator or petty cash fund cashier for liquidation of the advance.

D. The CUFFS Administrator or petty cash fund cashier will attach the receipts to the CUFFS Expense/Advance Approval Form and complete the section documenting the liquidation of the advance.

E. The original CUFFS Expense/Advance Approval Form with the receipts will be retained in the financial records of the operation and a copy of the CUFFS Expense/Advance Approval Form (indicating the liquidation of the advance) will be provided to the individual who had the advance.

Generally, advances will be made for a specific purpose and will be liquidated or returned within 5 working days. Responsibility for the repayment of advances is not transferable to another individual, nor can the advance be used for purposes other than those authorized on the CUFFS Expense/Advance Approval Form.

Generally, an individual may hold only one outstanding advance at a time. However, under extraordinary circumstances, multiple advances may be approved as long as the CUFFS Expense/Advance Approval Form clearly indicates the number and total amount of outstanding advances held by that individual.

### 6.7.1 SAC-Approved 30-Day Cash Advances

When operational needs require providing contingency funds to individuals engaged in undercover activities, the SAC may authorize advances for up to 30 days. This approval will be noted on the CUFFS Expense/Advance Approval Form and contain the SAC's signature. Such 30-day advances shall be liquidated or returned within 30 days. If the funds are required for more than 30 days, the old advance shall be liquidated and a new advance, with the required SAC's approval, will be executed.

### 6.7.2 Advances to Confidential Informants

Any monetary advance given to a CI must be documented utilizing a CUFFS Expense/Advance Approval Form. Additionally, an ICE Form 73-293 will be completed and signed by the CI, in his or her assumed name, and witnessed by two SAs or one SA and another law enforcement officer. ICE Form 73-293 will document the receipt of the funds by the CI.

Prior to making an advance to a CI, careful consideration should be given to the requirements for the advance. Other factors, such as possible alternatives and the CI's reliability, should also be taken into account.

### 6.8 Transactions Involving Confidential Informants

The relationship between a CI and OI can involve financial transactions that are difficult to properly classify, record, and document. Due to unusual circumstances in undercover scenarios, it is sometimes difficult to determine whether a transaction represents compensation to a CI (which would be characterized as POI or stipends and/or commissions, defined in the Glossary of this Handbook) or a direct expense of the operation. Undercover scenarios can also make it difficult to obtain proper documentation of expenditures. This Section provides guidance to ensure that transactions involving CIs are accurately recorded in CUFFS and properly documented.

In order to ensure uniform documentation and avoid uncertainty related to payment of funds to CIs, ICE Form 73-293 shall be utilized to document all financial and benefits transactions between OI and a CI. One of the purposes of ICE Form 73-293 is to ensure proper documentation of a payment to a confidential source. Full documentation protects the agency and the personnel involved in the transactions from allegations of improper activity.

In certified undercover operations, transactions involving CIs will generally fall into one of four areas: stipends and/or commissions, POI, POE, and operational expenses incurred by a CI.

#### 6.8.1 Transactions Involving CIs – Payment of Stipends and/or Commissions

In order to initiate long-term investigations, ICE must identify, cultivate, and retain assistance from CIs who are intimately involved with targeted criminal organizations. The credibility, potential, and services provided to the undercover operation by these CIs, as well as the positions, roles, and relationships they establish, are directly related to the stipends and/or commissions they receive. Based on these and other factors, stipends and/or commissions are considered necessary and reasonable expenses for the conduct of undercover operations.

Compensation paid to a CI in the form of stipends and/or commissions are generally negotiated in advance and are memorialized in a PAA signed by the CI and the SAC, and ultimately approved by the Unit Chief, ISU. These stipends and/or commissions are often recurring and amount to significant payments over the duration of the undercover operation.

Stipends and/or commissions paid to a CI are not based on enforcement results such as POI, but are specific to services rendered by the CI.



Post-Hearing Brief Exhibit 1

*Note:* *POI, which is separate from stipends and commissions, is defined as a payment by the U.S. Government to an informant for information or services that have already been provided to the Government in connection with an investigation. The amount of POI paid to a source of information is based on the value of the information provided to the Government.*

### 6.8.2 Transactions Involving CIs – Approval of Stipend and/or Commission Payments

In order to pay stipends and/or commissions to a CI, the amounts must be approved in the following manner:

A. Any stipend and/or commission to be paid to the CI must be stated in a PAA signed by the CI and the SAC, reviewed by ICE Counsel, and approved by the Unit Chief, ISU; and

B. If payments will be made by EFTs into a CI's account, the account must be fully identified in the PAA (all such accounts included in a PAA will be vetted by the operational personnel through TECS Case Management prior to the approval of the PAA); and

C. The original proposal for certification of an undercover operation and any reauthorizations require the following:

    1) a separate line item (points/commissions) in the 6-month expenditure authorization plan for anticipated commission expenditures for each 6-month certification period;

    2) a review through the URC process; and

    3) final approval by the Director of OI.

### 6.8.3 Transactions Involving CIs – Methods for Paying Stipends and/or Commissions

One of the following two methods must be used in order to pay stipends and/or commissions to a CI:

A. When stipends and/or commissions are paid to a CI in person using cash or a check, the transfer must be documented on ICE Form 73-293 by checking the "Money Laundering/Points" box and must be witnessed by two law enforcement officers; or

B. When a CI is unavailable for a person-to-person meeting, he or she may receive a stipend and/or commission payment via an EFT to a previously designated account. The account used for the payment must be included in the CI's approved PAA. All such accounts included in the PAA will be vetted by the operational personnel through TECS Case Management prior to approval of the PAA.

All stipends and/or commission payments must be documented via an ICE Form 73-293 for accounting purposes. A copy of the completed ICE Form 73-293 (minus the source signature in case of wire transfers) will be forwarded to the ISU, ISD, with a copy of the wire confirmation attached (as applicable).

*Note:* *This Handbook does not supersede any requirements of ICE policy related to meeting with, and debriefing, sources of information, as well as source file requirements. The requirements and policies related to sources of information/CIs are within the purview of the ISU, ISD.*

### 6.8.4 Transactions Involving CIs – Tracking and Documentation of Stipends and/or Commissions

The following steps must be taken in order to track and document the payment of stipends and/or commissions to a CI:

A. Each operation will maintain documentation of the payments through the use of ICE Form 73-293, CUFFS Expense/Advance Approval Form, EFT paperwork and bank statements, and CI payment logs.

B. A list of the payments will be maintained in the CI files.

C. Each payment is to be recorded in the undercover operation's CUFFS under Money Laundering Points (OCC 91.14).

### 6.8.5 Transactions Involving CIs – POI

POI payments are expenses of an operation paid to a CI and are:

A. payments made by the U.S. Government; and

B. payments that directly benefit the CI.

Such payments are based on information received and/or services performed on the U.S. Government's behalf and the enforcement results achieved due to the information and/or service.



Post-Hearing Brief Exhibit 1

All payments to CIs for POI must be supported by a properly executed ICE Form 73-293 and in compliance with the approval levels and procedures established by ICE. ICE Forms 73-293 for POI related to an undercover operation must include the TECS program code and be posted to CUFFS. A copy of ICE Form 73-293 will become part of the financial records of the operation.

*Note: Information and/or services resulting in a POI payment should be documented in an ROI.*

### 6.8.6 Transactions Involving CIs – Operational Expenses Incurred by a CI

Generally, expenditures related to activities of a CI will be considered expenses of an operation when they are:

A. necessary and reasonable for the conduct of the operation;

B. primarily for the conduct of the U.S. Government's mission (providing only incidental benefit to the CI); and

C. incurred by the CI in direct support of the undercover operation.

Operational expense reimbursement is not income for a CI but must be documented on an ICE Form 73-293. It shall be approved and documented as any other operational expense and pursuant to Section 6.18, "Approval of Expenditures."

Only to the extent that expenditures are necessary and reasonable for the conduct of the operation are they properly classified as operational expenses. At times, expenditures might facilitate the operation yet provide a significant benefit to the CI that is incidental to the needs of the U.S. Government. Such expenses will be considered POI and documented accordingly. For example, if a CI's boat required the permanent installation of a global positioning system (GPS) for an operation, the cost of the system could be considered POI and would, therefore, count towards the threshold levels for the CI. Otherwise, the GPS would be Government property and would have to be removed and retained by the Government at the conclusion of the operational need.

*Note: For detailed instruction related to CI travel expenses, SAs should see Section 6.22.3, "Travel by Confidential Informants."*

*Note: Advances can be made to CIs to cover anticipated expenses. The advances are subject to the same policies and procedures for advances found in Section 6.7, Cash Advances.*



Post-Hearing Brief Exhibit 1

### 6.8.7 Transactions Involving CIs – Payments to Third-Parties for Illegal Services and/or POE

Payments made by CIs to third parties for illegal services and/or involving POE can make it difficult to properly account for the expenditure. Payments of illegal brokerage fees, commissions, and bribes are not likely to generate proper documentation. In this situation, an ROI will document the details of the transaction. Every effort should be made to arrange for an OI agent to be an eyewitness to the transaction between the CI and the third party. If possible, an undercover operative should be introduced to the third party to execute the transaction.

If circumstances preclude the involvement of an undercover operative in the transaction, every effort will be made to electronically record (by audio and video means) the transaction. POE funds given to the CI will be documented on an ICE Form 73-293 and on a CUFFS Expense/Advance Approval Form (Appendix B). This documentation will:

A. be reviewed and approved by the SAC (This does not supersede the requirement for POE approval at the appropriate level.);

B. list the specific purpose for the expenditure;

C. name the individual(s) to whom the CI will make the payment;

D. reflect the date the money is turned over to the CI;

E. contain the signature of the CI to acknowledge receipt of the money;

F. be witnessed by an OI SA and another law enforcement officer; and

G. remain a part of the operation's financial records.

### 6.8.7(1) Transactions Involving CIs – Payments to CIs by Third-Parties

Payments made by third parties to CIs for illegal purchases or services while acting on behalf of OI are considered proceeds of the operation and the full amount must be surrendered to OI. At no time should the CI retain a portion of these funds. Subsequent payments by OI to the CI based on the activities of the CI that resulted in the illegal income are POI or commissions. They will be processed pursuant to approval levels and procedures in accordance with the current OI policy on informants.

*Note: Operational personnel should contact the Undercover Operations Unit if there are any additional questions on how to document transactions involving CIs within a certified undercover operation.*

### 6.9 Currency Pick-up Operations

This Section provides the administrative guidelines for maintaining records relating to certified undercover operations that conduct currency pick-up transactions. For further information regarding requirements and operational policies, contact the Headquarters Unit responsible for national policies governing financial investigations.

#### 6.9.1 Currency Pick-up Log

A currency Pick-up Log will be maintained for each and every pick-up. (A sample log is contained in Appendix C.) The purpose of the log is to establish a complete record of the approvals and relevant details for the transactions resulting from an operational pick-up event. The log will be updated until the balance is liquidated and retained as part of the operation's permanent files. The following policy applies:

A. The total amount of the pick-up will be entered into the log.

B. The amount forwarded to the target (laundered) will be entered.

C. Any points (commissions) due and held by the operation will be shown as transferred to proceeds.

D. Any commissions paid to a CI (based on a PAA) will be entered.

E. POI payments that relate to the pick-up will **not** be documented in the log. POI payments are not paid directly from these funds. Any related POI payment from pick-up proceeds are documented on an ICE Form 73-293 pursuant to current ICE policy.

#### 6.9.2 Currency Pick-up Transaction Approval

Operational management (GS or above) can approve transactions that cause pick-up funds (proceeds) to remain in U.S. Government control regardless of the amount.

A second-line supervisor (ASAC or above) must approve each transaction involving pick-up funds (proceeds) sent outside U.S. Government control regardless of the amount. Approval may be verbal (annotated on the Pick-Up Log) but must be followed by written approval which must be included in the operation's pick-up file.

All pick-up transactions will also be recorded in CUFFS in compliance with the procedures in the CUFFS Manual.

#### 6.9.3 Currency Pick-up/Target Directed Funds

Funds picked up or received by other means (e.g., wire transfer), from a target or other persons that will be used to purchase items that will be delivered to the target or other


Post-Hearing Brief Exhibit 1

persons as part of a money laundering scheme (i.e., Black Market Peso Exchange) are target-directed funds. These funds will be treated as pick-ups for documentation purposes. Items purchased for delivery to the target or other persons are not considered expenses of the operation and are not included in the 6-month expenditure authorization plan.

### 6.10 File Systems Required for Undercover Activity

It is essential that the activities of an undercover operation be sufficiently documented and the records maintained in an organized manner. This will facilitate the application and review of internal controls and audits. The following files and logs will be established and maintained for documenting undercover activities and operations:

#### 6.10.1 Undercover Operations Unit File Requirements

The Undercover Operations Unit will maintain files related to:

A. each ICE certified undercover operation; and

B. each ICE accredited undercover operative.

#### 6.10.2 SAC Office File Requirements

Each SAC office, regardless of the existence of a certified undercover operation, will maintain the following undercover-related files:

A. Undercover Identification – These files (normally maintained by the GS) shall contain a record of each SA (including TFOs or other individuals) issued undercover identification as required by Section 9.1.6, “Control of Personal Undercover Identification”;

B. Personal Undercover Checking Account Records – These files (normally maintained by the GS) shall contain the SAC approval documentation and copies of bank information for all individual undercover accounts maintained by an agent (including TFOs) within the SAC AOR. The files shall contain copies of reconciled bank statements that clearly differentiate personal transactions and official transactions required by Section 9.2.1, “Individual (Personal) Undercover Bank Accounts”;

C. Personal Undercover Credit Card Records – These files (normally maintained by the GS) shall contain the SAC approval documentation copies of credit card account information for each undercover credit card issued to an agent (including TFOs) within the SAC AOR. The files shall contain copies of monthly statements that clearly differentiate personal transactions and official transactions required by Section 9.2.2, “Individual (Personal) Undercover Credit Cards”; and

D. ULC Files – These files (maintained by the Primary Field ULC) shall contain a record of each undercover operative's training and other documents required by the ULC Program (see Chapter 10, "Undercover Liaison Coordinator Program").

*Note:* *The documentation mandated by the requirements set forth in Subsections of A, B, and C of 6.10.2 may be consolidated into one file.*

### 6.10.3 Certified Undercover Operation File Requirements

The files, records, and documents of a certified undercover operation are generally the responsibility of the operation's CUC Lead/Administrative GS, with the assistance of the CUC Program Manager and the CUFFS Administrator.

The following files are required for each Certified Undercover Operation:

A. Proposal and Certification Memoranda – This file shall contain a copy of the finalized application/re-authorization proposal that was presented to the URC, all supporting documents, and a copy of the certification signed by the Director of OI.

B. Certified Undercover Operation's Monthly Financial Review Worksheet – This file shall contain documentation regarding the monthly SAC review and approval of the operation's CUFFS records required by Section 7.1, "SAC Monthly Reports (Financial)."

C. Expenditures –

1) General requirements – The file shall contain documentation and expense approval for each operational expenditure.

2) Expenses paid with undercover credit cards – In addition to Subsection C.1, the file shall contain copies of statements showing undercover operational expenses, documentation, and expense approval.

D. Bank Statements – This file shall contain all operational bank statements, including documentation of reconciliation.

E. Property Log – This file shall contain a log of all property purchased by and/or controlled by the undercover operation (operational property should be included in the OI inventory system as required) (see also "Property/ Equipment Log for Undercover Operations" (Appendix D)).

F. Property Use Files – This file shall contain details of property use and distribution for all property controlled by the undercover operation.



Post-Hearing Brief Exhibit 1

G. Petty Cash Daily Register – This file shall contain a detailed register of all petty cash transactions, if applicable.

H. Record of Petty Cash Review – This file shall contain documentation of the regularly occurring SAC audits/reviews of the petty cash account, if applicable.

I. Pick-up Log (for financial pick-up operations) – This file shall contain a detailed log of all operational pick-ups required by Section 6.9, "Currency Pick-up Operations." (See also "Pick-Up Log for Undercover Operations" (Appendix C)).

J. Primary Personnel Log – This file shall contain a detailed log of personnel involved in the undercover operation, the dates they were involved, and their specific role. The names and titles of the following key personnel and the period of time that they held the operational role will be documented:

1) CUC Administrative Overseer(s);

2) CUC Lead/Administrative GS;

3) CUC Program Manager;

4) Undercover operative(s); and

5) CUFFS Administrator (Record-Keeper).

Each time an individual is assigned one of these positions (or is replaced), it will be recorded in the Primary Personnel Log.

K. SAC audits and reviews – this file shall contain copies of all audit and review documents generated within the SAC office.

L. Field Reviews and OPR Management Inspection Unit (MIU) Audits – this file shall contain a copy of each Undercover Operations Unit Field Review and each OPR/MIU Audit report. Additionally, the file should contain the SAC response to field review and audit findings.

*Note: Electronic files are allowed as long as they are in compliance with DHS Management Directive 0550.1, Records Management, and DHS Records Management Handbook, v.2, dated January 2005, and related ICE policy.*

### 6.11 Financial Records of a Certified Undercover Operation

CUFFS is the financial record-keeping system for all OI certified undercover operations. All operations that have been certified to use any of the statutory exemptions of 19

U.S.C. § 2081 and 9 U.S.C. § 1363a must establish and maintain CUFFS records. All funds, whether appropriated or proceeds, received and expended in conducting a certified undercover operation, shall be accounted for and reported in CUFFS.

A current CUFFS manual and the chart of accounts for certified undercover operations can be obtained by contacting the CUFFS Coordinator, Undercover Operations Unit. The accounting software (QuickBooks and subsequent updates) required for CUFFS must be purchased by the operation; this is considered a necessary and reasonable expense of the operation.

CUFFS serves as an extension of the official ICE financial management system and tracks all operational income (appropriated and proceeds) and all operational expenditures. The CUFFS records serve to:

A. establish a uniform accounting system, which is the primary source for fiscal control and audits of financial transactions in certified undercover operations;

B. provide a mechanism for oversight by managers who are responsible to monitor the proper use of statutory exemptions; and

C. provide the information needed for input into the official ICE financial management system to liquidate advances from appropriated funds and account for the generation and expenditure of proceeds.

ICE managers will monitor the use of the statutory authority for expenditures in undercover operations through the review of required monthly financial data that are forwarded to the Headquarters CUFFS Coordinator, Undercover Operations Unit, and forwarded to the Dallas Finance Center. It is imperative that field managers ensure that each CUFFS Administrator properly enters all transactions of an undercover operation into the CUFFS records.

### 6.11.1 Required Details (CUFFS Transactions)

To facilitate the documentation of funds used in support of a certified undercover operation:

A. All transactions in support of an operation must be recorded in CUFFS, including, but not limited to:

1) all income of the operation, including appropriated funds and proceeds;

2) all operational expenses paid with CUC appropriated funds (no-year funds);

3) all operational expenses paid with Headquarters-appropriated funds, including asset forfeiture funds (fiscal year funds);

4) all operational expenses paid with SAC-appropriated funds;

5) all operational expenses paid with proceeds;

6) all operational POI/POE paid with appropriated funds, asset forfeiture funds, or proceeds;

7) all commissions paid as part of the operation; and

8) all operational expenditures made through the use of a credit card (covert or overt).

B. The name and memo field of each CUFFS entry must include sufficient descriptive information to adequately identify the transaction.

C. A TECS case number will be included in the CUFFS records whenever a transaction can be linked to a specific case.

*Note:* *Appropriated SAC funds expended by the SAC under FAR for generic items (e.g., cameras, radios, vehicles, tape recorders, etc.) that are not dedicated for use in an undercover operation, and which subsequently are used by, or loaned to, the operation and which will be returned to the SAC for general office use should not be listed as expenditures of the operation or recorded in CUFFS. This also applies to fuel and maintenance for SAC-owned or SAC-leased vehicles used in support of undercover activities (e.g., surveillance and cover teams) if the vehicles are not dedicated for the sole use of the undercover operation.*

*Note:* *In extraordinary circumstances, a specific written waiver for the requirement that non-operational funds (funds other than proceeds or CUC-appropriated funds) expended as part of the operation be tracked in CUFFS may be granted by the DAD, ISD, as long as the waiver includes a requirement that documentation regarding the funds expended is included in the operation's permanent files.*

### 6.11.2 Backup of Data for CUFFS

Due to the importance of the electronic data and the significant amount of time that would be required to reconstruct, it is essential that a back-up copy of CUFFS (QuickBooks) computer records be created and updated regularly. The CUFFS Administrator will make a back-up copy of the CUFFS financial data:

A. on a device (hard drive, flash drive, CD-burner, etc.) other than the device which holds the original data;

B. that will be maintained in a secure area substantially away from the original data files; and

C. at the end of any day when a significant number of entries were made or, at a minimum of, once per month.

Previous back-up copies need not be retained.

### 6.12 CUFFS Administrator for Certified Undercover Operations

To ensure operational security, oversight, and accountability, the CUFFS Administrator shall be an OI employee. The Director of OI may grant a written exception for this requirement on a case-by-case basis (i.e., a contractor hired under FAR or other approved U.S. Government contract).

Operational funds may not be used for payment or reimbursement of the salary paid to a contract CUFFS Administrator.

#### 6.12.1 CUFFS Administrator – Separation of Duties

To ensure financial integrity and avoid any appearance of conflict of interest, a separation of duties for the CUFFS Administrator will be maintained. The CUFFS Administrator will <u>not</u>:

A. have signature authority on any operational bank account, including transactional access to on-line banking (see Section 6.14.2, “Bank Accounts with On-line Access”);

B. have approval authority for any operational expenditures;

C. make purchases for the operation; or

D. conduct any required internal audit of the operation (with the exception of self-audits).

### 6.13 Use of Undercover Credit Cards in Certified Undercover Operations

This Section provides policies and procedures for the issuance, use, and control of undercover credit cards that have been obtained to support a certified undercover operation and its proprietary businesses.

These guidelines are to be applied during an ongoing certified undercover operation.

For policy and guidance relating to individual undercover credit cards, see Section 9.2.2, “Individual (Personal) Undercover Credit Cards.”

The use of an undercover credit card to expend undercover appropriated funds or proceeds is an action under the statutory exemptions of 19 U.S.C. § 2081(a)(3) and 8



Post-Hearing Brief Exhibit 1

U.S.C. § 1363a(a)(4). Therefore, only transactions that are necessary and reasonable for the conduct of the certified undercover operation may be paid with operational funds.

Copies of all records of operational transactions using undercover credit cards, and the payment thereof, must be maintained in the CUFFS files of the operation incurring the expense. Unless issued as personal undercover identification under Section 9.2.2, "Individual (Personal) Undercover Credit Cards," undercover credit cards may not be used for personal transactions.

SAs using undercover credit card accounts obtained to support a certified undercover operation must adhere to the following conditions:

A. Prior written approval for each credit card account must be obtained from the SAC and kept on file in the office (the written approval will contain the instruction that the account is authorized by OI and therefore must be closed at the request of OI).

B. All accounts must remain current and in good standing with the issuing financial institution at all times.

C. Operational personnel must avoid interest charged to the account except by written authorization of the SAC indicating that the charge is a necessary and reasonable expense of the operation.

D. Except under exigent circumstances, transactions must be approved in advance.

E. Account maintenance fees may be paid with operational funds.

F. All transactions conducted using the operation's credit card must be posted to the operation's CUFFS records.

G. Copies of all monthly billing statements and supporting receipts must remain with the operation's books and records.

## 6.14 Bank Accounts (Covert and Overt)

After certification has been obtained, bank accounts may be opened and used to support certified undercover operations which hold the appropriate exemptions under 19 U.S.C. § 2081(a)(2) and 8 U.S.C. § 1363a(a)(3). Multiple bank accounts may be established, as needed, in order to accomplish the mission of the operation. This Section provides guidelines for the administration and control of these operational bank accounts.

### 6.14.1 Control of Bank Accounts

When a bank account is opened and/or closed in a certified undercover operation, the following information will be transmitted to the Undercover Operations Unit:

A. the operation's name and TECS program code;

B. the name of the bank;

C. the address of the bank;

D. the type of account;

E. the account name;

F. the account number; and

G. a statement as to whether it is a covert or overt account.

Operational bank accounts should have more than one authorized signatory in order to avoid unnecessary complications if operational personnel become unavailable.

<u>All</u> transactions in an operational bank account will be posted to CUFFS. There shall be a separation of duties between personnel performing the recording and approving functions. As an internal control, the approving official shall not have exclusive signature authority over a bank account.

If investigative needs dictate, multiple operations may deposit funds in the same bank account, as long as:

A. each operation has received a separate certification authorizing the deposit of funds;

B. each operation maintains separate records of related transactions in its CUFFS;

C. proceeds from one operation are not used to support another operation (except as authorized in Section 6.4.1(1), "Reimbursement of Supporting Operations (within OI)," and

D. the co-mingled funds are returned to their respective operations at the earliest possible time.

*<u>Note:</u> This practice is strongly discouraged as it can create unnecessary audit trail/accounting issues.*

### 6.14.2 Bank Accounts with On-line Access

Certified undercover operation bank accounts, whether overt or covert, must maintain operational integrity. The following guidelines apply to Internet banking, telephone banking, and direct computer banking:

A. Only operational personnel with signature authority for the operation's bank account shall have access and the ability to execute an on-line banking transaction. It is recommended that on-line banking be delegated to no more than two people within the operation, with strict controls in place.

B. CUFFS Administrators will not have on-line access to operational accounts that encompass the authority to make expenditures and to conduct related banking transactions, such as transfers of funds. However, CUFFS Administrators may have restricted on-line "view-only access" to an operational bank account, if this feature is available.

C. Only banks that use appropriate on-line security protocols while conducting on-line financial transactions shall be used for on-line banking. Due to security concerns, there shall be no direct interface between an on-line banking system and CUFFS/QuickBooks.

D. Computers utilized for covert banking transactions must be Government-owned through undercover purchase or forfeited and sanitized to ensure that the systems do not contain registration information indicating that the hardware was purchased or is being used by the U.S. Government. Software used for on-line banking shall not be registered to the government and shall be properly licensed, preferably to an undercover identity. Lists of recommended software for undercover computers are available from the Cyber Crimes Center (C3). Covert bank accounts shall be accessed only through undercover Internet access accounts that are registered and backstopped with undercover identities/businesses, consistent with the covert bank account registrant's identity. Overt accounts may be accessed via U.S. Government computers with corresponding overt Internet access. <u>No link should exist or be created between overt and covert bank accounts.</u>

E. All on-line transactions should be accompanied by a properly executed CUFFS Expense/Advance Approval Form and shall bear a notification indicating that the transaction was executed over the Internet.

### 6.14.3 Reconciliation of Operational Bank Accounts

As part of the monthly financial review, account statements, supporting documents, and related CUFFS Expense/Advance Approval Forms will be:



Post-Hearing Brief Exhibit 1

A. reconciled with CUFFS and a copy of the CUFFS (QuickBooks) reconciliation statement must be attached to the bank statement(s) in the operation's files;

B. reviewed (and initialed) by the CUC Lead/Administrative GS to ensure compliance with this policy; and

C. maintained as part of the operation's records.

### 6.14.4 Accounts in the Name of OI (Overt)

After the proper certifications have been obtained, an overt account must be opened in the name of OI, to be utilized in furtherance of undercover operations. It may be used to:

A. facilitate the electronic transfer of appropriated funds from OI Headquarters to a certified operation;

B. support transactions of the petty cash fund;

C. support transactions for goods and services in compliance with FAR; or

D. conduct any other transactions to support an operation where covertness and/or security will not be jeopardized.

Operational overt bank accounts are subject to the following restrictions:

A. Only funds from a certified undercover operation may flow through the account. The account shall not be used to receive any funds (i.e., POI/POE) unrelated to the certified undercover operation.

B. Care will be taken not to compromise covert accounts by means of transactions with overt accounts; therefore, there shall be NO transactions linking or creating a paper trail between overt and covert accounts.

C. All transactions involving the account must be entered into the CUFFS records of the certified operation.

D. Funds in the accounts must be safeguarded, as specified in Section 6.16, "Safeguarding Funds."

### 6.14.5 Foreign Bank Accounts

The exemptions contained in 19 U.S.C. § 2081(a)(2) and 8 U.S.C. § 1363a(a)(3) allowing the deposit of U.S. Government funds into commercial bank accounts is not limited to banks in the United States. Prior to an undercover operation establishing a foreign bank

account, the Director of OI shall approve an undercover operation proposal that includes a statement regarding the need to open and utilize a foreign bank account.

It is critical that, in all instances, there be proper coordination with the appropriate ICE Attaché (1811 series) of foreign undercover activity, including bank accounts. The ICE Attaché (1811 series) will liaise with the appropriate foreign entity designated by the host government regarding the authority to maintain undercover accounts. After determining the requirements for maintaining an undercover account, the ICE Attaché (1811 series) will establish an agreement with the host country relative to the account. It will be the ICE Attaché's (1811 series) responsibility to work with the host country in controlling the movement of the funds through the foreign undercover bank account.

All the financial review requirements and restrictions that pertain to domestic bank accounts will also pertain to foreign bank accounts.

### 6.14.5(1) Establishing a Foreign Bank Account

To establish a foreign bank account in support of an undercover operation, the operation's certification/recertification proposal (if required between recertification periods by means of a memorandum) will include a specific request which:

A. demonstrates the operational need for the account;

B. includes the appropriate statutory exemption; and

C. details who will control the account.

Additionally, all requests for foreign bank accounts will require a memorandum from the appropriate ICE Attaché (1811 series) that:

A. states concurrence with the proposed foreign bank account;

B. states that a review of the country's banking and currency laws has been conducted and that the proposed account activities either comply with host country laws and restrictions or have been coordinated with host country authorities to ensure proper host government authorization. (When notification to the host country would jeopardize the security of an operation, a detailed explanation and statement of appropriate approvals will be included in the memorandum.); and

C. lists any applicable host country banking restrictions and reporting requirements.

If a foreign account is needed in an ongoing certified undercover operation that did not request approval in the original proposal, a memorandum of enhancement can be used to amend the operational certification.



Post-Hearing Brief Exhibit 1

Additionally, properly certified undercover operations may use the foreign bank accounts of other certified operations, provided that they comply with Section 6.14.1, "Control of Bank Accounts."

**6.14.5(2) Control of Funds in Foreign Bank Accounts**

OI will exercise direct control over any undercover funds deposited in a foreign bank account except when specifically authorized by the SAC. In situations where direct control is not possible, control by a foreign law enforcement entity is allowed in cases where the ICE Attaché (1811 series) has an SOP established with the foreign law enforcement entity responsible for control of the funds. In cases where ICE will not exercise direct control over funds deposited in a foreign bank account, the SAC will exercise additional controls as appropriate. These accounts are subject to the same controls detailed in Section 6.14, "Bank Accounts (Covert and Overt)."

**6.15 Deposit of Foreign Government Law Enforcement Funds into ICE Undercover Accounts (Covert and Overt)**

Occasionally, OI is asked to assist in an investigation being conducted by a foreign government law enforcement agency by allowing it to use one or more of our existing undercover bank accounts (foreign or domestic). Such use solely in furtherance of an investigation related to violations of foreign laws would be beyond the scope of the statutory authority of 19 U.S.C. § 2081 and 8 U.S.C. § 1363a.

The exemptions granted under 19 U.S.C. § 2081 and 8 U.S.C. § 1363a can be applied only to the detection and prosecution of offenses within the jurisdictional authority of the Secretary of Homeland Security. Accordingly, a certified undercover operation that involves the deposit of funds by a foreign government law enforcement agency must:

A. initiate a joint investigation with the foreign government law enforcement agency;

B. have a reasonable expectation of disclosing a violation of law enforced by ICE;

C. coordinate all activities with the appropriate ICE Attaché (1811 series), including providing written reports of the activities relating to the ICE Attaché's (1811 series) AOR;

D. document the details of the undercover account activity in a memorandum to the ICE Attaché (1811 series), with a copy to the appropriate programmatic Unit Chief(s); the Unit Chief, Undercover Operations Unit; and the DAD, ISD, to be retained in the operation's permanent files; and

E. document all transactions in CUFFS as required.

### 6.16 Safeguarding Funds

This Section contains guidelines which are meant to minimize the risk of loss of U.S. Government funds from failed financial institutions and high-risk investments.

The managers of a certified undercover operation must be sensitive to the statutory requirement to deposit proceeds no longer necessary for the conduct of the operation into the U.S. Treasury. Because they make funds less liquid for the operation, certificates of deposit will not be purchased unless required for an undercover investigative scenario.

#### 6.16.1 Funds Deposited in Financial Institutions

The following guidelines will apply to all accounts opened under 19 U.S.C. § 2081 and 8 U.S.C. § 1363a, whether overt or covert:

A. Accounts will be established in federally-insured financial institutions, unless the nature of an operational investigation requires dealing with a particular financial institution.

B. Before a bank account (other than at national or regional commercial banks) can be opened, the solvency of the financial institution will be verified and documented through OI’s Financial and Logistics Management Unit (FLMU), MSD, and/or the appropriate federal regulatory agency.

C. Without jeopardizing the security of the operation, funds may be placed into sweep accounts (defined in the Glossary of this Handbook) in order to protect against bank insolvency.

D. Deposits should not exceed deposit insurance limits unless:

   1) it is necessary for the conduct of the operation; and

   2) it is approved by the SAC in a memorandum containing the relevant facts pertaining to the need to exceed insured levels.

E. Deposits of investigative targets’ checks (or other financial instruments), personal or third-party, should be avoided because of the potential for fraudulent, stolen, counterfeit, or altered checks. Such checks can be returned to the undercover account for collection long after the deposit, potentially causing the undercover account to become overdrawn. Problems associated with such negotiable instruments can be avoided by using alternative handling methods (e.g., cashing checks at the account-holder’s bank).

### 6.16.2 Safeguards Related to the Investment of Funds

Investment of U.S. Government funds is often a necessary and reasonable means to backstop an undercover business or individual. Investments may also be required as part of an undercover investigative strategy. The amount invested must be limited to the requirements of the undercover operation.

Undercover operation funds may not be placed into accounts other than in conventional savings and checking accounts (e.g., certificates of deposit, investment money market accounts) without the written approval of the SAC. High-risk investments require additional approval as stated in Section 6.16.2(1), "Authorization Required to Place Funds in High-Risk Investments."

#### 6.16.2(1) Authorization Required to Place Funds in High-Risk Investments

U.S. Government funds may not be exposed to unnecessarily high-risk investments. Speculative investments such as stocks, bonds, mutual funds, investment real estate, futures, derivatives, etc., are not permitted, unless:

A. the undercover investigative scenario requires the high-risk investment;

B. the funds placed at risk through the investments are kept to the minimum amount and for the minimum time required to accomplish the investigative goal;

C. the high-risk investment is reviewed by the URC (as part of the proposal/re-certification process or by memorandum requesting an enhancement of the operation); and

D. the high-risk investment is approved by the Director of OI.

### 6.17 Expenditure Approval Levels (FAR and Non-FAR)

As part of the authorization/certification process, the Director of OI authorizes the spending levels contained in an operation's 6-month expenditure authorization plan. Individual expenditures within the operation must be approved separately, using the "CUFFS Expense/Advance Approval Form" (Appendix B).

All operational travel expenditures shall be approved by the SAC unless specifically delegated in writing.

All POI/POE expenditures will be approved at the level mandated by the current OI policy on CIs.

FAR and non-FAR expenditures under the business/purchase exemption contained in 19 U.S.C. § 2081 and 8 U.S.C. § 1363a can be approved at the following levels:

### 6.17.1 Levels of Approval for Non-Property (Items That Will Not Be Inventoried):

A. up to $4,999 – GS;

B. up to $14,999 – ASAC and RAC;

C. up to $29,999 – Deputy SAC;

D. up to $49,999 – SAC

E. up to $99,999 – DAD, ISD; and

F. over $99,999 – Director of OI.

### 6.17.2 Levels of Approval for Property (Items That Will Be Inventoried):

A. up to $2,499 – GS;

B. up to $9,999 – ASAC and RAC;

C. up to $19,999 – Deputy SAC

D. up to $24,999 – SAC;

E. up to $49,999 – DAD, ISD; and

F. over $49,999 – Director of OI.

Each field manager will be responsible for monitoring operational expenditures to ensure that they are within the 6-month expenditure authorization plan approved by the Director of OI.

## 6.18 Approval of Expenditures

All expenditures, including those approved via an ICE Form 73-293, must be approved and/or documented on the CUFFS Expense/Advance Approval Form (Appendix B) prior to the expense being incurred. Operational personnel shall use the CUFFS Expense/Advance Approval Form in lieu of other standard government expense forms, unless the government standard form is required (i.e., FAR purchases exceeding $2,500 (for services) or $3,000 (for supplies) - see Section 6.19.2(2), "FAR Purchases Over $2,500 for Services and $3,000 for Supplies"). In situations such as this, both a CUFFS Expense/Advance Approval Form and the current required standard government procurement form will be used.

A CUFFS Expense/Advance Approval Form is required for each transaction that utilizes the funds of a certified undercover operation (Proceeds or CUC Appropriated Funds). The CUFFS Expense/Advance Approval Form is a multi-part document that is meant for



Post-Hearing Brief Exhibit 1

use within a SAC office and should not be forwarded to Headquarters for approval signatures. Required approvals at the Headquarters-level will be obtained by means of a "Request for Approval of a One Time Expenditure" memorandum or an ICE Form 73-293, as applicable. After Headquarters' approval is obtained, operational personnel should annotate the CUFFS Expense/Advance Approval Form with "see attached (memorandum or ICE Form 73-293) dated (MM/DD/YY) for required approval."

A CUFFS Expense/Advance Approval Form is not required when non-operational funds (e.g., SAC funds, Treasury Forfeiture Fund funds, HIDTA funds) are used to pay operational expenses. These expenditures must be recorded in CUFFS. The appropriate documentation showing the source, purpose, and expenditure of such funds must be included in the operations files. At the discretion of operational management, a CUFFS Expense/Advance Approval Form may be used to document the posting of these transactions in CUFFS.

### 6.18.1 Approval of Expenditures (Exigent Circumstances)

Reimbursement of any expenditures that did not receive prior approval because of exigent circumstances may be approved later by using a CUFFS Expense/Advance Approval Form with an attached memorandum (from a GS or higher to the operational file), which:

A. explains the exigency that existed;

B. has available supporting documentation attached;

C. is approved by the appropriate supervisor; and

D. is maintained as part of the operation's records.

### 6.18.2 Receipts for Expenditures

Every expenditure of funds must be adequately supported by a receipt or other documentation that includes the following information:

A. the date payment was made;

B. the payee and amount paid; and

C. a description of the items purchased or of the services provided.

A receipt constitutes documentation of, and reasonable proof for, a financial transaction. Goods and services paid for by credit card (e.g., hotel bill, rental car, lease agreement, etc.) should be accompanied by the original receipt and the original credit card slip listing the charge. In instances where purchases are made on-line, a screen print of the on-line order and purchase confirmation can substitute for a normal receipt.

### 6.18.3 Substitute Receipts for Expenditures

If a receipt is unavailable or impractical to obtain due to an undercover situation, then a memorandum to the file must substitute for the receipt. The memorandum should contain the required transaction information, as stated in Section 6.18.2, “Receipts for Expenditures,” and a statement explaining the reason a receipt is unavailable. The person who incurred the expense and the appropriate manager shall sign the memorandum. The memorandum will be maintained as part of the records of the operation as if it were a receipt. This Section applies to receipts unavailable because of loss or other approved reason.

## 6.19 Operational Purchases

Operational funds may be expended following the requirements of the FAR or outside the scope of FAR, as appropriate.

Expenditures that are reasonable and necessary for the conduct of the operation and which do not jeopardize the security, safety, and covertness of the undercover operatives or operation must be accomplished under the provisions of FAR.

All procedures and policies relating to ordinary U.S. Government transactions will apply to these purchases. This includes adherence to the ICE purchase card “Don’t Buy List” and “Don’t Buy Without Approval List” and the $2,500 limit (for services) and $3,000 limit (for supplies) on transactions. These are informal lists issued by Procurement, Office of Financial Management, and apply to certain items purchased under FAR. The lists, which should be reviewed whenever an operation is making a purchase under FAR, do not apply to purchases covered under the business/purchase exemption. A copy of the lists may be obtained from ICE Headquarters Procurement.

### 6.19.1 Purchases Outside the Scope of FAR Using the Business/Purchase Exemption (Covert)

Expenditures that are reasonable and necessary for the conduct of the operation and in which the U.S. Government’s involvement must be disguised in order to maintain the covert nature or to ensure the safety and security of the operation can be accomplished outside the provisions of FAR. The business/purchase exemption is the aspect of 19 U.S.C. § 2081 and 8 U.S.C. § 1363a which provides an undercover investigative operation the ability to expend U.S. Government funds (including proceeds) without compliance with FAR. (See Section 6.2.4, “Expenditure Flow Chart.”) These transactions, using the business/purchase exemption, would be accomplished using the operation’s covert bank account (and other covert assets as necessary) in the same way that any normal transaction by a non-government entity would be accomplished. These purchases are subject to the approval levels established in Section 6.17, “Expenditure Approval Levels (FAR and Non-FAR).”

Property purchased outside FAR must be liquidated or disposed of in accordance with Section 14.3, "Liquidation of Assets."

### 6.19.2 Purchases Under FAR (Overt)

All property purchased through normal FAR guidelines is ICE property. When no longer needed by the operation, it may be transferred (upon proper authorization) to the SAC and utilized in the accomplishment of ICE's mission. This applies whether the purchase was funded by proceeds or appropriated funds. The property shall be treated in the same manner as any other property owned by ICE and must comply with established property-management and inventory procedures.

*Note: The following FAR guidelines are subject to change and operational management should ensure that the most current guidelines are followed. If new or additional FAR guidelines are developed, the newer guidelines should be followed. Questions should be addressed to the Undercover Operations Unit.*

All FAR purchases within a certified undercover operation should be paid from an operational overt bank account. Operational personnel may obtain a debit/credit card (check card) for their overt bank accounts. These may be used for purchases under $2,500 (for services) or under $3,000 (for supplies).

#### 6.19.2(1) FAR Purchases Under $2,500 for Services or $3,000 for Supplies

If FAR purchases of items costing under $2,500 for services or $3,000 for supplies per vendor are necessary and reasonable, then operational personnel:

A. are required to utilize a CUFFS Expense/Advance Approval Form (Appendix B);

B. are required to utilize a tax-exempt form (as applicable);

C. may use payment of choice to the vendor from their overt bank account, i.e., a check, cashier's check, money order, overt bank debit, credit card, or cash (the petty cash fund may be used to make FAR purchases under $2,500 for services or $3,000 for supplies - see Section 6.6, "Petty Cash Fund," for further information); and

D. are required to properly document the transaction in CUFFS.

#### 6.19.2(2) FAR Purchases Over $2,500 for Services and $3,000 for Supplies

All FAR purchases over $2,500 for services and $3,000 for supplies must be coordinated with the FLMU, MSD. Requests with proper documentation (as outlined below) must be sent to "OI-Requisitions@dhs.gov" in Microsoft Outlook (or contact FLMU).

If FAR purchases of items costing over $2,500 for services and $3,000 for supplies, per vendor, are necessary and reasonable, then operational personnel are required to:

A. complete a CUFFS Expense/Advance Approval Form (Appendix B);

B. identify three vendors who sell the item in order to determine the best value/price (unless purchased from an established U.S. Government contract) and provide FLMU with three estimates with the requisition, as part of the market research requirement *(Note: SAs may use the GSA Advantage website to conduct market research and obtain the three estimates. It should be noted that receiving estimates by posting Request for Quotes on Ebuy is not authorized.)*;

C. send to FLMU a completed FFMS G-514 Requisition Form, with attached copies of the estimates from the three vendors (there will be no accounting string information as this is an operational purchase);

D. if purchased through a U.S. Government contractor, include the contractor's number on the requisition form;

E. ensure that the selected vendors are Central Contract Registered (www.ccr.gov);

F. forward to FLMU the "Special Fund(s) Certification" Standard Form (Contact the Undercover Operations Unit for the latest version) signed by the Investigative GS or higher, verifying that operational funds are available for procurement;

G. keep copies of all paperwork in the operation's permanent files for auditing purposes; and

H. properly document the transaction in CUFFS.

### 6.20 Prohibited Expenditures

The following expenditures, using operational funds, are specifically prohibited:

A. expenses related exclusively to trial preparation and/or prosecutions;

B. plaques, pins, patches, and/or other forms of mementos that do not directly support the operation's and/or operative's undercover identity. This includes mementos that would be given to agents, police officers, U.S. Attorneys, or any others who worked on an operational investigation;

C. law enforcement equipment that does not directly support the operation's and/or operative's undercover identity including, but not limited to: raid



Post-Hearing Brief Exhibit 1

jackets/hats; body armor; weapons; Special Response Team equipment and accessories; emergency vehicle equipment (lights, sirens, etc.); and law books for general office use;

D. purchase, lease, or rental of vehicles, vessels, or aircraft, other than those being used specifically and exclusively for the undercover operation;

E. conferences and training that do not directly support the mission and/or covertness of the operation and/or the operative's undercover identity (any training or conference expense which directly supports the operation requires the prior written approval of the DAD, ISD);

F. maintenance and fuel for U.S. Government-owned or Government-leased vehicles that are not being used specifically and exclusively for the undercover operation;

G. any other equipment, furniture, or supplies that are not being used specifically and exclusively for the undercover operation;

H. payment or reimbursement of the salary paid to a contract CUFFS Administrator. However, in limited circumstances and after approval from the DAD, ISD, a certified undercover operation may purchase the services of a Certified Public Accountant or bookkeeper to audit or maintain the records of an <u>undercover proprietary business</u>. The business/purchase exemption under 19 U.S.C. § 2081 and 8 U.S.C. § 1363a would be applied, and these services may be paid for as a necessary and reasonable expense of the operation using proceeds or appropriated funds.

<u>Note:</u> *The above prohibitions do not preclude the SAC from using SAC-appropriated funds or other U.S. Government-appropriated funds (excluding CUC-appropriated funds) to purchase such items for the SAC office and then making the items available for use by the operation.*

## 6.21 Accounting for Certified Undercover Operation Property

All property acquired in the course of an undercover operation will be entered into the Property/Equipment Log for Undercover Operations (Appendix D). The log must list any property that has been provided by the SAC and, because of its use and location, cannot be properly tracked by the usual property management procedures. In addition, a Property Use File should be established and maintained to record the location and the individual responsible for the property item.

Access to property and its assignment to operational personnel will be limited to the authorized individuals who are designated as the certified undercover operation's property officers. In most cases, the property officers will be the CUC

Lead/Administrative GS and an alternate. Operational property will be controlled and made available to be signed in or out by the property officers.

Property that is purchased outside FAR, pursuant to the business/purchase exemption, can be used only by the operation that purchased it, unless:

A. another certified undercover operation, in support of its proprietary business, funds the transfer with the understanding that the property must be liquidated at the conclusion of the acquiring operation; or

B. the property is seized, forfeited, and retained for official use.

(See Section 14.3, "Liquidation of Assets," for guidance on the final disposition/ liquidation of property acquired in a certified undercover operation.)

### 6.22 Travel in Support of Undercover Operations

Like any other expenditure, both appropriated funds and proceeds may be used to pay for travel that is necessary and reasonable for the conduct of the certified undercover operation. Operational funds shall not be used to pay for travel that is not directly related to the certified undercover operation.

All travel (covert or overt) related to a certified undercover operation shall be documented using a manual travel authorization, a manual travel voucher, and a CUFFS Expense/Advance Approval Form. This documentation will be processed and maintained in accordance with the provisions of this Handbook. The original documents and all supporting receipts will be maintained in the operation's financial records and recorded in CUFFS.

All travel paid for using operational funds (proceeds or CUC-appropriated funds) requires the approval of the SAC unless specifically delegated in writing.

<u>Note:</u> *Notwithstanding the Federal Travel Regulations (FTR), a receipt is required for every expense. (See Section 6.18.2, "Receipts for Expenditures.")*

<u>Note:</u> *In cases where certified undercover operational travel paid by appropriated funds (funds other than proceeds or CUC-appropriated funds) and documented in Travel Manager, SACs will have controls in place to ensure that such travel expenses are in compliance with the policy set forth in this Handbook.*

### 6.22.1 Travel at Actual Expense (Approval and Documentation)

Except with specific approvals, all travel (overt and covert) must be in compliance with the limits set in the FTR. These policies apply to all travel, including travel by undercover operatives, CIs, cover agents, and supervisors. SAC approval is required for actual subsistence travel expenses.



Post-Hearing Brief Exhibit 1

Undercover expenses incurred during travel are not travel expenses and are therefore not subject to the limits of FTR. However, without direct approval of the SAC, reimbursement for per diem or meals and incidental expenses cannot exceed 300 percent of the rate applicable to the temporary duty location. That amount may be exceeded only when a memorandum or, in exigent circumstances, verbal permission granting prior approval by the SAC and documented after the fact

A. includes a TECS case number and specifies the circumstances warranting approval of subsistence travel in excess of 300 percent of per diem; and

B. all such expenses are documented in the operational CUFFS records.

### 6.22.2 Premium (Including First and Business) Class Travel

All requests for undercover related premium (including first and business) class travel must be forwarded to the Director of OI through the appropriate DAD. The request must contain supervisory certification that the premium class travel is necessary and reasonable, i.e., the traveler's physical location on the conveyance is an integral part of the clandestine mission. Undercover assignments and en route surveillance duties are characteristic examples of these situations. In these cases, the employee's physical location on the conveyance is dependent on the suspect violator's location.

The Director of OI is responsible for reviewing and approving requests for business class travel, and reviewing and forwarding for approval requests for first-class travel when such travel is necessary to accomplish a covert investigative work assignment. Supervisory certification must be obtained and maintained on file for each such assignment. Authorization for premium class travel shall be requested at the earliest possible time, but no later than 10 business days prior to the travel.

If emergency circumstances exist and it is impossible to obtain prior approval for premium class travel, the SAC may approve the travel and shall send a memorandum through the DAD, ISD, to the Director of OI at the earliest possible time, but no later than 2 business days after the start of the travel. The memorandum will:

A. describe the circumstances that required the emergency SAC approval of the premium class travel;

B. contain supervisory certification that the premium class travel is necessary and reasonable, i.e., the traveler's physical location on the conveyance is an integral part of the clandestine mission; and

C. request concurrence, with the SAC approval, by the Director of OI.

A copy of the memorandum and any subsequent correspondence from the Director of OI must be included in the operation's financial records.



Post-Hearing Brief Exhibit 1

### 6.22.3 Travel by Confidential Informants

A CI's operational travel must be documented in the manner specified in Section 6.22, "Travel in Support of Undercover Operatives," Subsection 6.22.1, "Travel at Actual Expense (Approval and Documentation) and Subsection 6.22.2, "Premium (Including First and Business) Class Travel." The CI's number and/or assumed name will be used for identity purposes on all travel documents. An ICE Form 73-293 will be required as the receipt for all the payments to the CI.

In circumstances where the CI is unavailable to physically accept any reimbursement for travel expenses, the funds may be paid by EFT and a CUFFS Expense/Advance Approval Form may be used. The CUFFS Expense/Advance Approval Form must be attached to the travel voucher. The SA responsible for the EFT payment will cite the CI's source number and write "paid by EFT" and also affix the SA's name and signature in the appropriate place on the travel voucher and ICE Form 73-293. All CI bank accounts used for this purpose must be vetted by operational personnel through TECS Case Management, and the documentation of the vetting must be attached to the wire receipt.

In circumstances where the CI's travel is partially paid by the operation, a memorandum itemizing the costs and reimbursements associated with that travel must be attached to the travel voucher prior to the SAC's (or properly authorized designee) approval for payment.

*Note: In cases where the CI's true name appears on a receipt, the receipt should be redacted and a memorandum of explanation should be attached to the redacted receipt.*

## 6.23 Covert Expenditures for Safety and Security

During the course of an undercover investigation, operational needs often require that goods and services be procured in a manner that does not reveal the involvement of the U.S. Government. As described above, most of these needs can be met by employing the exemptions granted under 19 U.S.C. § 2081 and 8 U.S.C. § 1363a. However, there are times when a necessary and reasonable expense of an operation does not appear to be covered by the business/purchase exemption, because it is also a requirement of the law enforcement mission rather than for direct support of the undercover proprietary business.

There must be an authorized method for meeting the safety and security needs of the operation that coincide with the more general law enforcement mission. These needs usually involve expenditures for services such as airfare for cover agents, room rental for operational security, surveillance vehicle rental, etc. that are necessary for the gathering of evidence related to the undercover investigation.

### 6.23.1 Cover Agent Expenses

When an agent is required to travel in an undercover capacity, one or more cover agents may be required for safety and security. This necessary and reasonable expense is in

support of the covert nature of the investigative operation and is covered by the exemptions granted by 19 U.S.C. § 2081(a)(3) and 8 U.S.C. § 1363a(a)(4). Under the above guidelines, the procurement of tickets, hotel rooms, etc. can be retained outside the FAR and FTR.

In order to avoid placing the operation in jeopardy or compromising a case, the Cover Agents often need to purchase tickets outside the FAR and FTR at the standard rate offered to the traveling public and travel using their undercover identity. These expenditures can be made with the authorization of the SAC, or, except for travel, can be delegated to the approval levels for non-property expenditures listed in Section 6.17.1, "Levels of Approval for Non-Property (Items That Will Not Be Inventoried)."

In addition, the need to rent a vehicle for surveillance of an undercover meeting may be authorized by an appropriate approving official if the rental is necessary and reasonable. If the procurement under FAR would unduly delay the investigation and therefore jeopardize the safety and security of SAs or the security and/or covertness of the operation, the transaction can be accomplished outside FAR.

If, however, there are no issues related to safety and security requiring covert travel, the travel should be accomplished within the scope of the FAR and FTR.

### 6.24 Funding Sources for Certified Undercover Operations

All funding issues should be directed to the Undercover Operations Unit. All funds expended within an operation must be tracked in CUFFS.

#### 6.24.1 Proceeds

Proceeds (defined in the Glossary of this Handbook) are funds acquired from a non-Government source during the undercover operation. These sources include, but are not limited to:

A. Violator-directed funds/assets;

B. Income/profits from undercover endeavors;

C. Interest from operational bank accounts; and

D. Salary paid to an undercover agent (by the target).

Proceeds are no-year funds that stay in the operation until expended or otherwise disposed of (i.e., forfeited to the U.S. Government or deposited into the U.S. Treasury as miscellaneous receipts).

Proceeds are not programmed/allocated to any particular OCC until expended by the operation. These funds can be expended for any necessary and reasonable expense


Post-Hearing Brief Exhibit 1

(defined in Section 6.2.1, "Expenditures Must Be Necessary and Reasonable for the Conduct of the Operation") of the operation. At no time may the expenditures exceed the current 6-month expenditure authorization plan.

### 6.24.2 CUC-Appropriated Funds

CUC-appropriated funds are statutory authorized funds controlled by the Undercover Operations Unit. Once allocated to a certified undercover operation, these funds roll over into the new fiscal year (no-year money) and do not expire at the end of the fiscal year. These funds stay in the operation until they are spent or returned to Headquarters.

The request and authorization for CUC-appropriated funds is included on the 6-month expenditure authorization plan of the undercover operation proposal. After certification, the distribution of these funds is accomplished by means of a SAC memorandum to the Director of OI requesting the distribution of the funds. Supplemental funding can be requested at any time during the operation's 6-month authorization period (i.e., unforeseen operational expenses (see also Section 6.2.3, "Unforeseen Expenses that Will Exceed the Limit of the 6-Month Expenditure Authorization Plan for Certified Undercover Operations").

Due to OI budget constraints, approval of the funding request on the operation proposal's 6-month expenditure authorization plan does not guarantee that the operation will obtain the full amount requested.

CUC-appropriated funds are allocated (programmed) at the two-digit OCC level. Operational personnel will make the determination as to how the funds are to be allocated and include this information in the funds distribution memorandum (using the standard format approved by the Unit Chief, Undercover Operations Unit).

The funds must be expended within the OCC to which they are allocated.

The operation's CUFFS Administrator, via a budget in CUFFS (QuickBooks), tracks each separate CUC appropriation until expended.

#### 6.24.2(1) Reallocation (Reprogramming) of CUC-Appropriated Funds

CUC-appropriated funds can be reallocated (reprogrammed) by way of a written request to the Director of OI through the DAD, ISD. The Dallas Finance Center tracks the expenditure of appropriated funds (not proceeds) by OCC and therefore must be informed of any approved reallocation (reprogramming) of CUC appropriations. (The Undercover Operations Unit should be contacted to obtain the standardized memorandum format.)

### 6.24.3 Recoverable Funds for Money Laundering

The request for, and authorization to use, recoverable funds (defined in the Glossary of this Handbook) is included in the 6-month expenditure authorization plan of the



Post-Hearing Brief Exhibit 1

undercover operation proposal. After certification, the distribution of these funds is accomplished by means of a SAC memorandum (using the standard format approved by the Unit Chief, Undercover Operations Unit) requesting the distribution of funds and an ICE Form 73-293. For the purposes of the use of recoverable funds, the Director of OI is the approving official of ICE Form 73-293, regardless of the amount requested. The total amount of recoverable funds is returned to OI Headquarters after the operational need for the funds ends. Recoverable funds are similar in nature to a "Flash Roll," except that the funds may be retained by the operation over longer periods of time.

Proceeds can be used as recoverable funds by obtaining prior specific written approval from the Director of OI. The use of proceeds as recoverable funds shall be noted via the proposed 6-month authorization plan using the annotation "Proceeds for Laundering." (The Undercover Operations Unit should be contacted to obtain the standardized memorandum format.)

#### 6.24.4 SAC Funds

SAC funds are funds within the SAC's budget and are sometimes used by operations for smaller POI/POE and agent operational travel.

#### 6.24.5 Other ICE Funds

Other ICE funds are generally controlled by other Investigative Programs Units and are funds for special projects or specific targets (i.e., POI/POE, counterfeit pharmaceuticals investigative project, high-threat human-trafficking organization, etc.)

These funds are generally year-end funds and expire with the fiscal year. These funds must be expended, rolled over to the next fiscal year, or returned to Headquarters prior to the end of the fiscal year. Generally, these funds are from the Treasury Executive Office for Asset Forfeiture Fund or congressionally-mandated programs.

#### 6.24.6 Non-Agency Funds

Non-agency funds are funds that come from other law enforcement agencies or U.S. Government programs such as HIDTA and High Intensity Financial Crimes Area.

### 6.25 Lease Agreements

Lease agreement expenses must be approved at the level equal to the entire amount of the lease agreement period prior to the implementation of the lease, not at the level of the monthly expense. As with all individual expenses, the monthly lease expense will be approved at the appropriate expense approval level prior to being paid.

ICE Counsel must review all lease agreements for legal sufficiency prior to implementation.

*Note:* *Operational personnel are not required to have the total amount of the lease expense on hand at the time of the lease execution.*

### 6.26 Leased Vehicles

Operational funds may be used to lease vehicles as long as they are "necessary and reasonable" expenses for the conduct of the undercover operation and are used specifically and exclusively for activities associated with the operation. Furthermore, the SAC must approve the use of all leased vehicles in writing. Written SAC approval must occur prior to the initial certification and again at the time of all subsequent reauthorizations (every 6 months).

*Note:* *Under no circumstances (life threatening emergencies exempted) are personnel above the first-line supervisor (GS) permitted to use operationally-funded (including retained) vehicles.*

The narrative portion of the operational proposal must include a statement of SAC approval, specific or anticipated vehicle models, monthly and annual lease costs, operator names, and a brief justification for the use of each vehicle. Additionally, an entry on the cover page of both the application and reauthorization proposal shall indicate the intended use of the leased vehicles.

A cost comparison should be made to determine the appropriate length of a vehicle's lease. Should the comparison determine that the penalty for early termination of a lease is less than the sum of the monthly expenses for a lease of short duration, then a longer lease should be employed. Vehicles remaining under lease at the conclusion of the undercover operation must be returned to the lessor and the lease must be terminated.

If proceeds are generated from investigative activities of the undercover operation, then proceeds **must** be used to pay for the expense of the leased vehicles. CUC-appropriated funds may be used only when proceeds are unavailable.

Vehicles shall be leased under the provisions of FAR, unless the business/purchase exemption is required, based on the need for a covert lease in order to maintain operational covertness/security.

## Chapter 7. MANAGEMENT CONTROLS AND REPORTING REQUIREMENTS FOR UNDERCOVER OPERATIONS

Certified undercover operations by their nature require investigative and procurement techniques that are unlike standard U.S. Government procedures. The authority granted to OI to conduct certified undercover operations permits SAs to engage in activity as part of an operation that is exempt from various statutes intended to create checks and balances in the management of public monies. Therefore, it is imperative that field managers employ proper controls that provide complete accountability for the use of this



Post-Hearing Brief Exhibit 1

powerful investigative tool and all U.S. Government monies (appropriated and proceeds) involved.

This Chapter provides a review of the management controls and reporting requirements that serve to ensure that the activities of undercover operations are properly documented and reviewed.

Additional requirements for management controls may be promulgated by the Unit Chief, Undercover Operations Unit.

### 7.1 SAC Monthly Reports (Financial)

Each certified undercover operation is required to complete and maintain a monthly financial review. At the beginning of each month, and after the CUFFS Administrator has completed all CUFFS entries of financial transactions for the reporting period, each operation must undergo a thorough financial review by field office managers.

The CUFFS Administrator will prepare financial review documentation with the following information:

A. CUFFS Balance Sheet Report ending on the last day of the previous month;

B. CUFFS Income and Expenses by All Classes Statement from inception to the last day of the previous month;

C. CUFFS Income and Expenses Itemized Report for the month being reported; (Attach copies of approval documents and transaction documents for any expenditures exceeding $2,499 (property) and $4,999 (non-property), or the locally-established first-line supervisor approval level copies paid during the current month); all applicable documentation related to petty cash funds on hand (if applicable) and other reports as required;

D. budget reports for all outstanding appropriated investigative advances received;

E. CUFFS Income and Expenses Report, reflecting the expenses incurred during the same 6-month timeframe identified on the current 6-month Expenditure Authorization Plan;

F. statement of current proceeds balance;

G. CUFFS Reconciliation Summary Report for each bank account; and

H. copies of the most recent bank statements for all accounts.



Post-Hearing Brief Exhibit 1

The operation's CUC Lead/Administrative GS will use the financial review documentation to complete the Certified Undercover Operation Monthly Financial Review Worksheet (Appendix E). This worksheet will include:

A. any findings requiring correction or further review, which will be noted in the spaces provided; and

B. any corrective action taken, which will also be recorded.

The operation's CUC Lead/Administrative GS will forward the completed Certified Undercover Operation Monthly Financial Review Worksheet and documentation to the SAC for certification and signature. *SAC review and certification may not be delegated*. The signed financial review package and worksheet will be retained as part of the operational files.

### 7.1.1 SAC Financial Reporting – Operation's Financial Records to Headquarters

On a monthly basis, each certified undercover operation will submit a copy of its CUFFS (QuickBooks back-up file) financial data file to the Undercover Operations Unit. The data must be received by the Undercover Operations Unit by close of business on the 15th of each month. If the 15th does not fall on a business day, the information must be received by close of business on the last business day prior to the 15th of the month. The following procedures will be used:

A. Pursuant to Section 7.1, "SAC Monthly Reports (Financial)," the CUFFS Administrator will reconcile CUFFS for the month being reported.

B. A complete copy of the CUFFS data will be generated as a QuickBooks backup file (.qbb). The file will be named in the format "0XXXMMYYYY.qbb" where:

"0" (zero) is a constant;
"XXX" is the TECS CUC program code;
"MM" is the month being reported; and
"YYYY" is the year being reported.

C. The backup file will be transmitted to the Undercover Operations Unit by inter-office email, as specified by the Undercover Operations Unit. If there are questions relating to the transmittal of the file, the Undercover Operations Unit should be contacted.

D. The Undercover Operations Unit will review the files for accuracy and conformance to the policies and procedures contained in this Handbook. The financial data will then be transmitted to the Dallas Finance Center by close of business on the 22nd of each month.



Post-Hearing Brief Exhibit 1

### 7.2 SAC Petty Cash Review

At least once every 3 months, the SAC will direct a supervisor (GS-14 or above) who is not involved in the certified undercover operation to conduct an unannounced review and reconciliation of the petty cash fund if one is maintained for the operation. At a minimum, the cash count must be reconciled with:

A. the balance shown in the Petty Cash Daily Register;

B. all outstanding advances;

C. all documentation relating to expenditures made since the previous review; and

D. all documentation relating to advances made by the operation to the fund.

The audit will also include:

A. a random sampling of not less that ten transactions to determine compliance with record-keeping and approval policies and procedures (if less than ten transactions were made in the period, a 100% review will be required); and

B. a review of the CUFFS records to determine if all Petty Cash Fund transactions from the last 2 completed months have been properly posted.

A memorandum will document the findings of the Petty Cash audit, which will be conducted in accordance with the current DHS Imprest Fund Manual of Procedures and Instructions for Cashiers (Cashiers Manual), Office of Financial Management, Cash Management Section, February 2003. This memorandum will be retained as part of the operation's records.

### 7.3 Headquarters Oversight

The DAD, ISD, the ADs, Operations (East and West), and DADs, Investigative Programs and MSD, will ensure that sufficient Headquarters staff monitor the conduct of certified undercover operations. They will gather and assess information to establish whether operations are being conducted in accordance with:

A. existing policies and procedures;

B. appropriate operational techniques; and

C. current programmatic priorities.

### 7.3.1 Headquarters Oversight – Programmatic Units

During the course of certified undercover operations, the designated Program Manager/Operational Desk Officer(s) must monitor and review the progress of operational cases. This will be accomplished principally through personal contact with field managers and by the review of investigative activity reports. The Desk Officers are charged with finding, coordinating, and resolving operational and programmatic issues that arise in undercover operations.

### 7.3.2 Headquarters Oversight – Undercover Operations Unit

In close coordination with the appropriate OI Headquarters staff and field managers, the Undercover Operations Unit will attempt to resolve any policy and procedural inconsistencies they note, based on the requirements of this Handbook and related case information. Policy or procedural issues that cannot be adequately resolved, or issues that are determined to be operational in nature, will be referred to the appropriate Headquarters Management.

### 7.3.2(1) National Program Managers - Undercover Operations Unit

The Program Managers in the Undercover Operations Unit will monitor OI undercover activity for conformance to policies and procedures relating to undercover:

A. certification (statutory exemptions);

B. authorization (sensitive circumstances);

C. backstopping;

D. record-keeping (CUFFS);

E. training; and

F. ULC.

### 7.4 On-site Field Reviews of Certified Undercover Operations

The intent of the on-site certified undercover operation field review is to thoroughly examine all operational and administrative aspects of an ongoing operation. The review will be conducted by representatives from OI Headquarters and/or field managers. The field review will include a comprehensive review of information provided to OI Headquarters as part of the 6-month recertification packages and field interviews of operational personnel.

Undercover operations will undergo a detailed on-site review every 1 or 2 years (see Section 7.4.1, "Frequency of On-Site Field Reviews") to determine whether:



Post-Hearing Brief Exhibit 1

A. the operation is being conducted as authorized;

B. the stated goals of the operation are being adequately addressed;

C. the books and records are current and in accordance with the policy in this Handbook; and

D. the operation is being properly administered and supported by SAC and Headquarters management.

### 7.4.1 Frequency of On-site Field Reviews

Based on the results of an operation's last Undercover Operations Unit Field Review, OPR/MIU audit, and 6-month recertification proposal, the certified undercover operations will be assessed as to whether it should be reviewed annually or biennially. Operations will be placed into one of two categories:

A. Category 1 – annual field review required:

1) new certified operation; or

2) an operation that does not meet the criteria established for inclusion in Category 2.

B. Category 2 – biennial field review:

1) An operation that has had an initial Undercover Operations Unit field review and OPR/MIU audit.

2) Senior operational management are providing active oversight to ensure policy compliance.

3) The financial books and records (CUFFS/QuickBooks) of the operation have minor, if any, deficiencies.

4) Operational personnel are adhering to administrative policy specified in this Handbook, including, but not limited to, the requirements for waivers, inventories, property, undercover identification, and the use of operational funds, travel requirements, leased vehicles, bank accounts, and monthly reporting requirements.

5) The operation has minor, if any, operational CI deficiencies.

6) The operation has a solid investigative focus and high quality undercover investigations are being conducted within the operation.



Post-Hearing Brief Exhibit 1

7) The operation's recertification paperwork prepared for the URC is accurate, timely, and indicative of a well-maintained operation.

8) The operation has strong enforcement results during the previous year and continues to show strong potential.

*Note: The Unit Chief, Undercover Operations Unit, will have the sole responsibility, based on the above criteria, for determining the category placement for each certified undercover operation.*

The categorization of operations will not be construed as a positive or negative indicator, but rather as a delineation of operations that require more or less of OI Headquarters' input and oversight to ensure that every ICE certified undercover operation's integrity is maintained.

A SAC can, at any time, request the assistance of an Undercover Operations Unit Jump Team to provide instruction to the individuals involved in the various aspects of the undercover operation (see Section 8.5, "Undercover Operations Unit Jump Team").

### 7.4.2 On-site Field Reviews (Interviews)

Operational personnel who will be interviewed during the on-site reviews include (but are not limited to):

A. senior management (SAC, Associate SAC, ASAC, and/or RAC);

B. the CUC Administrative Overseer(s);

C. the CUC Lead/Administrative GS and CUC Program Manager;

D. each Case Agent;

E. each undercover agent;

F. the Undercover Liaison Coordinator (primary/secondary);

G. the AUSA responsible for the review of the recertification proposal and other AUSAs who have prosecuted the operational investigations;

H. the CUFFS Administrator; and

I. the petty cash cashier, if applicable.

### 7.4.3 On-site Field Reviews (Assessment)

The field review summary and evaluation will be used to provide SAC management with an overview of the operation's condition. The Field Review Assessment will be used as a framework for all on-site reviews. The review process will cover:

A. a review of ROIs for the cases in the operation;

B. a review of the results of the previous 6 months towards the stated goals of the operation;

C. a review of the use of statutory exemptions granted to the operation, as well as the sensitive circumstances authorized;

D. a review of expenditures since the previous undercover operations field review;

E. a review of the current and last 6-month expenditure authorization plan, as well as an assessment of the proposed plan for the following 6-month period;

F. an assessment of the operational strategy proposed for the following 6 months;

G. interviews as specified in Section 7.4.2, "On-site Field Reviews (Interviews)";

H. an assessment of operational assets to ensure compliance with policies (e.g., storefronts, warehouses, conveyances, etc.); and

I. identifying areas where OI Headquarters can provide additional support.

The preliminary results of the on-site review will be summarized and provided to the SAC at the conclusion of the on-site review. After the review is finalized, the DAD, ISD, will provide the SAC with a copy of the completed summary and evaluation, which will become part of the operation's permanent files.

It is incumbent upon the SAC to correct the issues identified for corrective action in the summary and evaluation report and provide a written response of the corrective actions within 45 days to the DAD, ISD, who will then forward it to the Undercover Operations Unit and the appropriate Unit Chief(s), for review and concurrence.

The Unit Chief, Undercover Operations Unit, will provide a verbal summary of each field review report to the URC.

### 7.4.4 Independent Audits of Certified Undercover Operations

Auditors from OPR/MIU will conduct a comprehensive independent audit of each undercover operation every 2 years. This audit will be conducted according to OPR policy and procedures. A copy of the final audit report will be retained as part of the operation's permanent records. Travel costs associated with such audits are a necessary and reasonable expense of the operation.

## 7.5 Financial Reporting – Headquarters Internal

On a monthly basis, the Undercover Operations Unit will generate a financial report containing the following data for each ongoing certified undercover operation:

A. the total amount of CUC-appropriated funds disbursed to the operation since inception;

B. the total amount of CUC-appropriated funds remaining in the operation;

C. the total amount of proceeds generated by the operation since inception;

D. the total amount of proceeds remaining in the operation;

E. the total amount of "Recoverable Funds" disbursed to the operation since inception;

F. the total amount of "Recoverable Funds" remaining with the operation;

G. the total amount of operational expenditures since inception (including CUC-appropriated funds, proceeds, and all other funding sources); and

H. other data elements required by OI Headquarters management for effective financial oversight.

## 7.6 Reporting Investigative Activities

Investigative case activities are the core of all undercover operations. They must be documented in an ROI in a timely and comprehensive manner. ROIs are used by local and OI Headquarters managers to:

A. ensure that investigative cases placed under the operation have undercover activity or a direct nexus to undercover activity;

B. monitor the progress towards the objectives of the operation;

C. provide additional detail and explanation of the information contained in new proposals, reauthorization requests, expansion requests, and reviews;

D. support documentation of certain financial transactions; and

E. provide justification for operational POI payments to CIs.

Unless there are compelling reasons to do otherwise, ROIs should be set at level 3 (OI viewing) access in TECS. If it is necessary to create level 4 (Social Security Number (SSN) viewing) access to an ROI, the following OI Headquarters personnel must be added to the access list:

A. the Unit Chief of the appropriate investigative programmatic Unit(s);

B. the Unit Chief, Undercover Operation Unit; and

C. the Program Manager(s) for the programmatic area responsible for the investigation (there may be more than one Program Manager).

To ensure that all related information can be easily retrieved, the certified undercover operation's management must confirm that each case record related to an undercover operation has the correct TECS CUC program code.

## 7.7 Use of TECS CUC Program Codes

### 7.7.1 Primary Case File (TECS)

Only **<u>one</u>** CUC program code shall be used for an undercover investigation's primary TECS case record (including collateral case records). The CUC program code for the operation embodies the certification and authorization of the operation. This code indicates that a particular investigation is certified and authorized within the noted certified undercover operation. The code also indicates which operation is authorized to generate and/or receive proceeds as well as fund any reasonable and necessary expenses of the investigation.

### 7.7.2 Case Reports (ROI, Incident Reports)

When an investigation of one certified undercover operation receives investigative assistance and/or support (i.e., transportation, pick-up activities, undercover meetings, and other law enforcement support) from another certified undercover operation, the assistance may be documented by inputting the assisting operation's TECS CUC program code on ROI and Incident Reports. This assistance will **<u>not</u>** be documented by inputting additional CUC program codes on the primary TECS case record.

## 7.8 Property Inventories of Certified Undercover Operations

The CUC Administrative Overseer(s) will ensure that a complete annual physical inventory of all items on the Property/Equipment Log for Undercover Operations

(Appendix D) is conducted. This inventory will coincide with the annual ICE inventory of capitalized property.

The following inventory procedure will be employed:

A. The SAC will assign an SA who is not involved in the operation to conduct the inventory.

B. The CUC Lead/Administrative GS will provide a complete copy of the Property/Equipment Log for Undercover Operations to the person assigned to conduct the inventory.

C. Using a **copy** of the Property/Equipment Log for Undercover Operations, the person taking the inventory will perform a physical inspection of each item listed, and date and initial the "Inventory" column to indicate that the item has been located.

D. Any discrepancies will be brought to the attention of the CUC Lead/Administrative GS who will provide an explanation and make the appropriate changes to the Property Files.

E. If, for any reason, an item cannot be physically inspected, the CUC Lead/Administrative GS will provide a memorandum explaining the reason and certifying its location and condition.

F. If any property is determined to be lost, stolen, or destroyed:

   1) the SAC will notify OPR as appropriate;

   2) the CUC Lead/Administrative GS will ensure that a *Report of Property for Survey* is completed;

   3) the procedures contained in the current ICE Personal Property Management Handbook will be followed to determine final disposition;

   4) the final disposition will be noted in the Property/Equipment Log for Undercover Operations; and

   5) a copy of the completed *Report of Property for Survey* will be placed in the Property Use File.

The Annual Property Inventory memorandum will be attached to the annotated copy of the Property/Equipment Log for Undercover Operations and any supporting memorandum(s) signed by:

A. the individual who conducted the inventory;



Post-Hearing Brief Exhibit 1

B. the CUC Lead/Administrative GS; and

C. the SAC or Deputy SAC.

The signed package will then be retained as part of the operation's permanent records.

## 7.9 Undercover Identification Annual Inventory

Coinciding with the annual property inventory, the SAC must ensure that a complete physical inventory of all undercover identification is conducted (see Section 9.1.6, "Control of Personal Undercover Identification"). All undercover identification must be inventoried and inspected. This is not limited to undercover agents assigned to a particular certified undercover operation. Using the SAC's undercover identification files, the individual assigned to inventory covert identification documents must personally ensure that the location of all undercover identification has been properly documented. SAs who have been authorized to retain undercover identification shall physically present it for inspection. A memorandum certifying the completion of the inventory and listing any discrepancies found will be signed by:

A. the individual who conducted the inventory; and

B. the SAC or Deputy SAC.

The memorandum will then be retained as part of the primary ULC's permanent office records.

## 7.10 Managing Transgressions Within Certified Undercover Operations

Managers should assess certified undercover administrative and operational transgressions as to whether they are operation-wide or compartmentalized (i.e., only involving one programmatic area or investigative group) problems. Critical operation-wide problems may result in the suspension of the operation. Critical compartmentalized issues may result in the suspension of the offending program and/or group activity. Appendix F is a Table of Transgressions and Corrective Actions establishing a uniform and balanced approach to correcting problems within certified undercover operations. The Table is for general guidance and is not meant to be all-inclusive, nor does it create requirements related to the addressed issues.

As always, the Director of OI is the certifying and authorizing official for certified undercover operations and, as such, is the official responsible for all corrective actions. Additionally, any requirements related to the OPR notification are in no way affected by this Table or the actions set forth therein.



Post-Hearing Brief Exhibit 1

## Chapter 8. TRAINING

The Undercover Operations Unit is responsible for the oversight, review, and presentation of the following courses in support of undercover investigative activities:

A. Undercover Operatives School (UCOS);

B. Undercover Managers School (UCMS);

C. Undercover Liaison Coordinator School (ULCS);

D. CUFFS Administrator School (CUFFSAS);

E. Other Undercover Operations Unit-sponsored training, as needed; and

F. Other OI-sponsored undercover training.

*Note: All training accreditations provided through the Undercover Operations Unit will expire after 5 years, unless otherwise stated in this Handbook.*

### 8.1 Undercover Operatives School

All ICE undercover operatives (including other agency law enforcement officers working undercover assignments for OI) assigned to work in any undercover capacity, with the exception of limited undercover duties, must have completed the OI UCOS. However, under limited exigent circumstances, this requirement may be temporarily waived for a period not to exceed 1 year with the approval of the DAD, ISD, as stated in Section 8.1.4, "Waiver for Undercover Operatives School."

### 8.1.1 Requirements

Prior to attending the UCOS, the undercover operative candidate must be vetted and deemed suitable by the Primary Field ULC (see Section 10.3, "Selection Procedures for Undercover Operatives (ULC's Role)"). Additionally, the undercover operative candidate must possess a minimum of 3 years of federal, state, or local criminal investigative experience (patrol, correctional officer, and inspector duties do not count towards this experience) prior to attending the UCOS.

### 8.1.2 Supervisors Acting in an Undercover Capacity

OI supervisors and managers shall not perform the function of an undercover operative, except in situations of extraordinary circumstance and need. Additionally, OI supervisors and managers shall not perform the function of undercover operative without written approval from the DAD, ISD.



Post-Hearing Brief Exhibit 1

### 8.1.3 Non-ICE Employees Acting in an Undercover Capacity

With the exception of OI personnel, no employee of a government and/or law enforcement organization shall perform the functions of an undercover operative (except limited) within an OI undercover investigation without written approval from both the Director of OI or designee and a senior manager who is equivalent to a second-line supervisor (ASAC or higher) from the organization where the operative is employed. Attendance and successful completion of the UCOS shall constitute such approval.

### 8.1.4 Waiver for Undercover Operatives School

In order to obtain a training waiver to perform in an undercover role prior to attending the UCOS, the SAC must submit a request to the DAD, ISD, that addresses the following items:

A. The Primary Field ULC's concurrence of suitability of the operative candidate and a statement that the required psychological assessment has been completed.

B. The overall law enforcement experience of the operative (operatives are required to have a minimum of 3 years of criminal investigative experience), including any previous undercover assignments and undercover training with other agencies.

C. The operational necessity giving rise to the waiver request, including any unique skills or knowledge the officer possesses or any unique relationships he or she has with targets or informants.

D. The exigent circumstances which require that a waiver be granted before the next available UCOS, including a statement regarding the lack of available accredited undercover operatives.

E. The particular undercover role that the officer will be performing and the type and frequency of undercover contacts that are anticipated. The memorandum must specifically, and in detail, address what the undercover operative will be doing in the undercover capacity that he or she will be assuming.

After a waiver is granted, the officer will be scheduled to attend the next available UCOS. As always, the SAC will ensure that every effort is made to ensure the physical and emotional safety of the undercover operative while he or she is performing in an undercover capacity.

*Note: For case-specific waivers where there is no intention of having the SA attend the UCOS, the DAD, ISD, may waive the requirement for the psychological assessment.*



Post-Hearing Brief Exhibit 1

### 8.1.5 Exemption for Equivalent Training for Other Federal and State Agency Undercover Operatives

The Unit Chief, Undercover Operations Unit, may exempt in writing another law enforcement agency's undercover operatives from the requirement to attend the UCOS based on the following criteria:

A. The undercover operative's agency must provide a comparable UCOS.

B. The undercover operative's agency must provide a comparable undercover psychological evaluation.

C. The undercover operative must have attended and successfully completed his or her agency's undercover training school and passed his or her agency's undercover operative psychological evaluation.

D. The other law enforcement agency's undercover operative must be a sworn officer of that agency and be working with OI on an ICE undercover investigation.

### 8.1.6 Failure to Become Accredited

Should an operative candidate fail to complete the UCOS in two attempts, that candidate shall no longer be considered for accreditation as an ICE undercover operative. If the operative candidate is not accredited at the first UCOS, the Primary Field ULC will be responsible for briefing SAC management as to the reason(s). After failing to complete the first UCOS, the candidate may not be renominated for a second UCOS prior to 12 months from the notice date of the failed accreditation attempt, which is the day the candidate is notified by the National ULC. If renomination is anticipated, the operative candidate, beginning with the date of notification, will be monitored every 30 days by a Field ULC to determine if progress has been made to correct the issues outlined by the National ULC. Additional psychological testing of the undercover operative candidate will not be required.

Upon renomination of an operative candidate, the National ULC will be provided documented observed improvements in the candidate's suitability. The operative candidate may improve his or her suitability by working with experienced, veteran accredited operatives.

## 8.2 Undercover Managers School

The following personnel are required to attend the UCMS:

A. CUC Administrative Overseer(s);

B. CUC Lead/Administrative GS; and

C. CUC Program Manager.

### 8.2.1 Waiver for Undercover Managers School

The Unit Chief, Undercover Operations Unit, may approve a temporary waiver (not to exceed 1 year) from this training requirement.

## 8.3 Undercover Liaison Coordinator School

Completion of the ULCS is required prior to assuming the duties of Primary and/or Secondary Field ULC.

### 8.3.1 Requirements

Prior to attending the ULCS, the candidate must be vetted and deemed suitable by the Unit Chief, Undercover Operations Unit. At a minimum, the candidate must possess a minimum of 5 years of federal, state, or local criminal investigative experience (patrol, correctional officer, and inspector duties do NOT count towards this experience) and have successfully completed the UCOS and have been accredited as an undercover operative. Additional requirements are documented in Section 10.2.1, "Primary/ Secondary Field ULC – Prerequisites".

*<u>Note:</u> There will be no waiver of these requirements.*

## 8.4 CUFFS Administrator School

Completion of the CUFFSAS is required prior to assuming the duties of a CUFFS Administrator.

### 8.4.1 Waiver for CUFFS Administrator School

A temporary waiver (until the next available CUFFSAS) of this training requirement may be issued by the DAD, ISD, under the following conditions:

A. The individual assuming the CUFFS Administrator responsibilities has a general accounting background and/or demonstrates accounting knowledge.

B. There is an exigent need for the individual to take over as CUFFS Administrator prior to attending the CUFFSAS.

## 8.5 Undercover Operations Unit Jump Team

To ensure compliance with the provisions of this Handbook, a SAC may request the assistance of an Undercover Operations Unit Jump Team to provide instruction to the personnel involved in the various aspects of a certified undercover operation.



Post-Hearing Brief Exhibit 1

The request for the Undercover Operations Unit Jump Team to travel to the site of the operation may be made at any time by sending a memorandum to the DAD, ISD. Upon approval of the request, the Undercover Operations Unit, in conjunction with the appropriate Headquarters managers, will assemble a team of managers who have experience in undercover operations and are knowledgeable about undercover policies, procedures, and record-keeping.

The SAC memorandum requesting the Undercover Operations Unit Jump Team should include the:

A. operation's name and certification date;

B. CUC Lead/Administrative GS's name and contact telephone numbers; and

C. nature of the assistance required and specific area(s) of the operation on which the Undercover Operations Unit Jump Team should focus its attention (i.e., record-keeping, policy, undercover activity).

*Note: The use of operational funds for the travel expenses of an Undercover Operations Unit Jump Team is considered a necessary and reasonable expense of the operation.*

## Chapter 9. UNDERCOVER IDENTIFICATION AND BACKSTOPPING

Obtaining credible undercover identification is crucial to establishing and maintaining an effective undercover identity. Ultimately, ICE is accountable for the actions of all its employees and must maintain accurate records of any aliases and/or false identities issued and/or used. This Chapter provides policies and procedures for the issuance and control of undercover identification. The provisions of this Chapter apply to all OI employees and to all federal, state, and local law enforcement officers (or other persons) who obtain undercover identification through OI.

*Note: Undercover operatives should be aware that advances in technology have eroded the ability of law enforcement to fully backstop undercover operatives and undercover businesses. It is incumbent on all undercover operatives and operational personnel to understand the limitations of their backstopping and to have contingency plans in place for situations when investigative targets question alias information.*

### 9.1 Personal Undercover Identification

Undercover (or alias) identification normally falls into two categories: federally-issued and state-issued identification. Additionally, alias identification could potentially be obtained from other sources such as private corporations and foreign governments.

All undercover identification obtained through the authority of OI is OI property and must be relinquished to the SAC or the Undercover Operations Unit upon request.



Post-Hearing Brief Exhibit 1

At any time, the SAC or the Unit Chief, Undercover Operations Unit, may require an agent to relinquish any or all of his or her issued personal undercover identification. The SAC or the Undercover Operations Unit will return all such items to the original issuer as applicable.

### 9.1.1 Who May Obtain Personal Undercover Identification

Given the proper approval, all ICE employees and federal, state, and local law enforcement officers (or other persons) working directly with ICE OI may obtain undercover identification through the OI processes. The process to be followed differs based on various factors such as the type of identification requested, the individual who will use the identification, and the purpose of the alias identification.

#### 9.1.1(1) Undercover Identification for CIs/Cooperating Defendants

Fictitious identification will be issued only to a CI/Cooperating Defendant on a case-by-case basis with the written approval of the DAD, ISD. SAC requests for CI/Cooperating Defendant alias identification will require a memorandum addressed to the DAD, ISD, through the Unit Chief, ISU, and the Unit Chief, Undercover Operations Unit. The request must detail the need for and the specific use of the fictitious identification will be needed, the time frame when it will be needed, and the security measures to be used to ensure that the fictitious identification is not used improperly.

### 9.1.2 Federally-Issued Identification

All federally-issued undercover identification/backstopping documentation shall be obtained through the Unit Chief, Undercover Operations Unit. No requests for federally-issued personal undercover identification will be approved unless the SA has attended the UCOS or is in possession of a valid exempt-from-training waiver signed by the DAD, ISD. SAC Primary ULCs are the local points of contact for information relating to all undercover identification and backstopping. The SAC-designated ASAC or higher official is responsible for any classified program and for providing coordination between the SAC and OI Headquarters. Types of available federally-issued undercover or fictitious identification include, but are not limited to, the following:

A. SSNs (<u>The use of SSNs that are not issued through or with the written concurrence of the Undercover Operations Unit is strictly prohibited.</u> );

B. CBP Brokers Licenses;

C. FAA pilot and medical certificates;

D. U.S. Coast Guard licenses and certifications;

E. immigration documents;



Post-Hearing Brief Exhibit 1

F. personal credit cards;

G. credit histories; and

H. classified programs documents.

Licenses and certificates requiring technical skill and/or testing to receive the license or certificate (e.g., FAA pilot and U.S. Coast Guard licenses) may be obtained only by individuals who actually possess the specific license and/or certificate. For example, an alias name FAA pilot's license will be issued only to an agent who will act in an undercover capacity if that agent is in fact an FAA-licensed pilot.

The use of SSNs that are not issued through or with the written concurrence of the Undercover Operations Unit is strictly prohibited. The use of fictitious SSNs that are not issued by the Social Security Administration can have very serious consequences. Such numbers may be assigned to private individuals and there can be long-term effects on credit ratings, individual reputations, and the security of an operation.

All requests for personal undercover federally-issued identification shall be initiated through a SAC memo directed to the Unit Chief, Undercover Operations Unit, clearly stating the particular type of identification requested. The request shall include all completed applicable forms, agreements, and applications required by the issuing agency. These forms/applications shall be original and contain only alias information. The request shall also include copies of the individual's bona fide license and/or certificate, as applicable. The Undercover Operations Unit will provide specific request requirements for each type of identification. Federally-issued identification must be maintained in accordance with the controls listed in Section 9.1.6, "Control of Personal Undercover Identification."

Other types of specialized identification are available but are governed by classified programs and cannot be addressed in this Handbook. The Undercover Operations Unit should be contacted through the proper secure channels regarding these programs.

### 9.1.3 State-Issued Identification

All alias identification issued by a state authority (e.g., driver's licenses or state employee identification) is the responsibility of the appropriate SAC and must be authorized and obtained by the SAC. Local SAC procedures will be established for each state or territory as appropriate. State-issued identification must be maintained in accordance with the controls listed in Section 9.1.6, "Control of Personal Undercover Identification."

### 9.1.4 Foreign Government-Issued Identification

No alias identification available from any foreign government will be issued without the prior written approval of the DAD, ISD, and the Director of OIA. Any such request will be routed through the Unit Chief, Undercover Operations Unit, and will be coordinated

with OIA and the appropriate ICE Attaché (1811 series). Foreign government-issued identification must be maintained in accordance with the controls listed in Section 9.1.6, "Control of Personal Undercover Identification."

*<u>Note:</u> Foreign documents for use as "flash" only may be available from the Forensic Document Laboratory by request through the Undercover Operations Unit.*

### 9.1.5 Private Business-Issued Identification

All alias identification issued by a private business authority (e.g., phone or delivery company) is the responsibility of the appropriate SAC and must be authorized by the SAC. Local SAC procedures will be established for private business-issued alias identification, as appropriate. Private business-issued identification must be maintained in accordance with the controls listed in Section 9.1.6, "Control of Personal Undercover Identification."

### 9.1.6 Control of Personal Undercover Identification

All undercover identification obtained through OI authority is OI property and subject to the following controls:

A. All undercover identification issued or obtained will have written SAC approval and, as needed, OI Headquarters written approval. The approval(s) must be maintained in the SAC Undercover Identification File.

B. Long-term retention/personal possession (more than 72 hours) of undercover identification by an agent must be approved by the SAC in a memorandum to the file that specifically lists the piece(s) of identification and provides justification for the retention of the identification. Undercover identification that is not needed for immediate undercover activity (within 72 hours) shall be retained by the SAC in a locked and secure file cabinet (normally by the agent's GS) until such time as the identification is required for undercover activity.

C. Undercover identities and documents shall be considered law enforcement sensitive and shall be revealed only on a need-to-know basis only.

D. A SAC memorandum identifying all undercover identification and the account numbers of all personal bank and credit card accounts (see Section 9.2, "Maintaining a Personal Financial History") opened in fictitious names will be retained in the SAC Undercover Identification File and a copy will be forwarded to the Undercover Operations Unit. The Undercover Operations Unit will be responsible for maintaining a master file of aliases and fictitious bank and credit card accounts issued to agents in the field.



Post-Hearing Brief Exhibit 1

E. A SAC Undercover Identification File will be established for each SA who is issued undercover identification. The file will be secured in a locked file cabinet at all times and will contain:

1) a complete list of all undercover identification issued to the SA;

2) a complete list of account numbers of all personal bank and personal credit card accounts;

3) undercover identification approval memoranda from the SAC and Headquarters, as applicable;

4) personal possession retention authorization memoranda, as applicable;

5) photocopies of all undercover identification; and

6) all original pieces of identification not currently being utilized or authorized for personal possession and/or retention.

F. Any undercover document issued pursuant to any classified program is to be used for official business only. Any compromise or loss must be immediately reported verbally to the SAC and the SAC must immediately notify the Undercover Operations Unit verbally to receive instructions on what other actions must be taken subsequent to the loss. There will be no communications made to other agencies, including the issuing agency, by any personnel outside the Undercover Operations Unit.

G. Any undercover document issued pursuant to any classified program must be immediately returned, using an appropriate method, by the SAC to the Undercover Operations Unit, if an agent transfers to another SAC office, separates from ICE, takes extended leave, or does not have an immediate operational need for the document. Upon notification and return of the document, the Undercover Operations Unit will determine whether the document will be reissued to another SAC office, stored at Headquarters, or liquidated.

H. If an agent transfers to another OI office, the SAC losing the agent is responsible for properly sending the undercover identification, except identification issued pursuant to any classified program, to the SAC gaining the agent. The SAC transferring the undercover identification is also responsible for notifying the Undercover Operations Unit via a SAC memorandum as to which identification is being transferred to the receiving office and, if applicable, which is being returned to the issuer. Photocopies of all undercover documents being transferred shall be provided to the Undercover Operations Unit.

I. If an agent is separated from ICE, all undercover identification documents and related instructional material will be collected by the SAC as accountable property. Any document issued pursuant to a Headquarters program shall be returned to the Undercover Operations Unit within 30 days. All other alias documents obtained directly from an issuing agency within a state or other jurisdiction (e.g., driver's licenses, locally-obtained credit cards) must be returned to such agency by the SAC within 30 days or earlier if required by the issuing agency.

J. If fictitious identification is requested for an individual who is not an OI SA, requests must be routed through the appropriate OI SAC. For federally-issued undercover identification, requests will be routed to the Undercover Operations Unit. The SAC will maintain any such issued identification in accordance with the procedures specified above.

### 9.2 Maintaining a Personal Financial History

The advent of relatively easy automated access to the financial records of individuals makes it extremely difficult for an undercover identity to withstand the scrutiny of subjects who may seek to confirm an operative's undercover representations. One of the features of a cover identity is a credible financial history. Therefore, OI policy includes procedures where, on a restricted basis, an agent can maintain individual (personal) bank accounts and credit cards under an alias identity.

As an extension of an alias identity, these bank accounts and credit cards are OI property and must be immediately relinquished at the request of the SAC or the Unit Chief, Undercover Operations Unit.

#### 9.2.1 Individual (Personal) Undercover Bank Accounts

To facilitate and maintain an undercover personal financial history, an agent may be authorized to establish and maintain a personal bank account in his or her alias identity. Individual (personal) undercover bank accounts are not directly associated with a certified undercover operation but with the undercover agent. These accounts will exist only under the following conditions:

A. Prior written approval must be obtained from the SAC and kept on file in the SAC Undercover Identification File (this approval will state that the account is authorized by OI and therefore must be closed at the request of OI).

B. All bank accounts shall be non-interest bearing to avoid tax complications.

C. While the account is not being used in direct support of a certified undercover operation, only the employee's personal (non-government) funds will be utilized. Personal transactions will be conducted for the sole purpose of maintaining the account and will not be more than needed to keep the account



Post-Hearing Brief Exhibit 1

active. U.S. Government funds may not be deposited into the account (unless statutory exemptions of an OI certified undercover operation are being utilized).

D. Sufficient personal funds must be deposited prior to making a personal transaction.

E. Government funds may not be used to reimburse an operative for penalties charged on the account, unless the penalty charged is beyond the control of the agent and the payment is authorized by the SAC in writing.

F. An agent may request an advance of CUC funds to be deposited into the personal undercover bank account only to offset operational expenses in direct support of a certified undercover operation.

G. Only personal and U.S. Government funds from advances for authorized undercover activity associated with a certified undercover operation may be deposited into these accounts.

H. All expenditures of operational funds must be approved in advance by the appropriate undercover operation manager on the CUFFS Expense/Advance Approval Form (Appendix B).

I. Government funds may be used to reimburse normal bank maintenance fees.

J. Copies of monthly bank statements, supporting documents, cancelled checks, and receipts connected or related to expenditures or the use of funds of a certified undercover operation must be recorded in CUFFS. These documents must be reconciled and remain with that operation's books and records. The records must be annotated with the word "Personal" to indicate a personal transaction or a Case Management case number to indicate an operational transaction.

K. Copies of each monthly bank statement shall be supplied to and retained by the SA's first-line supervisor. The records must be annotated with the word "Personal" to indicate a personal transaction or a Case Management case number to indicate an operational transaction. First-line supervisors will review the records to ensure compliance with this policy and to protect against misuse.

L. An undercover bank account may not be used for any personal or non-government transactions that would be unbecoming or cast ICE in an unfavorable light.

The aforementioned requirements apply to all ICE employees and federal, state, and local law enforcement officers (or other persons) working directly with OI who obtain personal undercover bank accounts through ICE OI.

### 9.2.2 Individual (Personal) Undercover Credit Cards

To facilitate and maintain an undercover personal financial history, an agent may be authorized to establish and maintain a credit card in his or her alias identity. Individual personal undercover credit cards are not directly associated with a certified undercover operation but with the undercover agent. These undercover credit card accounts will exist only under the following conditions:

A. Prior written approval must be obtained from the SAC and kept on file in the SAC Undercover Identification File (this approval will contain the instruction that the account is authorized by OI and therefore must be closed at the request of OI).

B. If an agent is not currently working in an undercover capacity, but is reasonably expected to resume undercover work at a later time, he or she may use the account for personal transactions for the sole purpose of maintaining an active account. Officers may use undercover credit card accounts for personal transactions of not more than $100 per month. The Unit Chief, Undercover Operations Unit, may authorize additional charges if required and requested by the SAC. Only personal (non-government) funds shall be used to pay the charges that are personal and not expenses of the government.

C. All accounts must remain <u>current and in good standing</u> with the issuing financial institution at all times.

D. Government funds <u>may not</u> be used to reimburse an operative for interest charged on the account (including late fees), unless the fee charged is beyond the control of the officer and the payment is authorized in writing by the SAC.

E. Government funds may be used to reimburse an agent for normal account maintenance fees.

F. Except under exigent circumstances, operational transactions must be approved in advance in accordance with normal expense authorization guidelines.

G. Copies of monthly account statements, supporting documents, and receipts connected or related to a certified undercover operation must be recorded in CUFFS. These documents must be reconciled and remain with that operation's books and records. The records must be annotated with the word "Personal" to indicate a personal transaction or a Case Management case number to indicate an operational transaction.

H. Copies of each monthly account statement shall be supplied to and retained by the agent's first-line supervisor. The records must be annotated with the word "Personal" to indicate a personal transaction or a Case Management case number to indicate a Government transaction. First-line supervisors will review the statements on a monthly basis to ensure compliance with this policy and to protect against misuse.

I. An undercover credit card account may not be used for any personal or non-government transactions that would be unbecoming or cast ICE in an unfavorable light.

The aforementioned requirements apply to all ICE employees and federal, state, and local law enforcement officers (or other persons) working directly with OI who obtain personal undercover credit card accounts through ICE OI.

*Note:* *With appropriate approval, personal undercover credit cards may be obtained through the SAC or through the Undercover Operations Unit.*

*Note:* *The use of an individual (personal) undercover credit card in direct support of a certified undercover operation is an action under the statutory exemptions. For additional information, see Section 6.13, "Use of Undercover Credit Cards in Certified Undercover Operations."*

## 9.3 Corporate Backstopping

Federally-issued undercover identification/backstopping for undercover proprietary businesses and shell companies can be obtained through the Undercover Operations Unit. Types of available corporate identification/backstopping include, but are not limited to, the following:

A. Employer Identification Numbers (EINs) *(Note: All EINs must be obtained through the Undercover Operations Unit in order to avoid tax issues with the Internal Revenue Service);*

B. Dun and Bradstreet reports;

C. Department of Transportation/Motor Carrier numbers;

D. Department of Defense Trade Compliance Registration numbers;

E. Office of Foreign Asset Control License;

F. FAA airplane registration number/certificates;

G. U.S. Coast Guard marine identification; and

H. business credit cards.

*Note:* *Business credit cards are for the sole use of a certified undercover operation. For additional information, see Section 6.13, "Use of Undercover Credit Cards in Certified Undercover Operations."*

*Note:* *Certain undercover businesses can be backstopped with fictitious and/or legitimate private insurance. For additional information, see Section 3.9, "The Use of Private Insurance Within Certified Undercover Operations."*

### 9.3.1 Using Multiple Undercover Businesses

Undercover operations are authorized to establish proprietary businesses necessary to accomplish the mission. If using an existing covert proprietary business to secure required materials or services would jeopardize the security of the operation, additional proprietary businesses may be established to engage in these transactions. For example, if the lease of vehicles were necessary for surveillance to support an investigation that had a small undercover company purporting to be an established exporter, it may be unrealistic for a small company to lease six cars. Therefore, additional unrelated company(s) and associated covert bank account(s) may be established to execute the necessary leases and conceal the involvement of the U.S. Government.

Additionally, expenses related to having "standby" businesses set up and available for immediate use by the operation is considered necessary and reasonable.

## Chapter 10. UNDERCOVER LIAISON COORDINATOR PROGRAM

The ULC Program is for the benefit of personnel directly involved in undercover activity. This Chapter outlines the assessment, monitoring and, if necessary, treatment for undercover operatives. This Chapter also delineates the role of the ULC in the planning, preparation, and execution of undercover activity. The ULC Program exists to protect the safety and well-being of each undercover agent as well as to protect ICE from liability issues that may arise from undercover activity. Additional roles and responsibilities may be promulgated by the Unit Chief, Undercover Operations Unit, as required, to ensure the effectiveness of the program.

*Note:* *In light of the sensitive nature of the ULC Program, all personal information of personnel involved in the ULC Program will be treated with the utmost confidentiality and released to others only on a need-to-know basis. However, violations of policy or law* ***MUST*** *be disclosed to management. Release of personal information gathered as part of this program, except as required for the administration of the ULC Program, is strictly prohibited and will be done only with the written approval of each of the following: the National ULC; ICE Counsel; and the Unit Chief, Information Disclosure Unit, MSD.*



Post-Hearing Brief Exhibit 1

### 10.1 National ULC

The National ULC is the Program Manager in the Undercover Operations Unit with the responsibility to:

A. ensure proper implementation, usage, and coordination of the ULC Program;

B. verify that the Primary and Secondary Field ULC nominees possess the requisite qualification standards outlined in this Handbook; and

C. arbitrate any conflicting opinions regarding agent suitability for undercover accreditation between field ULCs and the SAC.

The National ULC may select a Field ULC outside the referring ULC's AOR to assist in resolving conflicts on the assessment of the suitability of operative candidates.

### 10.2 Primary/Secondary Field ULC

SACs will nominate Field ULCs within their AOR. The selection and nomination shall be documented via memorandum from the SAC to the Unit Chief, Undercover Operations Unit. The Unit Chief, Undercover Operations Unit, will ensure that each nominee is vetted and has the requisite experience prior to attending the ULCS. The SAC, in consultation with the Primary Field ULC, will nominate Secondary Field ULCs to assist the Primary Field ULC in performing the ULC duties. The appointment of Secondary Field ULCs may be beneficial for RAC offices, satellite offices, or large SAC offices.

Primary and Secondary Field ULC positions are considered collateral duties.

*<u>Note:</u> For instances in which the ULC is required to travel for ULC-related duties, the SAC will pay all expenses related to the travel. In instances where the duties relate directly to an ongoing certified operation, these expenses may be paid by that operation.*

#### 10.2.1 Primary/Secondary Field ULC – Prerequisites

The requirements for selection and accreditation for Primary and Secondary ULCs are as follows:

A. The Primary Field ULC shall:

1) be a non-supervisory grade GS-13/14 OI SA;

2) have successfully completed the OI UCOS and ULCS and have been accredited as an undercover operative;



Post-Hearing Brief Exhibit 1

3) have conducted substantial undercover work with positive results (i.e., significant investigations, arrests, indictments, or convictions) supported by investigative documentation; and

4) have at least 5 years of criminal investigative experience.

B. The Secondary Field ULC shall:

1) be a non-supervisory grade GS-13/14 OI SA;

2) have successfully completed the OI UCOS, ULCS, and have been accredited as an undercover operative; and

3) have at least 5 years of criminal investigative experience.

### 10.2.2 ULC Responsibilities

The Primary Field ULC's responsibilities are to:

A. oversee the activities of the Secondary Field ULC as they relate to the ULC Program;

B. conduct pre-screening interviews and administer psychological assessments (in coordination with the undercover contract psychologist) of undercover operative candidates to assess suitability to conduct undercover duties;

C. conduct post-graduation briefings with the undercover operative once the operative has completed the UCOS and has been accredited;

D. provide a viable peer support resource for undercover operations and operatives regarding the planning, strategy, and execution of undercover investigations;

E. assist senior management in assigning operatives to the level consistent with their ability and training (i.e., secondary undercover role with experienced primary undercover operative, primary undercover role with primary undercover support, or primary undercover role;

F. coordinate and track the progression of accredited undercover operatives through the levels of undercover activity (i.e., secondary undercover role with experienced primary undercover operative, primary undercover role with primary undercover support, or primary undercover role);

G. ensure that each accredited undercover operative (and operative candidate on a training waiver) is assigned to a ULC (Primary or Secondary);

H. monitor and mentor operatives in performing undercover duties;

I. monitor the progress of newly-assigned undercover operatives in certified undercover operations or task forces (i.e., HIDTA, Joint Terrorism Task Force, etc.), and serve as liaison between the operative, SAC management, and task force management;

J. contact the National ULC to initiate psychological services when an operative is experiencing psychological or health problems. The contract psychologist should telephonically contact the affected operative within 4 hours of notice of an operative experiencing problems; if necessary, the psychologist or a member of his or her network will be dispatched to the affected operative within 48 hours for a face-to-face consultation.

K. consult with SAC managers and operatives regarding issues related to officer safety and evidentiary development as they pertain to undercover activities;

L. immediately report to management any instances where criminal or self-destructive activity is discovered;

M. ensure that, at a minimum, semi-annual interviews are conducted with each accredited undercover operative to monitor the well-being of the operative;

N. administer psychological re-testing (in coordination with the undercover contract psychologist) every 5 years to active accredited operatives (re-testing will be similar to that of new operative candidates);

O. be the local informational source regarding OI Headquarters procedures for requesting any undercover identification and backstopping; and

P. maintain a file for each accredited undercover operative (and operative candidate) that shall contain:

    1) documentation related to the operative's experience, skills, completion of UCOS, waivers, and concurrence letter (when the operative is a non-ICE law enforcement officer);

    2) copies of all undercover identification issued to the operative; and

    3) biographical inventory questionnaire, pre-screening interview information, psychological testing results, semi-annual evaluations by the ULC, and any other pertinent documentation related to the operative.

Secondary Field ULCs perform duties under the guidance of the Primary ULCs, including administering psychological testing. The Secondary ULC will provide all

information, documentation, and file copies pertaining to operative candidates and accredited operatives to the Primary ULC.

### 10.3 Selection Procedures for Undercover Operatives (ULC's Role)

The Primary Field ULC shall assist SAC management in examining the needs of an investigation/operation and in determining who, including existing accredited undercover operatives and new operatives, would be best suited to conduct undercover assignments.

When an OI SA (including TFO) is considered for undercover operative accreditation, the following procedures apply:

A. The Primary Field ULC will conduct a pre-screening interview, as defined by the Unit Chief, Undercover Operations Unit, of the undercover operative candidate to assess suitability to conduct undercover duties. A biographical inventory questionnaire will be completed to assist in the determination of suitability. The Primary Field ULC will consult with the candidate's supervisor as to the results of the pre-screening interview. This pre-screening process must take place prior to submitting the candidate's name to the SAC Field Training Officer and/or the Undercover Operations Unit.

B. If a new operative is determined to be preliminarily suitable, the Primary Field ULC will conduct a formal suitability assessment in coordination with the undercover contract psychologist. The candidate will be administered standardized psychological tests under prescribed controlled conditions (e.g., time constraints, basic instructions, location of testing, etc.). Tests include the Minnesota Multi-Phasic Inventory, Fundamental Interpersonal Relations Orientation-Behavior, and/or Sixteen Personality Factor Test.

C. The ICE undercover contract psychologist will evaluate the psychological test(s) and interview the operative candidate during the UCOS or before. The contract psychologist will provide a full written psychological assessment to the Primary Field ULC regarding the operative candidate's suitability for undercover assignments.

*Note: If an accredited operative has not conducted undercover duties for a period of 5 years or more, the operative shall be placed in an inactive status. In such cases, should an agent resume undercover responsibilities, that agent will be required to repeat the ULC screening and training process (including the UCOS) for new undercover operative candidates.*

*Note: If an undercover operative contacts an ICE contract psychologist as a result of a personal/professional stressor, the operative is protected from any adverse consequences affecting background clearances and employment-related matters germane to the operative's official duties. It is incumbent upon the operative, as a matter of professional responsibility to the undercover operation or investigation, to report any stressor(s) that*



Post-Hearing Brief Exhibit 1

*the operative is experiencing so as not to jeopardize the integrity of the ongoing investigation or place other personnel in harm's way.*

### 10.3.1 Exempt from Training Waiver for Operative Candidates

Once the selection of a potential undercover operative is made, that individual shall be required to attend the next available UCOS. In exigent instances (including resource limitations) where the undercover operative candidate is required to conduct undercover activity requiring accreditation prior to attending the UCOS, the SAC shall request an exempt-from-training waiver from the Director of OI. However, before the waiver request is made, the Primary Field ULC shall have already administered the aforementioned psychological assessment and, additionally, the contract psychologist will have conducted a telephonic interview. The primary Field ULC will monitor undercover candidates possessing an exempt-from-training waiver on a monthly basis until accreditation is obtained through the UCOS.

<u>Note:</u> *For a case-specific waiver, where there is no intention to have the undercover operative attend the UCOS, the requirement for the psychological assessment evaluation may be waived. However, the pre-screening selection interview must be completed.*

## Chapter 11. TRAUMATIC INCIDENT RESPONSE (PSYCHOLOGICAL SERVICES)

Managers of undercover investigations and/or operations should have an action plan for responding to the emergency requirements of a traumatic incident, as well as the psychological aftermath. Should a traumatic incident occur during an undercover assignment, such as a shooting or other incident threatening life or limb, the SAC should notify the Unit Chief, Undercover Operations Unit, as soon as possible. The Unit Chief, Undercover Operations Unit, will ensure that the services of the undercover contract psychologist are made available to provide support to any affected undercover operative, as appropriate. Additionally, the Unit Chief, Undercover Operations Unit, will ensure coordination with the Employee Assistance Program (EAP) in order to facilitate support for other OI employees and/or family members affected by the incident.

### 11.1 ULC Assistance

The ULC Program is responsible for the well-being of undercover operatives. As such, in situations involving a traumatic incident during an undercover assignment, the National ULC will provide assistance to the Primary Field ULC in the coordination of any services required of the undercover contract psychologist. The ULCs will provide assistance and support as required (see Chapter 10, "Undercover Liaison Coordinator Program").



Post-Hearing Brief Exhibit 1

### 11.1.1 Contract Psychologist

The services of the Undercover Operation Unit's contract psychologist are available only to undercover operatives and other individuals approved by the DAD, ISD. When responding to a traumatic incident, the Undercover Operation Unit's contract psychologist will not seek to analyze the incident, but will provide only psychological assistance to designated involved individuals.

Participation in traumatic incident debriefings and follow-up interviews provided by the Undercover Operation Unit's contract psychologist is not mandatory. These services are provided for the safety and well-being of the undercover operative and participation is voluntary.

## 11.2 Employee Assistance Program

The EAP offers confidential, short-term counseling, information, referral, and other social services to help ICE employees cope with alcoholism/substance abuse; death of a family member or co-worker; domestic abuse; emotional concerns; interoffice conflicts; managing debt; marital/family conflict; sexual harassment; stress management; and ***traumatic experiences***.

The EAP Headquarters is in Washington, D.C., and can be reached at 1-800-222-0364. EAP services are available throughout the country. EAP counselors are licensed in the state in which they practice. Many of these counselors specialize in working with law enforcement officers and their families.

### 11.2.1 Use of the EAP to Cope with Traumatic Incidents

If there is an operational traumatic event, an EAP counselor can debrief ICE employees and family members to prevent or minimize psychological injury. For EAP purposes, any emotionally charged event that is considered unusual may be considered a traumatic incident. Licensed counselors with debriefing experience conduct EAP debriefings. Debriefings are CONFIDENTIAL! Traumatic events may also affect family members, especially young children. For this reason, debriefings are available to family members.

### 11.2.2 EAP Assistance for Managers

An EAP goal is to help managers help their employees. ICE managers can call and talk to an EAP counselor to find out what options are available to help an employee. ICE managers may also request one of many professional training courses available to help with work, health, and wellness-related issues.

## Chapter 12. UNDERCOVER ACTIVITY IN FOREIGN COUNTRIES

This Chapter encompasses certified undercover operations and investigations that include undercover activity in a foreign country by an OI SA, ICE TFO, or a CI (working under the immediate direction and control of an OI SA or ICE TFO).

Undercover activities in foreign countries **must** have the concurrence of, and be coordinated through, the appropriate ICE Attaché (1811 series) in order to ensure compliance with 22 U.S.C. § 3927(b), "Chief of Mission – notice to." The ICE Attaché (1811 series) has final field authority for undercover investigative activity within his or her AOR.

ICE undercover activities in foreign countries that may violate foreign law require special consideration and attention. The ICE Attaché (1811 series) is responsible for determining the appropriate course of action in these situations. **However, OI personnel should be aware that there are potential civil and criminal liabilities under foreign law that may arise from undercover activities taking place in foreign countries.**

*Note: This Handbook does not supersede or take the place of any requirements by ICE policy related to activities conducted by ICE personnel in foreign countries.*

### 12.1 Domestic Undercover Investigations Involving Undercover Activity in Foreign Locations

A. Undercover investigations (whether or not conducted as part of a certified undercover operation) involving undercover activity in a foreign location must have the concurrence of the appropriate ICE Attaché (1811 series) prior to the start of any undercover activity in that foreign location. Concurrence may be obtained in writing or verbally. If the concurrence is verbal, it shall be documented, with the date, time, and name of the official giving the concurrence, on a Case Chronology and Review Sheet (ICE Form 73-004).

B. All undercover investigative reports pertinent to an ICE Attaché's (1811 series) AOR will be copied and forwarded to that Attaché (1811 series) via distribution in Case Management or other appropriate means.

C. While in a foreign country on official business, ICE SAs, ICE TFOs or CIs working under the immediate direction and control of an OI SA or ICE TFO will be under the supervision of the appropriate ICE Attaché (1811 series).

### 12.2 Certified Undercover Operations Conducted in Foreign Locations

A. Certified undercover operations conducted in foreign locations must adhere to the policies and requirements of this Handbook.



Post-Hearing Brief Exhibit 1

B. In addition to the required documentation and procedures needed for authorization and certification of a domestically-operated certified undercover operation, operations conducted in foreign locations must include the following:

1) written concurrence of the Director of OIA;

2) written concurrence of the DOJ OIA (this concurrence substitutes the requirement of the U.S. Attorney's Office's concurrence letter); and

3) written acknowledgement from each U.S. Attorney's Office that holds venue where the targets of the foreign operation are reasonably expected to be prosecuted.

## Chapter 13. UNDERCOVER INTERNET ACTIVITY

This Chapter provides guidelines for official undercover investigative Internet activities. These activities should be coordinated with C3 and ICE Counsel, as appropriate. Special care must be taken because on-line undercover activities can raise novel and/or complex legal issues and/or involve sensitive policy issues. These include evidence collection and entrapment and privacy issues.

SAs should adhere to accepted on-line investigative techniques as well as applicable rules and laws. Available undercover Internet investigative resources include C3, ICE Counsel, the local Internet Crimes Against Children Task Force, the OI "Child Sexual Exploitation Investigations Handbook," and the DOJ Criminal Division's "Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations Manual."

The use of privately-owned computers/Internet connections for undercover investigative activities is prohibited except when approved in writing by the SAC.

The use of undercover computers or Internet connection devices for personal business is prohibited. Personal business includes, but is not limited to: email, Internet Relay Chat, Instant Messaging, and Blogs.

### 13.1 Limited Undercover Internet Investigative Activities

Limited undercover Internet investigative activity is activity that is approved by a first-line supervisor and requires utilizing the Internet in an undercover capacity to pursue short-term investigations that do not involve either ICE or DHS sensitive circumstances. Undercover operative accreditation is not required for limited undercover Internet investigative activities.

Limited undercover activity includes conducting searches on a suspect or target company, visiting a target website, communicating with a target via Internet chat and/or downloading information from *Usenet*, and/or maintaining contact with a suspect via an undercover email account.

The following applies to limited undercover Internet investigative activities:

A. Backstopped identification, such as an undercover mailing address, driver's license, and/or credit cards should be used.

B. Computer hardware must be Government-owned and -authorized, and must be backstopped/sanitized to ensure that the systems do not contain any registrations that could reveal that the hardware was purchased or is being used by the U.S. Government.

C. Software must not be registered to the U.S. Government. However, it must be properly licensed, preferably to a backstopped undercover identity. Lists of recommended software for undercover computers are available from C3.

D. Email accounts/addresses can be obtained either through paid Internet access providers with bundled email accounts or through free services. The registration for paid accounts is associated with the identity used to set up each account. Backstopped identity must be utilized when setting up email accounts/addresses. Upon establishment of an email account, SAs are encouraged to contact C3 to ensure that the email provider does not include header information that could reveal the governmental nature of the email holder and compromise the undercover accounts.

E. Internet Service Provider (ISP) access accounts and other accounts used to enable Internet access should be properly backstopped. Upon establishment of an ISP account, SAs are encouraged to contact C3 to ensure that the ISP provider does not include information that could reveal the governmental nature of the ISP holder and compromise the undercover accounts.

F. SAs conducting undercover activity via wireless connections must ensure that the connections are properly secured and encrypted to prevent compromise.

G. SAs must use proper evidence collection techniques.

### 13.2 Certified Undercover Internet Investigative Activities

Certified undercover Internet investigative activity is activity that requires the authorization of a certified undercover operation and utilizes the Internet where the undercover investigation is generally long-term and/or contains one or more ICE and/or DHS sensitive circumstances. Certified undercover Internet investigative activity includes agents operating in covert capacities developing and launching websites or

posting messages on Internet bulletin boards purporting to sell legal and/or illegal items, narcotics, weapons, and/or legal/illegal services.

The following applies to certified undercover Internet investigative activities:

A. all the items under Section 13.1, “Limited Undercover Internet Investigative Activities”;

B. the authorization and certification of a certified undercover operation, including the appropriate exemptions under 19 U.S.C. § 2081 or 8 U.S.C. § 1363a; and

C. authorization for investigations involving ICE or DHS sensitive circumstances must be obtained in accordance with the policy and procedures in this Handbook.

## 13.3 Maintenance of Electronic Subject Records

To facilitate investigative deconfliction, OI SAs must ensure the timely entry of business subject records in TECS Case Management for all undercover websites, email addresses, and screen names. The remarks section should contain the statement “contact the record owner for further information.”

## 13.4 Special Circumstances

As with all undercover investigations, contract psychologists are available to undercover SAs involved in undercover Internet investigations, as these can be particularly distressing. For instance, they frequently involve viewing images of child pornography and/or dealing with people who trade child pornography and/or travel to engage in sex with minors. A contract psychologist is also available through C3 to address the well-being and concerns of SAs involved in undercover Internet investigative activity. SAs are strongly encouraged to utilize these services when needed.

# Chapter 14. PROCEDURES FOR CLOSING CERTIFIED UNDERCOVER OPERATIONS

The procedures for closing certified undercover operations set forth in this Handbook must comply with the provisions of 19 U.S.C. § 2081 and 8 U.S.C. § 1363a, to satisfy liquidation, reports to Congress, and closeout audits. Since 19 U.S.C. § 2081 and 8 U.S.C. § 1363a are the provisions that authorize ICE to conduct certified undercover operations, failure to comply with these provisions could result in the modification or loss of this statutory authority by ICE.

This Chapter incorporates procedures for closing undercover operations, including:

A. notification to Headquarters;

B. preparation of a closeout report;

C. liquidation of assets; and

D. financial reconciliation and closeout audit.

### 14.1 Notification of Intent to Close

When a decision has been made to close an ongoing certified undercover operation, the SAC will send an "intent to close" memorandum to the Unit Chief, Undercover Operations Unit.

The "intent to close" memorandum must include:

A. the CUC Case Management Program Code;

B. the date the undercover activities will/did cease;

C. an anticipated date when all criminal proceedings (other than appeals) will be concluded;

D. an anticipated date when the required closeout report will be completed;

E. the date the records will be available for the OPR/MIU closeout audit;

F. the name and phone number of a point of contact to coordinate closeout activities; and

G. a detailed account of any operational or administrative matters that may have an impact on the closeout process.

Upon receipt of the memorandum, the Undercover Operations Unit will notify the appropriate OI Headquarters personnel and prepare an interim closing certification for the period required (not to exceed 180 days) to shut down the operation and forward it to the Director of OI for review and approval. The closing certification will include the appropriate statutory exemptions required for the completion of the closing process. The closing certification will allow the operation to maintain a bank account and continue using proceeds to fund the closeout process.

### 14.2 Closeout Report

The closeout report serves to provide an overview of the strategy and results of the undercover operation. It shall include descriptions of the successes, as well as problems that influenced operational effectiveness.



Post-Hearing Brief Exhibit 1

The closeout report must be completed as soon as possible, but no later than 60 days from the date of the interim closing certification or the date the last certification expired, whichever is later.

The closeout report format may be obtained from the Undercover Operations Unit.

The closeout report shall contain a section for reporting incomplete administrative tasks. A closeout report may be submitted prior to the completion of all related administrative activities. If no additional undercover activities are anticipated, the closeout report should be completed even though:

A. additional statistics may result from upcoming criminal proceedings;

B. not all property has been disposed of; and

C. all funds have not yet been deposited into the U.S. Treasury.

For example, if an undercover operation is no longer active and is retaining money in bank accounts to pay for OPR/MIU audit travel expenses, the closeout report should be completed. Completion of the outstanding activities will be captured in the closeout audit and/or via a SAC memorandum to the Undercover Operations Unit (see Section 14.5, “Closeout of CUFFS”).

### 14.3 Liquidation of Assets

The following procedures will be used to liquidate the assets of closed certified undercover operations. For the purposes of liquidation, the assets of an undercover operation are divided into three basic categories:

A. monetary assets (CUC-appropriated funds and proceeds);

B. property acquired outside FAR using the statutory business/purchase exemption paid with appropriated funds or proceeds; and

C. property acquired by the operation through FAR paid with appropriated funds or proceeds.

The options for liquidation of the various assets are different in each category. However, it is essential that:

A. the final disposition of assets be supported with proper documentation;

B. the final disposition of property is consistent with statutory requirements; and

C. the property log is annotated to show the final disposition of each item.

### 14.3.1 Monetary Assets (Proceeds and CUC-Appropriated Funds)

See also Section 6.5.3, "Seizure of Proceeds from Ongoing Operations."

#### 14.3.1(1) Proceeds

The determination as to which proceeds can be forfeited and placed in the appropriate Forfeiture Fund or liquidated and deposited in the U.S. Treasury as miscellaneous receipts must be made by the SAC prior to the issuance of the "intent to close" memorandum. Proceeds that remain at the conclusion of an undercover operation can be liquidated in one of two ways:

#### 14.3.1(1.1) Forfeiture

If it can be sufficiently documented that operational proceeds are associated with the violation of a statute that gives rise to the forfeiture of the proceeds, the proceeds can be seized from the operation, forfeited, and deposited into the appropriate Forfeiture Fund. This action should be coordinated with the local AIRG and the OI Asset Forfeiture Unit at Headquarters.

The source (i.e., investigative target) of most proceeds received during undercover investigations no longer has a legal claim to the funds (i.e., the proceeds were payment to the operation for services, albeit illegal); therefore, notification (related to the seizure of such proceeds) to the target is not required, although regulations regarding the advertisement of the seizure still apply. In some circumstances, it will be necessary for the SAC to determine whether or not any person, such as an innocent third party, may have a legal interest in the specific proceeds to be forfeited. The SAC should consult with the appropriate ICE Counsel for advice regarding any legal issues.

*Note: The procedure contained in this Subsection (14.3.1(1.1)) may be used to forfeit the proceeds of an ongoing certified undercover operation. This action requires the prior written authorization of the SAC.*

See also Section 6.5.3, "Seizure of Proceeds from Ongoing Operations."

#### 14.3.1(1.2) Deposit of Proceeds as Miscellaneous Receipts

19 U.S.C. § 2081 and 8 U.S.C. § 1363a require that, as soon as the proceeds from an undercover investigative operation are no longer necessary for the conduct of such operation, such proceeds or the balance of such proceeds remaining at the time shall be deposited into the U.S. Treasury as miscellaneous receipts. Additionally, if a proprietary business, established or acquired as part of an undercover operation, is liquidated, sold, or otherwise disposed of, the proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited into the U.S. Treasury as miscellaneous receipts.

Proceeds can be deposited as miscellaneous receipts by means of a cashier's check or other appropriate means as dictated by the Dallas Finance Center. The cashier's check should be made payable to "U.S. Immigration and Customs Enforcement" and sent to:

U.S. Immigration and Customs Enforcement
Dallas Finance Center
P.O. Box 561587
Dallas, TX 75356-1587
Attention: U.S. Treasury Accounts Team

Prior contact and coordination with the Dallas Finance Center is required.

A memorandum from the SAC requesting deposit into the U.S. Treasury will be forwarded to the ICE Finance Center accompanied by the funds. The memo will identify the money as proceeds of a certified undercover operation and list the CUC Case Management program code. Documentation of the transaction and a copy of the memorandum must be included in the financial records of the operation.

*Note: It is important to note that the deposit of proceeds may be delayed until they are no longer needed as evidence in a court proceeding.*

*Note: The procedure contained in this Subsection (14.3.1(1.2)) may be used to deposit the proceeds of an ongoing certified undercover operation as miscellaneous receipts. This action requires the prior written authorization of the SAC.*

**14.3.1(2) Return of CUC-Appropriated Funds**

CUC-appropriated funds that remain at the conclusion of the operation will be returned to the Undercover Operations Unit's CUC funds account for distribution to other certified undercover operations. This action will be coordinated with the Undercover Operations Unit. CUC-appropriated funds will be returned by means of a cashier's check or other appropriate means as dictated by the Dallas Finance Center. The cashier's check should be made payable to "U.S. Immigration and Customs Enforcement, Office of Investigations (CUC Funds)" and sent to:

U.S. Immigration and Customs Enforcement
Dallas Finance Center
P.O. Box 561587
Dallas, TX 75356-1587
Attn: Undercover Operations CUC Account

Prior contact and coordination with the Undercover Operations Unit and the Dallas Finance Center is required.

A memorandum from the SAC identifying the money as CUC-appropriated funds of a specific operation will be forwarded to the Dallas Finance Center with the funds. The



Post-Hearing Brief Exhibit 1

memorandum will include the name of the operation, the program code of the operation, the date the funds were distributed to the operation, and the accounting control number(s) assigned at the time the funds were distributed. The memorandum will request that the funds be returned to the CUC Undercover Operations Funding Account. Documentation of the transaction and a copy of the memorandum must be included in the financial records of the operation. A copy of the documentation shall be forwarded to the Undercover Operations Unit.

*Note: The procedure contained in this Subsection (14.3.1(2)) may be used for the return of CUC-appropriated funds of an ongoing certified undercover operation. This action requires the prior written authorization of the Unit Chief, Undercover Operations Unit.*

### 14.3.2 Property

#### 14.3.2(1) Purchases Outside the Scope of FAR Using the Business/Purchase Exemption (Covert)

If, under the business/purchase exemption, appropriated funds or proceeds were expended outside FAR to purchase property for an undercover operation, the property must be disposed of in one of four ways:

#### 14.3.2(1.1) Sale

Operational personnel should attempt to dispose of non-sensitive equipment (i.e., furniture, files, copiers, etc.) through the completion of Standard Form (SF) 126, "Report of Property for Sale." The completed SF 126 should be sent to the National Logistics Center, Laguna Niguel, California. The National Logistics Center will subsequently interact with General Services Administration (GSA) officials to process the claim for liquidation.

In the case of sensitive law enforcement equipment (i.e., radios, technical equipment, etc.), the equipment must not be made available to the general public via GSA. This equipment may be transferred to another certified undercover operation, sold to other law enforcement agencies following the standard GSA requirements, or destroyed, as detailed below.

*Note: All funds received from the sale of the property must be deposited into the U.S. Treasury as miscellaneous receipts (see Section 14.3.1(1.2)), "Deposit of Proceeds as Miscellaneous Receipts.")*

#### 14.3.2(1.2) Transfer

After an operation has been concluded, items purchased using the business/purchase exemption may be transferred to another ongoing certified undercover operation (including operations in other SAC offices). The receiving operation must pay any and all expenses associated with the transfer of such property. The receiving operation will



Post-Hearing Brief Exhibit 1

then become responsible for the proper liquidation of the property at the conclusion of that operation. The transfer of property must be approved, in writing, by the DAD, ISD. The transfer must occur at the time of liquidation, as the property cannot be stored in anticipation of starting another operation.

The transfer of property that has been acquired under the business/purchase exemption to another certified undercover operation requires a memorandum from the closing operation's CUC Lead/Administrative GS which:

A. lists the operations involved in the transfer, including the CUC Case Management program code;

B. specifically identifies the equipment being transferred (make, model, serial number, color, etc.) and states the reason for the transfer;

C. states that the property was acquired under the statutory business/purchase exemption and must be disposed of pursuant to 19 U.S.C. § 2081 and 8 U.S.C. § 1363a;

D. has an approval line for the SAC(s) and the DAD, ISD; and

E. includes a signature block for the acquiring operation's CUC Lead/ Administrative GS accepting responsibility for the property.

The transfer memorandum will be forwarded for approval. After approval,

A. a copy of the transfer memorandum will be placed in the Property Use File of each operation;

B. copies of all documents related to the transferred item in the original Property Use File will be provided to the receiving operation;

C. the Property/Equipment Log of the transferring operation will be annotated to show the transfer in the "Final Disposition" column; and

D. the receiving operation will enter the property into their Property/Equipment Log showing the origin (operation name) and $0 as the cost of acquisition.

Any expenses incurred in transferring the property shall be paid from the funds of the receiving operation.

*Note:* *The Property Use File and Property/Equipment Log are defined in Section 6.21, "Accounting for Certified Undercover Operation Property."*

*Note:* *Proceeds cannot be transferred and must be liquidated as described in Section 14.3.1(1), "Proceeds."*

### 14.3.2(1.3) Forfeiture

Any property that has been purchased with proceeds, using the business/purchase exemptions that are subject to forfeiture under a statute containing a tracing provision, may be seized and forfeited. See Section 14.3.1(1.1), "Forfeiture," for additional information regarding the forfeiture of proceeds.

After forfeiture, applicable procedures should be used to acquire the property for U.S. Government service.

### 14.3.2(1.4) Destruction

Property that has very little or no value and therefore cannot efficiently be sold, transferred, or forfeited will be destroyed using the standard ICE property destruction procedures.

The documentation related to the destruction, including the authorization and a memorandum documenting the destruction, will be included in the operation's permanent files. The destruction will be noted on the Property Log in the "Final Disposition" column.

### 14.3.2(2) Property Acquired Through the Use of the FAR Requirements (Overt)

If appropriated funds or proceeds were expended to purchase property using the requirements of FAR, the property should be treated in the same manner as any item owned by ICE. The documentation related to the disposition of such property will be included in the operation's permanent files. The disposition will be noted on the Property Log in the "Final Disposition" column.

In the case of sensitive law enforcement equipment (i.e., radios, technical equipment etc.), the equipment must not be made available to the general public via GSA. These items may be sold or transferred to other law enforcement agencies following the standard GSA requirements.

*<u>Note:</u> The procedure contained in this Subsection (14.3.2) may be used to liquidate property acquired by an ongoing certified undercover operation. This action requires the prior written authorization of the DAD, ISD. Property must be held by the purchasing operation for a minimum of 1 year prior to transferring to another ongoing operation. This procedure is not intended to facilitate the purchasing of equipment by one ongoing operation for use by another ongoing operation. The transfer of property of an ongoing certified undercover operation for the general use of ICE is <u>prohibited</u>.*

## 14.4 Closeout Audits

A detailed closing financial audit must be conducted on operations that have been certified to:



Post-Hearing Brief Exhibit 1

A. establish a proprietary business;

B. deposit funds in a bank; or

C. generate and/or expend proceeds.

The OPR/MIU will conduct all closeout audits. The Undercover Operations Unit will notify OPR/MIU of the need for a closeout audit. Coordination of the closeout audit will take place between OPR/MIU and the operation's designated contact person. The Undercover Operations Unit will provide assistance with the closeout audit as appropriate.

### 14.5 Closeout of CUFFS

When a certified undercover operation is identified for closure, the following steps shall be taken to close out CUFFS:

A. All outstanding advances must be liquidated.

B. The petty cash fund will have a final reconciliation and any balances will be deposited into the operation's bank account.

C. All recurring obligations such as leases and service contracts will be terminated, or arrangements can be made for the obligation to be transferred to another ongoing certified undercover operation, if applicable.

*Note: The termination of leases and other obligations should be achieved with the advice of ICE counsel.*

D. All outstanding debts of the operation will be settled.

E. All investments will be liquidated and deposited into the operation's bank account.

F. Security deposits or other monies owed to the operation will be collected and deposited in the operation's bank account.

G. The assets of the operation will be liquidated as per Section 14.3, "Liquidation of Assets," and any expenses and/or proceeds generated from the liquidation will be entered into CUFFS.

Once the above steps have been taken, all remaining funds except $20,000, if available, will be liquidated using one of the methods detailed in Section 14.3, "Liquidation of Assets." The remaining $20,000 will be used to offset expenses incurred by OPR/MIU personnel performing the closeout audit of the operation. Following the closeout audit, OPR/MIU will provide a detailed account of expenses for the closeout audit (i.e., travel)

to the Undercover Operations Unit. The Undercover Operations Unit will forward the expense items to the SAC with instructions regarding payment of the items. Any operational funds remaining after these payments will be deposited into the U.S. Treasury as miscellaneous receipts and the CUFFS records will be closed.

The undercover operation's management must continue to file monthly financial reports as described in Section 7.1, "SAC Monthly Reports (Financial)," until the CUFFS records are closed. Once the final OPR/MIU closeout audit is completed and the CUFFS records are closed, a final CUFFS report must be sent to the Undercover Operations Unit.

**Appendix A**

# AUTHORITIES

*The following authorities were transferred to the Department of Homeland Security (DHS) in the Homeland Security Act of 2002 and delegated by the Secretary of Homeland Security to the Assistant Secretary of ICE in Sections 2A and DD of DHS Delegation 7030.2 entitled, "Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement," and further redelegated to the Director of OI in ICE Delegation Order 04-002 entitled, "Authority to Certify the Exemption of Undercover Operations Form Certain Laws Within U.S. Immigration and Customs Enforcement."*

## 19 U.S.C. § 2081, "Undercover Investigative Operations of the Customs Service"

(a) **Certification required for exemption of undercover operations from certain laws.**

With respect to any undercover investigative operation of the United States Customs Service (hereinafter in this section referred to as the "Service") which is necessary for the detection and prosecution of offenses against the Unites States which are within the jurisdiction of the Secretary of the Treasury -

(1) sums authorized to be appropriated for the Service may be used -

(A) to purchase property, buildings, and other facilities, and to lease space, within the United States, the District of Columbia, and the territories and possessions of the United States without regard to -

(i) sections 1341 and 3324 of title 31,
(ii) sections 11(a) and 22 of title 41,
(iii) section 255 of title 41,
(iv) section 8141 of title 40, and
(v) section 254 (a) of title 41, and

(B) to establish or to acquire proprietary corporations or business entities as part of the undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to sections 9102 and 9103 of title 31;

(2) sums authorized to be appropriated for the Service and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18 and section 3302 of title 31; and

(3) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3302 of title 31; and



Post-Hearing Brief Exhibit 1

only upon the written certification of the Commissioner of Customs (or, if designated by the Commissioner the Deputy or an Assistant Commissioner of Customs) that any action authorized by paragraph (1), (2), or (3) of this subsection is necessary for the conduct of such undercover operation.

(b) **Liquidation of corporation and business entities.**

If a corporation or business entity established or acquired as part of an undercover operation under paragraph (1)(B) of subsection (a) of this section with a net value over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or his designee determines is practicable, shall report the circumstances to the Secretary of the Treasury. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.

(c) **Deposits of proceeds.**

As soon as the proceeds from an undercover investigative operation with respect to which an action is authorized and carried out under paragraphs (2) and (3) of subsection (a) of this section are no longer necessary for the conduct of such operation, such proceeds or the balance of such proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.

(d) **Audits.**

(1) The Service shall conduct a detailed financial audit of each undercover investigative operation which is closed in each fiscal year, and

(A) submit the results of the audit in writing to the Secretary of the Treasury; and

(B) not later than 180 days after such undercover operation is closed, submit a report to the Congress concerning such audit.

(2) The Service shall also submit a report annually to the Congress specifying as to its undercover investigative operations -

(A) the number, by programs, of undercover investigative operations pending as of the end of the 1-year period for which such report is submitted;

(B) the number, by programs, of undercover investigative operations commenced in the 1-year period preceding the period for which such report is submitted; and

(C) the number, by programs, of undercover investigative operations closed in the 1-year period preceding the period for which such report is submitted and, with respect to each such closed undercover operation, the results obtained and any civil claims made with respect thereto.

(e) **Definitions.**

For purposes of subsection (d) of this section -

(1) The term “closed” refers to the earliest point in time at which -

(A) all criminal proceedings (other than appeals) are concluded, or

(B) covert activities are concluded, whichever occurs later.

(2) The term “employees” means employees, as defined in section 2105 of title 5, of the Service.

(3) The terms “undercover investigative operation” and “undercover operation” mean any undercover investigative operation of the Service -

(A) in which –

(i) the gross receipts (excluding interest earned) exceed $50,000, or

(ii) expenditures (other than expenditures for salaries of employees) exceed $150,000; and

(B) which is exempt from sections 3302 or 9102 of title 31,

except that subparagraphs(A) and (B) shall not apply with respect to the report required under paragraph (2) of subsection (d) of this section.

**8 U.S.C. §1363a, “Undercover Investigative Authority” (of the Immigration and Naturalization Service)**

(a) **In general**

With respect to any undercover investigative operation of the Service which is necessary for the detection and prosecution of crimes against the United States-

(1) sums appropriated for the Service may be used for leasing space within the United States and the territories and possessions of the United States without regard to the following provisions of law:

(A) section 1341(a) of title 31,
(B) section 11(a) of title 41,
(C) section 255 of title 41,
(D) section 34 of title 40,
(E) section 3324(a) and (b) of title 31,

(F) section 22 of title 41, and

(G) subsections (a) and (c) (FOOTNOTE 1) of section 254 of title 41;
*(FOOTNOTE 1) See References in Text note below.*

(2) sums appropriated for the Service may be used to establish or to acquire proprietary corporations or business entities as part of an undercover operation, and to operate such corporations or business entities on a commercial basis, without regard to the provisions of section 9102 of title 31;

(3) sums appropriated for the Service, and the proceeds from the undercover operation, may be deposited in banks or other financial institutions without regard to the provisions of section 648 of title 18 and of section 3302(a) of title 31; and

(4) the proceeds from the undercover operation may be used to offset necessary and reasonable expenses incurred in such operation without regard to the provisions of section 3302(b) of title 31.

The authority set forth in this subsection may be exercised only upon written certification of the Commissioner, in consultation with the Deputy Attorney General, that any action authorized by paragraph (1), (2), (3), or (4) is necessary for the conduct of the undercover operation.

(b) **Disposition of proceeds no longer required**

As soon as practicable after the proceeds from an undercover investigative operation, carried out under paragraphs (3) and (4) of subsection (a) of this section, are no longer necessary for the conduct of the operation, the proceeds or the balance of the proceeds remaining at the time shall be deposited into the Treasury of the United States as miscellaneous receipts.

(c) **Disposition of certain corporations and business entities**

If a corporation or business entity established or acquired as part of an undercover operation under paragraph (2) of subsection (a) of this section with a net value of over $50,000 is to be liquidated, sold, or otherwise disposed of, the Service, as much in advance as the Commissioner or Commissioner's designee determines practicable, shall report the circumstances to the Attorney General, the Director of the Office of Management and Budget, and the Comptroller General. The proceeds of the liquidation, sale, or other disposition, after obligations are met, shall be deposited in the Treasury of the United States as miscellaneous receipts.

(d) **Financial audits**

The Service shall conduct detailed financial audits of closed undercover operations on a quarterly basis and shall report the results of the audits in writing to the Deputy Attorney General.



Post-Hearing Brief Exhibit 1

**Appendix B**

# Certified Undercover Operation

# CUFFS
# Expense/Advance Approval Form

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# CERTIFIED UNDERCOVER OPERATION
# CUFFS EXPENSE / ADVANCE APPROVAL FORM

| Operation Name: | CUC Program Code: | Case Number: |
|---|---|---|
| Name of Requestor: | Date: | Total Amount Requested: $ |

**Requestor's Description of Required Item and Justification for Expense or Advance** (CBR)

**FUNDS CONTROL** (CBCA/GS)

**Are sufficient funds available to incur this transaction?** Yes ☐ No ☐
**Is this transaction within the Operation's 6-Month Expenditure Authorization Plan?** Yes ☐ No ☐

I certify that sufficient funding is available in the respective OCC(s) and CLASS(es) used to record this transaction in CUFFS.

______________________ Reviewed by Lead GS: ______________________
CUFFS Administrator/or/GS: (Sign/Date) (optional) Reviewed by: ______________________

**TYPE OF EXPENSE APPROVED (check all that apply)** (CBCA)

☐ Covert ☐ Overt ☐ Recurring Obligation ☐ General ☐ Equipment **(Update Property Log)**
☐ CI Expense ☐ POI/POE ☐ Travel ☐ Advance ☐ Petty Cash

**APPROVAL AND CERTIFICATION OF EXPENSE/ADVANCE**

I hereby acknowledge both affirmative Funds Control responses provided by the CUFFS Administrator/GS and authorize an expenditure of operational funds ☐ and/or an advance ☐ not to exceed $ ______________ for the item described above. I certify that the expense is reasonable and necessary for the conduct of the operation and within my approval authority.

Signature ______________ Name/Title of Approving Official: ______________ Date: ______________

**RECEIPT ADVANCE** (CBR)

**I acknowledge receipt of $** ______________ **an advance for the expenditure described above. I currently have** ☐ **unliquidated advance(s) totaling $** ______________ **Date this Advance Issued:** ______________

______________________________ (Recipient's Signature & Title)

**ALL advances *will* be liquidated in accordance with the Undercover Operations Handbook.**

**Advance Certification**
(CBCA) Date: ☐ Check No.: ☐ Transaction No.: ☐

**LIQUIDATION OF ADVANCE** (CBCA)

Date ______________ ☐ Receipts ☐ Invoice ☐ Other Certification Document ☐ ICE Form 73-293

Advance Holder (Sign/Date) ______________ CUFFS Administrator (Sign/Date) ______________

Advance Amount $ ______________ Documented Expenses $ ______________ Amount Returned $ ______________ * Remaining Outstanding Balance ______________

* If Remaining Balance is not zero, advise the GS

**CUFFS Financial Information** Posting Notes (CBCA)

| Entry Date | Check Number | Transaction Number | CLASS | OCC | CUFFS Account | Amount |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

CBR – Completed by Requestor CBCA – Completed by CUFFS Administrator – Record-Keeper

**Appendix C**

# Pick-Up Log for Undercover Operations

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## PICK-UP LOG FOR UNDERCOVER OPERATIONS

| Operation: | | | | | FY: | |
|---|---|---|---|---|---|---|
| Date | Trans-action Number | Amount | Undercover Agent/CI | Report/Case Number | Points | Disposition Status |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **TOTAL** | | **$** | | | | |

**DISPOSITION CODES:** A = Assisting Other Offices; B = Bank Deposit; C = Cash; D = Drafts; E = EFTs; O = Other; P = Physical Delivery; S = Seized; T = Transfer

ICE Form 73-007 (04/08)

**Appendix D**

# Property/Equipment Log
# for
# Undercover Operations

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**PROPERTY/EQUIPMENT LOG
FOR UNDERCOVER OPERATIONS**

Operation:

| Item Description | Purchase Date | Vendor | Cost | Purchase Method (see codes) | Location of Equipment | Final Disposition (see codes) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

PURCHASE CODES: DISPOSITION CODES:
P=Procured R=Retained
A=Appropriated S=Seized
F=Federal Acquisition Regulations L=Liquidated
N=Non-Federal Acquisition Regulations

ICE Form 73-008 (04/08)

# CERTIFIED UNDERCOVER OPERATION MONTHLY FINANCIAL REVIEW WORKSHEET

(Instructions)

The Undercover Operations Handbook requires that a monthly financial review be performed for each open certified undercover operation.

**I. The CUFFS Administrator (Record-Keeper) should create a Financial Status package which includes, at a minimum, the following items:**

**Item A** - CUFFS Balance Sheet (select date range - "ALL" and "EXPAND" to reveal details) ending on the last day of the previous month.

**Item B** - CUFFS Income and Expenses by All Classes Statement (select "COLLAPSE" to conceal details) from inception to the last day of the previous month.

**Item C** - CUFFS Income and Expenses Itemized Report for the month being reported. (Attach copies of approval documents and transaction documents for any expenditures exceeding $2,499 (property) and $4,999 (non-property), or the locally established first-line supervisor approval level; copies of ICE Form 73-293 paid this month; Petty Cash funds on hand count sheet, if applicable; and other reports as required.)

**Item D -** Budget reports for all outstanding Investigative Advances received by the operation.

**Item E** - CUFFS Income and Expenses report, reflecting the expenses incurred during the same 6-month timeframe identified on the current 6-Month Expenditure Authorization Plan**.** (The QuickBooks report settings should be: "From" first month/first day/current year; "To" sixth month/last day/current year; Columns "Total only" and "Sort By" Default.)

**Item F** - Statement of Current Proceeds Balance.

**Item G** - CUFFS Reconciliation Summary Report for each bank account.

**Item H** - Copies of the most recent bank statements for all bank accounts.

**II. The Operation Manager will use the Financial Status package to complete the Undercover Operation Monthly Financial Review Worksheet.**

Findings will be noted in the space provided. Any corrective action taken will be recorded.

**III. The Operation Manager will forward the completed worksheet and supporting documents through the established chain of command to the SAC for certification and signature.**

After SAC signature, the original Monthly Financial Review Worksheet and Financial Status package will be retained as part of the operational files.

**IV. Each deficiency must be resolved as soon as possible. Issues that cannot be resolved should be referred to the Undercover Operations Unit.**

# CERTIFIED UNDERCOVER OPERATION MONTHLY FINANCIAL REVIEW WORKSHEET

Name of Undercover Operation

Date of This Monthly Review ____________________

Current Certification Expiration Date ____________________

Signature of CUFFS Administrator (Record-Keeper) ____________________

Signature of Lead GS or Operation Manager (Reviewer) ____________________

Signature of CUC Administrative Overseer ____________________

Signature of SAC and Date ____________________

An "**X**" appears in a box below to indicate that action was taken to verify that the corresponding information is included in this Financial Status package. The reviewer may require additional documents as noted.

☐ **Item A** - CUFFS Balance Sheet (select date range - "ALL" and "EXPAND" to reveal details) ending on the last day of the previous month.

☐ **Item B** - CUFFS Income and Expenses by All Classes Statement (select "COLLAPSE" to conceal details) from inception to the last day of the previous month.

☐ **Item C** - CUFFS Income and Expenses Itemized Report for the month being reported. (Attach copies of approval documents and transaction documents for any expenditures exceeding $2,499 (property) and $4,999 (non-property), or the locally established first-line supervisor approval level; copies of any ICE 73-293 paid this review month; Petty Cash funds on hand count sheet, if applicable; and other reports as required.)

☐ **Item D -** Budget reports for all outstanding Investigative Advances received.

☐ **Item E** - CUFFS Income and Expenses Report, reflecting the expenses incurred during the same 6-month timeframe identified on the current 6-Month Expenditure Authorization Plan**.** (The QuickBooks report settings should be: "From" first month/first day/current year; "To" sixth month/last day/current year; Columns "Total only" and "Sort By" Default.)

☐ **Item F** - Statement of Current Proceeds Balance.

☐ **Item G** - CUFFS Reconciliation Summary Report for each bank account.

☐ **Item H** - Copies of the most recent bank statements for all bank accounts.



Post-Hearing Brief Exhibit 1

## I. Balance Sheet Report (Item A)

### I. A. Bank accounts with balances over $100,000

Operational bank account balances in domestic banks should not exceed $100,000 (Section 6.16.1 of the Undercover Operation Handbook). This is due to the maximum insurance deposit limit of $100,000 per account. Undercover operations may, in certain circumstances, need to exceed this $100,000 limit in any one bank account. When this situation arises, it is the responsibility of the SAC to minimize the risk of loss and to document (via memorandum) the relevant facts pertaining to the need to exceed insured levels.

In addition, the SAC must be aware that funds deposited into foreign financial institutions may not receive any insurance protection. The SAC must evaluate and balance the operational necessity of keeping large amounts in foreign accounts against the risk of potential loss.

Reviewer's findings and comments presented below: Reviewer's Initials _________

| Comments Required | ***List any and all bank accounts with balances over $100,000. Justify why each account is in excess of $100,000, not in a sweep account, and/or why the funds are not maintained in separate accounts with individual EINs.*** |
|---|---|

SAC Concurrence ____________________

Date:



Post-Hearing Brief Exhibit 1

## I. B. Outstanding Advances (Section 6.7) of Funds and/or Outstanding Liabilities

Review funds advanced (CUFFS accounts 1801.xx to 1890.xx) to other persons/entities. By reviewing the Balance Sheet on a monthly basis, the manager can determine whether advances are being liquidated in a timely manner.

Question large or increasing liabilities or advances and ascertain why any advance is outstanding more than 5 business days.

The manager must also carefully examine any advances to ensure that the advances are utilized only in support of this undercover operation.

*Note: End-of-month money pickups that have not been distributed should show as liabilities within QuickBooks.*

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***List all outstanding advances, including dollar amounts, the payee's name and the number of days outstanding. If any advance listed has been outstanding in excess of 5 business days, include a justification indicating why additional time is required prior to liquidation.***

***Attach photocopies of the Expense/Advance Approval Form showing advances outstanding in excess of 5 business days.***

SAC Concurrence ____________

Date:

## I. C. Undeposited Funds

Undeposited funds financial activity involves CUFFS account 1250.XX. Any financial activity involving undeposited funds increases the risk of loss or theft. All undeposited funds should be accounted for by the Reviewer. The SAC is responsible for ensuring that undeposited funds are safeguarded and are left undeposited only when required by operational necessity.

A petty cash fund maintained by the undercover operation must follow policy (Section 6.6 of the Undercover Operations Handbook). The Petty Cash Daily Register must be properly maintained and all transactions must be posted to CUFFS within the month they occur.

Petty Cash Current Balance $ ________________

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***List all dollar amounts of undeposited funds, the source of the funds, number of days undeposited, and a justification as to why the funds remain undeposited.***

SAC Concurrence ____________________

Date:



Post-Hearing Brief Exhibit 1

## I. D. Bank Reconciliation (Items A, G and H) (CUFFS Manual)

Compare the bank account balances shown on the **CUFFS Balance Sheet Report** with balances shown on the **bank statement** for each account.

Verify that any differences in these amounts are reconciled in the **CUFFS Reconciliation Report** for each account.

On the Reconciliation Report, the **CUFFS "Cleared Balance"** should be the same as the **bank statement** balance.

The "**CUFFS Ending Account Balance**" should be the same as the amount shown on the **CUFFS Balance Sheet** Report.

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***List all bank accounts that are not reconciled and what specific steps are being taken to reconcile each bank account.***

***Document corrective action.***

SAC Concurrence ____________________

Date:



Post-Hearing Brief Exhibit 1

## II. Income and Expenses by All Classes (Collapsed) Report (Items B, D and F )

### II. A. Negative balances on the CUFFS Report Net Income line. (Refer to the CUFFS Manual.)

This report shows all funding and disbursements from the inception of the operation to the end of the reporting month. Each column represents a Class in QuickBooks (a specific investigative advance or proceeds balance). Review the total balance of funds available for each investigative advance by reviewing the Net Income row, including Proceeds. Any negative Net Income balances must be examined and corrected. Expenses can be charged only against a particular funding source to the extent that there are funds available.

#### Budget

Verify that each funded OCC line item in each Investigative Advance (CUC-Appropriated), Item D has a **minus sign (-) and dollar amount** or **0.00** in the "**$ Over Budget**" column or **100%** or less in the "**% of Budget**" column. The - $,$$$.$$ or 100% or less indicates that funds are available in that specific Investigative Advance in that specific OCC to offset related expenses.

If a SAC determines that monies in the investigative advance need to be reprogrammed from one OCC to another, this should be coordinated with the Undercover Operations Unit. The SAC is responsible for ensuring that funds received as investigative advances by OCC are not overspent in that OCC. The Budget Report is used to monitor the availablity of funds and identify overspending.

#### Investigative Advances

Verify that the CUFFS manager has developed budgets for ALL Investigative Advances (CUC-Appropriated Funds).

When an operation requests an Investigative Advance, the Advance is distributed into specific OCCs. This allows the operation to incur general expenses (travel OCC 21, rent OCC 23, services OCC 25, supplies OCC 26, and equipment OCC 31). The expensing of these funds is recorded and tracked by the Dallas Finance Center.

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

**List all Classes that are showing a negative Net Income balance. Explain why this is the case and provide a justification for each negative balance. Document corrective action.**

**List any OCC line item that does not reflect a minus sign (-) or reflects a percent greater than 100% and describe what action will be taken to resolve each item.**

**List each Investigative Advance Budget that was reviewed during this reporting cycle. Identify any expenses funded by an Investigative Advance which resulted in the Advance exceeding its two-digit OCC budgeted levels. Document corrective action.**

SAC Concurrence ____________________

Date:

## II. B. Unclassified Column

**If the Income & Expenses Report lists a Class identified as "Unclassified," no dollar value should be reflected other than $0.00.**

Each financial transaction must include a specific funding source (Class). If the CUFFS Administrator did not assign a Class to a transaction line, QuickBooks automatically creates a column labeled "Unclassified." **This must be corrected by the CUFFS Administrator.** This can be prevented from recurring by going to QuickBooks, Preference, Accounting, Company Preferences, and checking the box "Prompt to assign classes."

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***List any financial transaction not showing a funding source (Class). Document corrective action.***

SAC Concurrence ____________________

Date:



Post-Hearing Brief Exhibit 1

## III. Income and Expenses (Item C)

### III. A. Verify that any and all funds received during the month are recorded properly.

The SACs are responsible for ensuring that all funding associated with the undercover operation is recorded in QuickBooks. This includes all funding provided by Headquarters, Proceeds, Other Agencies, SAC, etc.

If the operation involves money pick-ups, a separate Pick Up Log (Appendix C) must identify each pick-up conducted.

The reviewer should verify with the CUFFS Administrator and operation manager that all funding received has been properly recorded in QuickBooks.

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***List all funding received for this month and verify its documentation in CUFFS. Document corrective action.***

SAC Concurrence ____________________

Date:

**III. B. Verify that all expenditures are properly recorded and explained.**

The "Name" and "Memo" fields associated with each expense must provide sufficient information to enable the reviewer to determine if expenses are recorded in CUFFS using the correct CUFFS accounts, OCCs, CLASS, etc.

Whenever an expense can be attributed to a particular investigation, the specific case number must be included in the memo column.

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***List any case-specific or non-recurring expenses not associated with a case number and justify. Document corrective action.***

SAC Concurrence ________________

Date:

## III. C. Necessary and Reasonable Expenses (Section 6.2.1)

The Undercover Operations Handbook contains guidance for necessary and reasonable expenditures. Look for unusual transactions or spikes in expenses. For example, you have seen approved monthly cell phone expenses totaling $200-$300 in previous months. This month, you find that the same cell phone expenses are $4,000. Ensure that operational funds are not supplementing non-operational expenses (general SAC office budget). The same applies to other expenses, advances, vehicles, etc.

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***List any unusual or costly expenditures and provide the appropriate justification.***

SAC Concurrence ____________________

Date:



Post-Hearing Brief Exhibit 1

## III. D. Expenditure Approval Levels (Section 6.17)

Review all Expense/Advance Approval Forms and verify that prior authorization for each expenditure was obtained at the management level appropriate for the amount of the expenditure. Review transaction source documents (e.g., receipts) to ensure that expenditures correspond to approval documents. Exigent expenses that did not receive prior approval require a memorandum.

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comment Required**

***List any "expense" transaction that does not have the proper supporting receipts, explain why and if there is a supporting memorandum (required). Document corrective action.***

SAC Concurrence ____________________

Date:



Post-Hearing Brief Exhibit 1

## III. E. Property (Section 6.21)

Ensure that property acquired over the past month has been properly recorded in the Operation's Property/Equipment Log and, if necessary, the current ICE property system.

Reviewer's findings and comments presented below: Reviewer's Initials ________

| Comments Required | ***List all property acquired within the past month and indicate whether the business exemption and/or FAR was used when purchasing the property.*** |
| --- | --- |

SAC Concurrence ____________________

Date:



Post-Hearing Brief Exhibit 1

### III. F. Recoverable Funds (CUFFS Manual) (Item B)

Ensure that the available Recoverable Funds balance reported in CUFFS is the same amount that was initially made available to this CUC operation. If the actual amount reported is less than that which was originally issued, a full explanation is required.

*Note: Funds previously reported as "written-off" via a Lost Load Report and follow-up investigation are exempt.*

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***Determine if any discrepancies exist between each Money Laundering (Recoverable Funds) Investigative Advance made available to this CUC operation and what is reported in QuickBooks.***

***If the funds reported available in any Money Laundering Investigative Advance are less than its original funding level, list that advance, the original funded amount, current funds available, and the events that contributed to this discrepancy. In addition, describe the interim steps/resolution (i.e., lost load memo, stolen by CI, etc.) until the respective amounts are properly written off both in CUFFS and by the Dallas Finance Center.***

SAC Concurrence ____________________

Date:



Post-Hearing Brief Exhibit 1

### III. G. Third-Party Payments

Verify that any and all compensation (POI/POE, stipends, commissions, etc.) made within the past month are individually supported by a properly completed ICE 73-293 and whether or not policy was adhered to during the entire compensation process.

Reviewer's findings and comments presented below: Reviewer's Initials ________

**Comments Required**

***List (sequentially) all ICE 73-293s that were executed during this reporting cycle, provide the dollar amount for each, and indicate whether policy was followed regarding payments, i.e., two law enforcement officer signatures; if paid via wire transfer, a copy of said wire transfer; original report in the file; the correct copy forwarded to HQ, etc.***
***Additionally, note if points and commissions were paid and indicate whether an approved corresponding PAA exists. Document corrective action.***

SAC Concurrence ________________

Date:

**III. H. Expenditure Authorization (Item E)**

Using the Income & Expenses Report for the current authorization period, ensure that operational expenses do not exceed the expenditure authorization approved by the Director of OI.

If it appears that expenses will exceed the expenditure authorization prior to the end of the authorization period, ensure that a revised package is submitted requesting an expansion in expenditure authority.

Reviewer's findings and comments presented below: Reviewer's Initials ________

| Comments Required | ***List any OCC that has exceeded the expenditure authorization approved for this current 6-month cycle. Document corrective action.*** |
|---|---|

Print Form

SAC Concurrence ____________________

Date:

**Appendix F**

# TABLE OF TRANGRESSIONS AND CORRECTIVE ACTIONS

The following Table of Transgressions and Corrective Actions establishes a uniform and balanced approach to correcting problems within certified undercover operations. The Table is for general guidance and is not meant to be all-inclusive, nor does it create requirements related to these issues. Operational issues should be assessed as to whether they are operation-wide or compartmentalized (i.e., only involving one programmatic area or investigative group) problems. Critical operation-wide problems may result in the suspension of the operation. Critical compartmentalized issues may result in the suspension of the offending program and/or group activity.

The Director of OI is the certifying and authorizing official for certified undercover operations and, as such, is the official responsible for all corrective actions. Any requirements related to the Office of Professional Responsibility notification are in no way affected by this Table or the actions set forth herein.

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| **RECORD KEEPING** | | |
| QuickBooks Entry | | |
| Serious | Errors in the use of proper OCCs, funding classes or similar entry actions that have no effect on the operation's financial integrity. | The operation's CUFFS Administrator will correct the errors. The errors and the corrective actions taken will be reported on the next Monthly Financial Worksheet. |
| Severe | Errors in the use of proper OCCs, funding classes or similar entry actions that have some minor effect on the operation's financial integrity. | The operation's management shall ensure that the proper corrective entries have been input into CUFFS and that the CUFFS Administrator fully understands any errors so that they do not recur. The errors and corrective actions taken will be reported on the next Monthly Financial Worksheet. |
| Critical | Errors in the use of proper OCCs, funding classes or similar entry actions that have the effect of disrupting the operation's financial integrity. | The SAC will suspend all operational expenditures until such time as the operation's managers and the CUFFS Administrator have corrected all errors. The SAC will ensure that the appropriate correcting entries |



Post-Hearing Brief Exhibit 1

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | | have been input, and that the operational managers and the CUFFS Administrator fully understand the errors so that they do not recur. The SAC will ensure that the operation's CUFFS/QuickBooks are financially sound prior to allowing operational expenditures to recommence. The errors and corrective actions taken will be reported on the next Monthly Financial Worksheet. |
| CUFFS Documentation | | |
| Serious | Errors in the proper use of EAFs, ICE Forms 73-293s, receipts (including substitute memos) or similar documentation that have no effect on the operation's financial integrity. | The operation's managers will correct the errors. Appropriate explanatory documentation will be created and made part of the operation's permanent record. A general note of explanation will be added to the next Monthly Financial Worksheet. |
| Severe | Errors in the proper use of EAFs, ICE Forms 73-293s, receipts (including substitute memos) or similar documentation that have a minor effect on the operation's financial integrity. | The SAC will ensure that the operation's managers correct the errors. Appropriate explanatory documentation will be created and made part of the operation's permanent record. The operation's management shall ensure that all operational personnel fully understand the errors so that they do not recur. A detailed explanation of the errors and corrective action taken will be added to the next Monthly Financial Worksheet. |
| Critical | Errors in the proper use of EAFs, ICE Forms 73-293s, receipts (including substitute memos) or similar documentation that have a major effect on the operation's financial integrity. | The SAC will suspend all operational expenditures and report the issues to the Undercover Operations Unit. The Undercover Operations Unit will assess the issue and report its findings to the Director of OI. The SAC will ensure that the |

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | | appropriate corrective action is taken and that the operation is fiscally sound prior to allowing operational expenditures to recommence. A detailed explanation of the errors and corrective actions taken will be reported to the Undercover Operations Unit and on the Monthly Financial Worksheet. The SAC shall ensure that all operational personnel fully understand the errors so that they do not recur. |
| Six-Month Expenditure Authorization | | |
| Serious | Exceeding the operation's 6-month expenditure authorization at the four-digit OCC level by more than 10% (without proper approval). | Operational management will forward a memorandum of explanation and a request for retroactive approval of required increases to expenditure authorization to the SAC. Operational management will ensure that operational expenses are actively tracked against the operation's 6-month expenditure authorization. |
| Severe | Exceeding the operation's 6-month expenditure authorization at the two-digit OCC level by more than 10% (without proper approval). | The SAC will forward a memorandum of explanation and a request for retroactive approval of required increases to expenditure authorization to the Director of OI (through the Undercover Operations Unit). The SAC will ensure that operational personnel have implemented corrective action and are actively tracking operational expenses against the operation's 6-month expenditure authorization. |
| Critical | Exceeding the operation's total 6-month expenditure authorization by more than | The SAC will suspend all operational expenditures and report the issue to the |

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | 10% (without proper approval).<br><br>*Note:* OPR/MIU recommended audit adjustments are excluded. In such cases, a memorandum to the operation's file should be generated detailing the issue and stating, "due to OPR/MIU audit adjustments to correct the CUFFS records, the 6-month expenditure authorization levels were exceeded." | Undercover Operations Unit. The SAC will forward a memorandum of explanation to the Director of OI (through the Undercover Operations Unit) with a request for retroactive approval of required expenditure authorization increases. The SAC will ensure that operational personnel have implemented corrective action and are actively tracking operational expenses against the operation's 6-month expenditure authorization prior to allowing expenditure to recommence. |
| **FINANCIAL INTEGRITY** | | Distinguish as:<br>1) Operation-wide issue<br>2) Compartmentalized issue |
| EAF Procedures | | |
| Serious | Failure to fully explain and document expenses on the EAF. Failure to ensure that funds are available prior to approval of the EAF. | 1) Operation-wide issue – Operational managers will implement corrective action and actively ensure that all operational expenses are properly documented. Operational managers will ensure that all operational personnel are given additional training in the requirements of properly documenting expenses.<br>2) Compartmentalized issue – Operational managers will implement corrective action and actively ensure that all operational expenses are properly documented. Operational managers will ensure that operational personnel associated with the problem are given additional training in the requirements of properly documenting expenses. |



Post-Hearing Brief Exhibit 1

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| Severe | Failure to get expense authorization in a timely manner and/or properly document expenses on the EAF. Failure to ensure that funds are available prior to expenditure. | 1) Operation-wide issue – The SAC will implement corrective action and actively ensure that all operational expenses are properly documented. The SAC will ensure that all operational managers and personnel are given additional training in the requirements of properly documenting expenses.<br>2) Compartmentalized issue – The SAC will implement corrective action and actively ensure that all operational expenses are properly documented. The SAC will ensure that operational managers and personnel associated with the problem are given additional training in the requirements of properly documenting expenses. |
| Critical | Failure to get expense authorization and/or document expenses on the EAF. Having expenditures in excess of available funding. | The SAC will suspend all operational expenditures and report the issue to the Undercover Operations Unit. The SAC will forward a memorandum of explanation to the Director of OI (through the Undercover Operations Unit) with a request for retroactive approval of expenditures. The SAC will ensure that operational personnel have implemented corrective action and are actively controlling all operational expenses prior to allowing expenditures to recommence. |
| <u>POI/POE Procedures</u> | | |
| Serious | Failure to fully explain and document POI/POE on the ICE Form 73-293 and associated EAF. Failure to properly ensure that funds are available prior to approval of the ICE Form 73-293 and | 1) Operation-wide issue – Operational managers will implement corrective action and actively ensure that all operational POI/POE expenses are properly documented. Operational managers will ensure |

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | associated EAF. | that all operational personnel are given additional training in the requirements of properly documenting POI/POE expenses.<br>2) Compartmentalized issue – Operational managers will implement corrective action and actively ensure that all operational POI/POE expenses are properly documented. Operational managers will ensure that operational personnel associated with the problem are given additional training in the requirements of properly documenting POI/POE expenses. |
| Severe | Failures to get timely authorization of POI/POE on ICE Form 73-293. Failure to properly ensure that funds are available prior to expenditure through the use of the associated EAF. | 1) Operation-wide issue – The SAC will implement corrective action and actively ensure that all operational POI/POE expenses are properly documented. The SAC will ensure that all operational managers and personnel are given additional training in the requirements of properly documenting POI/POE expenses.<br>2) Compartmentalized issue – The SAC will implement corrective action and actively ensure that all operational POI/POE expenses are properly documented. The SAC will ensure that operational managers and personnel associated with the problem are given additional training in the requirements of properly documenting POI/POE expenses. |
| Critical | Failure to get POI/POE expense authorization and/or document expenses on ICE Form 73-293 and associated EAF. Having POI/ POE expenditures in excess of | The SAC will suspend all operational POI/POE expenditures and report the issue to the Undercover Operations Unit. The SAC will forward a memorandum of explanation to |

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | available funding. | the Director of OI (through the Undercover Operations Unit) with a request for retroactive approval of POI/POE expenditures. The SAC will ensure that operational personnel have implemented corrective action and are actively controlling all operational POI/POE expenses prior to allowing POI/POE expenditures to recommence. |
| Travel Expense Procedures | | |
| Serious | Failure to fully explain and document travel expenses on travel voucher and associated EAF. Failure to properly ensure that funds are available prior to approval of travel authorizations and associated EAF. | 1) Operation-wide issue – Operational managers will implement corrective action and actively ensure that all operational travel expenses are properly documented. Operational managers will ensure that all operational personnel are given additional training in the requirements of properly documenting travel expenses.<br>2) Compartmentalized issue – Operational managers will implement corrective action and actively ensure that all operational travel expenses are properly documented. Operational managers will ensure that operational personnel associated with the problem are given additional training in the requirements of properly documenting travel expenses. |
| Severe | Failure to get timely travel expense authorization. Failure to properly document travel expenses on the travel voucher. Failure to properly ensure that funds are available prior to approval of travel voucher and associated EAF. | 1) Operation-wide issue – The SAC will implement corrective action and actively ensure that all operational travel expenses are properly documented. The SAC will ensure that all operational managers and personnel are given additional training in the |



Post-Hearing Brief Exhibit 1

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | | requirements of properly documenting travel expenses.<br>2) Compartmentalized issue – The SAC will implement corrective action and actively ensure that all operational travel expenses are properly documented. The SAC will ensure that operational managers and personnel associated with the problem are given additional training in the requirements of properly documenting travel expenses. |
| Critical | Failure to get travel expense authorization and/or failure to document travel expenses on travel voucher. Having travel expenditures in excess of available funding. | The SAC will suspend all operational travel and report the issue to the Undercover Operations Unit. The SAC will forward a memorandum of explanation to the Director of OI (through the Undercover Operations Unit) with a request for retroactive approval of travel expenditures. The SAC will ensure that operational personnel have implemented corrective action and are actively controlling all operational travel expenses prior to allowing travel expenditures to recommence. |
| **<u>INVESTIGATIVE</u>** | | Distinguish as:<br>1) Operation-wide issue<br>2) Compartmentalized issue |
| <u>Undercover Investigative Activity</u> | | |
| Serious | Operational investigation that has no undercover activity or nexus to undercover activity. | Operational managers will remove the investigation from the operation and ensure that no operational funds are expended related to the investigation. |
| Severe | Numerous operational investigations that have no undercover activity or nexus to undercover activity. | 1) Operation-wide issue – SAC will ensure the removal of the investigations from the operation and ensure that no operational |



Post-Hearing Brief Exhibit 1

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | | funds are expended related to the investigations. The SAC should implement immediate corrective action to ensure that investigations that have no undercover activity or nexus to the undercover activity are not placed under the operation.<br>2) Compartmentalized issue – Operational management will remove the investigations from the operation and ensure that no operational funds are expended related to the investigations. Operational management should implement immediate corrective action to ensure that investigations that have no undercover activity or nexus to the undercover activity are not placed under the operation. |
| Severe | An operational investigation that includes a sensitive circumstance that is outside the scope of the operation's authorized DHS and/or ICE sensitive circumstances. | The SAC will ensure the immediate suspension of the particular investigation and associated investigative activity. The SAC will immediately forward a memorandum seeking exigent approval for the sensitive circumstances involved and the resumption of the investigation from the Director of OI (through the Undercover Operations Unit). The SAC should implement immediate corrective action to ensure that investigations are not conducted without the appropriate authorization for any DHS and/or ICE sensitive circumstances involved. |
| Critical | Numerous operational investigations that include sensitive circumstances that are outside the scope of the operation's authorized DHS and/or ICE sensitive | The SAC will ensure the immediate suspension of the investigations and associated investigative activity. The SAC will immediately forward a memorandum of explanation |

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | circumstances. | including a request for exigent approval for the sensitive circumstances involved and the resumption of the investigations from the Director of OI (through the Undercover Operations Unit). The SAC will implement and document immediate corrective action to ensure that investigations are not conducted without the appropriate authorization for any DHS and/or ICE sensitive circumstances involved. |
| Critical | None of the operational investigations have undercover activity or a nexus to the undercover activity. There is no reasonable likelihood of future undercover activity. | The SAC should immediately implement certified undercover operation closing procedures as defined in Chapter 14 of the Undercover Operations Handbook. |
| Critical | Operational activity that is outside the scope of the statutory authority of the certified undercover operation. | The SAC will ensure the immediate suspension of all activity associated with the breach of statutory authority. The SAC will immediately forward a memorandum of explanation to Director of OI (through the Undercover Operations Unit). The Director of OI will take appropriate corrective action. |
| **OPERATIONAL MANAGEMENT** | | |
| Serious | Failure to exercise appropriate management control over the operational activity at the Group Supervisor (first-line supervisor) level | The Administrative Overseer (ASAC or higher) should take immediate corrective action as well as ensure that appropriate training is provided to operational first-line managers. The Administrative Overseer should ensure that operational managers (first-line supervisors) have full knowledge and understanding of the policies and |

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| | | procedures for administering a certified undercover operation. |
| Severe | Failure to exercise appropriate management control over operational activity at the second-line (ASAC and higher) level. | The SAC should take immediate corrective action as well as ensure that appropriate training is provided to operational managers. The SAC should ensure that operational managers have full knowledge and understanding of the policies and procedures for administering a certified undercover operation. |
| Critical | Failure to exercise appropriate management control over operational activity at the SAC level. | The Director of OI should suspend all operational activity. The Director of OI should take immediate corrective action and ensure that the SAC and operational managers have full knowledge and understanding of the policies and procedures for administering a certified undercover operation prior to authorizing recommencement of operational activity. |
| **OTHER ISSUES** | | |
| Expending Operational Funds for other than Necessary and Reasonable items | *Note:* All operational expenses should be documented in such a way that, upon review, the documentation would lead a reasonable law enforcement officer to conclude that the expenditures were necessary and reasonable for the conduct of the operation. | |
| Critical | Purchases/expenses that are not necessary and reasonable for the conduct of the undercover operation. | The SAC should suspend expenditure authority at the level of the offending authorizations until such time as remedial training has been conducted regarding the definition and requirements of "necessary and reasonable for the conduct of the operation." |

| COMPONENT AND CONDITION | EXPLANATION OF ISSUE | CORRECTIVE ACTIONS |
|---|---|---|
| Leased Vehicles | | |
| Serious | Leased vehicles are used for non-operational requirements on an intermittent basis (other than emergency situations). | The SAC will ensure that policy compliance is enforced and that termination of the vehicles' lease be considered. |
| Severe | Leased vehicles are used for non-operational requirements on a regular basis. | The SAC will ensure that policy compliance is enforced and that the vehicles' lease is terminated |
| Critical | Leased vehicles are used for general SAC office duties on a daily basis. | The Director of OI will ensure that all operational vehicle leases are terminated. No new leases will be authorized unless specific SAC office and operational management controls regarding the use of leased vehicles are developed and implemented. |
| Leased Space | | |
| Critical | Leased space is used for purposes other than the conduct of the operation (other than emergency situations or written approval from the Assistant Secretary). | The SAC will ensure that policy compliance is enforced across the operation. The lease may be terminated. |



Post-Hearing Brief Exhibit 1

**Appendix G**

# GLOSSARY

The following definitions are provided for the purposes of the Undercover Operations Handbook and as additional explanation; as such, they carry the weight of policy.

**Administrative Overseer**: The SAC-appointed second-line supervisor (ASAC or higher) serving as the primary decision-maker for matters related to the administration and oversight of a certified undercover operation. This position is mandatory in SAC offices that maintain/conduct certified undercover operations.

**Agent or ICE Agent:** The term Agent or ICE Agent refers to any ICE OI Special Agent or to any other ICE officer or federal, state, or local law enforcement officer working directly with and under the policies of OI on an undercover investigation.

**Appropriate Federal Prosecutor:** The U.S. Attorney from the jurisdiction where operational cases are reasonably expected to be prosecuted, including an AUSA from that office. This can also be a supervisory trial attorney in DOJ's Criminal Division at headquarters.

**Appropriated Funds:** U.S. Government funds appropriated by Congress for the conduct of Governments business. For the purposes of certified undercover operations, appropriated funds fall into two categories:

- CUC-Appropriated Funds – these are statutory authorized funds controlled by the Undercover Operations Unit that may be used only for necessary and reasonable expenses for the conduct of certified undercover operations. These funds are distributed to certified undercover operations with no fiscal year expiration. The funds stay with the operation until 1) they are expended by the operation in accordance with the allocation budget plan; 2) they are recalled by Headquarters; or 3) the operation closes.

- Other Appropriated Funds – these are all other funds that are not CUC-Appropriated Funds. These funds are generally year-end funds and must be expended prior to the end of the fiscal year. These include, but are not limited to, Special Operations funds (i.e., Title III and POI/POE), SAC funds, and other agency funds (e.g., HIDTA).

All funds expended in furtherance of a certified undercover operation, no matter the source, must be recorded in the operation's CUFFS records.

**Budget:** *See* Six-Month Expenditure Authorization Plan.

**Business:** *See* Proprietary Undercover Business.



Post-Hearing Brief Exhibit 1

**Business/Purchase Exemption:** This term refers to 8 U.S.C. § 1363a(a)(1) & (2) and 19 U.S.C. § 2081(a)(1)(A) & (B), which allow undercover operations and their proprietary businesses the ability to operate on a commercial basis and to purchase property, buildings, and other facilities and to lease space without compliance with FAR or the provisions of 31 U.S.C. relating to Government-owned corporations. If an operation seeks to purchase or lease space or acquire property outside FAR, then the Business/Purchase Exemption is necessary.

When used in conjunction with the Use of Proceeds Exemption (8 U.S.C. § 1363a(a)(4) and 19 U.S.C. § 2081(a)(3)), an undercover operation can use proceeds to establish a proprietary business and to purchase or lease necessary and reasonable goods and services related to the operation without compliance with FAR.

**Business Transaction:** A purchase, sale, or other transaction involving items or services in furtherance of undercover activity or a certified undercover operation.

**Certified Undercover Fundamental Financial System (CUFFS):** The automated financial record-keeping system maintained to record all the financial transactions of a certified undercover operation. This term includes the documents and files (paper and electronic) associated with the certified undercover operation's record-keeping system.

**Certified Undercover Operation:** An undercover operation that has received written certification from the Assistant Secretary or his or her designee (Director of OI) that any action under one or more of the exemptions contained in 8 U.S.C. § 1363a and/or 19 U.S.C. § 2081 are necessary for the conduct of the operation. This can include the authorization for investigations that include sensitive circumstances. A certified undercover operation is instituted principally to establish a long-term activity-based infrastructure to provide support and authenticity for other close-ended target, organization, or system-specific undercover activities.

**Civil Asset Forfeiture Reform Act (CAFRA) of 2000:** (Contact the Asset Forfeiture Unit for the current policy and procedures.)

**Commissions:** Any monies or other financial compensations that are:

- retained by, or paid to, a source of information (compensation paid to an informant in the form of commissions, points, brokerage fees, and monies of a similar nature will collectively be referred to as "commissions"); or
- retained by, or paid to, a potential target of an investigation; and
- paid for, or derived from, criminal activities (proceeds).

**Confidential Informant:** A Confidential Informant is an individual who:

- is a source of information;



Post-Hearing Brief Exhibit 1

- has been properly documented according to current OI policies on informants;
- works under the direction and control of an authorized representative of a federal law enforcement agency; and
- is not a sworn law enforcement officer acting solely in an official capacity.

Also referred to as "Source of Information" and "Cooperating Individual."

**Cooperating Individual:** *See* Confidential Informant.

**Credit/Debit Card:**

- Overt Credit/Debit Card – A credit card issued as a U.S. Government credit card for overt purchases of $2,500 or less, under the provisions of FAR, utilizing funds from an undercover operation.
- Undercover Credit/Debit Card – A credit card issued in a fictitious personal or corporate name used for operational-related transactions in support of an undercover activity or undercover operation.
- Personal Undercover Credit/Debit Card – A credit card issued in a fictitious personal name used for support of a personal undercover identity. This card is issued to the undercover operative and can be used for business transactions or for personal transactions to strengthen an undercover identity.

**CUFFS Administrator (Record-Keeper):** The CUFFS Administrator is an ICE OI employee who maintains the books and records of a certified undercover operation. Federal law requires that the person accountable for financial records of the U.S. Government be a Federal Government employee. The CUFFS Administrator must also be an OI employee. The Director of OI may waive this requirement on a case-by-case basis.

**Debit Card**: *See* Credit/Debit Card.

**Emergency Circumstances:** "Emergency circumstances" are defined as those instances where:

- events in an investigation require an immediate or instantaneous response by investigators; and
- there will be serious negative consequences of a delayed response, such as:
    - o the delay could place any individual in jeopardy of serious injury or death;
    - o the delay would prevent or unduly delay agents from interdicting the



Post-Hearing Brief Exhibit 1

introduction of controlled substances or other prohibited articles that represent a public safety threat into the commerce of the United States;

- o the delay would prevent or unduly delay agents from interdicting the unlawful import/export of munitions, weapons, hazardous materials, precursor chemicals, nuclear or missile proliferation technology or materials, or other dangerous items; or

- o the delay would have a negative impact on national security or critical foreign policy issues.

**Entrapment**: A defense to a criminal charge, on the theory that "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548 (1992). A valid entrapment defense has two related elements:

- government inducement of the crime, and

- the defendant's lack of predisposition to engage in the criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63 (1988). Of the two elements, predisposition is by far the more important.

**Exigent Circumstances:** "Exigent circumstances" are defined as those instances where:

- events in an investigation require a rapid or prompt response by investigators; and

- there will be definitive negative consequences of a delayed response, such as:

  - o the delay would seriously impede the investigation to the extent that violators may not be apprehended; or

  - o the delay would cause the loss of evidence or information critical to the continuation of the investigation or the successful prosecution of suspects.

**Federal Acquisition Regulation (FAR):** FAR are those regulations that govern the normal procurement procedures that agencies of the U.S. Government must follow when acquiring property or leasing space. Undercover operations conducted by OI may be specifically exempted from these requirements if they are certified under the provisions of 8 U.S.C. § 1363a(a)(1) & (2) and 19 U.S.C. § 2081(a)(1)(A) & (B) and such acquisition outside FAR is necessary to protect the covertness and security of the operation. This exemption is known as the business/purchase exemption.

**Joint Undercover Operation:** A joint certified undercover operation in which ICE and another law enforcement agency that is using their own certified undercover operation are investigating the same targets and have agreed to work jointly (may include splitting



Post-Hearing Brief Exhibit 1

proceeds), and are each providing manpower or other resources in support of an investigation/operation that involves undercover activity, regardless of which agency initiated the investigation.

When participating in joint undercover operations, managers should consider that the exemptions granted under 19 U.S.C. § 2081 and 8 U.S.C. § 1363a can be applied only to the detection and prosecution of offenses within the jurisdiction of the Secretary of Homeland Security. Accordingly, joint undercover investigations that take advantage of the exemptions must have a reasonable likelihood of disclosing a violation of law enforced by ICE.

If participation by OI is limited to furnishing investigative support, such as conducting surveillance or providing technical assistance, then it does not constitute a joint undercover operation.

**Money Laundering Points:** Any monies or other financial compensations that:

- are retained by, or paid to, the undercover operation by a potential target or source of an investigation; or
- are paid by the undercover operation to a potential target or source of an investigation; and
- constitute a percentage paid (money laundering fee) for, or derived from, money laundering activities.

**Nexus to Undercover Activities:** A direct link to an open undercover investigation and the undercover activity of that investigation.

All investigations placed under a certified undercover operation **MUST** have undercover activity or a direct nexus to the operation's undercover activity.

**Necessary and Reasonable**

- Necessary expenses are defined as those expenses that are directly related to the purposes and objectives of the undercover investigative operation (e.g., an undercover cellular phone for an undercover agent would be a necessary expense, whereas a cellular phone for every agent in the SAC office would not be a necessary operational expense).
- Reasonable expenses are defined as those expenses which, given the circumstances of the undercover operation, are logical, judicious, and justifiable (e.g., if an operation needs a sedan for general surveillance and undercover security, leasing a $20,000 Toyota Camry would be a reasonable expense, whereas leasing a $45,000 Porsche Boxster would not be a reasonable expense).

**Otherwise Illegal Activity:** Except when authorized pursuant to ICE policy and this Handbook, no undercover operative will participate in any activity that would constitute a crime under federal, state, or local law if engaged in by a private person acting without authorization. For the purposes of this Handbook, such activity is referred to as an "otherwise illegal activity."

**Personal Assistance Agreement (PAA):** An agreement between a Cooperating Individual (CI) and a SAC that details the general activities and responsibilities expected of the CI as well as the limitations placed on his or her behavior. The agreement may also state the amounts (including commissions) and methods of compensation that the CI could expect to receive if the CI otherwise adheres to the provisions of the agreement. PAAs require the approval of the Unit Chief, Investigative Support Unit. (*Note:* Policy related to PAAs and CIs is the purview of the ISU, ISD.)

**Personal Transaction:** A purchase, sale, or other transaction involving items or services not related to ICE or official business.

**Proceeds:** Funds acquired from non-Government sources during the course of a certified undercover operation, including, but not limited to:

- the gross income and net profits from undercover endeavors (including money laundering "points" received);
- any tangible assets received from the targets of an investigation as a result of undercover endeavors;
- violator/trafficker-directed funds (those funds or monetary instruments provided by a violator to the undercover operation with the understanding that the funds are to be used in a specific way for the benefit of the violator or to further the illegal activity);
- interest from operational bank accounts;
- funds received for sales by undercover businesses;
- monies received by an undercover agent or CI for illegal services; and
- salaries paid to undercover agents by a third party.

At the time they are taken in, proceeds are considered U.S. Government funds and are subject to the same controls and procedures applicable to appropriated funds except as provided by the exemptions in 19 U.S.C. § 2081 and 8 U.S.C. § 1363a. Tangible assets (other than money) acquired during the course of a certified undercover operation, such as real estate, conveyances, or property are not considered proceeds. These assets will be recorded in the property records of the operation.



Post-Hearing Brief Exhibit 1

*Note:* *Care must be taken to ensure that funds that constitute a seizure are not designated as proceeds. Proceeds come to a certified undercover operation in the course of undercover activity. As a general rule, funds that come into government control as a result of an enforcement action (search, arrest) would not be considered proceeds.*

**Property Officer:** The ICE OI employee designated to control access to all property for which a certified undercover operation is accountable. Property will not be available to be signed in or out without the authorization by the Property Officer or designee.

**Proprietary Undercover Business:** A sole proprietorship, partnership, corporation, or other business entity operated on a commercial basis, which is owned, controlled, or operated wholly or in part on behalf of ICE and whose relationship with ICE is concealed from third parties. A certified undercover operation is required in order to operate a proprietary undercover business. Proprietary undercover businesses fall into one of two categories: those businesses that will not seek to do business with the general public and those businesses that will do business with the general public.

As applied to ICE undercover operations, the definition of operating “on a commercial basis” includes activities by undercover operatives who engage only in otherwise illegal business transactions, as well as activities of undercover operatives who engage in both legal and otherwise illegal business transactions.

- Proprietary undercover business that will not seek to do business with the general public.
  - An undercover business or undercover activity that is established exclusively to engage in business transactions with targets of investigation to support an illegal activity and will not seek to do business with the general public is considered a proprietary business, as defined under 19 U.S.C. § 2081 and 8 U.S.C. § 1363a. However, although this is not considered sensitive according to the DHS definition of sensitive circumstances, this is considered an ICE sensitive circumstance. (For example, a cooperating individual or undercover agent who is established in an apartment to provide the service of illegally exporting munitions would be considered a proprietary undercover business.) This will enable the SAC to seek the business/purchase exemption required to acquire services and property, as well as perform other necessary transactions in a covert manner outside FAR.
- Proprietary undercover business that will do business with the general public.
  - An undercover business or undercover activities that is established to engage in both legal and otherwise illegal transactions and which may engage in business with the general public is considered DHS sensitive. A proprietary business that will engage in business with the general public, as part of its covert façade, has additional liability connected with that activity. Precautionary steps to protect the general public and interests of ICE must be

undertaken by the undercover operation's management to ensure that the liability issues generated by the activity are addressed. The type of proprietary undercover business that engages in business with the general public is discouraged but not prohibited.

- A detailed plan of the activity of the undercover business must be presented to the DHS URC prior to commencement of such operational activity.

**Purchase Exemption:** *See* Business/Purchase Exemption.

**Recoverable Funds:** U.S. Government funds used in money laundering investigations that are given to targets of an investigation in order for that target to launder the funds for a certified undercover operation. These funds are provided through the Undercover Operations Unit and are returned in full to headquarters after the need for the funds has expired. "Proceeds for Laundering" refers to certified undercover operations proceeds that are designated, approved, and used as recoverable funds.

**Sensitive Circumstances Related to Undercover Activity: DHS and ICE**

**<u>DHS Sensitive Circumstances</u>**

DHS sensitive circumstances are present if there is a reasonable expectation that the undercover activity, investigation, or operation will involve:

- an investigation of possible criminal conduct by any elected or official candidate for a federal, state, or local judicial, legislative, or executive branch post or any appointed or official nominee for a senior executive position of trust in a federal, state, or local governmental entity or political subdivision thereof;

- an investigation of any public official at the federal, state, or local level in any matter involving methodical and systematic corruption of any governmental function;

- an investigation of possible criminal conduct by any foreign official or government, religious organization, political organization, or the news media;

- any investigative activity having a significant effect on, or a significant intrusion into, the legitimate operation of a federal, state, or local governmental entity;

- establishing, acquiring, or using an undercover proprietary business which will be conducting business with the general public (i.e., storefront open to the public), including the establishment of a publicly-accessible Internet website or "virtual store" that offers any goods or services;

- an undercover operative who will be a major participant in the scheme to move or transport illegal aliens across an international border or who will participate in the operation of an illegal alien stash house;

- providing goods or services that are essential to the commission of a crime, but are reasonably unavailable to a subject of the investigation except from the U.S. Government;

- activity that is proscribed by federal, state, or local law as a felony or that is otherwise a serious crime, but which does not include:

    - o the purchase of stolen or contraband goods;

    - o the purchase of illegal and/or fraudulent immigration documents;

    - o the delivery, sale, use, ownership, or possession by the government of contraband or stolen property whose ownership cannot be determined;

    - o the controlled delivery of drugs or other contraband that will not enter the commerce of the United States;

    - o the domestic transportation or concealment of illegal aliens when the undercover operative (see definition) does not have substantial control or direction of the scheme involving the domestic transportation or concealment of illegal aliens;

    - o the payments of bribes that are not included in the other sensitive circumstances; or

    - o the making of false representations to third parties in the concealment of personal identity or the true ownership of a proprietary business (this exception does not include any statement under oath or the penalties of perjury;

- activity involving a purported legal marriage between an undercover operative and a target or third party; or a marriage sting operation whereby an undercover operative proffers marriage to a target or third party;

- a significant risk that an undercover operative will be arrested or will supply false testimony or false documentation in an official government legal or administrative proceeding;

- an undercover operative who will be required to give a sworn statement or testimony in any official government judicial or administrative proceeding in an undercover capacity;

- an undercover operative who will attend a meeting or participate in communications between an individual and his or her lawyer where the purpose of the meeting or communication involves the defense of any person on criminal charges or involves civil or administrative proceedings to which the United States may be a party; or an undercover operative who will act as a lawyer and meet and/or communicate with purported clients;

- a significant risk that a third party will enter into a professional or confidential relationship with an undercover operative who is acting as an attorney, physician, psychologist, member of the clergy, spouse, member of the news media, or other person who is under a legal obligation of confidentiality;

- an undercover request to an attorney, physician, psychologist, member of the clergy, or other person for information that would ordinarily be privileged or to a member of the news media concerning an individual with whom the news person is known to have a professional or confidential relationship that would be treated as privileged;

- a significant risk of violence, physical injury to individuals, or financial loss to an innocent individual/third party;

- activities that could result in significant claims against the United States arising in tort, contract, or property law, or for compensation for the "taking" of property;

- untrue representations by a person participating in the undercover investigation concerning the activities or involvement of any innocent third person without that individual"s knowledge or consent, and there is a reasonable possibility that the false or misleading representations may cause significant embarrassment or physical or financial harm to the third person;

- a significant part of the undercover operation that will be conducted <u>substantially</u> outside the United States. However, an undercover investigation will **<u>not</u>** be considered to involve a sensitive circumstance if the only extraterritorial conduct consists of minimal contacts within the immediate border areas of Canada and Mexico; and

  - any such minimal contacts with subjects are necessary to maintain the credibility, cover, or safety of the undercover employee or cooperating individual; or

  - any such minimal contacts with persons other than the subjects are solely for information gathering purposes, do not involve the use of recording or broadcasting devices, occur under circumstances in which no person or entity has a reasonable expectation of privacy, and none of the other sensitive circumstances described in other sections of these guidelines are present; or



Post-Hearing Brief Exhibit 1

  - the activity will involve the direct participation of the appropriate foreign law enforcement agency.

*Note:* *These DHS sensitive circumstances may be superseded by new DHS-issued sensitive circumstances.*

**U.S. Immigration and Customs Enforcement (ICE) Sensitive Circumstances**

In addition to the DHS sensitive circumstances, the following are also considered sensitive for the conduct of ICE investigations:

- transmittal of weapons or munitions list articles, hazardous materials, or nuclear or biological materials beyond the immediate control of ICE agents;

- investigations and/or operations that continue for more than 1 year beyond the first undercover activity;

- indemnification/hold-harmless agreements in which the U.S. Government is granting indemnification to a third party (Absent express statutory authority to the contrary, the U.S. Government may not enter into an agreement to indemnify where the Government's liability is indefinite, indeterminate, or potentially unlimited);

- third-party funding sources (funding provided by other federal sources, such as High Intensity Drug Trafficking Areas or Organized Crime Drug Enforcement Task Forces, is not third-party funding. The acceptance of funding or property from private parties is proper only under very strict guidelines and only after DHS approval);

- establishing, acquiring, or using an undercover proprietary business that will not seek to conduct business with the general public (e.g., a trucking company that does business only with targets), including the establishment of a limited access Internet website that offers any goods or services;

- establishment of an undercover off-site location with the exception of post office boxes and mail drops;

- the undercover operation will require the use of proceeds generated by the undercover operation to offset necessary and reasonable expenses incurred in the operation of the proprietary business;

- the undercover operation will require the use of the statutory exemptions under 19 U.S.C. § 2081 and/or 8 U.S.C. § 1363a; and

- the undercover operation will establish an undercover bank (or other financial institution) account controlled by ICE into which appropriated funds or proceeds will be deposited.

Only the activities of Government employees determine sensitive circumstances. However, under ICE policy, activities of informants, which would constitute sensitive circumstances, will be reviewed on a case-by-case basis in order to make a determination as to whether they should be treated as sensitive circumstances.

*Note:* *These lists (DHS and ICE Sensitive Circumstances) are not all-inclusive. Any activity which presents, or has the potential for presenting, serious legal, ethical, or policy issues should be reviewed and, if considered sensitive, handled in accordance with the provisions of this Handbook.*

**Six-Month Expenditure Authorization Plan:** This is the 6-month operating expenditure limit of a certified undercover operation; it is included in the reauthorization package submitted to and reviewed by the URC and ultimately authorized by the Director of OI as part of the certification process.

**Source of Information:** *See* Confidential Informant.

**Sweep Account:** A sweep account is an account set up at a bank or other financial institution where the funds are automatically managed between a primary cash account and secondary investment accounts. Sweep accounts can be used to protect the operation's bank deposits. Uninsured deposited funds (bank deposit balances in excess of $100,000) are moved into secure financial instruments and returned as needed. To ensure the safety of undercover operation deposits, funds should be swept into U.S. Treasury obligations versus publicly held corporation bonds. The benefits of a sweep account include the following: 1) no red flags are raised since the same safeguard technique is used by private industry (as opposed to Federal Reserve collateral); 2) funds are secured in the event that the bank fails during normal business hours (the Federal Deposit Insurance Corporation (FDIC) takes over and completes the day's transactions including sweeps); and 3) a higher rate of interest is earned.

Distributing and maintaining balances of less than $100,000 in multiple accounts with the same financial institution does not afford protection of the funds, unless an undercover operation has a unique EIN assigned to each account. The FDIC insurance program does not determine coverage on a per account basis. Multiple account balances would be added together and insured up to a total of $100,000 per financial institution. In light of these facts, the use of sweep accounts shall be used as appropriate.

**Undercover Activity**: Any investigative activity involving the use of undercover resources and techniques, including the use of an undercover operative of ICE or other federal, state, or local law enforcement organization working with ICE. Undercover operative activity includes Internet-based, limited, moderate, and deep undercover activity.

- Internet-Based Undercover Activity: Undercover activity that involves:

  - undercover contact via the Internet or email with no face-to-face contact; or
  - undercover surfing of the Internet.

  This type of undercover activity does not require completion of the Undercover Operations Unit-sponsored UCOS and can be approved at the SAC level according to local procedures.

- Limited Undercover Activity: An assignment, with or without fictitious identification, that requires:

  - no change in appearance or personal habits and limited contact with violators or potential violators, such as undercover telephone calls or performing secondary duties at a storefront that requires little or no direct contact with suspects. This includes undercover purchases in public places (e.g., purchases of counterfeit merchandise from a store).

  This type of undercover activity does not require completion of UCOS and can be approved at the SAC level according to local procedures.

- Moderate Undercover Activity: An assignment that involves:

  - assuming a fictitious identity that may or may not involve a change in appearance or personal habits; and
  - short-duration, face-to-face contacts with violators or potential violators at an ICE-controlled covert location or an alternate location; and
  - possible frequent and repetitious contact with the same violators or potential violators in covert locations, over an extended period of time, during which the undercover operative maintains an independence from the targeted group; and
  - possible regular meetings with violators or potential violators with the intention of the assignment continuing for a period of greater than 6 months.

  This type of undercover activity requires completion of UCOS.

- Deep Undercover Activity: A long-term undercover assignment that also involves:

  - assuming a fictitious identity with significant changes in appearance or personal habits in order to infiltrate a criminal organization; and
  - working in a covert location or in a business enterprise operated by the targeted group or any other situation that requires regular and continuous face-to-face contacts with the violators or potential violators. Working in these isolated circumstances requires the use of a Contact Agent.

This type of undercover activity requires completion of UCOS.

*Note: All investigations placed under a certified undercover operation* ***MUST*** *have undercover activity or a direct nexus to the operation's undercover activity.*

**Undercover Identification:** Any identification document issued in a fictitious name or alias, including official documents, whether counterfeit or genuine, created by any agency of the federal, state, or local government, or by a bank or financial institution, or any credit card, license, or other document which is offered as proof of a fictitious identity. All undercover identification issued to ICE employees is considered the property of ICE, must be inventoried on an annual basis, and must be immediately surrendered upon request.

**Undercover Investigation:** An investigation involving any undercover activity. This can take place over a period of time. Undercover activity involving any DHS or ICE sensitive circumstances requires that the investigation be placed under a certified undercover operation, regardless of the type or number of undercover contacts involved.

**Undercover Liaison Coordinators:**

- Field Undercover Liaison Coordinator (ULC): The Special Agent experienced in undercover work who has volunteered and successfully completed the Undercover Operations Unit-sponsored ULCS. He or she will monitor, assist in the debriefing, and make recommendations to the ASAC, Associate SAC, and SAC for the selection of undercover operatives. Additionally, the ULC will act as a consultant for undercover activities, as appropriate.

- Headquarters Undercover Liaison Coordinator: The Program Manager who is an experienced undercover operative with undercover managerial experience and who is available for consultation with management and field coordinators on problems related to undercover assignments. This individual is responsible for coordinating field interventions and debriefings with licensed clinical psychologists under contract to ICE as deemed necessary by management.

**Undercover Operative:** An undercover operative is most often an OI agent (or any other ICE officer approved in writing by the Director of OI) acting in an undercover capacity. An undercover operative may also be a law enforcement officer of another federal, state, or local law enforcement agency who voluntarily works under the direction and control of OI in a particular investigation. An undercover operative's relationship with law enforcement is concealed from third parties during the course of an investigative operation.

**Undercover Review Committee (URC):** The URC is the body responsible for reviewing proposals for undercover activities that involve DHS and/or ICE sensitive circumstances. There are two URCs - the DHS URC and the ICE URC.



Post-Hearing Brief Exhibit 1

DHS URC members:

- DAD, ISD (Chairperson)
- All ICE URC members
- DHS representative
- representative of any other affected DHS Agency,
- representatives of the DOJ Criminal Division
- any other federal government personnel as specified by the Director of OI.

ICE URC members:

- DAD, ISD (Chairperson)
- Assistant Directors, Operations (East and West).
- DADs, National Security Investigations; Financial, Narcotics and Public Safety; and Critical Infrastructure and Fraud.
- Unit Chief, Arms and Strategic Technology Investigations
- Unit Chief, Asset Forfeiture
- Unit Chief, Commercial Fraud/Intellectual Property Rights
- Unit Chief, Compliance Enforcement
- Unit Chief, Contraband Smuggling
- Unit Chief, Cornerstone/Financial Operations
- Unit Chief, Cyber Crimes
- Unit Chief, Forensic Document Laboratory
- Unit Chief, Human Rights Violations/Public Safety
- Unit Chief, Human Smuggling and Trafficking
- Unit Chief, Identity and Benefits Fraud
- Unit Chief, Investigative Support
- Unit Chief, National Security Unit
- Unit Chief, Special Operations
- Unit Chief, Undercover Operations
- Unit Chief, Worksite Enforcement/Critical Infrastructure Protection
- Operations Chiefs, East and West
- ICE Counsel
- DEA representative (when Title 21 issues are involved)
- Other ICE personnel specified by the Director of OI.

To promote consistency, ICE members of the URCs will be required to attend every meeting of the URC. Substitutions are acceptable only when the principal is on leave or away from the office on official business. No URC business will be conducted unless the URC chairman finds that there is a quorum (a simple majority of the entire membership of the URC).

**Use of Proceeds Exemption:** The term used to refer to 19 U.S.C. § 2081(a)(3) and 8 U.S.C. § 1363a(a)(4) that provides an undercover operation the ability to use proceeds

to offset necessary and reasonable expenses incurred in the operation without regard to 31 U.S.C. § 3302, relating to the disposition of public monies.

- *Covert Expenditures:* Necessary and reasonable expenditures incurred in direct support of an investigation in which the identification of ICE as a party to the transaction should reasonably be concealed from the vendor, third parties, or the public in order to avoid compromising the covert operative, locations, or activities. Covert expenditures are justified when a reasonable expectation exists that an overt expenditure will compromise the covert operatives, location, or activity. These expenditures are not subject to FAR and can be conducted outside FAR using the business/purchase exemption.

- *Overt Expenditures:* Necessary and reasonable expenditures incurred in direct support of an investigation where it is not necessary to conceal the involvement of ICE to avoid compromising a covert operative, location, or activity. These expenditures are subject to FAR and must be conducted within the FAR guidelines.

**Violator/Trafficker-Directed Funds (Proceeds):** Those funds or monetary instruments provided by a violator to the undercover operation with the understanding that the funds are to be used in a specific way for the benefit of the violator or to further the illegal activity. These funds are considered proceeds and shall be treated as such.

**Appendix H**

# INDEX

This index is not all-inclusive and provides only significant terms. The chapters and sections referenced below are those where the terms appear in noteworthy discussion.


| | |
|---|---|
| Accounting | |
|     CUFFS | Sec 6.11 |
|     CUFFS Administrator (Record-Keeper) Responsibilities | Sec 4.18 |
|     QuickBooks | Sec 6.11, 7.1.1 |
| Additional Documents Required with Proposal | Sec 5.5.3(2) |
| Administrative Overseer (CUC) (ASAC) | |
|     Role and Responsibilities | Sec 4.10 |
| Agreements | |
|     Indemnification and Hold Harmless | Sec 3.7.2 |
|     Personal Assistance Agreements | Sec 3.8 |
| Alias Identification (see Undercover Identification) | Sec 9.1 |
| Alteration to Conveyances | Sec 3.6 |
| Application for Undercover Operation | Sec 5.5 |
|     Format | Sec 5.5.2 |
|     Procedures | Sec 5.3, 5.5.3 |
|     Who can make application for | Sec 5.2 |
| Appropriate Federal Prosecutor | Glossary |
| Appropriated Funds | Sec 6.3 |
|     Expenditure | Sec 6.2, 6.3 |
|     Funding Sources | Sec 6.24 |
|         CUC Appropriated (no year funds) | Sec 6.24.2 |
|         Other | Sec 6.24.5 |
|         Proceeds | Sec 6.24.1 |
|         SAC Funds | Sec 6.24.4 |
|     Tracking | Sec 6.2 |
| Approval of Expenditures | Sec 6.18 |
|     Approval levels | Sec 6.17 |
|     CUFFS Expense/Advance Approval Form (EAF) | App B |
| Assistant Directors | |
|     Roles and Responsibilities | Sec 4.5 |
| Assistant Secretary | |
|     Roles and Responsibilities | Sec 4.1 |
| Audit of CUC Operation | Sec 7.4.4 |
| Authority | |
|     Certification and Exemptions | Sec 2.2.1 |
|     Statutory Authority for CUC Ops | Sec 2.2, App A |
| Backstopping | Chap 9 |
|     Bank Accounts | Sec 6.14 |




Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Operational | Sec 6.14 |
| Individual (Personal) | Sec 9.2.1 |
| CI/Cooperating Defendant Undercover Identification | Sec 9.1.1(1) |
| Corporate | Sec 9.3 |
| Credit cards (Undercover) | |
| Operational (Corporate/Business) | Sec 9.3 |
| Individual (Personal) | Sec 9.2.2 |
| Federally-issued alias identification | Sec 9.1.2 |
| Foreign government-issued alias identification | Sec 9.1.4 |
| Individual (Personal) | Sec 9.1 |
| State-issued alias identification | Sec 9.1.3 |
| Back-Up Data for CUFFS | Sec 6.11.2 |
| Bank Accounts | Sec 6.14 |
| Foreign Bank Accounts | Sec 6.14.5 |
| On-Line Access | Sec 6.14.2 |
| Overt Bank Accounts (in the Name of OI) | Sec 6.14.4 |
| Personal (Undercover) | Sec 9.2.1 |
| Undercover Bank Accounts | Sec 6.14 |
| Bank Accounts (Overt and Covert) | Sec 6.14 |
| Foreign Bank Accounts | Sec 6.14.5 |
| Individual Bank Accounts | Sec 9.2.1 |
| Budget (Funds Allocation and Authorization Plan) | |
| 6-Month Expenditure Authorization Plan | Sec 6.2.2 |
| CUC-Appropriated Funds Allocation | Sec 6.24.2 |
| Business/Purchase Exemption | Sec 6.2.5, 6.19.1, 14.3.2(1) |
| Case Agent (Roles and Responsibilities) | Sec 4.14 |
| Cash Advances | Sec 6.7 |
| Credit-Maintaining a Personal Financial History (Alias) | Sec 9.2 |
| Certification and Exemptions | Sec 2.2.1 |
| Misuse of | Sec 2.2.2 |
| Certification Authority | Sec 2.2, 6.1 |
| Certified Undercover Fundamental Financial System (CUFFS) | Sec 6.11 |
| Certified Undercover Operation | Sec 5.5 |
| Application | Sec 5.5.2(1) |
| Reauthorization | Sec 5.5.2(2) |
| Closing Certified Undercover Operation | Chap 14 |
| Closeout Audits | Sec 14.4 |
| Closeout Report | Sec 14.2 |
| Closing Certification | Sec 14.1 |
| Intent to Close Memorandum | Sec 14.1 |
| Commissions | Glossary |
| PAA requirements | Sec 3.8 |
| Paid to CIs | Sec 6.8.1 |
| Confidential Informants (CIs) | |




Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Advances to | Sec 6.7.2 |
| PAA requirements | Sec 3.8 |
| Transactions Involving | Sec 6.8 |
| Confidentiality of Undercover Operations | Sec 3.10 |
| Conveyances (Alterations to) | Sec 3.6 |
| Contact Agent (Roles and Responsibilities) | Sec 4.17 |
| Cover Agent (Roles and Responsibilities) | Sec 4.16 |
| Corporate Backstopping | Sec 9.3 |
| Employer Identification Number (EIN) | Sec 9.3 |
| Services available from the Undercover Operations Unit | Sec 9.3 |
| Corporate Backstopping-Undercover Bank Accounts | Sec 6.14, 9.3 |
| Corporate Undercover Credit Cards | Sec 9.3 |
| Covert Purchases | Sec 6.19.1 |
| FAR - Requirements | Sec 6.2, 6.19, Glossary |
| Credit History (Undercover) | Sec 9.2, 9.3 |
| Credit Cards (Undercover) | Sec 6.13, 9.2.2 |
| CUC-Appropriated Funds | Sec 6.3, 6.24.2, 14.3.1(2) |
| CUC TECS Program Code | Sec 5.9, 7.7 |
| CUFFS | Glossary |
| Back-Up Data | Sec 6.11.2 |
| CUFFS Manager Administrator/Record-Keeper | Sec 4.18, 6.12 |
| QuickBooks | Sec 6.11 |
| CUFFS Administrator | Sec 4.18, 6.12 |
| Roles and Responsibilities | Sec 4.18 |
| Rotation | Sec 4.18.1 |
| Separation of Duties | Sec 4.19, 6.12.1 |
| Training | Sec 8.4 |
| Who Can Be A | Sec 4.18 |
| CUFFS Expense/Advance Approval Form (EAF) | App B |
| Currency Pick-Up Operations | Sec 6.9 |
| Log | Sec 6.9.1 |
| Deposit of Proceeds into the U.S. Treasury | Sec 6.5.4 |
| Deputy Assistant Director, Investigative Services Division | Sec 4.4 |
| DHS Sensitive Circumstances | Sec 2.4.1, Glossary |
| DHS Undercover Review Committee | Sec 4.3.1, 5.5.4(2) |
| DHS Policy | Sec 2.3 |
| Director, Office of Investigations | Sec 4.2 |
| Documents | |
| Additional Documents Required with Proposal | Sec 5.5.3(2) |
| Removal/Copying by Undercover Operative | Sec 3.5.3 |
| Electronic Documentation (Use of) | Sec 2.4.3 |
| Emergency Approval | Sec 5.8 |
| Entrapment | Sec 3.4, Glossary |




Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Exemptions (Statutory) | Sec 2.2.1 |
| Exigent Approval | Sec 5.7 |
| Expenditures (CUC Operation) | |
| Approval Levels | Sec 6.17, 6.18 |
| Authorization | Sec 6.2 |
| CUFFS Expense/Advance Approval Form (EAF) | App B |
| Exigent | Sec 6.18.1 |
| Flow Chart | Sec 6.2.4 |
| Necessary and Reasonable | Sec 6.2.1 |
| Prohibited | Sec 6.20 |
| Federal Acquisition Regulation (FAR) | Sec 6.2, Glossary |
| Business/Purchase Exemption | Sec 6.19.1 |
| Petty Cash Fund | Sec 6.6 |
| Expenditure Levels | Sec 6.17 |
| Purchases Outside FAR (Covert) | Sec 6.2.5, 6.19.1 |
| Purchases Under FAR (Overt) | Sec 6.19.2 |
| Federally-Issued Undercover Identification | Sec 9.1.2 |
| Field Review by the Undercover Operations Unit | Sec 7.4 |
| Expenses Associated With | Sec 6.4.5 |
| Field Undercover Liaison Coordinator | Sec 10.2 |
| File Systems Requirements | Sec 6.10 |
| Certified Undercover Operation | Sec 6.10.3 |
| SAC Office | Sec 6.10.2 |
| Undercover Liaison Coordinator | Sec 4.7, 10.1 |
| Undercover Operations Unit | Sec 6.10.1 |
| Financial Records of a Certified Undercover Operation | Sec 6.11 |
| Financial Reports (see Monthly Financial Reports) | Sec 7.1 |
| First Class (Premium) Travel (Approval required) | Sec 6.22.2 |
| Foreign Bank Accounts | Sec 6.14.5 |
| Foreign Government-Issued Undercover Identification | Sec 9.1.4 |
| Foreign Government Law Enforcement Funds | |
| Deposited into Undercover Operation Bank Account | Sec 6.15 |
| Forfeiture of Proceeds | |
| Closing Operation | Sec 14.3.1(1.1) |
| Limit on Amount of Proceeds Held | Sec 6.5.1 |
| Ongoing Operation | Sec 6.5.3, 14.3.1(1.1) |
| Funding Sources | Sec 6.24 |
| CUC-Appropriated Funds | Sec 6.24.2 |
| Proceeds | Sec 6.24.1 |
| Recoverable Funds | Sec 6.24.3, Glossary |
| Request as Part of Proposal | Sec 6.24.2 |
| Request for Distribution | Sec 6.24.2 |
| Sources | Sec 6.24 |
| Tracking in CUFFS | Sec 6.11 |
| Use of CUC-Appropriated Funds | Sec 6.3 |



Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Gifts (Third-Party Offers) | Sec 3.7.1 |
| Group Supervisor | Sec 4.11, 4.12 |
| CUC Lead/Administrative | Sec 4.11 |
| Investigative | Sec 4.12 |
| High-Risk Investments | Sec 6.16.2(1) |
| Hold Harmless Agreements (Indemnification) | Sec 3.7.2 |
| ICE Sensitive Circumstances | Sec 2.4.2, Glossary |
| ICE Undercover Review Committee | Sec 4.3.2, 5.5.4(1) |
| Identification (Undercover/Alias) | Sec 9.1 |
| Confidential Informant | Sec 9.1.1(1) |
| Federally-Issued | Sec 9.1.2 |
| Foreign Government-Issued | Sec 9.1.4 |
| Individual | Sec 9.1.1 |
| Private Industry-Issued | Sec 9.1.5 |
| State-Issued | Sec 9.1.3 |
| Illegal Activity (Otherwise) | Sec 3.2, 3.2.5 |
| Authorization to Engage in Otherwise Illegal Activity | |
| General Authorization | Sec 3.2.5 |
| Specific Authorization | Sec 3.2.5(1) |
| Authorization of Unforeseen Otherwise Illegal Activity | Sec 3.2.6 |
| Prohibitions | Sec 3.2.3 |
| Violence that Results from Criminal Activity | Sec 3.3 |
| Indemnification and Hold Harmless Agreements | Sec 3.7.2 |
| Independent Audit of Undercover Business | Sec 6.20 |
| Individual (Personal) Undercover Bank Accounts | Sec 9.2.1 |
| Inducements | |
| Authorization Requirements | Sec 3.4.1 |
| Exceptions to Inducement Policy (Waiver) | Sec 3.4.2 |
| Insurance | |
| Automobile Insurance | Sec 3.9.1 |
| Claims to Maintain Covertness | Sec 3.9.3 |
| Other Insurance | Sec 3.9.2 |
| Use of Private Insurance Within Undercover Operations | Sec 3.9 |
| Inventory | |
| Property Owned by a CUC Operation | Sec 7.8 |
| Undercover Identification | Sec 7.9 |
| Joint Undercover Operations | Sec 5.12, Glossary |
| Lease Agreements | |
| Approval requirements | Sec 6.25 |
| Review by ICE Counsel | Sec 6.25 |
| Leased Vehicles | Sec 6.26 |
| Legal Guidance (Procedures for Obtaining) | Sec 3.1 |
| Legal/Liability Issues | Chap 3 |
| Liquidation of Assets | |
| Closing Operations | Sec 14.3 |



Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Ongoing Operation | Sec 14.3 |
| Logs | |
| Pick-up Log | Sec 6.10.3 |
| Primary Personnel Log | Sec 6.10.3 |
| Property Log | Sec 6.10.3 |
| Monthly Financial Reports (CUC Operation) | Sec 7.1 |
| National Undercover Liaison Coordinator (ULC) | Sec 10.1 |
| Necessary Expenses (Necessary and Reasonable) | Sec 6.2.1, Glossary |
| Obtaining Legal Guidance | Sec 3.1 |
| Oral Communications (Undercover Operative Recording) | Sec 3.5.2 |
| Other Agencies | |
| Reimbursement of | Sec 6.4.1(2) |
| Joint Undercover Operations | Sec 5.12 |
| Participation in Undercover Operations | Sec 5.12 |
| Splitting Proceeds | Sec 6.4.1(4) |
| Otherwise Illegal Activities (Participation in) | Sec 3.2 |
| Overt Bank Accounts in the Name of OI | Sec 6.14.4 |
| Overt Purchases (under FAR) | Sec 6.19.2 |
| Payment of Overtime | Sec 6.4.4 |
| Personal Assistance Agreement (PAA) | Sec 3.8 |
| When One is Required | Sec 3.8.1 |
| When One is Not Required | Sec 3.8.2 |
| Personal Credit/Finance History | Sec 9.2 |
| Personal (Individual) Undercover Credit Cards | Sec 9.2.2 |
| Personal Undercover Identification | Sec 9.1 |
| Control of | Sec 9.1.6 |
| Federally-Issued | Sec 9.1.2 |
| Foreign Government-Issued | Sec 9.1.4 |
| State-Issued | Sec 9.1.3 |
| Petty Cash Fund | Sec 6.6 |
| Pick-Up (Currency) | |
| Pick-Up Operations (Currency) | Sec 6.9 |
| Pick-Ups (Log) | Sec 6.9.1 |
| Transaction Approval | Sec 6.9.2 |
| Position Titles (Savings Provision) | Sec 4.20 |
| Primary Personnel Log | Sec 6.10.3 |
| Proceeds | Sec 6.24.1 |
| Control of | Sec 6.4.1 |
| Expending (Use of) | Sec 6.4 |
| For Laundering (Recoverable Funds) | Sec 6.24.3 |
| Forfeiting (Seizure) | Sec 6.5.3, 14.3.1(1.1) |
| Limit of Proceeds Held by the Operation | Sec 6.5.1 |
| Regulating the Amount of | Sec 6.5 |
| Splitting (Other OI CUCs and Agencies) | Sec 6.4.1(3), 6.4.1(4) |
| Waiver for Limit on Amount Held | Sec 6.5.1 |




Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Program Code Assignment/Case Tracking (TECS) | Sec 5.9, 7.7 |
| Program Manager (CUC) Roles and Responsibilities | Sec 4.13 |
| Prohibited Expenditures | Sec 6.20 |
| Property | Sec 6.21, 14.3.2 |
| Property Inventories | Sec 7.8 |
| Property Log | Sec 6.10.3 |
| Proposal (Format) | |
| Application and Reauthorization | Sec 5.5.2 |
| Purchase Exemption (Business/Purchase Exemption) | Sec 6.2.5, 6.19.1, 14.3.2(1) |
| Purchases Outside FAR (Covert) | Sec 6.2.5, 6.19.1 |
| Purchases Using FAR (Overt) | Sec 6.19, 6.19.2 |
| QuickBooks (CUFFS) | Sec 6.11 |
| Reasonable Expenses (Necessary and Reasonable) | Sec 6.2.1, Glossary |
| Reauthorization of Undercover Operation | Sec 5.5.2(2) |
| Record-Keeper (see CUFFS Administrator) | Sec 4.18, 6.12 |
| Recoverable Funds | Sec 6.24.3 |
| Distribution of | Sec 6.24.3 |
| Proceeds for Laundering | Sec 6.24.3 |
| Requesting | Sec 6.24.3 |
| Return to Headquarters | Sec 6.24.3 |
| Use of | Sec 6.24.3 |
| Regulating (Limit) the Amount of Proceeds Held | Sec 6.5 |
| Reimbursements | |
| Other Agencies | Sec 6.4.1(2) |
| Other Operations (within OI) | Sec 6.4.1(1) |
| Overtime Expenses | Sec 6.4.4 |
| Return of CUC-Appropriated Funds | Sec 14.3.1(2) |
| Roles and Responsibilities | Chap 4 |
| Assistant Director(s), Operations | Sec 4.5 |
| Assistant Secretary | Sec 4.1 |
| Case Agent | Sec 4.14 |
| Contact Agent | Sec 4.17 |
| Cover Agent | Sec 4.16 |
| CUC Administrative Overseer (ASAC) | Sec 4.10 |
| CUC Program Manager | Sec 4.13 |
| CUFFS Administrator | Sec 4.18 |
| Deputy Assistant Director, Investigative Services Division | Sec 4.4 |
| Director of OI | Sec 4.2 |
| Group Supervisor | Sec 4.11, 4.12 |
| Investigative | Sec 4.12 |
| CUC Lead/Administrative | Sec 4.11 |
| Special Agent in Charge (SAC) | Sec 4.9 |
| Undercover Liaison Coordinator (ULC) | Sec 4.7, Chap 10 |



Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Undercover Operative | Sec 4.15 |
| Undercover Review Committee (DHS and ICE URC) | Sec 4.3 |
| Unit Chief, Undercover Operations Unit | Sec 4.6 |
| Unit Chiefs, ISD, Inv. Programs, and Operations | Sec 4.8 |
| Safeguarding Funds | Sec 6.16 |
| High Risk Investments | Sec 6.16.2(1) |
| Sweep Accounts | Sec 6.16.1, Glossary |
| Search Authority (Undercover Operative) | Sec 3.5, 4.15 |
| Documents (Removal/Copying) | Sec 3.5.3 |
| Oral Communications | Sec 3.5.2 |
| Suspect's Premises | Sec 3.5.1 |
| Seizure of Proceeds | Sec 6.5.3, 14.3.1(1.1) |
| Self-Defense (Undercover Operative) | Sec 3.2.4 |
| Sensitive Circumstances | Sec 2.4, 5.3.3(2), Glossary |
| DHS Sensitive Circumstances | Sec 2.4.1 |
| ICE Sensitive Circumstances | Sec 2.4.2 |
| Separation of Duties | |
| Case Agent | Sec 4.19 |
| CUC Lead/Administrative Group Supervisor | Sec 4.19 |
| CUC Program Manager | Sec 4.19 |
| CUFFS Administrator | Sec 4.19, 6.12.1 |
| Undercover Operative | Sec 4.19 |
| Waiver | Sec 4.19.1 |
| Sharing (Splitting) Proceeds | Sec 6.4.1 |
| Agreements | Sec 6.4.1(3), 6.4.1(4) |
| Other Participating Agencies | Sec 6.4.1(4) |
| Prohibition | Sec 6.4.1 |
| With Another OI CUC Operation | Sec 6.4.1(3) |
| Six-Month Expenditure Authorization Plan | Sec 6.2.2 |
| Revision of | Sec 6.2.3 |
| Sources of Information (Transactions Involving) | Sec 6.8 |
| Special Agent in Charge (Roles and Responsibilities) | Sec 4.9 |
| Splitting Proceeds | Sec 6.4.1 |
| Agreements | Sec 6.4.1(3), 6.4.1(4) |
| Other Participating Agencies | Sec 6.4.1(4) |
| Prohibition | Sec 6.4.1 |
| With Another OI CUC Operation | Sec 6.4.1(3) |
| State-Issued Undercover Identification | Sec 9.1.3 |
| Statutory Authority | Sec 2.2, App A |
| 8 U.S.C. § 1363a (INS Title) | Sec 2.2 |
| 19 U.S.C. § 2081 (USCS Title) | Sec 2.2 |
| Certification and Exemptions | Sec 2.2.1 |
| Stipends (Paid to CI) | Sec 6.8.1, Glossary |
| PAA requirements | Sec 3.8 |



Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Substitute Receipts | Sec 6.18.3 |
| TECS Program Code (CUC) | Sec 5.9, 7.7 |
| Third-Party Assistance | Sec 3.7 |
| Third-Party Gifts | Sec 3.7.1 |
| Training | Chap 8 |
| CUFFS Administrator School (CUFFSAS) | Sec 8.4 |
| Undercover Liaison Coordinator School (ULCS) | Sec 8.3 |
| Undercover Managers School (UCMS) | Sec 8.2 |
| Undercover Operatives School (UCOS) | Sec 8.1 |
| Using Operational Funds for | Sec 6.20 |
| Waiver for UCOS | Sec 8.1.4 |
| Transferring Property | |
| To Another CUC Operation | Sec 14.3.2(1.2) |
| To ICE | Sec 14.3.2(2) |
| Travel in Support of Undercover Operations | Sec 6.22 |
| Actual Expenses | Sec 6.22.1 |
| Confidential Informants | Sec 6.22.3 |
| Premium (Including First and Business) Class | Sec 6.22.2 |
| Undercover Activity | |
| Foreign Countries (Activities in) | Chap 12 |
| Internet-Based | Chap 13 |
| Undercover Activity (Types) | Glossary |
| Deep | Glossary |
| Internet-Based | Glossary |
| Limited | Glossary |
| Moderate | Glossary |
| Undercover Operative | Sec 4.15 |
| Undercover Bank Accounts | Sec 6.14 |
| Business/Corporate Bank Accounts | Sec 6.14, 9.3 |
| Foreign Bank Accounts | Sec 6.14.5 |
| Individual Undercover Bank Accounts | Sec 6.14, 9.2.1 |
| Undercover Business | Sec 9.3.1 |
| Undercover Credit Cards (Personal/Individual) | Sec 6.13, 9.2.2 |
| Undercover Credit Cards (Business) | Sec 6.13, 9.3 |
| Undercover Identification | Sec 9.1 |
| Confidential Informant (Issued to) | Sec 9.1.1(1) |
| Control of | Sec 9.1.6 |
| Federally-Issued | Sec 9.1.2 |
| Foreign Government-Issued | Sec 9.1.4 |
| Inventory (Annual) | Sec 7.9, 9.1.6 |
| Private Business-Issued | Sec 9.1.5 |
| State-Issued | Sec 9.1.3 |
| Undercover Liaison Coordinator (ULC) | Sec 4.7, Chap10, Glossary |
| Undercover Operations | |




Post-Hearing Brief Exhibit 1

| | |
|---|---|
| Application and Reauthorization Procedures | Sec 5.5 |
| Closing | Chap 14 |
| Confidentiality of | Sec 3.10 |
| Types | Sec 5.3 |
| Who May Make Application for and Conduct | Sec 5.2 |
| Undercover Operative | |
| Roles and Responsibilities | Sec 4.15 |
| Search Authority of | Sec 3.5 |
| Documents (Removal/Copying) | Sec 3.5.3 |
| Oral Communications | Sec 3.5.2 |
| Suspect's Premises | Sec 3.5.1 |
| Undercover Review Committee | Sec 4.3, 5.5.4 |
| Members | Glossary |
| Role/Responsibilities | Sec 4.3 |
| DHS URC | Sec 4.3.1 |
| ICE URC | Sec 4.3.2 |
| Unforeseen Circumstances | Sec 5.11 |
| Unforeseen Expenditures | Sec 6.2.3 |
| Revision of 6-Month Expenditure Authorization Plan | Sec 6.2.3 |
| Unforeseen Otherwise Illegal Activity | Sec 3.2.6 |
| Unit Chief, Undercover Operations Unit | Sec 4.6 |
| U.S. Attorney (Additional Documents Required with Proposal) | Sec 5.5.3(2) |
| Use of Proceeds | Sec 6.4 |
| Vehicles (Leased) | Sec 6.26 |
| Waivers | |
| Inducement Policy | Sec 3.4.2 |
| Limit on Amount of Proceeds Held | Sec 6.5.1 |
| Separation of Duties | Sec 4.19.1 |
| Training | |
| Cuffs Administrator School | Sec 8.4.1 |
| Undercover Managers School | Sec 8.2.1 |
| Undercover Operative School | Sec 8.1.4 |




Post-Hearing Brief Exhibit 1

**Appendix I**

# SUPERSEDED DOCUMENTS

The Undercover Operations Handbook supersedes the following policy documents. This list is not all-inclusive:

-ICE OI Interim Undercover Operations (September 2003)

-OI Directive (DIR) 05-002, “Online (Internet) Banking Within Certified Undercover Operations” (December 29, 2004).

-OI DIR 05-003, “Disposition of Excess Proceeds from Certified Undercover Operations” (January 14, 2005)

-OI DIR 05-004, “Use of Proceeds to Fund Undercover Training” (January 31, 2005)

-OI DIR 06-004, “Undercover/Sensitive Assignments Liaison Coordinator Program” (January 11, 2006)

-OI Memorandum, “Designation of an Administrative Overseer for Certified Undercover ‘Umbrella Operations’” (February 23, 2004)

-OI Memorandum, “Undercover Review Committee Presentation Requirements” (December 19, 2005)

-OI Memorandum, “Undercover Field Review Requirements” (February 3, 2006)

-OI Memorandum, “Revision to the Frequency of Field Reviews for Certified Undercover Operations” (April 3, 2006)

-OI Memorandum, “Revised Undercover Operations Monthly Financial Review Worksheet (Appendix I)” (April 10, 2006)

-OI Memorandum, “Implementation of the Revised Expense Approval and Monthly Review Forms for ICE OI Certified Undercover Operations” (July 20, 2006)

-OI Memorandum, “Undercover Operations Administrative Overseers” (January 11, 2007)

-OI Memorandum, “Transgressions and Corrective Action Related to Certified Undercover Operations” (November 27, 2007)

**Appendix J**

# ACRONYMS

**A**

AD – Assistant Director
AIRG – Asset Identification and Removal Group
AOR – Area of Responsibility
ASAC – Assistant Special Agent in Charge
AUSA – Assistant United States Attorney

**B**

**C**

C3 – Cyber Crimes Center
CBP – U.S. Customs and Border Protection
CI – Confidential Informant
CUC – Certified Undercover
CUFFS – Certified Undercover Fundamental Financial System
CUFFSAS – Certified Undercover Fundamental Financial System Administrator School

**D**

DAD – Deputy Assistant Director
DEA – Drug Enforcement Administration
DHS – Department of Homeland Security
DOJ – Department of Justice

**E**

EAF – Expense Advance/Approval Form
EAP – Employee Assistance Program
EFT – Electronic Funds Transfer
EIN – Employer Identification Number
EIU – Executive Information Unit

**F**

FAA – Federal Aviation Administration
FAR – Federal Acquisition Regulation
FDIC – Federal Deposit Insurance Corporation
FLMU – Financial and Logistics Management Unit
FP&F – Fines, Penalties and Forfeitures
FTR – Federal Travel Regulations

**G**

GPS – Global Positioning System
GS – Group Supervisor
GSA – General Services Administration

**H**

HIDTA – High Intensity Drug Trafficking Area

**I**

ICE – U.S. Immigration and Customs Enforcement
INS – Immigration and Naturalization Service
ISD – Investigative Services Division
ISP – Internet Service Provider
ISU – Investigative Support Unit

**J - L**

**M**

MIU – Management Inspection Unit
MOA – Memorandum of Agreement
MOU – Memorandum of Understanding
MSD – Mission Support Division

**N**

**O**

OCC – Object Class Code
OI – Office of Investigations
OIA – Office of International Affairs
OPR – Office of Professional Responsibility

**P**

PAA – Personal Assistance Agreement
POE – Purchase of Evidence
POI – Purchase of Information

**R**

RAC – Resident Agent in Charge
ROI – Report of Investigation

**S**

SAC – Special Agent in Charge
SF – Standard Form
SSN – Social Security Number

**T**

TECS – Treasury Enforcement Communications System
TFO – Task Force Officer

**U**

UCOS – Undercover Operatives School
ULC – Undercover Liaison Coordinator
ULCS – Undercover Liaison Coordinator School
URC – Undercover Review Committee
US – United States
USC – United States Code
USCS – U.S. Customs Service
UCMS – Undercover Managers School

**V - Z**